C8DMKADT

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ADINA KADDEN,

4                 Plaintiff,

5           v.                           11 Civ. 4892 (SAS)

6   VISUALEX LLC,

7                 Defendant.

8   ------------------------------x
                                        New York, N.Y.
9                                       August 13, 2012
                                        10:05 a.m.
10
    Before:
11
                    HON. SHIRA A. SCHEINDLIN,
12
                                        District Judge
13
                          APPEARANCES
14
    MARK RISK
15       Attorney for Plaintiff

16  EPSTEIN BECKER & GREEN
         Attorneys for Defendant
17  BY:  TRAYCEE E. KLEIN
         MARGARET C. THERING
18

19

20

21

22

23

24

25

C8DMKADT

```
1              (Case called)

2              THE COURT:  Mr. Risk.

3              MR. RISK:  Good morning, your Honor, Mark Risk, Mark

4    Risk PC, for the plaintiff.  With me is the plaintiff, Adina

5    Kadden.

6              THE COURT:  Ms. Klein.

7              MS. KLEIN:  Good morning, your Honor.  From Epstein

8    Becker & Green, representing Visualex, the defendant.

9              MS. THERING:  Ms. Thering representing Visualex, the

10   defendant.

11             THE COURT:  This is a technical aide?

12             MS. KLEIN:  This is a technician.  And Lillian Romano,

13   the president of Visualex, as well as Gina Pastena from my

14   office.

15             MR. RISK:  I should add, your Honor, that's Virginia

16   Hardwick, who is an employment lawyer practicing in New Jersey

17   and Pennsylvania, a friend and colleague of mine.

18             THE COURT:  Everybody is welcome.  It's a public

19   courtroom.

20             We are here to have this nonjury trial because

21   apparently you are unable to settle this case.  You really

22   tried to do that.  You really tried, folks?

23             MR. RISK:  You'll have to ask the defendant, your

24   Honor.  It's my sense that defendants are not interested in a

25   settlement.
```

C8DMKADT

1          THE COURT:  Ms. Klein, did you really try to settle

2    this case?

3          MS. KLEIN:  We did really try early on.

4    Unfortunately, we are not able to.

5          THE COURT:  You didn't try recently?

6          MS. KLEIN:  No, we did not speak about settlement

7    recently.

8          THE COURT:  Did I send you to a magistrate judge or

9    the court-annexed mediation program?

10          MS. KLEIN:  You did, your Honor.

11          THE COURT:  Magistrate judge?

12          MS. KLEIN:  I believe we went to the magistrate.  I

13    don't recall at the moment who it was, but we did go.

14          MR. RISK:  In the fall we had a brief unsuccessful

15    meeting with Magistrate Judge Francis.

16          MS. KLEIN:  Correct.

17          MR. RISK:  To our disappointment.

18          THE COURT:  You should have gone back recently.

19          Be that as it may be, if you are not interested, we

20    will do it the slow way.

21          I guess we will have opening statements.  Short but to

22    the point.

23          MS. KLEIN:  Your Honor, before we begin, I would like

24    to just make an application to the Court.

25          THE COURT:  I thought I had all the pretrial motions

C8DMKADT

```
 1     that I am going to have.  I set dates for motion in limine.  We
 2     had them.  What kind of application?  If it's anything
 3     resembling a motion in limine, it's denied.  What kind of
 4     application.
 5               MS. KLEIN:  It is not, your Honor, a motion in limine.
 6               THE COURT:  We will see.
 7               MS. KLEIN:  In light of the fact it is the defendant's
 8     burden, we request that the defendant get to go first.
 9               THE COURT:  That's a small point.  It's usually
10     pleasant to go last.  You want to go first, be my guest.
11               MR. RISK:  We would like to go first, your Honor.
12               THE COURT:  I am not going to get into that.  You
13     agree it's her burden of proof to prove an exemption?
14               MR. RISK:  Yes, your Honor.
15               THE COURT:  Let her go first.  Go ahead.
16               Ms. Klein, if you want to go first, go first.
17               MR. RISK:  Your Honor, may I raise --
18               THE COURT:  No.  Can we get started on an opening
19     statement.  We are not going to have a good day if we are going
20     to have just one thing.  Your Honor, can I have one more thing?
21     Can we just be heard?  No, that's not the way we try cases.  We
22     try cases with opening statement.  All she asked is that she go
23     first because she has the burden of proof.
24               MR. RISK:  Your Honor has ruled.  I wanted to ask if
25     we are trying the whole case or just liability today?
```

C8DMKADT

1                  THE COURT:  The whole case.

2                  MR. RISK:  Fine.

3                  THE COURT:  Ms. Klein.

4                  MS. KLEIN:  Your Honor, would you like us to have

5        opening statements or just start with the evidence?

6                  THE COURT:  Did I not say twice already that I would

7        like to have opening statements?  This is maybe the third time.

8        Can we have opening statements now.

9                  MS. KLEIN:  Good morning, your Honor.

10                 As you're aware, this case involves whether or not the

11       position of a graphic consultant is an exempt position as that

12       job was performed at Visualex, a company that is located in

13       Dobbs Ferry, New York.

14                 It is the defendant's position on multiple reasons

15       that the job of graphic consultant is an exempt position.  We

16       believe that the evidence will show that the exemption is

17       applicable for many reasons.  It is applicable specifically to

18       Ms. Kadden for the following reasons.  Ms. Kadden falls under

19       the administrative exemption.  She also falls under the

20       professional exemption under the learned provision, and she

21       also falls under the creative exemption.  There is also, as

22       this Court understands, a combination exemption if one doesn't

23       exactly fit.

24                 What matters here is the important facts regarding

25       what was her compensation.  She was paid a steady salary.  What

C8DMKADT                    Opening – Ms. Klein

1    were her primary jobs and duty?  We believe the evidence will

2    show that her job required her to exercise discretion and

3    judgment, that she exercise creativity and imagination, that

4    she managed both internally and externally, meaning internally

5    the staff at Visualex as well as the clients on the outside,

6    and the expectations when she was doing the consulting work

7    that she was performing.

8            Your Honor, in summary, this is what this case about.

9            We then will, of course, if we need to, as has been

10   previously discussed with the Court, address the issues

11   concerning actual hours and good faith.  At this point, your

12   Honor, I don't know if you want us to address this.  However,

13   we believe that the classification of the consultant is in good

14   faith.  According to the Department of Labor, a consultant is

15   an exempt employee, as well as all of the other steps that

16   Visualex took to make sure that in fact the position that Ms.

17   Kadden was performing falls and suggests nothing other than

18   good faith.  Also, we believe, if we get to that point, based

19   on the recent decision of the Supreme Court, we also understand

20   that industry practice is relevant to show whether or not it

21   has been treated that way historically.

22           THE COURT:  What Supreme Court case are you referring

23   to?

24           MS. KLEIN:  GlaxoSmithKlein that just came out that

25   talks about the industry and the industry practice and the

C8DMKADT                    Opening – Ms. Klein

1    Department of Labor's position as to whether or not they take a

2    different position ultimately.  But, again, we don't have the

3    situation where there is a different position.  The Department

4    of Labor specifically says that a consultant position is

5    exempt.  I know that's getting into the legal issues.

6               THE COURT:  I want to make sure we are doing the same

7    thing.  Is that Christopher v. SmithKlein Beecham, June 18,

8    2012.  That's the case you are referring to?

9               MS. KLEIN:  Yes, your Honor.

10              Your Honor, at this time we would be ready to proceed,

11   pending, of course, the plaintiff's opening.

12              THE COURT:  One moment before we do it.

13              You can have a seat.  Your adversary will make a brief

14   opening statement.

15              Mr. Risk.

16              MR. RISK:  Your Honor, much of our case comes right

17   off the job description for the position that Ms. Kadden was

18   hired.  When we began our case, I'll submit Exhibit 1, which is

19   defendant's admissions in response to our request for

20   admissions, which establishes that Visualex created the job

21   description and that it's an accurate description of the job.

22              Visualex can't make the education prong of the learned

23   profession exemption.  The job description is almost from a law

24   school exam.  It indicates that a graduate degree was

25   preferred, not required.  It gives as examples, e.g., social

C8DMKADT                    Opening - Mr. Risk

1    sciences, law or, et cetera.  By its terms, that doesn't make

2    the learned professional exemption.

3          As you will hear in the testimony, your Honor,

4    Visualex is an unusual workplace.  And it's one I would best

5    describe as like a firehouse.  They assist lawyers who are

6    trying cases and that means they may sit idly during the day

7    and work very late into the night when lawyers are on trial and

8    creating and revising demonstratives quickly.

9          The job description, Exhibit 2, is more than

10   theoretical because the evidence will show that Visualex

11   followed it in the people it actually hired for the position.

12         Kim Matthiesen, who was a graphics consultant in 2006,

13   had a master's degree in English literature, but had very

14   relevant industry experience, which is probably one of the

15   reasons she was hired.

16         Kim Nawyn had a master's degree and was at the

17   dissertation stage in criminal justice, and she was

18   Ms. Kadden's colleague there.

19         Ms. Romano, the senior and always graphics consultant

20   there, has a master's degree from Hofstra University in applied

21   research, which really, she will tell us, is industrial

22   psychology, which I understand to be the study of employees and

23   organizations and workplaces.

24         Heather Moran, who is on call and will come here to

25   testify, was a career paralegal with some graduate courses, but

1   no graduate degree.

2           So the pattern of hiring does reflect that they meant

3   business in this job description.  They carried it out exactly.

4           THE COURT:  Did all these people earn more or less the

5   same salary?

6           MR. RISK:  Their offer letters are more or less

7   identical and the salary never changed over five or six years,

8   75,000 dollars even.

9           THE COURT:  Moran made it and she made that same

10  salary?

11          MR. RISK:  Yes.

12          THE COURT:  And Kim Nawyn made it, Moran made it?

13          MR. RISK:  And Matthiesen.

14          THE COURT:  Matthiesen.

15          MR. RISK:  The offer letters, which we will show you,

16  your Honor, are virtually identical, the same template with

17  minor or no deviations, the principal one being that by the

18  time Ms. Moran was hired the offer letter no longer explicitly

19  provided for overtime.

20          THE COURT:  Still 75?

21          MR. RISK:  75.  The only benefit was health insurance,

22  which was 383 a month and the company was paying half of that.

23          THE COURT:  You only addressed one of the three

24  exemptions so far?

25          MR. RISK:  I don't have so much to say, your Honor,

C8DMKADT                    Opening - Mr. Risk

1      about the other two.

2                THE COURT:  You addressed the learned profession, but

3      you didn't address creative, professional, and administrative.

4                MR. RISK:  I will, your Honor.

5                Visualex employs about ten people, all at relevant

6      times, and four or five of them are professional graphics

7      people.  There are two job categories.  There are graphic

8      designers supervised by art directors.  As Visualex will tell

9      you, I think, these are serious people.  They are professional

10     graphic artists, the designers are, and, even more so, the art

11     directors who supervise them.  They had Adobe Illustrator

12     software and they created the graphics.  Ms. Kadden and

13     Ms. Romano don't even have that software on their computer

14                THE COURT:  What do they do?

15                MR. RISK:  Ms. Kadden will testify that her job is to

16     talk to the lawyers about revisions to the graphics, go back to

17     the people in the studio, the designers and art directors, and

18     communicate the revisions, and it goes around and around and

19     around, often late at night, until the final graphics are

20     agreed on.  Ms. Kadden interfaces with the lawyers and takes

21     the changes.

22                There are two consultants assigned to every matter as

23     a matter of Visualex policy.  Ms. Romano, whose hourly rate is

24     considerably higher, is typically the senior one, and she goes

25     to the initial meeting with the client and talks about the

1    strategy and generally sketches out the prototype of what the

2    graphics will be.

3          The backup consultant, as Visualex calls it, comes on

4    the revision stage.  And there is rounds and rounds and rounds

5    of quality control, multiple proofs of the drafts inside

6    Visualex, and then multiple exchanges of the drafts with the

7    client, and the backup consultant, who is often the one working

8    at midnight and 3 in the morning with the trial teams, is the

9    one communicating back and forth between them, communicating

10   back and forth between the lawyers -- should I stop, your

11   Honor?

12         THE COURT:  I have a little emergency.  I have to take

13   a phone call.  Be right back.

14         (Recess)

15         MR. RISK:  We were speaking about the creative

16   professional exemption, your Honor.  They have artists.  And

17   she is plainly not one of them.  That's what I want to say

18   about that.

19         Quickly, the administrative exemption.  Ms. Kadden is

20   not an administrator.  Her job description in her offer letter

21   make it quite clear that she is hired to render services for

22   clients.  At Visualex her hours are the service rendered.  It's

23   like a law firm.  They record time, and your Honor will see the

24   time sheets, and then they send bills to clients.  On the

25   production administration dichotomy --

C8DMKADT                    Opening - Mr. Risk

1          THE COURT:  Why does anybody think there is fault

2     under the administrative exemption.  You do think so,

3     Ms. Klein?

4          MS. KLEIN:  Yes, I absolutely do.

5          THE COURT:  Why?

6          MS. KLEIN:  I absolutely do.

7          THE COURT:  Why.

8          MS. KLEIN:  For the reasons that we have previously

9     set forth.  For several reasons.  One is, she regularly

10    exercised discretion and judgment.

11         THE COURT:  Every employee exercises discretion and

12    judgment, don't they, to some degree?

13         MS. KLEIN:  To some degree you like to think everybody

14    works professionally, but that's understood differently under

15    the federal law.  It has a very significant meaning, whether or

16    not she was exercising discretion and judgment of matters of

17    significance to either her employer or the employer's

18    customers.  You will see here, again, that as a consultant,

19    which the Department of Labor itself recognizes as an MD

20    administrative exemption, that this is exactly the type of

21    case.  She was making recommendations.  She was making

22    decisions consistently.  This is not the type of job that has

23    ever, ever historically or currently been recognized as one by

24    the Federal Government as one that is a nonexempt position.

25         THE COURT:  I'm really not grasping the administrative

C8DMKADT                    Opening - Mr. Risk

1    exemption.  In a recent Ninth Circuit case, the circuit said an

2    administrative employee participates in the running of the

3    business and not merely the day-to-day carrying out of its

4    affairs.  It's hard to understand that she was running the

5    business, hardly.

6            MS. KLEIN:  And servicing the business' clients.

7            THE COURT:  That's what I'm trying to say.  You're

8    losing me on that exemption.  Everybody services a client.

9    Let's say you are a law firm, which you are.  Everybody, from

10   the receptionist, to the secretaries, to the paralegals, to the

11   lawyers, are servicing the client.  That's the purpose of the

12   law firm, is to service the client.  I'm not understanding that

13   exemption.  I understand the creative one.  I understand the

14   learned one.  You're really losing the administrative one.

15   You're sort of saying, everybody who is in client services is

16   an administrator.

17           MS. KLEIN:  No, your Honor, I'm not at all saying

18   that.

19           THE COURT:  I'm not getting it.  You have to convince

20   one person today.

21           MS. KLEIN:  That's right.  And, again, I believe, not

22   to cut off Mr. Risk's opening --

23           THE COURT:  I'm asking you.  It's informal.  I'm

24   asking you.

25           MS. KLEIN:  Again, I am absolutely confident that

1    under the regulations they specifically say that a consultant,

2    which is doing the type of work -- this isn't the dichotomy

3    that Mr. Risk says is a production line.  The production line

4    is the artists who are making the demonstrative exhibit that

5    ends up in the courtroom.

6           When she was doing her job, Ms. Kadden, as well as the

7    other consultant, is looking at something, after interviewing

8    and analyzing extensively complicated patent information,

9    medical backgrounds, expert reports.  She is making a

10   recommendation.  She admits at her deposition about visually,

11   does this work, does it further my client, the law firm's

12   story?  What it is that they are trying to sell so they can

13   benefit their clients.  This is exactly what the statute was

14   written to cover of this type of administrative exemption.  She

15   exercised on a daily basis, if she was doing her job,

16   discretion and judgment of matters of significance.

17          THE COURT:  This is the closest call to me.  This is

18   the most worrisome one.  I don't get this one terribly well.

19   Your adversary is utterly convinced, her passion is convincing,

20   but I don't truly understand the law part of it.

21          MR. RISK:  We are convinced, too, your Honor.  Here is

22   why.

23          THE COURT:  She does exercise judgment, doesn't she?

24          MR. RISK:  She does.

25          THE COURT:  She exercises independent judgment.  She

1   exercises discretion, right?

2              MR. RISK:  We don't think so, your Honor.

3              THE COURT:  Somebody has to decide whether this

4   graphic is communicating what the lawyers want.  You said she

5   is not the artist.  She is the one who is back and forth

6   between the lawyers and the artists to try to get the concept.

7   So the lawyers explain it to her, then she tells the artist,

8   then she gets a draft, reviews it with the lawyers, go back and

9   forth.

10             MR. RISK:  Your Honor, when your Honor sees the

11  graphics and hears the testimony, we think you'll conclude that

12  her role was extremely limited.

13             But that takes us away from the administrative

14  exemption because that is hard.  It's for people who administer

15  the organization.

16             THE COURT:  You say that.  Your adversary doesn't say

17  that at all.

18             MR. RISK:  I know.

19             THE COURT:  She said, look at the regulation, which is

20  one thing I don't have in front of me, is the regulation.

21             MR. RISK:  I know she does, your Honor.

22             THE COURT:  You want to hand it up.  You said the

23  regulation.

24             MS. KLEIN:  Yes.  I'm happy to provide it.

25  Unfortunately, I have handwritten notes, if you don't mind.

1          THE COURT:  If you have a clean copy of the

2   regulations.

3          MS. KLEIN:  They are also cited in the briefs, the

4   specific sections.

5          THE COURT:  I didn't bring the briefs.

6          MS. KLEIN:  We will get it for you.

7          THE COURT:  Because I realize that she is not managing

8   the company.  She is not carrying out the affairs of the

9   company.  If that's critical to this exemption, then there is

10  no way she fits in it, period.

11         MS. KLEIN:  The regulation says under the

12  administrative exemption under 29 CFR 541.200(22)(c) -- I'll

13  read it.  To be exempt as a bona fide administrative employee

14  under 29 CFR 541200, all of the following tests must be met.

15         THE COURT:  All of the following tests?

16         MS. KLEIN:  Right.

17         THE COURT:  Is there one about running the company?

18         MS. KLEIN:  The three parts.  May I read them?  The

19  employee must be compensated on a salary basis, salary or fee

20  basis as defined in the regulations at a rate of not less than

21  $455 a week and then a part --

22         THE COURT:  She meets that one.

23         MS. KLEIN:  I think we do not dispute that.

24         MR. RISK:  I dispute that Ms. Klein is reading from

25  the regulations.  I think that's the field operations manual.

1   I have the regulations.

2            THE COURT:  You can read from it.

3            MR. RISK:  I have one copy, your Honor.

4            THE COURT:  That's why I said, you can read from it,

5   if you read slowly.

6            MR. RISK:  Section 541.200.  The term employee

7   employed in a bona fide administrative capacity shall mean any

8   employee:  Part 2, whose primary duty is the performance of

9   office or nonmanual work directly related to the management or

10  general business operations of an employer or the employer's

11  customers; and, part 3, whose primary duty involves the

12  exercise of discretion and independent judgment.

13           THE COURT:  I think part 3 I'm not worried about.

14           MR. RISK:  If I may continue.  541.201:  To qualify

15  for the administrative exemption, an employee's primary duty

16  must be the performance of work directly related to the

17  management and general business operations of the employer or

18  the employer's customers.  The phrase directly related to the

19  management or general business operations refers to the type of

20  work performed by the employee.  To meet this requirement, an

21  employee must perform work directly related to assisting with

22  the running or servicing of the business as distinguished, for

23  example, from working on a manufacturing and production line or

24  selling a product in retail or service establishment.

25           B.  Work directly related to management or general

 1    business operations includes but is not limited to work in

 2    functional areas, such as tax, finance, accounting, budgeting,

 3    auditing, assurance, quality control, purchasing, procurement,

 4    advertising, marking, research, safety and health, personnel

 5    management, human resources, employee benefits, labor

 6    relations, public relations, government relations, computer

 7    network, Internet and database administration, legal and

 8    regulatory compliance, and similar activities.  Some of these

 9    activities may be performed by employees who also would qualify

10    for another exemption.

11            C.  An employee may qualify for the administrative

12    exemption if the employee's primary duty is the performance of

13    work directly related to the management or general business

14    operations of the employer's customers, which Ms. Klein pointed

15    out; thus, for example, employees acting as advisors or

16    consultants to their employer's clients or customers as tax

17    experts or financial consultants, for example, may be exempt.

18            Ms. Kadden and her colleagues that are consultants at

19    Visualex did the work that Visualex makes its living from.

20            THE COURT:  She didn't, though.  She didn't do the

21    drawing.  She is not the graphic artist.

22            MR. RISK:  But her time was billed by the hour --

23            THE COURT:  I know.

24            MR. RISK:  She did not have an administrative job

25    inside Visualex.

1          THE COURT:  I don't know about that.  She was the

2    consultant, right, on the graphic design.  She interfaced

3    between the lawyers and the artist.

4          MR. RISK:  Yes.

5          THE COURT:  Just like a tax consultant.

6          MR. RISK:  Well, the regulations contemplate that when

7    an employee renders services for a customer in its internal

8    administration, that might qualify for the administrative

9    exemption.  Here, the clients are law firms, the law firms have

10   clients.  The Visualex bill presumably ultimately finds its way

11   to the law firm's clients.  She is the product or service.  Her

12   time, her hours add product or service rendered by Visualex.

13   She had some small administrative responsibilities inside

14   Visualex, but it's clear she is hired to do billable work.

15         THE COURT:  I don't know that doing billable work

16   exempts you from being classified for the administrative

17   exemption because a tax consultant also bills by the hour.  So

18   the fact that people bill by the hour doesn't disqualify them

19   from that exemption, from what I'm listening to.

20         MR. RISK:  That's right, your Honor.  I think if a

21   consulting firm rendered tax advice to a client, that tax

22   advice is part of the internal administration of the client.

23   Here, the law firm is hiring Visualex, as this gentleman may be

24   hired here today, to render services in connection with its

25   provision of services to its own clients.  That's why it's

C8DMKADT                    Opening – Mr. Risk

1   nonadministrative.

2             THE COURT:  You might as well finally continue past

3   the three exemptions.

4             MR. RISK:  Well, I think I'll stop there, your Honor.

5   We have briefed -- there is a somewhat complicated legal issue

6   raised by Visualex, which is, if Ms. Kadden is entitled to

7   overtime, it should be computed on the half time method, and I

8   think your Honor may have read a little bit about that in the

9   drafts addressed in the motion in limine.  As we have said in

10  the papers, the halftime method has never been used in the

11  Second Circuit.  It's been rejected a bunch of times.  To say

12  it in plain English, your Honor, it takes the guts of the

13  remedy out of what is a remedial statute.

14            THE COURT:  Why do you think the halftime methodology

15  applies then, Ms. Klein, if it's been repeatedly rejected in

16  the Second Circuit?

17            MS. KLEIN:  It has never been rejected from the Second

18  Circuit.

19            THE COURT:  Why did he say that?

20            MR. RISK:  In Second Circuit courts.

21            THE COURT:  Not the circuit court.  He means in

22  district courts in this circuit.

23            MS. KLEIN:  As well as courts have endorsed it, as

24  well as the Department of Labor endorses it as the proper way.

25  And I would also note --

1          THE COURT:  Now you are both saying the Second Circuit

2     has not yet ruled.

3          MS. KLEIN:  I have never addressed it.  It has never

4     been put in front of it.  The majority of the circuits have

5     adopted, as well as the Department of Labor, which is the

6     agency in charge with enforcing it.

7          I would also put out there, your Honor, while it's not

8     a direct, in a sense, explicit ruling per se I'm adopting,

9     because I don't want to mislead anything, but your Honor

10     yourself in 2009 in a case called continuing Ting Yao Lin v.

11     Hayashi, it was a case which Magistrate Judge Peck had the

12     issue in front of him on an FLSA case and the calculation there

13     that was endorsed and adopted by your Honor was a halftime

14     rate.

15          THE COURT:  For all I know, there was not even an

16     objection.

17          MS. KLEIN:  Of course, but I am sure.

18          THE COURT:  In other words, if he did a report and

19     recommendation and there was no objection, of course I adopted

20     it.  It doesn't mean I gave it any thought.  I'm saying it's

21     Judge Peck's opinion.  If there was no objection, that's it.

22          MR. RISK:  Were the Second Circuit or were your Honor

23     to decide there might be a case that is appropriate for

24     application of the halftime method, it wouldn't be this case.

25          The case law on halftime method suggests it begins

1   with an understanding between the employer and an employee.

2   There was an understanding between Visualex and Ms. Kadden set

3   forth in a signed offer letter, dated May of 2008, and it said

4   explicitly -- that's going to be Exhibit 3 -- explicitly you'll

5   be paid time and a half, overtime, time and a half after 40

6   hours.  The pay stubs, which we will introduce as Exhibit 5,

7   indicate during that period regular rate, $36; overtime rate,

8   $54.  So the documentary trail shows that the time and a half

9   method was used.

10          It's true that in March of 2009, Visualex told Ms.

11  Kadden that it wasn't going to pay any more overtime.  And I

12  suppose, I suppose there was an understanding in the loosest

13  sense, to the extent that when the employer says I'm not paying

14  that anymore, she heard what they said.  It would be a poor

15  case for application of the halftime method.  I am going to

16  stop there, your Honor.

17          THE COURT:  I would like you to address the last

18  point, which is liquidated damages.

19          Is she entitled to liquidated damages?

20          MR. RISK:  Yes.

21          THE COURT:  That's the last one.

22          MR. RISK:  Your Honor addressed that, as your Honor

23  may recall, in the motion in limine, and there is some history

24  that goes with that.

25          Your Honor can give us some guidance on how the Court

1   would like us to proceed here.  The deposition testimony from

2   Ms. Romano says, I've been around the industry and I didn't

3   think consultants -- what she said was, I thought they are

4   salaried.  I knew that and I did a Google search and it took me

5   to the Department of Labor.  I don't remember it so well now,

6   but I concluded that I didn't have to pay the overtime.

7            And then there is the issue about advice of counsel.

8   We were here in March and your Honor ruled not to disclose the

9   documents and now it's been revisited.  I don't know if your

10  Honor wants -- the documents have not been disclosed.  I don't

11  know how your Honor wants to proceed.

12           THE COURT:  Depends if they rely on the advice of

13  counsel.  I said if they do that at trial, they have to

14  disclose that.

15           MR. RISK:  Our position is that we are entitled to

16  liquidated damages.  We are a little in the dark.  We don't

17  think that the testimony that we have heard so far is

18  unequivocal enough as to what was done.  We don't know what

19  happened or whether they will rely on advice of counsel, and we

20  remind the Court, we think in view of all of the facts of this

21  case and the way the overtime was withdrawn, we would hope the

22  Court would exercise its discretion to award the liquidated

23  damages, even upon a finding of good faith and reasonable

24  basis, which discretion the Court has.  The statute reads, your

25  Honor, that in the event the finding of good faith and

C8DMKADT                      Opening - Mr. Risk

1   reasonable basis is made, the Court has discretion to award

2   liquidated damages in no amount or in any amount up to 100

3   percent.

4            THE COURT:  Is there some issue about an offset?

5            MS. KLEIN:  Yes.

6            MR. RISK:  Yes.

7            THE COURT:  What's that last issue about an offset?

8            MS. KLEIN:  Your Honor, before we move on, may I

9   address one thing, because I want to know how the Court would

10  like us to proceed.

11           In the decision in the motion in limine and I believe

12  at the earlier, one of the conferences that we had, I

13  understood that we were not going to get to the issue of the

14  good faith, the attorney-client until you made a decision as to

15  whether or not the position was exempt.  You had suggested that

16  it would be an informally sort of bifurcated, let's see whether

17  or not the position falls within an exemption.  And if it does

18  not, that we would then be faced with the situation, if we want

19  to put on the evidence about good faith --

20           THE COURT:  But half an hour ago Mr. Risk asked if we

21  were bifurcating.  I didn't want to formally bifurcate.  We

22  have to recall witnesses.  But if you want me to rule orally

23  and quickly at some point about these exemptions -- otherwise,

24  I would have to take a break for two weeks and write a learned

25  opinion, call you back and do damages.  I don't want to go

1    through all that.  If you want some quick read on these

2    exemptions, I'll give it to you before you make that decision.

3    But I don't want to recall witnesses.  They are going to have

4    to testify pretty much about everything anyway, so it's tricky.

5        MS. KLEIN:  Your Honor, may I ask something.  This is

6    sort of food for thought.  We are scheduled to be here --

7        THE COURT:  Three days.

8        MS. KLEIN:  Exactly, until Wednesday.  And two primary

9    witnesses are going to be here the whole time.  Depending, I

10   guess, on how fast we can move along today and tomorrow, if it

11   was just on the issue about the work that was actually done, I

12   would not be opposed, I don't know if Mr. Risk is, I don't want

13   to unnecessarily waste the Court's time with the offset.  The

14   back pay is tedious going through week by weeks of descriptions

15   of work which we may never have to get to.

16       THE COURT:  What's the offset issue?

17       MS. KLEIN:  The offset issue involves essentially the

18   fact that not only the base salary, let's put that aside, that

19   she was paid significantly more than any of the nonexempts, but

20   even as having her base salary of 75,000, there were many

21   things that she received because of the understanding that she

22   was exempt, which was, for example, comp days, paid time off,

23   other things that she would not otherwise have gotten.

24       There was also improper characterizations in her time

25   sheet where she characterized things.  For example, as, you

C8DMKADT                    Opening – Mr. Risk

know, a sick day, but it was having her car fixed.

Unfortunately, as a result of this litigation we have gone

through them.  And when she ultimately left the company, she

was given, what was the company's policy.  If you have accrued

unused vacation, you were given a check to represent that

amount.  But having now had an opportunity --

            THE COURT:  Is that true for exempts and nonexempts?

They both get the vacation pay?

            MS. KLEIN:  Yes.  Any accrued unused time --

            THE COURT:  Both of them get that.

            MS. KLEIN:  Yeah.  But the issue is, she was overpaid.

She was paid vacation which was not truly vacation.  She was

fully responsible, Ms. Kadden, in inputting her own time,

characterizing it as whatever she wanted, consulting, quality

control client revisions.  She characterized her time.  And

basically the way a small company works, I'm sure your Honor is

familiar, is, it's somewhat of good faith and they push a

button and it calculates and it said she has vacation.  She was

handed a check for 54 hours of vacation or approximately.

            In fact, she wasn't entitled to it because she had not

been putting in her time correctly.  She was calling it sick,

which gave her more vacation left in a pot, when in fact she

didn't have it.

            Our only point on the offset, and I'm hoping we don't

have to get there, if the Court is going to decide that she is

C8DMKADT                    Opening - Mr. Risk

1   nonexempt, which we don't agree with, if it does, that equity

2   and fairness would mean that everybody be put --

3            THE COURT:  How much money are we talking about on the

4   offset issue?

5            MS. KLEIN:  Around $4,000, I believe.  The whole

6   amount isn't that much.  If we apply the halftime method --

7            THE COURT:  I suggested at the outset that we all get

8   our three days back and settle the case.  You apparently are

9   not interested.

10           MS. KLEIN:  Can I share with you why we can't do it,

11  if you have any desire to know?  This is only about Ms. Kadden.

12  This is an entire industry that qualifies, graphic consultant

13  as exempt.  We have other employees.  This is not a sole

14  plaintiff.  It's much bigger than that.

15           How can Visualex function as a business, not knowing?

16  It's following what it believes the Department of Labor said.

17  How can it function and live and go forward when there is this

18  hanging over them?  If they pay her, it's an unanswered

19  question.  And we have all these other people that are behind

20  us.  We have New York statutes of limitations.  There is a lot

21  more at stake.  You know what, even if you rule that she is

22  nonexempt, better to know but the Department of Labor says one

23  thing and if this Court believes differently, you know what,

24  the business owners can't function if they don't know.  So,

25  unfortunately, it's not the number.  It's just not.

1          THE COURT:  What are you saying that the Department of

2     Labor says?

3          MS. KLEIN:  That consultants are exempt employees.

4          THE COURT:  Consultants, no matter what kind of

5     consultant, no matter what kind of business, all consultants?

6          MS. KLEIN:  Of course it uses that as the example and

7     then it sets forth in the regs the examples and you have to

8     meet the test, the primary duty matters of significance.

9          THE COURT:  Which exemption is that?

10          MS. KLEIN:  The administrative.  We are not sticking

11     on a label.  We are not saying that she was -- she doesn't

12     disagree that she was a consultant.  It would be one thing if I

13     called you a consultant, but I really had you acting as a

14     janitor.  Titles don't mean anything in that way.  We don't

15     dispute the work she was doing, nor did she.  She admitted at

16     her deposition all of the matters of significance.

17          MR. RISK:  There are a number of things to address,

18     your Honor.  Titles don't mean anything under the FLSA.  Duties

19     do.

20          THE COURT:  Your adversary agrees with that.

21          MR. RISK:  We are going to put on a case about that.

22     To say that consultants are exempt or nonexempt is not really

23     the language --

24          THE COURT:  Your adversary agrees.  It depends on the

25     job duties.  But generally, nonetheless, the Department of

 1   Labor seems to say consultants then defined.

 2          MS. KLEIN:  It says acting as an advisor or

 3   consultant.

 4          MR. RISK:  If an employee gives advice on the

 5   administrative functions of a customer, that might be the same

 6   as administering in the home company.

 7          THE COURT:  We talked about that because I told you

 8   that's the most difficult one for me apparently, really just

 9   became confirmed in this last minute or so of colloquy.  This

10   is the one that's confusing, you said, because the Department

11   of Labor uses the word consultant as exempt, depending on the

12   duties.  This is the trickiest of the three, I think.

13          MS. KLEIN:  Also, one of the things that may help

14   hopefully crystallize it for everyone is, think about it.  A

15   law firm, what do we do?  Our business, right, is hopefully

16   winning cases for our client, whichever side that may be.  If I

17   am acting as a consultant in advising Skadden Arps, whatever

18   law firm, on how to do a better job so that they will have a

19   better result for their client, I am rendering advice to them

20   on how to do it better.  That is exactly, again, what the

21   Department of Labor has addressed.  This isn't unique.  It's

22   not something unusual.

23          MR. RISK:  It's not what the Department of Labor has

24   addressed at all.  If someone were advising Skadden Arps on its

25   matching information systems --

C8DMKADT                    Opening – Mr. Risk

1                THE COURT:  That's running the business.  I see that

2       one.  That's running the business of Skadden Arps, sure.

3                MR. RISK:  That's where the administrative exemption

4       goes.

5                I would like to speak on this offset issue because

6       there is no issue, and we have briefed it very carefully.  This

7       is not the first employer in the history of the FLSA to come in

8       and say, even if we owe overtime, we paid some other money, the

9       statute and the regs are clear about what can be offset.  I

10      don't think there is -- I didn't hear from Ms. Klein nor seen

11      in the papers any statutory basis for this claim of offset.

12               The time sheets that we are hearing about are

13      Visualex's time records.  Ms. Kadden entered time which was

14      reviewed by Visualex and its bills were sent to clients based

15      on that.  The idea that we are going to put Ms. Kadden on the

16      stand and ask her what she did on a Thursday three years ago,

17      it's not right and there is no authority for it.  Even in

18      courts that have allowed an offset where the payment is a

19      premium pay payment, often that's limited to a premium payment

20      during the same pay period that the claim of overtime is for.

21      There is no legal basis for that at all.

22               More importantly, your Honor, in connection with the

23      submission of the pretrial order, we went back and forth with

24      defendant's counsel and I think we reached an agreement, and it

25      involved me modifying my calculation of the numbers.  I thought

C8DMKADT                    Opening – Mr. Risk

1    we reached an agreement, which I have set forth in an e-mail,

2    that the productive working hours at issue here are 416.7

3    hours, and I thought that's the one fact that we resolved.

4              THE COURT:  Have we resolved it?

5              MS. KLEIN:  Your Honor, what the documents show and

6    what we have agreed is that plaintiff is claiming there are 416

7    hours of overtime that based on looking at those time sheets

8    and you add them up and you are correct, we worked on some that

9    clearly were not and should not have been in there, we have

10   reached the number of 416.

11             In regards to the issue of the premium pay and things

12   of that sort, if I can just address one other thing, not to

13   make this so legalese at this point, the Department of Labor as

14   well as numerous circuit courts have also addressed and adopted

15   not only the halftime method, but also the prepayment method,

16   which says that if you take somebody that is improperly

17   classified and they were being paid as an exempt employee along

18   the way, every paycheck, 1500, 1500, there is no deductions or

19   anything like that, and it's then determined that it wasn't

20   correct, the extra money and the things that they received are

21   allowed to basically be considered prepayment going towards the

22   overtime.  This isn't supposed to be a windfall.  If we are

23   saying that Ms. Kadden was hourly, as she is claiming, then,

24   again, she should have been treated that way.  This is not

25   meant to be anything more than making sure she got the wages

1  she was supposed to get.  She can't take from here.

2          THE COURT:  She can't have it both ways.  I

3  understand.

4          MS. KLEIN:  That's right.  That's all we are saying.

5          THE COURT:  She is entitled to overtime.

6          MS. KLEIN:  One or the other.

7          THE COURT:  Then she wasn't entitled.

8          MS. KLEIN:  To the benefit of being an exempt.  You

9  get to come in at 11:00, you get paid the same salary because

10  there is no deduction, or you leave, as she writes in her

11  notes, on her calendar, it's a gorgeous day, leaves at 1:30,

12  that's nice, but that comes with being a professional because

13  you know you could get your work done.

14          MR. RISK:  What I don't think there is a basis for,

15  and I hope we are not going to spend thousands of dollars in

16  professional time and this Court's time going over Ms. Kadden's

17  recollection of time sheets that were submitted to and accepted

18  by Visualex three years ago, because she will have no

19  recollection of what she did on a Thursday three years ago.

20          Not to talk about settlement, but Ms. Klein did, the

21  problem -- I don't really understand why a typical nonadmission

22  settlement agreement would create a problem for Visualex.  I

23  would think it would help them.  But, your Honor, the problem

24  at this stage, as your Honor has alluded to, is it's a modest

25  claim, but it's under the federal statute and we have spent a

1    year now of professional time that we tried to head off last

2    fall.  That's the problem.  But we are here.

3              MS. KLEIN:  Your Honor, may I say one other thing.  We

4    are talking sort of mixing between openings and facts and law

5    and stuff.

6              While Mr. Risk says this is a modest dollar amount.

7              THE COURT:  It is.  But you said it's bigger than

8    that.

9              MS. KLEIN:  That's right.  What I think that this case

10   has boiled down to, and I think the parties -- Mr. Risk

11   admitted it the first time we were in front of your Honor, this

12   part of it isn't in dispute.  Ms. Kadden was hired.  Visualex

13   had at that time the ability to give incentive compensation in

14   the form of overtime to its professional staff.  You'll hear

15   the reasons why they did that, for a good reason, to treat

16   employees a certain way.  She was an hourly employee.  She

17   didn't have an employment contract.  There came a point in time

18   in 2009 where it couldn't be.

19             Either everyone was going to be laid off or nobody

20   would have food to put on the table for their families and

21   money coming in, or they were able to make a decision.  They

22   were able to look to see where are we spending money that we

23   either don't need to or we can't afford to right now, but

24   legally still within the realm of legality.

25             Hourly employees were never changed.  They still

C8DMKADT                     Opening – Mr. Risk

1    receive overtime to this day.  I understand, if Ms. Kadden is

2    disappointed she accepted a job and somewhere along the way it

3    changed, I get that.  The alternative was laying her off.  And

4    when it was announced that at this point we can no longer pay

5    the professionals this, and this will be your salary going

6    forward, if things get better, we are the first ones, Visualex,

7    that want to, if we can do it, we want to share the wealth.

8    But we are tightening our belts and therefore you have to.  And

9    when she stays and continues to work there, it changes.

10          Again, it's no different than –– I know many lawyers

11   and many professionals that in the difficult times of 2009,

12   2010 took rollbacks in their salary.  That happens.  And this

13   is not, although I think it was meant to be started as, a

14   breach of contract claim.  And that's what this case comes down

15   to.  Ms. Kadden didn't receive overtime.  She considered

16   herself exempt when she did the exact same job at Doar.  Why

17   are we here?  It's because there was a change.  I agree it

18   might have been –– yeah, it stinks, I get that.

19          MR. RISK:  Well, your Honor, I am not sure what kind

20   of argument that is.

21          THE COURT:  I understood what it is.

22          MR. RISK:  It needs a response.

23          THE COURT:  Oh, really.

24          MR. RISK:  She didn't do the exact same job at Doar.

25   We are just asking the Court to apply the law.

C8DMKADT                    Opening - Mr. Risk

1              Back to that firehouse I was telling your Honor about,

2        where they sit often idly and then work late at night serving

3        trial teams at trial.  After 6:00, Visualex increases by 50

4        percent the consultant's hourly rate.  Ms. Kadden's hourly rate

5        was 225.  I think that makes it 337.50.  This is a job where

6        midnight is quite common.  If it's a trial, midnight night

7        after night, 3 in the morning.  Whether Visualex is rich or

8        poor, I don't know.  I know they do big matters for some of the

9        best-known law firms in the world.  I hear them claiming

10       poverty.  I don't know.

11             We are here asking the Court to apply the law and

12       recognize that the hours at issue here, Visualex is making a

13       lot of money on Ms. Kadden's time.  And she was paid $54 an

14       hour and that's what we are seeking for the hours.

15             THE COURT:  Ms. Klein.

16             MS. KLEIN:  Your Honor, may I just, before we start

17       the direct, can we take a two-minute break and start with our

18       first witness.  Is that okay?

19             THE COURT:  Sure.

20             (Recess)

21             MS. KLEIN:  Your Honor, just as a housekeeping matter,

22       we had delivered down to the Court all of the exhibits.  You

23       are like, what do I need them for?

24             THE COURT:  No.  I don't know where we put them.

25             MS. KLEIN:  We have two big binders that were

C8DMKADT

```
1    delivered to the Court.

2               THE COURT:  When?

3               MS. KLEIN:  Friday.  They are around this big.

4               THE COURT:  Whatever.  Two big binders.  We will look

5    around.  We would have brought them down if we found them, but

6    I am sure -- not sure.  They may have arrived after the

7    mailroom made its last delivery, which means it would not have

8    been made until the morning delivery and the morning delivery

9    is around 11:30.

10              MR. RISK:  I have two books to hand you.  Should I do

11   that now or later?

12              THE COURT:  Later.  Those are your books.

13              They came on Friday?

14              MS. KLEIN:  They were hand-delivered around 2:00.

15              THE COURT:  You think they were hand-delivered at

16   2:00, two binders?

17              MS. KLEIN:  On Friday.

18              Your Honor, while that's going on, if I can just share

19   something with you.  So some of the exhibits, as you can see

20   from the amount of paper that are on our tables, are very

21   extensive.  I will not be using all of them.

22              So what I have done, to just try to make this go

23   faster for everyone, is the exhibits that are the ones that are

24   hundreds and hundreds of pages I have selected out the pages

25   that we are using and bound them, just to make it easier for
```

C8DMKADT

1    everyone.  They are part of this.  And if that's okay with

2    everyone, I made a copy for everyone.

3              THE COURT:  That's fine.

4              MS. KLEIN:  That I think will make this go faster.

5              THE COURT:  Okay.

6              MS. KLEIN:  We will find out where specifically it was

7    left.  We are going to call our mailroom, who brought it down.

8    I have extra copies as we go through.

9              THE COURT:  Who is the first witness?

10             MS. KLEIN:  You are ready, your Honor?

11             THE COURT:  Yes.

12             MS. KLEIN:  At this time I would like to call Lillian

13   Romano to the stand, your Honor.

14    LILLIAN ROMANO,

15        called as a witness by the Defendant,

16        having been duly sworn, testified as follows:

17             MS. KLEIN:  Your Honor, may I just ask, since we are

18   not in front of a jury, how you want to run things.  We have

19   the exhibits.  When I am going to offer them, if we can show

20   them on the projector, if that's okay with you so we are all

21   looking at the same thing.

22             THE COURT:  Sure.  I don't have the exhibit set yet.

23             MS. KLEIN:  I do.  And I have extra copies of most.

24   If not, we will have that and I can replace them.

25             THE COURT:  I hope we get them in the next half hour.

C8DMKADT

1    DIRECT EXAMINATION

2    BY MS. KLEIN:

3    Q.  Good morning, Ms. Romano.

4    A.  Yes.

5    Q.  Are you currently employed?

6    A.  Yes.

7    Q.  Can you tell me where you're currently employed?

8    A.  Visualex LLC.

9    Q.  What is your profession?

10   A.  I'm a graphics consultant.

11   Q.  How long have you worked as a litigation graphics

12   consultant?

13   A.  A little over 20 years.

14   Q.  Can you briefly tell us your professional background?

15   A.  I started as a graphics consultant at Litigation Sciences

16   back in 1990.  I was there for about five years.  And then I

17   took a position as a graphics consultant at Pixel.  I was there

18   for about ten months.  And then I went to FTI Consulting, and I

19   was a graphics consultant there until end of 1999, at which

20   point I started Visualex.

21   Q.  As a result of your professional background that you just

22   testified, are you familiar with the industry?

23   A.  Yes, very.

24   Q.  In your years of experience in the industry, are litigation

25   graphic consultants known by any other titles?

C8DMKADT                    Romano - direct

1    A.  A lot of different companies give different titles.  They

2    all mean the same thing.  It could be a trial graphics

3    consultant, a communication consultant, a trial consultant.

4    There is a lot of different nomenclature, but it all means the

5    same thing.

6    Q.  Have you personally ever held the title trial graphic

7    consultant?

8    A.  That's the function I perform, but I have always called it

9    graphics consultant.

10   Q.  And can you explain to the Court -- let me ask you.  You

11   said that you started Visualex.  That's your company?

12   A.  Yes.

13   Q.  And are you the sole owner?

14   A.  No.  There are three owners.

15   Q.  Can you tell us --

16          THE COURT:  When did you start it?

17          THE WITNESS:  The end of 1999.

18          THE COURT:  Who are the other two owners.

19          THE WITNESS:  Brian Fennessy is the creative director

20   and vice-president, and then we have just an investment

21   partner, which was actually my brother, Joseph Romano.

22          THE COURT:  Thank you.

23   Q.  Can you tell us, Ms. Romano, what is Visualex in its most

24   basic form?

25   A.  In its most basic form we are a litigation support company.

C8DMKADT                           Romano - direct

1   Q.  Does Visualex specialize in anything in particular?

2   A.  Yes.  We specialize in providing visual presentations in

3   conjunction with litigation.

4   Q.  And generally who are Visualex's clients?

5   A.  Generally, it's the law firm, but there are times that we

6   actually work directly with the ultimate client.  But generally

7   it's the law firm.

8   Q.  Throughout the history of Visualex, just for purposes of

9   make it simpler, has the general format of the business

10  remained the same?

11  A.  Yes.

12  Q.  And what I would really like you to focus on is if there is

13  a difference between the time when Ms. Kadden was there to

14  today.

15          What are the different job titles at Visualex during

16  the time in question?

17  A.  Consultants, art directors, designers, production

18  coordinator, director of motion graphics, and bookkeeper.

19  Q.  And what is the primary job of the consultants?

20  A.  The primary job of the consultants is to review and analyze

21  case materials and to create and develop the most effective

22  visual strategy to help the trial teams communicate their case

23  to the trier of fact.

24  Q.  And in your experience did graphic consultants have any

25  specialized areas of education?

1   A.   Yes.

2   Q.   And what are they?

3   A.   A postgraduate degree, social sciences, or a JD.   Any

4   postgraduate degree, really.

5   Q.   When you say JD, just for the record, can you tell us what

6   you are referring to?

7   A.   They are a lawyer.

8   Q.   In 2008, were you aware of any individuals that worked in

9   your profession as a graphics consultant that did not have an

10  advanced educational degree?

11  A.   No.

12  Q.   In your opinion, if you can just explain for us, what is

13  the interplay or the relevance between these various areas of

14  the law, whether it's the psychology and the relevance of the

15  background?

16            MR. RISK:   Object to the form of the question.

17            THE COURT:   It's compound.   Is that what you object

18  to?

19            MR. RISK:   Compound, vague, confusing.

20            THE COURT:   I don't know about any vague or confusing,

21  but it's certainly compound.

22  Q.   In your opinion, what is the interplay between psychology

23  of the law and the job of graphic consultant?

24  A.   The law aspect of it, obviously, if you are familiar with

25  the legal industry and you kind of know how it works, that's

C8DMKADT                        Romano - direct

1   always an advantage.  You are going to be dealing with lawyers.

2   Obviously, if you have some knowledge of how the legal industry

3   works, that's very helpful.  From the psychology side of it,

4   because what you are trying to do is to craft a presentation

5   that most effectively communicates very complex concepts, what

6   you have to understand and be aware of is human learning

7   theory, how people assimilate information.  That's how you know

8   different ways that would make the visual presentation more

9   impactful.

10  Q.  Do you have an advanced degree?

11  A.  Yes.

12  Q.  In what?

13  A.  Applied research and evaluation, psychology.

14  Q.  In the time when you started in the industry, had you

15  already had an advanced degree?

16  A.  Yes.

17  Q.  You mentioned before that your first job as a graphic

18  consultant, if I remember correctly, was Litigation Sciences,

19  Inc.?

20  A.  Correct.

21  Q.  Is that also referred to as anything else?

22  A.  Yes.  It's LSI.

23  Q.  So LSI and Litigation Science is one in the same?

24  A.  Right.

25  Q.  Would you have been hired by LSI if you did not have an

C8DMKADT                      Romano - direct

1   advanced degree?

2   A.  No.

3   Q.  Why is that?

4   A.  It was required.

5   Q.  Do you know of anyone at LSI that worked as a graphic

6   consultant that did not have an advanced degree?

7   A.  Not that I'm aware of, no.

8   Q.  What was your primary duty as a graphic consultant at LSI?

9   A.  It's the same as what it is, as I sit here today, as a

10  graphic consultant for Visualex.  It is to review case

11  materials, analyze them, and come up with the most effective

12  visual strategy to advance the client's case and obviously help

13  them to get a win for their client.

14  Q.  Were graphics consultants considered exempt employees at

15  LSI?

16  A.  Yes.

17  Q.  Do graphic consultants receive overtime at LSI?

18  A.  No.

19  Q.  After you left LSI, you joined a company called Pixel, is

20  that correct?

21  A.  Yes.

22  Q.  Are you aware of anyone at Pixel that worked as a

23  litigation graphic consultant that did not have an advanced

24  degree?

25  A.  No.

C8DMKADT                          Romano - direct

1   Q.   What was your primary duty as a graphic consultant at

2   Pixel?

3   A.   Consultant, as a consultant.  It's the same as it always

4   was.  It was to review the case materials and to develop the

5   most strategic visual presentation for clients.

6   Q.   And were graphic consultants considered exempt employees at

7   Pixel?

8   A.   Yes.

9   Q.   Did graphic consultants receive overtime at Pixel?

10  A.   No.

11  Q.   After you left Pixel you said you joined FTI?

12  A.   Correct.

13  Q.   Would you have been hired by FTI if you did not have an

14  advanced degree?

15  A.   No.

16          MR. RISK:   Objection.  Lack of foundation.

17          THE COURT:   Well, right, if you didn't make that

18  objection when the same question was asked as to LSI, I

19  wondered if you would.  Because she is saying would you have

20  been hired.  You could ask it differently.  Were all the

21  graphic consultants there, did all of them have advanced

22  degrees?

23          THE WITNESS:   Yes.

24          THE COURT:   Did any of them get overtime?

25          THE WITNESS:   Yes.

1          THE COURT:  That you can ask.

2          MS. KLEIN:  Thank you, your Honor.

3   Q.  Again, not to be repetitive, just to make it clear for the

4   record, what was your primary duties and responsibility as a

5   graphic consultant at FTI?

6   A.  Again, same responsibilities, to review the case materials

7   and to develop strategic visual presentations.

8   Q.  Since Visualex has opened its doors, how many graphic

9   consultants have worked for the company?

10  A.  Nine, including myself.

11  Q.  Can you tell us who they are?

12  A.  Yes.  In addition to myself, there was Ted Gipstein; Chip,

13  we call him Chip, but his name was Theodore walker; Marilyn.

14  Wesel, Kim Nawyn, Nicole Matthiesen, Adina Kadden, David Mykel,

15  and Heather Moran.

16  Q.  Did Mr. Gipstein have an advanced degree at the time that

17  Visualex hired him?

18  A.  Yes.

19  Q.  Do you know what his advanced degree was?

20  A.  Yes.  A JD.

21          MS. KLEIN:  Your Honor, if I can have the witness or

22  if I can hand it up, have her look at what's been premarked as

23  Exhibit AA.

24          May I approach, your Honor?

25          MR. RISK:  Your Honor, Exhibit AA was not included in

C8DMKADT                        Romano – direct

1   the joint pretrial order.  I did get it a week ago.  And I

2   won't object to this one.

3            MS. KLEIN:  Can you see it, your Honor?

4            THE COURT:  Sort of.  What I can't see is probably not

5   important, like his address.  I don't see his address.

6            MS. KLEIN:  I have it.  Would you like it?

7            THE COURT:  All right.

8   Q.  Ms. Romano, have you seen this document before?

9   A.  Yes.

10  Q.  And what is it, please?

11  A.  It's the résumé of Ted Gipstein.

12  Q.  Is this document part of Visualex's business records?

13  A.  Yes.

14  Q.  And was it maintained in the ordinary course of Visualex's

15  business?

16            THE COURT:  I am never going to allow this in as a

17  business record.  You don't even have to lay the foundation.

18  He is not objecting.  That's the end of it.  It's not a

19  business record.  It's the man's résumé.  He wrote it, I

20  assume.  Mr. Gipstein wrote it, correct?

21            THE WITNESS:  Yes.

22            THE COURT:  The fact that it's maintained, remember

23  the business record exception made in the regular course of

24  business.  It is not the regular course of her business to

25  write other people's résumés.  Let's all be learned about the

C8DMKADT                          Romano - direct

 1   business record exemption.

 2              MS. KLEIN:  Your Honor, it was maintained in the

 3   ordinary course.

 4              THE COURT:  It doesn't matter.  It has to be made and

 5   kept in the ordinary course.  This could never be a business

 6   record.  You know that now, right.  I'm glad I've been helpful.

 7   Now you now about the business records exception.

 8              MS. KLEIN:  Yes, your Honor.

 9              THE COURT:  There is no objection.  It's received.

10              (Defendant's Exhibit AA received in evidence)

11   Q.  Does Exhibit AA reflect Mr. Gipstein's advanced degree?

12   A.  Yes.

13              MS. KLEIN:  Your Honor, you said it's already been

14   admitted.

15              THE COURT:  Yes.  From the moment he didn't object, AA

16   was received.  Yes, the man went to law school.  And graduated,

17   I assume.  JD, there it is.

18              MS. KLEIN:  Your Honor, I'd like to hand the witness

19   what has been premarked as Defendant's Exhibit CC.

20              THE COURT:  Are you going to object to CC, Mr. Risk?

21              MR. RISK:  No, your Honor.

22              THE COURT:  CC is received.

23              (Defendant's Exhibit CC received in evidence)

24              THE COURT:  What's CC?

25              MS. KLEIN:  It's Bates stamped VIS 2001 and VIS 2002.

1              THE COURT:  It's a letter from Mr. Gipstein to Ms.

2     Romano?

3              MS. KLEIN:  Yes.  It's a cover letter.

4              THE COURT:  Why is it being offered?  I know it's

5     received because there is no objection.  Why are we getting it?

6              MS. KLEIN:  Your Honor, it's relevant to showing the

7     interplay between law and the JD and the job of a graphic

8     consultant.

9              THE COURT:  I don't think it's relevant to any of

10    that.  It's his letter saying, hire me, I'm good.  I quickly

11    understand legal issues and client objectives.  Good.  That's

12    his self promotion.  That's fine.

13             Did you hire this guy?

14             THE WITNESS:  Yes, I did.

15             THE COURT:  When did he start, roughly?

16             THE WITNESS:  In the early 2000s.

17             THE COURT:  Is he still there?

18             THE WITNESS:  No.

19             THE COURT:  How long did he stay?

20             THE WITNESS:  About three years.  He had a stroke,

21    unfortunately.

22             MS. KLEIN:  If we are not going to go over that --

23             THE COURT:  We are not going over it.  This letter is

24    not important.  Go ahead.

25             MS. KLEIN:  Your Honor, if I may, just for the record,

C8DMKADT                        Romano - direct

1    say it is important for the purposes --

2            THE COURT:  The ruling is, it's not important to me,

3    so we need to move on.  I don't need reargument on each

4    rejected idea.  I already took the exhibit.  It's in the

5    record.  I'm telling you, it's of no weight to me.  I don't

6    care what he said about himself.  I get it.  He's a lawyer and

7    that's going to help him do his job.  I get it.

8            MS. KLEIN:  May I have Exhibit Y.

9            THE COURT:  Do you object to Exhibit Y?

10           MR. RISK:  Let me find it.

11           THE COURT:  Take a minute, find it, tell me whether

12   you object.

13           MS. KLEIN:  It's the résumé of Theodore Walker.

14           MR. RISK:  No objection.

15           THE COURT:  Y is received.

16           (Defendant's Exhibit Y received in evidence)

17           THE COURT:  I see this person has a JD from Cardoza

18   law school in a year I can't read from here.

19   Q.  Did Mr. Walker have an advanced degree --

20           THE COURT:  You are going to have to stay with me.

21   I'm fast.  He has got a JD from Cardoza law school in 1986.

22   You don't have to ask her if this person has an advanced

23   degree, because I just said it.

24           Did you end up hiring Walker?

25           THE WITNESS:  Yes.

1              THE COURT:  When did you hire him, roughly?

2              THE WITNESS:  In 2005.

3              THE COURT:  And how long did he stay?

4              THE WITNESS:  He stayed for about a year.

5              THE COURT:  Was he a graphics consultant?

6              THE WITNESS:  Yes, he was.

7              MS. KLEIN:  Your Honor, I'd like the witness to next

8    look at Exhibit Y.

9              THE COURT:  This was Y?

10             MS. KLEIN:  I'm sorry.

11             THE COURT:  Y was received.  It's in the record.

12             MS. KLEIN:  Exhibit X.

13             THE COURT:  Any objection to X?

14             MS. KLEIN:  It's the résumé of Marilyn Wesel.

15             MR. RISK:  No objection.

16             THE COURT:  Marilyn Wesel's résumé, that one I can't

17   read on the screen.

18             This person also has a JD from the University of

19   Cincinnati College of Law 1993, right?

20             THE WITNESS:  Yes.

21             THE COURT:  And was a general counsel and a magistrate

22   in state court?

23             THE WITNESS:  Yes.

24             THE COURT:  You hired this person?

25             THE WITNESS:  Yes, I did.

C8DMKADT                           Romano - direct

1              THE COURT:  Roughly when?

2              THE WITNESS:  Roughly in -- I am not exactly sure.  It

3    was after Chip left, so it must have been like 2006, around

4    there.

5              THE COURT:  How long did this person stay, roughly?

6              THE WITNESS:  About a year.

7    Q.  Ms. Romano, Kim Nawyn also worked as a graphic consultant?

8    A.  Yes.

9    Q.  And did she have an advanced degree?

10   A.  Yes.

11   Q.  And do you recall as you sit here today what her advanced

12   degree was in?

13   A.  Yes.  In criminal justice.

14   Q.  Do you know what degree she had?

15   A.  Master's degree.

16             MS. KLEIN:  Your Honor, I'd like to move to admit

17   Defendant's Exhibit W.

18             MR. RISK:  No objection.

19             THE COURT:  W is received.

20             (Defendant's Exhibit W received in evidence)

21             MS. KLEIN:  Would you like a copy of it, your Honor?

22             THE COURT:  Sure.

23   Q.  And you hired Ms. Nawyn?

24   A.  Yes, I did.

25   Q.  And did you hire her in part because of her advanced

C8DMKADT                          Romano - direct

1   degree?

2   A.  Yes, I did.

3   Q.  And was there any other relevant experience that she had

4   which made her a desirable candidate for Visualex?

5   A.  Yes.

6   Q.  And what is that?

7   A.  She was a professor, which obviously was very helpful

8   because our job as consultant is to teach juries and judges

9   sometimes very complex information.  So it's all about

10  teaching.

11  Q.  Ms. Romano, Nicole Matthiesen, she was also a graphic

12  consultant?

13  A.  Yes.

14  Q.  And she had an advanced degree?

15  A.  Yes.

16  Q.  And do you recall, as you sit here now, what her advanced

17  degree was?

18  A.  Yes.  She had a master's in English literature, I believe.

19          MS. KLEIN:  Your Honor, I would move to have

20  Defendant's Exhibit Z admitted, the résumé of Nicole

21  Matthiesen.

22          MR. RISK:  No objection.

23          THE COURT:  Z is received.

24          (Defendant's Exhibit Z received in evidence)

25          MS. KLEIN:  May I approach?

C8DMKADT                      Romano - direct

1            THE COURT:  You don't need to ask.  It's a nonjury

2     trial.

3     Q.  Up until this last résumé, are all of these graphic

4     consultants that were hired before Ms. Kadden?

5     A.  Yes.

6     Q.  And were all of the graphic consultants that we just went

7     through hired to perform the same duties?

8     A.  Yes.

9     Q.  And what was their primary duty and responsibility?

10    A.  Primary duty and responsibility of a graphics consultant is

11    to review case materials and to come up with the most effective

12    strategic presentation of key case facts and to buttress any

13    case weaknesses to help our clients help their clients to win

14    their case.

15    Q.  Do the graphic consultants manage anyone at Visualex?

16    A.  Yes.

17    Q.  And who do they manage?

18    A.  Everyone.

19            THE COURT:  What does that mean?  They don't manage

20    you.

21            THE WITNESS:  I'm a graphic consultant.

22            THE COURT:  You're also the head of the firm.  Who do

23    the other graphic consultants manage?

24            THE WITNESS:  They manage the studio staff.  The

25    graphic consultant is the one who is developing the individual

C8DMKADT                          Romano - direct

1    graphics, and then they have to convey what the takeaway needs

2    to be and what needs to be done to the studio who actually

3    executes the layout.  They have to tell the production

4    coordinator what needs to go out when and what order, who it

5    needs to be sent to, those kinds of things.  They are basically

6    the one pulling the strings to get the case through the door.

7              THE COURT:  When you say manage, is that like a direct

8    report?  Could they say to such an employee, no, you can't take

9    off tomorrow?

10             THE WITNESS:  Yes.  Because when you're managing --

11             THE COURT:  Do they hire those people?

12             THE WITNESS:  I make all the final hiring decisions.

13   But when we are looking for consultants, they are always

14   interviewed by the other consultants because we are working so

15   closely.

16             THE COURT:  I'm talking about the graphic artists, the

17   ones that produce the drawings, do they hire them?

18             THE WITNESS:  No.

19             THE COURT:  Do they fire them?

20             THE WITNESS:  No.

21             THE COURT:  Do they write out employee reviews with

22   them?

23             THE WITNESS:  No.

24   Q.  Does Visualex have a formal review process?

25   A.  They are supposed to be, but we are such a small

C8DMKADT                        Romano - direct

1    business -- there is supposed to be a yearly review, but it

2    rarely happens, just because there is other things going on.

3    Q.   Is trial graphics a recognized professional field?

4    A.   Yes.

5    Q.   Do you know for how many years it's been a recognized

6    field?

7    A.   It started -- LSI was the first one to ever use graphics at

8    a trial, and I believe it was an explosion of a sewer line in

9    Louisville, Kentucky, and that was in the early '80s.

10   Q.   And is there a professional association for litigation

11   graphic consultants?

12   A.   Yes.

13   Q.   And what is that?

14   A.   It's called ASTC, the American Society of Trial

15   Consultants.  It's all trial consultants, jury consultants, and

16   graphics consultants participate.

17   Q.   Had Visualex consultants been featured speakers for any

18   legal and social science organizations?

19   A.   Yes.

20   Q.   Can you tell me where?

21   A.   A lot of different engagements, the American Bar

22   Association, Practicing Law Institute, American Society of

23   Corporate Counsel, all -- we do a lot of education and

24   presentations, CLE courses, those kinds of things.

25   Q.   Have you written about your profession?

C8DMKADT                         Romano - direct

1   A.  Yes.

2   Q.  And have you been published?

3   A.  Yes.

4   Q.  And can you tell us where you've been published?

5   A.  The National Law Journal, I think twice, and then the

6   Massachusetts Lawyer, which I think got picked up by a bunch of

7   other trade publications.

8   Q.  Did there come a time in 2008 that Visualex was looking to

9   hire a new graphic consultant?

10  A.  Yes.

11  Q.  What steps did Visualex take, if any, to fill the position?

12  A.  We retained a few headhunters.  I believe we put an ad on

13  the ASTC website, and I think we placed ads on Monster.com.

14  Q.  Are you familiar with the name the Cowen Group?

15  A.  Yes.

16  Q.  Can you tell me who they are?

17  A.  They are a headhunter.

18  Q.  In 2008, when you were looking to hire a graphic

19  consultant, did you have any interaction with the Cowen Group?

20  A.  Yes.

21  Q.  Did you have communications with them?

22  A.  Yes.

23  Q.  Do you recall what the form of the communication was?

24  A.  Some phone calls, but predominantly e-mail.

25          MS. KLEIN:  Your Honor, I would like to hand the

C8DMKADT                      Romano - direct

1   witness Defendant's Exhibit C, please.

2              MR. RISK:  No objection.

3              THE COURT:  No objection to C.  C is received.

4              (Defendant's Exhibit C received in evidence)

5   Q.  Do you recognize the first page of Exhibit C?

6   A.  Yes.

7   Q.  And can you tell me what this is, please?

8   A.  It's actually the cover letter from Cowen Group for Adina

9   Kadden's résumé.

10  Q.  And who was this from?

11  A.  Jared Coseglia.

12  Q.  Did you receive Exhibit C in connection with the position

13  that you were looking to fill?

14  A.  Yes.

15  Q.  Can you tell us what, if anything, you did as a result of

16  receiving this document?

17  A.  After reviewing it, I believe that I contacted Jared and

18  said that based upon the experience and education that I would

19  be interested in interviewing this candidate.

20  Q.  And what, in particular, do you remember was the

21  educational part of it that you were interested in?

22             MR. RISK:  Objection.  Leading.

23             THE COURT:  I don't think that was leading.  Maybe I

24  didn't hear it.

25  Q.  I said, what, if anything, was the educational requirement

C8DMKADT                        Romano - direct

1    that she found interesting?

2            THE COURT:  Maybe it's the word requirement.  What was

3    the educational qualification that you found interesting?

4            THE WITNESS:  She was a lawyer.

5    Q.   Do you recall whether or not Ms. Kadden had any other

6    experiences concerning graphic consulting?

7    A.   Yeah.  Actually, the two other things that intrigued me

8    were that she worked at the U.S -- the Attorney General's

9    office and that in conjunction with that position she was

10   working with -- to develop the graphics presentations that were

11   used, and she also worked at a competitor of Visualex, Doar, as

12   a graphics consultant doing the same position that I was

13   looking to fill.

14   Q.   And were you familiar with Doar?

15   A.   Yes.

16   Q.   And how are you familiar with how the consultants worked at

17   Doar, since you didn't work at Doar?

18   A.   Because Kim Nawyn was also from Doar and she was very

19   successful as a graphics consultant with Visualex.

20   Q.   Did Visualex ultimately decide to interview Ms. Kadden?

21   A.   Yes.

22   Q.   Did you participate in the interview?

23   A.   Yes.

24   Q.   And who, if anyone, else did?

25   A.   I know Kim interviewed her.  I'm not exactly sure if Brian

C8DMKADT                        Romano - direct

1   did or not.  It's kind of a long time ago.  I can't remember.

2   Q.  Did you have a one-on-one interview with Ms. Kadden?

3   A.  Yes.

4   Q.  And at the interview did Ms. Kadden talk about her

5   qualifications and her experience?

6   A.  Yes.

7   Q.  And what did she tell you about her qualifications and

8   experience?

9   A.  She told me that she was a lawyer and that she had worked

10  at the Attorney General's office and actually, that was a large

11  part of it, that she was actually working -- that was the first

12  time that she had had actually been exposed to that whole

13  graphics process and that she really liked that aspect of the

14  field.  And then, of course, that she had been in litigation.

15  That kind of led her to taking the position at Doar, where she

16  performed the same kinds of job duties that we were looking

17  for, which is basically consulting with clients to come up with

18  case presentations and case strategies, and due to some

19  downsizing at Doar she had been let go and that was always

20  something she always enjoyed doing and she would like to get

21  back into the field.

22  Q.  Did she discussed whether she worked as a consultant alone

23  or as part of a team?

24  A.  As part of a team.  Doar had multiple consultants as well,

25  just like Visualex does.

C8DMKADT                        Romano - direct

1    Q.  I know it's an obvious question, but were you interested in

2    Ms. Kadden as a result of the interview?

3    A.  Yes.

4    Q.  And did you ultimately offer her a position?

5    A.  Yes.

6    Q.  Did you discuss with her what the timing of the position

7    was, meaning when you were looking to have someone start?

8    A.  Yes.

9    Q.  And when did you want someone to start?

10   A.  I wanted someone to start immediately.  We were really,

11   really busy, and I wanted -- and we needed help desperately,

12   and I wanted somebody who could hit the ground running as soon

13   as possible.

14              MS. KLEIN:  That box is music to my ears.

15              THE COURT:  Thank you.

16              MS. KLEIN:  Your Honor, there should be an electronic

17   disk in there that has all the exhibits if you want it.

18   Q.  She was ultimately hired?

19   A.  Yes.

20   Q.  And the job that you hired her for was?

21   A.  Graphics consultant.

22   Q.  At the time that you hired Ms. Kadden, how were graphic

23   consultants compensated?

24   A.  At time they had a base salary, and then we paid incentive

25   overtime compensation.

C8DMKADT                         Romano - direct

1    Q.  And who made the decision to pay consultants overtime

2    compensation?

3    A.  I did.

4    Q.  And what was the reason that you had made that decision?

5    A.  The reason was that I felt that I wanted to incentivize

6    people along the way as opposed to having to wait for a bonus

7    at some later time.  I had been in the industry with three

8    different companies for 15 years when I started Visualex, and I

9    just wanted to make sure that the compensation would

10   incentivize people to work as hard as you need to work when

11   you're a consultant.

12   Q.  When you were working as a consultant in the entire time

13   that you worked in your profession, have you ever been given

14   the days off and then been required to report to work at night?

15            THE COURT:  I'm sorry.  I'm losing you.

16            MS. KLEIN:  I lost myself on that one.

17            During her years as a consultant I wanted to know

18   whether or not she worked the night shift?

19            THE COURT:  Did she ever just work nights is what you

20   are asking?

21            MS. KLEIN:  Yes.

22   A.  No.

23   Q.  Is the predominant part of the work of a consultant done

24   during evening hours?

25   A.  Predominant, no.

1   Q.  And when is the work generally done?

2   A.  It's done while you're in the office.  It starts at 9 and

3   it goes -- it can go all night certainly, but we certainly

4   don't sit there from 9 to 6 and do nothing and wait to, all of

5   a sudden, the witching hour comes at 6:00 and people start

6   asking you for stuff.

7   Q.  When you offered Ms. Kadden a job, did you offer her an

8   employment contract?

9   A.  No.

10  Q.  Was the offer of employment memorialized anywhere?

11  A.  Yes.

12  Q.  And where was it memorialized?

13  A.  In an offer letter.

14  Q.  Did a lawyer draft the offer letter?

15  A.  I wish, but no.

16  Q.  And where did that offer letter come from?

17  A.  Actually, again, you know, having been in the industry and

18  several companies prior to starting Visualex, I took my offer

19  letters and kind of pick and choose the basis of it and then

20  added, obviously, some things that were just unique to

21  Visualex.

22  Q.  What were the things that were unique to Visualex?

23  A.  The incentive overtime compensation.

24          MS. KLEIN:  Your Honor, I would like for the witness

25  to look at Defendant's Exhibit E.

C8DMKADT                         Romano – direct

```
1            MR. RISK:  No objection.

2    Q.  Ms. Romano, are you familiar with this document?

3    A.  Yes.

4    Q.  And what is it?

5    A.  It's the invoice from the Cowen Group for the placement of

6    Adina contacted.

7    Q.  Did you pay a placement fee for her, a finding fee?

8    A.  Yes.

9    Q.  How much did you pay?

10   A.  $18,750.

11   Q.  Has Visualex ever paid that amount of money for a

12   nonprofessional staff?

13   A.  No.

14           MS. KLEIN:  It's already admitted since there is no

15   objection.

16           THE COURT:  No objection, E is admitted.

17           (Defendant's Exhibit E received in evidence)

18   Q.  Do you recall the annualized base salary of Ms. Kadden's

19   offer?

20   A.  Yes.

21   Q.  And what was it?

22   A.  $75,000.

23   Q.  During Ms. Kadden's employment was her annualized base

24   salary ever reduced to below 75,000?

25   A.  No.
```

C8DMKADT                      Romano - direct

1    Q.  I ask you to do a little math.  Do you know what Ms.

2    Kadden's annualized base salary was on a weekly basis?

3    A.  I think it was around $1500.

4           THE COURT:  I'm sorry?

5           THE WITNESS:  Around $1500 a week.

6    Q.  Where does the majority of the work of the graphic

7    consultant take place?

8    A.  In our office.

9    Q.  And who is the primary beneficiary of the work of the

10   consultants?

11   A.  Our clients.

12   Q.  And during Ms. Kadden's employment did she perform the job

13   of a graphic consultant as you described it today?

14   A.  Yes.

15   Q.  Does Visualex have and did they, during Ms. Kadden's

16   employment, a philosophy regarding what it is to be a

17   consultant?

18   A.  Yes.

19   Q.  Can you explain to the Court what that philosophy is?

20   A.  We tried to separate ourselves from our competitors, and

21   what we say to clients is we are not wrists.  We don't blindly

22   follow.  We don't regurgitate what a trial team tells us to do.

23   We basically review materials and we recommend, based on our

24   experience, what we think the best way to present information

25   to the trier of fact is, and we also really are very proactive

C8DMKADT                          Romano - direct

1   in teaching ourselves and learning the really complex concepts

2   so that we can have intelligent conversations with experts and

3   that also we can review every graphic that's created to make

4   sure that, in our opinion, we think it is the most effective

5   way to present the information.

6   Q.  Are you familiar with a case called CIEA?

7   A.  Yes.

8   Q.  And what did that case deal with?

9   A.  It's actually a patent case that had to do with transgenic

10  mice, which is basically -- obviously, when you want to do

11  research, medical research on cancer drugs, you can't do it on

12  humans, can't give humans cancer and then try to see what works

13  and what doesn't.  So what they basically do is breed mice and

14  they get rid of the mouse immune system, and they actually put

15  human cells in there which causes the mouse to have a human

16  immune system, and then they can see what drugs are working.

17  Q.  And who are the graphic consultants that worked on the CIEA

18  case?

19  A.  Actually, all three of us worked on that case.

20  Q.  When you say all three?

21  A.  It's myself, Adina Kadden, and Kim Nawyn.

22  Q.  And the information that you just testified about regarding

23  how it worked and what it was about, was that in information

24  given to you by the trial team?

25  A.  The background information was given to us.  That case

1    actually was such a difficult concept that we did a lot of

2    Internet research.  One of the things that we often take

3    advantage of are any kinds of sites that sometimes teach

4    children about these kinds of things because when you are

5    trying to explain these complex concepts to jurors, sometimes

6    looking like on how the body works, those kinds of things, help

7    you to distill it down so it's easier to understand.

8    Q.  What is your philosophy about not being wrists?  What does

9    that mean when you say not to be a wrist?

10   A.  We just don't blindly follow.  A lot of times attorney will

11   say I need and we always stop them and say, no, tell us what

12   you want the takeaway to be, and we will tell you what you

13   need.  Don't tell us what you want.  We will tell you what you

14   need in order to convey that point.  There are -- basically, we

15   are not just regurgitating -- if they say we want a pie chart

16   and we say okay here is a pie chart, that's not what we do at

17   all.  We bring value.

18   Q.  Why don't you just do what they need or ask you for?

19   A.  Then they wouldn't really need us.  They are hiring us

20   because we are experts in this field, and that's our job, to

21   recommend to them the best way to portray the information, and

22   also a lot of times when we get involved the attorneys have

23   been working on the cases for years and years and years.  They

24   get so close to the information, we will come to them and say,

25   we don't understand that.  And if we don't understand that,

C8DMKADT                          Romano - direct

1   obviously, it's something that needs to be explained to the

2   jury or to a judge, so we help them also identify areas where

3   they should be targeting for the use of graphics.

4   Q.  Are you familiar with a case called Wells Fargo?

5   A.  Yes.

6   Q.  And how are you familiar with that case?

7   A.  It was another case that Visualex was retained on.

8   Q.  And who were the graphic consultants that worked at

9   Visualex on Wells Fargo?

10  A.  Again, it was myself, Kim, and Adina, all three of us.

11  Q.  And did the three consultants in either this case or the

12  one you just talked about have different roles?

13  A.  No.  We are all responsible for coming up with the best way

14  to present the evidence.

15  Q.  And can you explain to us how it works when there is more

16  than one consultant assigned to a case?

17  A.  Yeah.  One of the other things that we do that sets us

18  apart is that we always want to have a person in the office who

19  is smart about the business.  So all of us, at least two

20  consultants and oftentimes all three consultants, will read all

21  the case materials because if any one of us is out, you don't

22  want the client to have to call and say, this is what the case

23  is about.  You want to have a smart person there so they can

24  respond to any requests.

25          And, also, since it's such a iterative process and

1    you're constantly communicating back and forth, you have to

2    have the base knowledge of the facts of the case and an

3    understanding of what needs to be communicated so that you can

4    evaluate.  As each exhibit comes through and is created you can

5    evaluate, does it do what it's supposed to do.

6    Q.  Does that evaluation process only take place when the

7    exhibit or the demonstrative is first created?

8    A.  No.

9    Q.  Can you explain to us that?

10   A.  That evaluation is constantly taking place.  Again, that's

11   what we are doing as consultants, is taking place internally,

12   before a layout ever goes out to a trial team, and then it's

13   taking place when the trial team then communicates changes or

14   concerns about what they have reviewed.  And so what you are

15   doing as a consultant is constantly, you are always passing

16   everything through that filter of, does this do what it's

17   supposed to do.  And if the answer is yes, the second question

18   needs to be, does it do it in the best way possible?  And if

19   the answer is no, then you need to come up with a different

20   approach.

21   Q.  And is it possible that, for example, simply a change of a

22   color could change the takeaway?

23   A.  Yes.

24   Q.  Can you explain that to us?

25   A.  Because humans process different colors in different ways.

1    Certain colors evoke visceral reactions.  So, for example, red

2    usually means dangerous because of stop signs and so we usually

3    use red for our adversaries, and blues and greens are very

4    pleasing colors, so we use them for traditionally our clients.

5              Also, there are instances where a client is a company

6    that has a very well recognized logo that has a color

7    associated with it.  For example, we do a lot of work for

8    AstraZeneca, and they are the purple pill.  Of course, the

9    AstraZeneca exhibits were purple.

10   Q.  And when constantly evaluating through the different

11   iterations of the document, if a client says, oh, I'd like all

12   the text centered, would that make a difference to you as a

13   consultant?

14   A.  Yes.

15   Q.  Can you explain why?

16   A.  Because, again, as a consultant, you understand how humans

17   process information.  And just like every novel you ever pick

18   up has left justified text, we read from left to right.  So

19   when you center text it makes it very difficult to find the

20   next line.  Especially when you're ten feet away in a jury box

21   or ten feet away from a screen, that's exacerbated.  We always

22   tell people, don't center your text because it's much easier to

23   read if it's left justified.

24   Q.  Would it be the job of the consultant to express that

25   opinion if one of your clients told you to do something that

C8DMKADT                        Romano - direct

1   was center?

2               MR. RISK:  Objection, leading.

3               THE COURT:  Can you rephrase it?

4               MS. KLEIN:  Yes.

5   Q.  If a customer of Visualex asked you to center text, is it

6   appropriate for the consultant to give their opinion as to the

7   effectiveness of that?

8   A.  Yes.  Obviously, again, they are hiring us as experts in

9   visual presentations.  So whenever a client -- that's the

10  interaction.  That's what we do.  Whenever anyone asks us to do

11  something that we don't believe is going to increase the

12  effectiveness of an exhibit and in fact may decrease the

13  effectiveness of an exhibit, we absolutely give our opinion and

14  recommend what we think needs to be done.

15              MR. RISK:  Move to strike everything after the answer

16  yes.

17              THE COURT:  I don't even recall what it was.  I don't

18  have real time up here.  I have to hear it all back, unless you

19  agree.

20              MS. KLEIN:  I don't agree.

21              THE COURT:  Let me hear the whole answer, please.

22              (Record read)

23              THE COURT:  I'll allow it.

24  Q.  Turning your attention back to the Wells Fargo case, again,

25  just to remind me, who were the consultants assigned to that

C8DMKADT                         Romano - direct

1    case.

2    A.   It was the three of us that were there at the time Visualex

3    was retained:  Myself, Adina, and Kim.

4    Q.   When you say Adina, you're referring to the plaintiff in

5    this case?

6    A.   Yes.

7    Q.   As you sit here today do you recall whether the Visualex

8    consultants, were they given case information in connection

9    with that case?

10   A.   Yes.

11   Q.   And is it necessary for the consultants to review legal

12   documents to do their job?

13   A.   Yes.

14   Q.   Why?

15   A.   Because you review anything that is going to get you up to

16   speed on the strategy.  Usually, we ask for summary judgment

17   motions, the complaint, the answer, any expert reports,

18   anything that we think is going to get us up to speed so we

19   don't have to drag the trial team down and have them explain to

20   us what's going on.

21   Q.   Why don't you not just rely on the information that's given

22   to you by the team, the trial team?

23   A.   Because they are not looking at that information in the

24   same way we are.  We are looking at that information to

25   determine, A, what's difficult to understand and what should be

1    supported by a graphic presentation and, B, once we identify

2    that to say, okay, what is the form the information is being

3    conveyed in these legal briefings and expert reports, and is

4    that the best way to present it visually, or is there a better

5    way, and how does that fit in the overall visual strategy that

6    we are developing.

7              MS. KLEIN:  Your Honor, I'd like to hand to the

8    witness Defendant's Exhibit G1.  And this is one of those, your

9    Honor, that's huge, huge, and I have made summaries for

10   everyone, if that makes it easier.

11             THE COURT:  I would rather take the summary.

12             MS. KLEIN:  Is that one of the smaller ones?  I

13   thought it was one of the bigger ones.

14             THE COURT:  Summary or is this the exhibit?  Is this

15   the summary?

16             MS. KLEIN:  This is the full exhibit of this one.

17             THE COURT:  Are you giving me the summary?

18             MS. KLEIN:  We broke it down.  We broke it down to G1,

19   G2, G3.  It's already sectioned off from the other part.  We

20   are not going through every page on this.

21             THE COURT:  You don't have anything smaller to give

22   me?

23             MS. KLEIN:  No.  That's it.

24             MR. RISK:  Your Honor, it's my understanding that G1

25   is not going to be offered into evidence and it's some sort of

C8DMKADT                    Romano - direct

1  demonstrative.

2          THE COURT:  I don't think so.  I think it's a portion

3  of what, G?

4          MS. KLEIN:  G1 is going to be offered.  This was one

5  that was created by Ms. Kadden and --

6          THE COURT:  It's a portion of a fuller exhibit?

7          MS. KLEIN:  Yes.

8          THE COURT:  The fuller exhibit is marked G.

9          MS. KLEIN:  Correct.

10          MR. RISK:  G1 is indicated DEM 0001.

11          MS. KLEIN:  Defendant's Exhibit G1.  That is an

12  identification to make it easier for us to get through the

13  pages.  This wasn't part of the document production.  You

14  didn't ask for it.  I put numbers on it to make it easier for

15  the Court to follow the testimony.

16          MR. RISK:  I'm sorry, your Honor.  I was told I was

17  going to get some demonstratives.  This is the only one that

18  indicated G1.

19          THE COURT:  But it's not.

20  Q.  Ms. Romano, are you familiar with what's been marked as

21  Defendant's G1?

22  A.  Yes.

23  Q.  I would like to turn your attention to the pages that are

24  numbered DEM 00024 through 25.

25  A.  Okay.

C8DMKADT                          Romano - direct

1    Q.  Can you tell me what this says?

2    A.  These are pages from an expert report from an expert that

3    was testifying in the Wells Fargo case.

4    Q.  Can you explain to us what the Wells Fargo case was about?

5    A.  Yeah.  It had to do with a securities lending program for

6    which Wells Fargo was the trustee, and there were four

7    investors in the trust that lost some money because some of the

8    underlying investments defaulted.  And they were suing Wells

9    Fargo basically saying that Wells Fargo should have known that

10   these were going to default.  But it was during the time when

11   the whole economy tanked.  And so it was our position that

12   nobody could have foreseen the economic crisis and that it was

13   not Wells Fargo's fault.

14   Q.  And during Ms. Kadden's employment while she was working as

15   a consultant, was she required to review pages DEM 000024 and

16   25?

17   A.  Yes.  All three of us read all -- were supposed to read all

18   of the case documentation for this case.

19   Q.  And the purpose of reviewing these particular pages was

20   what?

21   A.  Well, these were pages that jumped out at us, obviously,

22   since the case had to do with securities lending program.  The

23   first thing we had to teach the jury was, what does that mean

24   and how does it work so that they could evaluate whether it

25   worked the way it was supposed to in determining who had the

C8DMKADT                         Romano - direct

1   responsibility for the money that was lost by the plaintiffs.

2   Q.  And did the consultants imagine a way to depict this

3   information that's on 24 and 25?

4   A.  Yes.

5   Q.  Can you explain to the Court what it is that you did?

6   A.  Yes.  If you look at DEM 13, we basically developed a flow

7   chart, and oftentimes because the way humans learn is through

8   repetition and reinforcement, we developed a base flow chart

9   that had all of the steps -- all of the parties involved in the

10  process.  And then we pull off some explanatory texts for each

11  of the steps and then you light up things.  Again, it's a way

12  of being able to spoonfeed the jury, help the expert explain a

13  complex concept that they probably weren't familiar with.

14          So in the first one you can see that the lenders sell

15  their securities to or give their securities to Wells Fargo.

16  And then if you go to the next one you can just see how -- if

17  you go to the next step is that the borrower borrows the

18  security and so on.  If you just scroll through these, you can

19  see we basically came up with a flow chart that enabled the

20  expert to explain every step in the securities lending process.

21  Q.  If you could just take a look back at DEM 000014.

22  A.  Yes.

23  Q.  Can you look at this and tell us what was the intended

24  takeaway for your client?

25  A.  Well, we wanted to show what was actually happening.  And

C8DMKADT                    Romano - direct

 1   so obviously you can see that -- first thing that we do is

 2   craft a title that basically tells what the exhibit is about.

 3   So this is how the securities lending program works.  And then

 4   in this particular step we are explaining what the borrower

 5   does.  So the borrower borrows the security and then he has to

 6   post cash collateral at 102 percent in the event there is --

 7   any value is lost.  So the 102 percent collateral covers that.

 8   That's basically what I was trying to explain.

 9   Q.  And do your clients tell you what the title should be?

10   A.  No.

11   Q.  Who crafts that?

12   A.  The consultant crafts it.  The title is probably the most

13   important thing on any graphic.  And what we always tell

14   clients is that, you know, we will craft a title that gives the

15   takeaway.  And sometimes you really, really push the envelope

16   on the title because the theory behind it is that if the jury

17   doesn't even do anything other than read the title, they

18   understand why you are showing them the graphic and what the

19   takeaway is.  We also pick the colors, so, obviously, this is

20   an exhibit that's going to be used in furtherance of our

21   position in the case, which is why it's blue.  Green for money

22   so that people understand what's happening.  We developed

23   icons.  Again, icons are the little pictures of things.  So the

24   securities, it looks like a little stock certificate.  All of

25   these things just make the concepts less intimidating to a jury

C8DMKADT                        Romano - direct

1   so that they are more comfortable with it.

2           I am not going to give a psychology lesson, but,

3   basically, what you want to avoid is something called cognitive

4   dissidence, which is that juries shut down if they don't know

5   what to do with information.  They either distort it,

6   misrepresent it, or minimize its importance.  You don't want

7   them to do that for any of the things that you think are

8   important to advancing your case.  We try to make it as easy as

9   possible for them to understand things.

10  Q.  I would like you to look in also G1 DEM 000019 through DEM

11  000021.  Can you explain to us what this is?

12  A.  Yes.  This was also from an expert report.  And one of the

13  things that we felt was important is to make the point that

14  Wells Fargo, in addition to being the trustee, also invested in

15  the trust.  And so it was to go to motivation.  What would our

16  motivation be to invest in things that we thought were going to

17  lose money if we had the most to lose and we were actually

18  invested in the trust as well.  So this was an appendix to the

19  expert report.  And, obviously, you can see, if you scroll

20  through this, there is just a lot of names with numbers.  And

21  if you were to show it to a jury this way, you would be forcing

22  them to do a lot of analysis and evaluation to figure out.

23  Number one, what does it mean and how does it fit with the

24  overall scheme of your case?  And so what we do as consultants

25  is recommend the best way to take this information and put it

1   in a visual form so it's easier to understand.

2   Q.  Who were the consultants that worked on figuring out a

3   visual strategy and takeaway for these particular three pages?

4            MR. RISK:  Objection, leading.

5            THE COURT:  Who were the consultants?  What's the

6   leading part?

7            MR. RISK:  I think the question is eliciting the

8   answer that Ms. Kadden did the strategic work.

9            THE COURT:  She is saying identify the experts who

10  worked on it.  That's not leading.

11           Who worked on this one?

12           THE WITNESS:  We all worked on it.  All three of us:

13  Adina, myself, and Kim.  As I said, there is always at least

14  two and in this particular one there were three of us.

15  Q.  Please turn your attention to DEM 000044 through DEM

16  000056.

17           Can you tell me what this is that we are looking at?

18  A.  Again, this is information that was provided to us by an

19  expert, and this was a listing.  And if you scroll through it

20  it's just pages and pages and pages of issuers.  Basically, in

21  the case these are 416 securities that the plaintiffs alleged

22  were unsuitable and should not have been invested in.

23           MS. KLEIN:  I apologize.  I skipped something.  Can I

24  have us move back.

25  Q.  The last expert report that you were testifying about,

C8DMKADT                      Romano - direct

1    pages 19 through 21, did you turn that into a visual?

2    A.  Yes, we did.

3    Q.  And what visual is that in this packet?

4    A.  It's DEM 22.

5    Q.  And can you please turn to that page.  And can you explain

6    to us what it is that is trying to be conveyed in DEM 22?

7    A.  In DEM 22, as I said, the takeaway was that Wells Fargo was

8    the largest participant in the trust and, therefore, what would

9    their motivation be to invest in unsuitable investments.  All

10   of those names that you would have forced a jury to go through

11   and try to find them, we basically applauded it in a bar chart

12   and we color Wells Fargo blue because it's our client and you

13   can clearly see that it makes the point much more effectively

14   that they were the largest participant and therefore had the

15   most to lose.

16        And this is kind of how the process works.  Once we

17   develop this and send it to the client for a review, they said,

18   this is great, it absolutely works, but what it doesn't do is

19   show what Wells Fargo percentage is compared to the plaintiff's

20   in the case.  And I said, okay, we can do something that builds

21   upon this.

22        And if you go to DEM 23, instead of doing a bar chart

23   for that one, we actually decided that pie charts were the

24   better way to convey that information because we -- it wasn't

25   necessary to see what everyone else was doing.  Now we were

1    just focused on the four plaintiffs and Wells Fargo.  By

2    pulling that piece out of the pie, you separate that and focus

3    the attention and then we color-code each of the plaintiffs, so

4    it was very easy to find what any one of them's percentage was

5    in comparison to Wells Fargo.

6              Once they received that pie chart, they said, wow,

7    this is great, but there are reasons, strategic reasons we want

8    to show certain points in time and how that percentage that

9    Wells Fargo still remained the largest participant over a

10   relevant time period.  And so we said, okay, we can do four pie

11   charts on one so you can see that trend easily.

12   Q.  And did the clients at Visualex tell you when this case

13   started that they wanted a demonstrative exhibit that had four

14   pies on it?

15   A.  No.

16   Q.  Did they ultimately use those?

17   A.  Yes.

18   Q.  Do you know what the outcome of the case was?

19   A.  Actually, we technically lost, but it wasn't a large award,

20   so it was considered a win by the client.

21   Q.  Now, if you could go back to the 44 through 56.  If you can

22   walk us through and explain to us what the consultants did in

23   connection with this information.

24   A.  Again, what I mentioned earlier, that this is a list of the

25   400 somewhat unsuitable investments as alleged by the

1    plaintiffs.  And what we needed to show is that the strategy

2    that Wells Fargo employed in dealing with the economic downturn

3    was called a hold to maturity strategy.  And so basically we

4    had to explain that if we had sold these unsuitables as soon as

5    the market started tanking we would have definitely incurred

6    really, really large losses.  So we felt that the best course

7    of action was to hold them and hopefully the economy would come

8    back and that some of them would either be sold or mature at

9    par.

10   Q.  Ms. Romano, when you say what we needed to show, I think

11   you said that through a couple of the exhibits we have gone

12   through, who is the we you are referring to?

13   A.  The we -- the we is the consultants at Visualex and the

14   trial team.  We consider ourselves part of the trial team.  And

15   so we really don't make much of a distinction between that when

16   we are dealing with the visual presentation.  Our clients, we

17   consider them -- we are an extension of our clients.

18   Q.  Please continue explaining the process.

19   A.  If you scroll through this, you can see that is mind

20   numbing and nobody would be able to tell what this is actually

21   trying to convey.  And so we needed to figure out a way to

22   present this information in a fairly simple matter.

23        Actually, if you look at the headings up at the top,

24   you can see that there is a lot of information here.  When we

25   receive something like this, obviously, there is a lot of

C8DMKADT                        Romano - direct

1    information here.  Since you're constrained by the size of a

2    screen -- we used to do boards.  We don't do boards anymore.

3    Even so, you have a finite area to put something on.  This

4    would be a difficult task to convey all of this information.

5    And so what you do as the consultant is say, well, explain to

6    me what is the most important takeaway that you want to get

7    from this and the most important takeaway is that the hold

8    maturity strategy was right, that maturity date, the face

9    amount, all of this stuff is irrelevant to make that point.

10          If you look at the status column, that's really the

11   key information, whether it's matured, whether it's sold,

12   whether it actually in fact defaulted.  That's the column we

13   focused on and decided to come up with a visual representation

14   of these 400 some odd securities focused on what was occurring

15   in that column.

16   Q.  Can you tell us how the consultants recommended to their

17   clients to visually depict this information?

18   A.  Yes.  If you look at DEM 57, there were actually three

19   trusts at issue here.  And so the first thing that we did is

20   separate it into three separate exhibits, one for each trust,

21   so that we had the room to be able to make the representation

22   of each issuer is represented by a box.  We were able to get

23   bigger sizes on it by not putting all 400 on one.  So we broke

24   it down by trust.  You can see, these are the 170.  Those were

25   the big lists.  There was 170 of those in the business trust.

C8DMKADT                          Romano - direct

1              And then if you bring up DEM 58, if you went down that

2       column, you would see that only three out of the 170 defaulted,

3       so it was a very small percentage.

4              And then if you look -- that was actually the simpler

5       of the three.  If you look at DEM 60, this was the collateral

6       investment trust.  That status column had several other types

7       of identifiers.  So 188 matured at par.  That's actually not so

8       bad, 188 out of 216.  13 were sold, one was transferred or

9       matured, 12 were extended, and only one defaulted.  Obviously,

10      the hold to maturity strategy was the correct strategy to

11      protect the investors in their investment.

12  Q.  And was this demonstrative exhibit that we are looking at

13      ultimately used in the courtroom?

14  A.  Yes.

15  Q.  Is it fair to say that that was the ultimate product that

16      was produced?

17  A.  That was displayed in the courtroom.  The Wells Fargo case

18      had over 400 exhibits when all was said and done.  It was a

19      pretty complicated case and it lasted for three weeks.  A lot

20      of expert witness testimony, really dense financial

21      information.

22              MS. KLEIN:  Your Honor, I'd like to move to have G1

23      admitted.

24              MR. RISK:  Objection, your Honor.  All but four or

25      five pages were not listed in the pretrial order.

C8DMKADT                         Romano - direct

1          THE COURT:  I'm sorry.  Double negative.  I don't

2    understand what you said.

3          MR. RISK:  This exhibit is not in the joint pretrial

4    order, except for five pages are.

5          THE COURT:  You mean G1?

6          MR. RISK:  That's right.

7          THE COURT:  I thought she said it's all there, but

8    this is breaking out portions of G, which was a real fat

9    exhibit.

10          MS. KLEIN:  This was on the revised exhibit list that

11    we submitted to the Court.  You were correct, it wasn't on the

12    original one that was part of the first pretrial order.  And

13    then we submitted a revised one, as you also, counsel, reserved

14    your right to, as we got closer, put specific numbers in.

15    Clearly you have known about this for weeks.

16          MR. RISK:  I first saw these documents in the evening

17    of August 9.  Four or five of them are on the original pretrial

18    order.

19          THE COURT:  Anyway, what are we going to do?  I have

20    seen them already.  It's a nonjury trial.  They are just

21    graphics.  I get the point of what graphics are.  I have tried

22    a lot of cases.

23          MS. KLEIN:  Your Honor, I do apologize.  I know your

24    Honor has, but this is unfortunately the substance of the case.

25          THE COURT:  I am going to overrule the objection.  I

1  know what graphics are.

2  Q.  I would like you to take a look at what we have marked as

3  G3.

4           MS. KLEIN:  May I approach?

5           MR. RISK:  Your Honor, for the record, I am going to

6  make the same objection that these were not in the pretrial

7  order.

8           THE COURT:  Overruled.

9  Q.  Ms. Romano, have you ever seen G3 before?

10  A.  Yes.

11  Q.  Can you tell us what this is, generally?

12  A.  This is an expert report from a different case.  We called

13  it the SCOR arbitration.  It was basically an arbitration that

14  we did on behalf of Allianz that was related to the World Trade

15  Center insurance coverage litigation that we did actually down

16  the hall in Judge Mukasey's courtroom.  But this had to do

17  with, obviously, there was a lot more money that the insurance

18  company had to pay out than that he thought because of the

19  global settlement.  And this was Allianz trying to recover

20  their payout from their reinsurance company, which was SCOR.

21  Q.  Who were the consultants at Visualex who worked on the SCOR

22  arbitration?

23  A.  Again, it was the three of us that were there at the time

24  Visualex was retained:  Myself, Adina, and Kim Nawyn.

25  Q.  Were the job responsibilities in connection with the

1   graphic consulting divvied up between the three of you?

2   A.  We all were all responsible to do the same thing.  I don't

3   know what you mean by divvy up.

4   Q.  Did each of you have specific tasks?

5   A.  Our specific tasks were to consult on the case, to

6   generate --

7   Q.  Were the three of you consulting on different areas?

8   A.  No.

9   Q.  Can you please take a look at DEM 000080 through 82, which

10  is part of G3, and explain to the Court what this is?

11  A.  This is, again, from the expert report.  One of the things

12  that was important to show is what SCOR's motivation was to go

13  along with the settlement during the negotiations and not say

14  anything about thinking that Allianz was doing anything wrong

15  by agreeing to the settlement.  And so the explanation that the

16  expert was giving was that SCOR had experienced an economic

17  downturn, and the way you can evaluate the financial strength

18  of the company is by looking at their ratings given by the

19  ratings agencies.  This is an appendix to the expert report and

20  this is how he presented the information.  And once we received

21  that, we felt that that was not the most effective way to make

22  that point.

23  Q.  So what advice did Visualex give its client in order to

24  advance its client's case?

25  A.  We recommended that the tabular type of presentation of the

1   information should be converted to a line chart so you could

2   actually follow and see the trend.  And then you could also

3   focus on the particular relevant time in the context of what

4   happened before.

5   Q.  And Were the consultants able to figure out a visual

6   strategy that would get your client's point across?

7   A.  Yes.

8   Q.  And is that contained within G3?

9   A.  Yes.  If you look at DEM 83.  So the first thing to note

10  here is that the graphic is red, got a red title band.  As I

11  mentioned earlier, red has a visceral response of stop, bad,

12  whatever.  The consultant would say, we want this to be a red

13  exhibit.

14          The second thing you will notice is the takeaway,

15  which is SCOR's weak capital levels and deteriorating

16  performance were damaging to their credit profile.  You see you

17  have the whole chart, but part of it is way back because what

18  we want to be able to focus on is the time prior to the time of

19  the relevant month, because we want to show all of the ratings

20  agencies' downgrading score.  That tabular thing that we showed

21  earlier, basically, what we did, we gave a circle and a number

22  to each of the four rating agencies and they are the big ones,

23  S&P, A.M. Best, Moody's, and Fitch.

24          Every time the rating changed, we put the circle in

25  there so I could follow the trend.  Then we added the dotted

1     line because once you fall below a A minus credit rating,

2     people in the market don't want to go near you.  That was kind

3     of the demarcation that we wanted to be able to explain to the

4     arbitration panel, that once they fell below this, obviously,

5     you can see that ratings agencies were downgrading them.

6     Q.  Why is this important to your client's case?

7     A.  Because other than -- if you were to try to explain this

8     concept using that tabular information, I don't know about you,

9     but I didn't get that takeaway from that appendix, from the

10    expert report, but this really is an instantaneous, you can

11    definitely see what's happening, you can see the trend.  Yet,

12    you are also able to follow individual ones of the ratings

13    agencies, if necessary.  And so it really armed the expert with

14    a wonderful vehicle of being able to explain this point.

15         THE COURT:  How many more of these demonstratives do

16    you want to show in this trial?  Because I get the point.  I am

17    not going to sit through 50 more demonstratives at all.  How

18    many more do you think --

19         MS. KLEIN:  Right now this is the last one I have for

20    this and then there was specific ones, which we don't have to

21    go through if counsel is going to admit.  I have tons of them

22    that have Ms. Kadden's handwriting all over them.  Unless she

23    is going to admit, which I would assume and hope that she

24    would, that that was her consulting on them, it's her initials

25    all over them.  This is what the case is about, whether or not

C8DMKADT                          Romano - direct

1    she was acting as a consultant.

2              THE COURT:  I don't know that that's what the case is

3    about.

4              MS. KLEIN:  That's what I understand the case to be.

5              THE COURT:  Not me.

6              MS. KLEIN:  Is whether or not the job duties and

7    responsibilities that she was doing were exempt.

8              THE COURT:  That's right.  In other words, there may

9    be no disagreement that she was working on these graphics and

10   her initials show she was working on these graphics.  That

11   doesn't decide the case.  Then there is the question of law for

12   me to decide whether the person who does this work, creating

13   and changing and revising these graphics, is exempt.  That's

14   for me.

15             MS. KLEIN:  Yes.

16             THE COURT:  I don't know that there is any factual

17   disagreement.  Indeed, she may agree she worked on these

18   exhibits.

19             MS. KLEIN:  Again, I think the question goes to, she

20   didn't work on them in the sense -- she wasn't responsible for

21   actually producing them.

22             THE COURT:  Not the artwork, I know.

23             MS. KLEIN:  But in regards to understanding the

24   underlying legal issues, reading them, reviewing them, making

25   an analysis and determination.

1           THE COURT:  I understand that.  Something Ms. Romano

2    is perfectly capable of doing, too, and she is not a lawyer.

3           MS. KLEIN:  Yes.

4           THE COURT:  I get it.

5           MS. KLEIN:  Again, it goes right towards all of the

6    different exemptions.

7           THE COURT:  I know it does.  I'm losing what we are

8    debating here.

9           Maybe you can help, Mr. Risk.  Your client doesn't

10   disagree.  She worked on these exhibits with the graphic

11   artists.

12          MR. RISK:  Your Honor, the question is what she did on

13   these exhibits.

14          THE COURT:  When you get her on the stand, you will

15   ask her.

16          MS. KLEIN:  When we talk about what she did on that,

17   then we are going to have to go through --

18          THE COURT:  I'm telling you both right now, there is a

19   limited number I will go through.  We have probably gone

20   through five or six.  I'm not going to go through a hundred, I

21   am not going to go through 50.

22          MS. KLEIN:  Two different cases.

23          THE COURT:  Five or six or seven exhibits from other

24   trials.  That's about enough.  You want to go to ten, fine, but

25   that's it.  Three more of these, maybe?  I don't need them,

C8DMKADT                      Romano – direct

1    really.  I understand trial exhibits.  I've been doing this for

2    years and seeing all these exhibits.  Now it's nice to know how

3    they got made, but I assume they got made that way all along.

4              MS. KLEIN:  Your Honor, what is important, not to

5    disagree at all, is showing what is the value, if any, what is

6    the part that the consultant is doing.

7              THE COURT:  I understand.  It's a creative process.

8              MS. KLEIN:  It is using independent thought,

9    knowledge --

10             THE COURT:  It's all of that.  There is a process of

11   creating it.  First, there was this ugly list of tightly packed

12   data that somebody wants to read and suddenly there is one

13   chart.  It morphed from a list to a chart.  It took a few

14   people to do that.  It took the graphic people and the

15   consultant people and the lawyer people back at the law firm.

16   And those three groups together, the lawyer people, the

17   consultant people and the graphic people, together came up with

18   this.

19             MS. KLEIN:  It does.  What is important is whether or

20   not what they came up with something is a matter of

21   significance.  It matters directly towards the exemption.

22   Again, I am not going to go through tons more.

23             THE COURT:  That's really a legal argument.  Showing

24   me endless exhibits doesn't change that.  I understand these

25   are exhibits and you use it at trial.  That's all you need to

1    say about matters of importance.  If that's what the law

2    defines as matters of significance.  In other words, one

3    exhibit to the other doesn't make that difference.  I get trial

4    exhibits.  You see my point?

5              MS. KLEIN:  I do.  I apologize for having to go

6    through this.  I also just to make sure that I am showing -- I

7    don't want to assume --

8              THE COURT:  You showed seven or eight.  I am saying

9    stop at ten.  That's enough.

10             MS. KLEIN:  May I proceed, your Honor?

11             THE COURT:  Yes.

12   Q.  Please look at DEM 000084, Ms. Romano.  That's part of G3?

13             THE COURT:  That's part of what?

14             MS. KLEIN:  G3.  You have that.

15             THE COURT:  Great.

16   Q.  Just looking at this, can you tell me what it is that the

17   consultant was recommending to the client?

18   A.  Well, the first thing is so, again, because it's repetition

19   and reinforcement, we are building on the same chart.  We

20   changed the title because the takeaway from that chart is going

21   to be different.  It now says -- it's now communicating the

22   takeaway that SCOR didn't achieve or return to an A rating

23   across the board until November 20, 2006.  The reason that's

24   important and we know it from reading the expert reports is

25   that they didn't want to do anything at that time that would

1  cause those ratings would be downgraded again.

2          And so the yellow, if you go to the next one, DEM 85,

3  that's the relevant time period that are the settlement

4  negotiations.  So you can see why they weren't going to

5  increase their reserves, because they knew that doing that

6  would endanger their economic recovery or at least the

7  perception of their economic recovery in the market.

8  Q.  If the client, the lawyers called and said, I want you to

9  change the title to green, what was the consultant at Visualex

10  supposed to do?

11  A.  We would say, first of all, it's color coded and anything

12  with SCOR we have color coded red, and the reason we do that is

13  because it is going to evoke something bad happened.  That's

14  the feeling we want the jury to have when they look at this, or

15  in this case the arbitration panel.  And we don't have green in

16  the case and all of a sudden to throw up an exhibit that has a

17  green title would not fit in with the overall visual strategy.

18  Q.  Would it have made a difference if the client told you that

19  they wanted the various lines to be broken up in dots?

20  A.  Yes.  I don't think it would have shown the trend and,

21  again, that's what we are saying as the experts here.  If you

22  are trying to show a trend, which is what my understanding is,

23  what the takeaway is, that would not be the best way.  In

24  response to that conversation, the attorney may say, well,

25  that's what I told -- that's what we wanted to do originally,

C8DMKADT                     Romano - direct

1   but now we found this other information and we don't think we

2   want to show the trend.  It's a constant iteration process,

3   whereas the consultant you are saying, tell me your concerns

4   about this, tell me why you don't think it does what it's

5   supposed to do, and then they give you more information and

6   then you say, well, in light of that, we are going to change it

7   this way or, in light of that, we still recommend that this is

8   the best presentation.

9             MS. KLEIN:  Your Honor, I move to have G3 admitted.

10            THE COURT:  Is there an objection?

11            MR. RISK:  I think I made the objection and your Honor

12   admitted.

13            THE COURT:  I think so, too.  G3 was received.

14            (Defendant's Exhibit G3 received in evidence)

15   Q.  Ms. Romano, is the job of the graphic consultant during Ms.

16   Kadden's employment the same as a production coordinator?

17   A.  No.

18   Q.  Can you explain to us what is the different

19   responsibilities?

20   A.  Production coordinator is just that.  They are just

21   coordinating the production.  So they are basically just

22   trafficking the exhibits around the studio because there is a

23   fairly elaborate process that's followed to create every

24   exhibit.  And the production coordinator is just tracking that

25   layout around the office.  And then the production coordinator

1   is also the one -- the consultant when you put anything into

2   this the studio basically says, okay, these exhibits have to be

3   out by this time for these people, and the production

4   coordinator is tracking to make sure that it's getting done and

5   then assembling the presentation to actually then get to the

6   client for their review.

7   Q.  When the consultants are working on a case, do they manage

8   the production coordinator?

9   A.  Yes.

10  Q.  Do they have the authority to tell the production manager

11  when to report to work?

12  A.  Yes.  There are times when you have to come in earlier or

13  stay late, yes.

14  Q.  And do they tell them when to leave?

15  A.  They tell them, yes, when they are able to leave if there

16  are deadlines that need to be met.

17  Q.  Not from a legal perspective, but from Visualex's

18  perspective, do you group the different job titles you talked

19  about into different categories?

20  A.  Yes.

21  Q.  What are those categories?

22  A.  We have a professional staff, which are basically the

23  people that are determining what needs to be done and when it

24  needs to be done, and that's the consultants and also to some

25  degree the art directors.  So there is a hierarchy that

C8DMKADT                        Romano - direct

consultants basically explain to the art director what needs to

be done.  And then the art director then hands out various

exhibits and explains to the designers from an aesthetic

standpoint that needs to be done and also communicates to the

designers as well what the takeaway that he's been told has to

be achieved, as was briefed by the consultant.

Q.  Is the production coordinator considered to be part of the

professional staff?

A.  No.

Q.  Does the production coordinator receive overtime?

A.  Yes.

Q.  What is the specific job of the graphic designers?

A.  The graphic designers actually just create the layout in

one of the software programs.  The Adobe Suite software is what

we use.

Q.  So are they responsible for the actual physical creation?

A.  They are executing -- yes, they are executing on two

levels.  They are executing what they have been told the best

way to achieve the takeaway is, and they are executing

specifically what the art director has put in place as far as

what type of layout to use, whether the title band should be

across the top or if it should be on the side, those kinds of

things.

Q.  Are the graphic designers considered part of the

professional staff?

C8DMKADT                         Romano - direct

1   A.  No.

2   Q.  Why not?

3   A.  Because they just do what they are told to do.  They don't

4   get to tell anybody what to do.

5   Q.  And do you have a bookkeeper?

6   A.  Yes.

7   Q.  And is she considered part of the professional staff?

8   A.  No.

9   Q.  And why not?

10  A.  Again, she is just basically taking information that people

11  enter and just running various reports and using it to generate

12  payroll or taxes or whatever.  She doesn't get to -- the

13  information she is working is the information.  She doesn't get

14  to change it, judge it, do whatever.  She just presses a button

15  to get the software to print out the reports necessary to run a

16  business.

17  Q.  Are the graphic consultants considered part of the

18  professional staff?

19  A.  Yes.

20  Q.  And have they always been part of the professional staff?

21  A.  Yes.

22  Q.  And can you explain why?

23  A.  Because they are the ones who are directing what needs to

24  be done on a daily basis and are assembling the team within

25  Visualex to actually meet the deadlines and deliver what our

1   clients are hiring us to deliver.

2   Q.  Are the same deliverables that you talked about ever

3   recycled and used again in another case?

4   A.  Not without changes.  Sometimes the same concepts are used

5   from one case to the next, but you can never use a graphic as

6   is with no changes.  Every case is different.  So you always

7   have to alter for fact patterns.

8   Q.  Did Ms. Kadden during her employment work on any cases

9   other than Wells Fargo and SCOR?

10  A.  Yes.

11  Q.  And can you tell me on how many cases did she work as a

12  consultant?

13  A.  I couldn't -- a lot.  A lot.  Any case that was in the --

14  there is no -- we are a pretty small office.  Everybody is

15  working on everything.  Everybody knows what's going on.

16  That's why we have 4:00 production meetings every night, so

17  everybody knows what's going on.  She worked on every case.

18  Q.  Do the graphic consultants do any marketing?

19  A.  Yes.

20  Q.  And is marketing part of their job?

21  A.  It's part of the job.  Obviously, you want to always have

22  more potential clients out there, but it's certainly not a

23  primary responsibility.  Any marketing activities are only done

24  when there is no case work.

25  Q.  Are you familiar with the phrase primary contact?

1    A.  Yes.

2    Q.  And what does that mean in Visualex's business?

3    A.  Basically, it's just an easy way for attorneys to know who

4    to call, who to ask for when they call the office if they need

5    to get something done.

6    Q.  And does Visualex use the nomenclature of lead consultant?

7    A.  Sometimes, yeah.

8    Q.  Explain to me the different job between the lead consultant

9    and the nonlead.

10   A.  I mean, honestly, there is no difference in the job.  It's

11   just the mouthpiece.  Someone needs to communicate to the

12   client what we have decided is the best way to present

13   something or communicate whether we don't agree with what they

14   are asking us to do or if they have suggestions of what needs

15   to be done.  It's basically the person who is the face.  It's

16   kind of like a partner on a case.  You don't call a 200-person

17   law firm and just say, hi, I'm Joe Shmoe and just expect

18   everybody -- you have a person to ask for.

19   Q.  And can you explain to us the process during Ms. Kadden's

20   employment of how it was if there was a particular case that

21   the consultants would work together in coming up with the

22   visual strategy, internally, how it worked?

23   A.  When the background information came in, everybody -- at

24   least two, but in most cases all three of us would review the

25   information.  I made a business decision in many cases not to

1    bill for all three people.  I never billed for all three people

2    reading it.  First of all, the clients would push back on that.

3    But it's a business decision that I wanted to be able to

4    represent that when you hire Visualex you hire a company where

5    everybody is smart on your case.  And when documentation would

6    come in, we have a folder that's called public on the server

7    and it would go into that folder under the case number so that

8    all of the consultants had access to that information to be

9    able to read it.  And also if they wanted to go back and look

10   at something or need to pull information from that that it was

11   accessible to all of us.

12   Q.  During this time did Ms. Kadden work on cases commonly

13   referred to as CSX?

14   A.  Yes.

15   Q.  What is CSX?

16   A.  CSX is the railroad.

17   Q.  Can you explain what Ms. Kadden did in connection with CSX

18   as a consultant?

19   A.  CSX is a large client of Visualex and over the years they

20   have waves of different types of litigation.  So, basically,

21   what happens is that, you know, plaintiff lawyers say, hey, we

22   work for the railroad and do you have hearing loss, then you

23   have all these hearing loss claims.  You try a couple of them,

24   you get a few defense verdicts and they say, we are not

25   recovering under that.  Do you have carpal tunnel syndrome when

C8DMKADT                         Romano - direct

1    you are fixing the locomotives, you can get carpal tunnel and

2    you have that wave.  There are these waves of litigation that

3    we do for CSX.

4            The current waves are solvent litigation, that you're

5    exposed to solvents, allegedly called toxic brain

6    encephalopathy from cleaning the locomotives and also ballast

7    cases.  Walking on ballasts gives osteoarthritis.

8            Whenever we get these cases, we have to read the

9    depositions of the medical doctors and the workers to try to

10   come up with graphics that are going to advance the position of

11   the railroad, which is that we were not responsible.

12   Q.  And did Ms. Kadden work on these CSX cases?

13   A.  Yes.

14   Q.  Did she work on the advice strategy of them?

15   A.  Yes.

16   Q.  And did she create demonstrative exhibits that were

17   ultimately delivered to the clients?

18   A.  Yes.

19   Q.  Were there any cases that you recall, as you sit here

20   today, whether or not Ms. Kadden was identified as the primary

21   contact?

22   A.  Yes.

23   Q.  And what cases were those?

24   A.  There were a couple of them.  Sobieski case, the Derea

25   case, the Mirror World case at a certain juncture.

C8DMKADT                        Romano - direct

1           THE COURT:  Which one?

2           THE WITNESS:  Mirror World.

3           THE COURT:  Two words?

4           THE WITNESS:  Yeah.  Mirror World.  It was a patent

5    case against Apple.

6    Q.  Can you tell us about some of the patent work that the

7    consultants work on?

8    A.  Tell you --

9    Q.  For example --

10   A.  Yes.

11   Q.  What was Visualex retained for in connection with Mirror

12   World?

13   A.  The Mirror World case is actually a really interesting

14   case.  David Gelertner had these patents.  On some of the

15   things, like the cover flow thing that Apple has right now

16   where you can scroll through and then the page that you're

17   looking at highlights large, and then also this automatic

18   archiving software.  There was a spotlight type of thing.

19   Apple was practicing this on their iPods, their iPads, their

20   MacBooks, and we represented the inventor, Gelertner, who had

21   these three patents on these technologies that Apple was

22   accused of infringing.

23           MS. KLEIN:  Your Honor, what time does the Court break

24   for lunch?

25           THE COURT:  1:00.

C8DMKADT                          Romano - direct

1           MS. KLEIN:  At 1:00?

2           THE COURT:  Yes.

3           MS. KLEIN:  Since it's 4 minutes to one, is it okay to

4    take a break right now?

5           THE COURT:  Why do we do that?

6           MS. KLEIN:  I was going to start another line of

7    questioning.

8           THE COURT:  Start it.  It's a nonjury trial.

9           MS. KLEIN:  I would like to hand the witness select

10   parts of Exhibits I and J, and this is one of the ones that was

11   huge and we did compile that.  So I have a copy for everybody.

12   Q.  Ms. Romano, are you familiar with this group of documents?

13   A.  Yes.

14   Q.  And can you tell us what this is?

15   A.  This is information that is related to an exhibit from the

16   Sobieski case.

17   Q.  Who were the consultants that worked on this case?

18   A.  I think at some point it was all three of us, but it was

19   predominantly Adina.

20   Q.  And looking at these documents, how can you tell that Ms.

21   Kadden worked on this document?  Was the consultant working on

22   this case?

23   A.  I can tell her handwriting.

24           THE COURT:  Doesn't she agree she worked on these,

25   Mr. Risk, when you look through them?

C8DMKADT                          Romano - direct

1                MR. RISK:  She was involved in the Sobieski case and
2       her initials are on one or more of these documents.
3                THE COURT:  And her handwriting?
4                MR. RISK:  Somewhere, yes.
5                THE COURT:  She can look through it and tell whether
6       her handwriting and initials were there?
7                MS. KADDEN:  Yes.
8                THE COURT:  Some?
9                MS. KADDEN:  Yes.
10               MS. KLEIN:  Your Honor, I move to have this admitted.
11               THE COURT:  Yes.  All right.
12               MS. KLEIN:  Just for ease of convenience, should we do
13      it as a new number because it's parts of I and J?
14               THE COURT:  You called it I and J1.  That's the new
15      number.
16               MS. KLEIN:  But it's not all I and J1.
17               THE COURT:  I and J1 is the big one?
18               MS. KLEIN:  J1 is the huge one.  This has two pages.
19      The way that the graphics are maintained at Visualex's normal
20      course of business is the graphics and how it's produced and
21      all the work of the consultants, their recommendations are in
22      one thing called an envelope folder, and e-mail written
23      communications about the consulting are separate.  So in order
24      that one can see the particular things, we have put them
25      together.

1          THE COURT:  Why don't you call it I and J1 excerpt?

2          MS. KLEIN:  Good.  That's perfect.  Thank you.

3          THE COURT:  I and J1 excerpt is received.

4          MR. RISK:  No objection.

5          (Defendant's Exhibit I and J1 excerpt received in

6     evidence)

7          MS. KLEIN:  Your Honor, I'd like to show the witness

8     another excerpt of it, if I may approach.  The front page of

9     this is VIS 747.

10    Q.  Do you recognize this document?

11    A.  Yes.

12    Q.  And can you tell us what this is?

13    A.  It's an e-mail string between Adina and an attorney from

14    Stroock working on the Sobieski matter.

15    Q.  In reviewing this document, can you tell whether or not Ms.

16    Kadden was acting in a consulting capacity?

17    A.  Yes.

18    Q.  Can you explain to us what she was doing in connection with

19    this?

20    A.  Well, she is evaluating the request by the client.  If you

21    look down at the bottom, which is the first e-mail from Bill

22    Seymour, he is asking, can we make sure that the small circle

23    is 1 percent by area the size of the larger circle, which,

24    again, if she was a wrist, the answer to that would be

25    unequivocally yes.  But because she is a consultant, what she

C8DMKADT                    Romano - direct

1   actually is telling him is that, it's actually -- it's 75

2   percent of 1 percent, as the label says less than 1 percent.

3   Do you want the size changed to 1 percent or remove the less

4   than text?  She is basically saying what you are asking doesn't

5   make sense because she is evaluating that information and

6   saying, well, if the label says less than 1 percent and we are

7   showing it as 1 percent, then that would be -- it would be

8   confusing to a jury.  So she is basically alerting the attorney

9   to the fact that what he's asking for doesn't make sense.

10  Q.  In connection with this exhibit that you're looking at in

11  this e-mail, did that ultimately become a demonstrative

12  exhibit?

13  A.  I'm sorry.  Can you say that again?

14  Q.  Yes.  Did the work that Ms. Kadden is talking about in this

15  e-mail ultimately become a graphic?

16  A.  Yes.

17  Q.  Is the graphic in the package?

18  A.  Yes.

19  Q.  And can you tell me whether or not her advice was followed?

20  A.  Yes.  If you look at VIS 1215, it looks like her advice was

21  followed.

22          MS. KLEIN:  Your Honor, I move to have this admitted

23  also as the summary and it's J5 and I, summary 2.

24          MR. RISK:  I have no objection.  It's not a summary.

25          THE COURT:  Excerpt.  Excerpt 2.

C8DMKADT                    Romano – direct

1            Now we managed to run the clock until 1:00.  We will

2    take our luncheon recess now until 10 after 2.

3            (Luncheon recess)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C8DMKADT                      Romano - direct

                        AFTERNOON SESSION

                            2:15 p.m.

 1              MS. KLEIN:  Your Honor, may we approach the side bar

 2     with you?

 3              THE COURT:  It can't be done in open court?

 4              MS. KLEIN:  It can be.  Just in trying to figure out

 5     how to best sort of expedite this and not waste everyone's

 6     time, one of the possible options that I thought would work is,

 7     the long time period is going to be going through her time

 8     sheets, adjustments, things like that.

 9              THE COURT:  Which you keep pointing out won't be

10     necessary, depending on these economics and the decision.

11              MS. KLEIN:  One of the things I was wondering, is it

12     possible or feasible for the Court that we take all of the

13     testimony relating to obviously the position, what she did,

14     things like that, possibly the good-faith issue, so we wouldn't

15     have to call any witnesses back in regards to that.

16              Ms. Kadden has testified at her deposition that her

17     handwritten notes were accurate.  The time sheets are her

18     entries that she put in.  And it's really mechanical of going

19     through.  I would be just as happy, if the Court would so

20     indulge, if and when you issue your ruling --

21              THE COURT:  On exempt, nonexempt?

22              MS. KLEIN:  Yes.  Based on that ruling, if you find it

23     exempted, it doesn't matter what time she comes.  She was free

C8DMKADT                        Romano - direct

1    to do what she did.  In the event that you find that she is

2    nonexempted before we close the official sort of record, if the

3    parties could then maybe on submission -- it's numbers and it's

4    going through -- I'm happy to have Ms. Kadden, we will read in

5    the testimony about her handwritten notes.

6            THE COURT:  It's okay with me if it's okay with

7    Mr. Risk.

8            MR. RISK:  The time sheets are the time sheets, as far

9    as we are concerned.  These handwritten notes are nowhere in

10   the record for this trial, so an examination comparing

11   handwritten notes that are not exhibits with official time

12   sheets that are.  I don't care how the Court wants to do it,

13   but I think those handwritten notes are out of play.

14           MS. KLEIN:  You produced them.  They are hers.  She

15   maintained them in this case and she said that they were

16   accurate and they are reflected as to what she did.  If it says

17   arrived 9:35, leave 6:00, I don't know how she can dispute

18   that.

19           MR. RISK:  Your Honor's pretrial order says in the

20   strongest terms that that exhibit list is final and we have

21   operated that way.  And those handwritten notes are nowhere in

22   the record for this trial right now.

23           MS. KLEIN:  I can use them for impeachment to cross

24   her.  Again, she testified at her deposition that they are

25   accurate.

C8DMKADT                        Romano - direct

1          THE COURT:  They are an admission of a party.  I don't

2     see any problem with using them.  They are a party admission.

3     She already acknowledged that at her deposition.

4          MR. RISK:  We think the time sheets are the official

5     record and we are fighting over nickels and dimes, but we will

6     do it in the way that the Court wants to do it, fine.

7          MS. KLEIN:  The problem with the time records is, Ms.

8     Kadden already testified that, no matter what, they accounted

9     in the time system for eight hours.  So even if you came in at

10    2, she would write two hours general, which meant she didn't

11    come in until 10.  Again, what shows that is her handwritten

12    record when she wrote the day, contemporaneous notes, arrived,

13    left early.

14         THE COURT:  What are these notes written on, on a

15    calendar?

16         MR. RISK:  Your Honor, she wrote handwritten notes,

17    which were the basis for then what she entered on the computer.

18    Ms. Klein is going to spend apparently a lot of our time

19    comparing the handwritten notes to the computer entries and

20    when the time comes she will testify about it.

21         THE COURT:  Whatever.

22         Let's use our time remaining today.  Let's keep going.

23         MS. KLEIN:  I guess I wanted to know how much to cover

24    with Ms. Romano, whether we should start going over on her time

25    sheets the comp she was paid.

1              THE COURT:  No.

2              MS. KLEIN:  We will submit that after?

3              THE COURT:  Yes.

4              MS. KLEIN:  Thank you, your Honor.

5         Just so I am clear on the record, we are going to put

6    in all the information that shows relevance towards just

7    strictly the exemption/nonexemption and not damages.  Is that

8    correct for now?

9              THE COURT:  No.  You said you were going to cover the

10   good faith.

11             MS. KLEIN:  Good faith, because it's not numbers,

12   correct.

13   BY MS. KLEIN:

14   Q.  Ms. Romano, do you still have what we marked as Exhibit

15   IJ1 --

16   A.  Yes.

17   Q.  -- in front of you, the excerpt.  I would like you to look

18   at the one because they look alike.  They are similar.  The

19   front page is the one that bears VIS 01103?

20   A.  Yes.

21             THE COURT:  I have it.

22   Q.  Can you explain to us what is going on in this group of

23   documents in regards to this demonstrative exhibit that was

24   produced for the plaintiff?

25   A.  This is basically a collection of the materials that are in

1    an exhibit envelope and also along with some communications

2    from the client, and it's a good representation of how an

3    exhibit evolves kind of from start to finish.

4    Q.  Can you take us through how it evolves?

5    A.  Yeah.  Obviously, the first thing that you do is, you are

6    reading background materials, and sometimes you have a

7    conversation with the client, sometimes not.  That depends on

8    the circumstance.

9          But when the client decides, yes, we want to go

10   forward with a particular exhibit that you had recommended,

11   they didn't have to provide the actual content information that

12   has to be utilized in developing the graphic.  So this first

13   page is basically the trial team sending us the names and the

14   dates of the predecessors of Sobieski that is going to be

15   utilized to start the creation of the graphic.

16          And so what the consultant does is receives the

17   information and sometimes it's what you expected.  They say,

18   I'll send you the names and you have an idea in your head.

19   Sometimes it's what you expected to receive and sometimes it's

20   not.  If it's not, then, again, there is a communication with

21   the client saying, hey, you know, we talked about doing this

22   flow chart and what you sent me really doesn't make sense to do

23   that.  Sometimes at that point it changes into something else,

24   but if it's what you requested from the client, then the next

25   step is, if you go to VIS 1105 and 1104, if you could put those

C8DMKADT                          Romano - direct

1    side by side, because it was actually too big to put on a

2    portrait one, so it's two pieces.

3            This is a form that the consultant fills out when

4    putting -- before anything gets put into the studio.  It's

5    called a chart type form.  And what the consultant is doing is,

6    you know, it's identifying the case number because a lot of

7    times we have multiple cases in the studio at the same time,

8    giving it an exhibit number.  This is the first exhibit created

9    for this case.  Also identifying when you think it's going to

10   be used.  This particular one was at this point being created

11   for use in opening.

12           And then the next thing is to craft the title, which

13   obviously is a really important thing.  This one is not earth

14   shattering, but many of them are, as far as giving the

15   takeaway.  And the information that was in that e-mail, the

16   party names and the dates, then is communicated to the studio,

17   that the consultant feels the best way to portray this is kind

18   of a flow chart with dates up at the top, names of the

19   companies at the next level.  And if there are pictures of the

20   liquor that was actually being created -- sold by these

21   companies, it was going to be in there.

22           Just to back up one second, this -- the allegation in

23   this case is that Sobieski, who is our client, misappropriated

24   the name Krupnik when they were selling their honey liquor, and

25   they used this other trademarked -- I think it's German name.

C8DMKADT                         Romano - direct

 1   Our point is, it wasn't us, basically, and that we did not

 2   misappropriate their trademark.  It was -- actually got out on

 3   the Internet and ended up on our website and we weren't

 4   responsible for it.  Anyway, we were going to put pictures.  We

 5   were recommending that the best thing to do is to put pictures

 6   of the various types of honey liquor within each box that goes

 7   with the predecessor.

 8            So what happens at this point is, again, the

 9   consultant is generating all this information.  The back of

10   that sheet, it's actually like a carbon paper, but it's really

11   not carbon paper.  It's called the yellow sheet.  What you

12   write on it goes through to the back.  That gets given to the

13   production coordinator so he can keep track of every exhibit in

14   the case and generate what's called a client status report so

15   that everybody always knows how many graphics and what graphics

16   are in the studio for a given case.

17            And then the next thing that consultant does is takes

18   this envelope, and the pictures would have been in there as

19   well, that they are going to use, as far as using for the

20   images of the bottles, and then they would have what's called a

21   briefing session with the art director who is assigned to the

22   case.  And in the briefing session, basically, the consultant

23   is explaining to the art director not only the overall

24   strategy, visual strategy of the case, but how this exhibit

25   fits in and what the takeaway from this exhibit needs to be and

C8DMKADT                         Romano - direct

1    also explains where the information that we say, we have

2    bottles of the images in the file on the server.  So they have

3    a good understanding of what needs to be communicated by the

4    layout.

5          And so, basically, then the art director goes back and

6    either he creates the layout or he directs the designers to

7    create the layout the way he wants it to be created.  For

8    example, there is a grid.  Every exhibit has a grid.  So titles

9    don't jump around when you scroll from one to the other.  So

10   those kinds of things he is telling them what typeface to use.

11   Those kinds of things.

12         So what then happens is the designer or the art

13   director, I guess -- just globally I'll call them the studio --

14   generates a layout, which is VIS 1100, and you will be able to

15   see from that that the layout actually looks pretty much the

16   way the consultant had requested it.

17         And so what happens, and I should back up because this

18   is a really important part of the whole process, is so if the

19   designer creates it, it goes back to the art director.  There

20   is a pretty elaborate proofing process in place because we

21   don't want any mistakes to get out of our office to the

22   clients.  And so the first thing, part of the proofing process

23   is the designer who creates it is obviously proofing their own

24   work to make sure that they did everything they were told to

25   do, and then they pass it on to the art director.  And the art

1    director is looking at it from an aesthetic standpoint.  Did

2    they snap to the grid?  Did they put the title on the right

3    spot?  Did they use, you know, franklin gothic and not

4    helvetica, all these kinds of things he is looking for from

5    that standpoint.

6          It then goes to the production coordinator because the

7    production coordinator has a list that's generated from the

8    consultant of all the things that need to go out in this

9    presentation.  When it comes to the production coordinator, he

10   checks it off, says okay it's done, and he is proofing for just

11   blatant errors.  Is something misspelled?  Is the word that the

12   consultant put on this page, is it on this graphic?  It's

13   actually pretty comical because sometimes if the consultant

14   misspells a word, the production coordinator will sign off on

15   it, concedes it's spelled wrong, so we are going to spell

16   concedes wrong.

17         Then he brings it to the consultants.  The consultants

18   are proofing for a very different purpose.  The consultants are

19   evaluating the layout for the takeaway.  Does it do what it's

20   supposed to do, A?  And, B, if the answer to that is yes, is

21   there anything that we can do to make us work harder, to help

22   the client communicate their point and ultimately win the case?

23   If the consultants all agree, yes, this is great, then we send

24   the file, we tell the production coordinator, okay, it's good,

25   he puts it in Power Point and he sends it to the client for

1    review.

2              What then happens is, once the attorneys see it, they

3    may have additional changes that they want to have done because

4    once they see it on paper they realize, oh, jeez, it doesn't

5    communicate this other point that we have to make, and so they

6    will communicate to us what changes they want to have made.  If

7    you look at VIS 1102, this is information that the client is

8    sending us and, lo and behold, the client says, hey, I told you

9    there was this one thing happening, but there was also this

10   licensing agreement which is an important issue in the case and

11   we would like to add that.

12             Obviously, there is a lot more information on this

13   chart than there was on the one that we previously created.  As

14   a consultant you say, okay, can I work this into the layout

15   that was created the first time?  And if the answer to that is

16   no, I can't squish it there.  Then you have to completely

17   reevaluate your approach and say, okay, well, was the flow

18   chart type of approach the way to go?  And the answer is,

19   obviously, this won't work.  As a flow chart there is too much

20   on there.

21   Q.  Ms. Romano, when you said whether or not you could smush it

22   onto the flow chart, physically, could it be done that this

23   stuff would go on it?

24   A.  It could, but it wouldn't be very effective.  Everything

25   would get much smaller and you are not going to be able to do

C8DMKADT                          Romano – direct

1    the comparison between these two events running at the same

2    time.

3              So what the consultant then does is he communicates

4    with the client and says, obviously, there is new information

5    on this now that we need to include.  We can't fit it the way

6    it's currently designed.  Tell us why this is important so we

7    can recraft this, reevaluate our approach to do something that

8    is going to work harder to communicate the point you are trying

9    to communicate.  And you can see what you do once you come up

10   with the new approach, you pull that exhibit envelope and there

11   is a tissue paper over the top, it's called flapping.  And

12   that's the way that you write things on there to communicate to

13   the studio what changes need to be made.  If you look at VIS

14   1099, you can see that we are actually writing the revisions on

15   there that need to be made to this.

16             And so the process starts all over again.  If the

17   designer is creating the layout, it goes back to the art

18   director, the art director is proofing for aesthetic reasons,

19   aesthetic things, then it goes back to the production

20   coordinator, who checks it off, based on the sheet, it's called

21   the conference report that the consultant generates, indicating

22   that this needs to be revised and resent.

23             And then it goes back to the consultants who are

24   saying, okay, A, did the changes I asked to be made, were they

25   made and, B, even though I asked them to do it this way, does

C8DMKADT                    Romano - direct

1    it work?  If the answer to that is no, then you say, I think

2    there is a better way to do this and it goes back into the

3    studio again and you go back to the art director and you say,

4    you know what, it's just not working hard enough.  It's just

5    not doing what it's supposed to do.  I think maybe we should

6    try something else.

7           And so you can see, the next one, 1098, is the art

8    director does what he is told to do by the consultant.  But

9    then if you look at 1097, the consultant is not happy with it.

10   It's not -- it's not working hard enough.  And so you can see

11   all of the markings on it.  The text could be larger, you need

12   to be able to read it.

13          And then why are we, all of a sudden, introducing a

14   new color?  Is that helping us or hurt us?  Is it making it

15   more confusing?  Don't change the color.  The color on the top

16   of the flag shouldn't be gray.  It should be blue.  It should

17   give ownership that this is the -- our client that we are

18   talking about.  Goes back into the studio, process starts all

19   over again.  The studio generates another draft, VIS 1095, goes

20   back through the proofing process again, the consultants are

21   still not happy with it.  It's still too small.  And there is

22   all this extra space up at the top being used for the title

23   band.  Lose the title bands.  Lift up the flags.  Make the text

24   larger.  It's got to be easier to read.  If we are going to

25   send this to our client, it's not going to work hard enough to

C8DMKADT                         Romano - direct

 1   help them communicate their case.  It goes back into the studio
 2   again.  The studio generates another layout, which is VIS 1101.
 3   Q.  Ms. Romano, who are the consultants that are working on
 4   this particular exhibit that we are looking at?
 5   A.  It's my initials and Adina's initials.  And, obviously,
 6   that's the other thing.  At the proofing process, everybody who
 7   looks at it signs it.  So if a mistake gets to the client, you
 8   know how to -- basically, you have to work a little bit harder,
 9   you signed off on it and there is a mistake in it.  But the two
10   consultants that are signing off on this is Adina and myself.
11   And there is some, towards the end here that it's just Adina.
12   It's not even my initials.  That happens when people get pulled
13   onto different things.  For example, on 1095, VIS 1095, it's
14   Abdul's initials and Adina's initials, not mine.
15           Anyway, once the layout is approved internally, all of
16   the consultants and the art director feel that it is the best
17   that we can do to communicate the point that the clients need
18   to communicate in order to persuade the trier of fact about
19   this argument, we then let the production coordinator know,
20   yes, it's good, it goes to the Power Point file and it gets
21   posted to the client for review.
22           Then the client, if you look at VIS 1101, the client
23   makes additional changes.  Again, the consultants are always
24   evaluating every single change that comes in that is requested
25   by the client, does it help or hurt the takeaway.  Does it help

C8DMKADT                         Romano - direct

1    the exhibit communicate what it needs to communicate, or does

2    it hurt it?  Can we keep it within this format or do we have to

3    find a different approach?  If we have to find a different

4    approach, again, it's up to the consultant to decide how to

5    manage the expectations of the clients.  You want to make sure

6    that they understand why you are doing what you are doing.  So

7    sometimes it can be a complete deviation from what they had

8    seen before.  You want to prime them for that so they don't

9    open it up and say, oh, my God, what did you do.  You want to

10   say, okay, by adding this information, all the text is going to

11   be small and you are not going to be able to read it, so we

12   recommend we are going to do this, would you like us to try it.

13   At that point they usually say yes or they say, yes, do it your

14   way, and can we see it our way, too, so we can see which works

15   better.

16            Once the consultant has a plan for how they are going

17   to change the exhibit so that it can accommodate the requested

18   changes, writes it on the tissue again, goes back through the

19   whole process again, that's VIS 1093, you can see that Adina is

20   making notes.  She adds the title collectively Sobieski.  She

21   is changing things to all caps.  She is also directing the

22   studio to modify the images a little bit for the coloring,

23   because the coloring of the liquor in the bottle had a

24   strategic importance.  And then this, again, I am not going to

25   beat a dead horse, it keeps going through the process until the

1    consultants agree that it communicates what the clients need to

2    communicate.

3           And then it is, again, sent to the client for review.

4    The client then -- you can see, we communicate with clients in

5    different ways.  Sometimes for the really complicated revisions

6    they actually call us because it's a lot more efficient than

7    trying to memorialize something in an e-mail, or sometimes they

8    really can't even articulate what they want.  They can tell you

9    what they don't like about it, but they can't articulate what

10   they want.  That's usually a phone call.  Or they send you with

11   a PDF with markups, or on VIS 676, they send you an e-mail that

12   kind of explains what they want.

13          On this one, whenever you have questions, concerns

14   with the client, again, it's your job as the consultant to

15   manage the expectations.  You never just blindly follow.  If

16   you have questions, concerns, recommendations, you always let

17   them know.  You can see at the bottom Adina is saying.  Hi,

18   Matt, please give me a call on my cell phone.  Obviously, there

19   is something in this e-mail that she has concerns about that

20   she doesn't understand that she wants to make recommendations

21   about.  It's really literally a chess game.  Every move you

22   make may cause the client to make a different move and the

23   process never stops until the final file is delivered, and even

24   sometimes it doesn't stop then when you had to e-mail a tech in

25   the courtroom a change.  Until it goes up on the screen, it's a

C8DMKADT                    Romano - direct

```
1   complete iterative process and at every step of the way the

2   consultant is making recommendations as the best way to

3   communicate the information.

4   Q.  Thank you.

5        MS. KLEIN:  I'd like to hand the witness what we will

6   mark as excerpt 3.  It's also selections from Exhibit J through

7   3.  It will be a much shorter thing.

8        THE COURT:  I don't think I need more of this to

9   understand the process.  I think you are wasting my time now.

10  I have got this.  I told you I got this.  This is a matter of

11  legal determination now.  I know what the person does.

12       MS. KLEIN:  I believe that Mr. Risk, based on what we

13  said right before we went on break, was suggesting that Ms.

14  Kadden did not do this work.  And, again --

15       THE COURT:  I think you shouldn't anticipate what he

16  is saying.  Her signature is on it.  Her notes are on it.  She

17  will testify to it herself.  If there is a direct conflict and

18  she says, I didn't do all those things that Ms. Romano said,

19  that's what she will say under oath.  It's unlikely since her

20  signature is all over it and her handwriting.  Sounds like it's

21  her job.

22       MS. KLEIN:  Your Honor, if I can have two minutes and

23  one short one and I'll be done because what you've indicated.

24       THE COURT:  All right.

25       MS. KLEIN:  I would like to hand the witness excerpt
```

C8DMKADT                        Romano - direct

1    3.

2              THE COURT:  Excerpt 3 is all e-mails.

3    Q.  Ms. Romano, please take a look through what is marked VIS

4    00702, 701, 700, 699, and 698, and 697.

5              Can you just take a quick look at this and tell me

6    whether or not you recognize this document?

7    A.  Yes.

8    Q.  And as this a document that was kept in the ordinary course

9    of Visualex's business?

10   A.  Yes.

11   Q.  Can you tell us what this document is?

12   A.  It's an e-mail string that's communications between

13   Visualex consultants.  Specifically, most of these look like

14   they are going back and forth between Adina and the trial team

15   at Stroock that's working on the Sobieski case.

16             MS. KLEIN:  Your Honor, I would like to move this into

17   evidence.

18             THE COURT:  I can't imagine any objection.  These are

19   communications from Ms. Kadden.

20             MR. RISK:  We have no objection.  They are not a

21   business record.  But we have no objection.

22             THE COURT:  I agree.  They are the state of a party

23   opponent.

24   Q.  Ms. Romano, in looking at these can you please tell me

25   whether or not Ms. Kadden was acting in her role as a

C8DMKADT                        Romano - direct

1   consultant?

2   A.  Yes.

3   Q.  Can you tell us what in these documents allows you to

4   conclude that?

5   A.  Well, on VIS 700, Bill Seymour sends an e-mail that says:

6   Hi, Adina, can we put a shipping container in the last picture

7   on a truck?  And as a consultant, as she is supposed to do, she

8   is evaluating whether or not the answer to that is yes.  Can

9   we?  Absolutely.  Can we?  Is it the right thing to do?  As a

10  consultant, obviously, she does not recommend it.  And she

11  explains why, which is her job to explain why she doesn't

12  recommend it.  It doesn't look like the distributor icon on

13  graphic 5, and we also have the shipping container box on the

14  left side.  I would not want to put that one on the truck

15  because it will be the same as a distributor box.  Of course,

16  all distributing container boxes should have the same icon to

17  reinforce the imagery.  What she is basically saying to the

18  client, sure, we can do it, but we don't recommend it because

19  you are using the same icons for two different things, which

20  could be quite confusing.

21  Q.  Same imagery or icon?

22  A.  Imagery, icon.  It's the same thing.

23  Q.  Is this excerpt 3 that's been admitted into evidence

24  typical of the work that Ms. Kadden did throughout the entirety

25  of her employment?

1    A.  Yes.

2              MR. RISK:  Objection.  Leading.

3              THE COURT:  Overruled.

4    A.  Then, as I was explaining, it is like a chess game.  If you

5    look at VIS 701, the attorney responds and basically agrees

6    with this suggestion and then explains what he says is, he is

7    giving more information.  We are actually saying that these two

8    steps do perform the same function, but from a different

9    perspective.  So they are collaborating on well, okay, I

10   understand what you are telling me, that you don't want to

11   confuse the jury by using the same thing for two -- the same

12   imagery for two different things, but he is then saying, okay,

13   I understand that, but it actually sort of is the same

14   function.  They are working together to come up with, based on

15   her advice, her coming up with what makes the most sense for

16   them and to communicate their takeaway as effectively as

17   possible.

18   Q.  Thank you, Ms. Romano.

19             Within the Visualex offices during the time that Ms.

20   Kadden worked there, was there a time keeping system?

21   A.  Yes.

22   Q.  Let me rephrase that.  Was there a manner for employees to

23   keep track of what they were doing?

24   A.  Yes.

25   Q.  Do you know the name of the system that is used?

C8DMKADT                          Romano - direct

1    A.   It's QuickBooks.

2    Q.   Can you just explain to us very simply the process of how

3    the employees keep track of their time?

4    A.   Basically, when you are working -- you have task codes that

5    you choose, so if you are working on a case you pick the case

6    name so that time, if it's billable, can be billed to the

7    correct case number.  Then you pick a task code of what you are

8    doing and there is several different ones.  You can be

9    consulting, you can be project management, depending on what

10   you were doing.  Then you write a description explaining what

11   you were doing and then you put the amount of time.  We bill in

12   six-minute increments.  So six minutes is equal to .1.  So you

13   basically put in the amount of time that you were spending

14   doing that task.

15   Q.   And are there, in the QuickBooks, different time rates for

16   the same item of book?  For example, is there an overtime rate

17   and a day rate?

18   A.   In QuickBooks?

19   Q.   Um-hum.

20   A.   Yes.

21   Q.   What is that for?

22   A.   That is -- it's an internal tracking of how much it's

23   actually costing us to -- it's just an internal tracking of

24   whether we are going to work extra hours on cases.

25   Q.   And is the overtime rate that's indicated on those

C8DMKADT                        Romano - direct

1   indicative of the fact that a client will absolutely pay an

2   additional fee?

3   A.  No.

4   Q.  Can you explain that?

5   A.  Because what happens a lot of times is that there are

6   multiple cases in the studio at the same time.  And because of

7   that, something slipped past 6:00 and people are working late

8   to meet all the deadlines, but it's not the client's fault so

9   that we don't charge them overtime for it.

10  Q.  And, yet, would an employee put that rate in?

11  A.  No.  They shouldn't.

12  Q.  They should not?

13  A.  They should not.

14  Q.  Is there anything in QuickBooks that would accurately

15  reflect an employee taking client revisions?

16  A.  Yes.  But it depends on -- when you say taking client

17  revisions, taking them from whom?  There is different things.

18  A consultant would put that down as consulting time because

19  they are actually reacting to client requests and evaluating

20  whether or not that makes sense.  But the designers have to

21  execute the revisions that the consultants decide to do.  The

22  designers have to execute that and they would put that down.

23  They would put it actually under the task client revisions

24  where the client would put it down under consulting.

25  Q.  If the consultant was not acting in a consulting role, what

1   would he put it as?

2   A.  Why would a consultant not be acting in a consulting role?

3   Q.  Are there any circumstances or times where they are not

4   working as a consultant?

5   A.  When they are working on case work?

6   Q.  Uh-huh.

7   A.  I mean, you're always a consultant.  You don't put on a

8   consultant hat or not a consultant hat.  There are certain

9   tasks that you perform as a consultant which you don't want to

10  charge the client a high rate for that are more logistical in

11  nature where you might be finding vendors to print boards in

12  Texarkana and you would charge that under product management,

13  not you weren't consulting, but because you were doing

14  something that you didn't want to charge that high rate for.

15  Q.  Have you had an opportunity to look through Ms. Kadden's

16  time sheets in connection with this lawsuit?

17  A.  Yes.

18  Q.  And do you know how she described the majority of her work?

19  A.  As consulting.

20  Q.  Did there come a point in time in Visualex's existence that

21  you decided to change the compensation scheme for the

22  professional staff?

23  A.  Yes.

24  Q.  And when was that?

25  A.  It was in, I think, March of 2009.

1    Q.  Can you explain for me the reason that Visualex made the

2    business decision to change the compensation structure for the

3    professional staff?

4    A.  Yes.  That was right about the time when the economy took a

5    downturn and it was pretty much unprecedented in the legal

6    industry the ramifications that that had on the legal industry.

7    So attorneys weren't getting cases and, therefore, we weren't

8    getting cases because we work with attorneys.  That, coupled

9    with a case that we had done where the invoice was about

10   $180,000 and the ultimate client, SGI, went bankrupt, Silicon

11   Graphics, and the law firm informed us that they would not be

12   paying the bill because their client hadn't paid them, and

13   about $80,000 of that invoice was direct expenses, equipment

14   rental, hotel rooms, things that I had paid out of pocket.

15          And so not only were we not going to receive $180,000

16   that we were expecting to receive, but 80,000 of that was

17   out-of-pocket expenses.  And so that, coupled with the fact

18   that in 2009 the first three months we had the worst three

19   months of our entire history, we really had no active cases and

20   no billable work, we had to sit down, the three owners, and

21   have some difficult conversations about where -- are we going

22   to be able to weather this storm?  If so, what do we need to do

23   in order to get through the other side.

24   Q.  Can you tell me, before changing the compensation scheme,

25   what, if anything, did you do?

C8DMKADT                    Romano - direct

1   A.  The first thing we did is the two owners, Brian and myself,

2   who drew salaries because we actually work in the company,

3   also, dropped drawing salaries.  And we actually -- that's

4   still in practice right now.  We have not drawn salaries since

5   last November.  But that wasn't enough.

6           THE COURT:  You mean November '11?

7           THE WITNESS:  '11, yeah.

8   A.  And we waited to see how -- if that was going to make any

9   difference, but you want to be able to make payroll.  You have

10  to make payroll.  If there is no money coming in, you have to

11  start evaluating other areas.  So we made a very, very

12  difficult decision to lay off one of our designers.

13  Q.  Ms. Romano, I'm sorry.  Maybe I didn't hear.  You stopped

14  drawing salaries before or after the change?

15  A.  Before.

16          MR. RISK:  Object to this line on the grounds of

17  relevance.

18          THE COURT:  I heard it all in opening statement.

19  That's their theory, this is what they call incentive pay, not

20  overtime, and they couldn't afford incentive pay anymore.  I am

21  not sure I see the relevance either.  Maybe it goes to good

22  faith.  I don't know.  But I'm listening to it.

23  Q.  In response to the Court's inquiry, I believe --

24  A.  We are still not.

25          THE COURT:  She said starting November 2011 --

C8DMKADT                          Romano - direct

1           THE WITNESS:  I'm sorry.  I misunderstood.  We have

2    not drawn a salary since -- in other words, I have not.

3           THE COURT:  You said that, November 11, 2011.

4           THE WITNESS:  It started back -- I think we stopped

5    taking salaries in January of 2009.  I'm still not taking a

6    salary is basically what I'm saying.

7           THE COURT:  Why did you bother telling me about 2011,

8    November?  What was the point of that?

9           THE WITNESS:  In other words --

10          THE COURT:  Now you are saying since January '09 you

11   have not taken a salary?

12          THE WITNESS:  In other words, when money came in, we

13   would draw some, but we are behind in salary since -- we are

14   behind in salary since November of 2011.  We stopped taking a

15   consistent salary, I guess I should say, in 2009.

16          THE COURT:  But you paid yourselves at intervals since

17   January 2009.

18          THE WITNESS:  Yes.

19   Q.  What, if anything, else did Visualex do at that time before

20   considering the change for the staff?

21   A.  We laid off a designer.

22   Q.  Were there any other changes made?

23   A.  Yeah.  That still wasn't enough.  And you get to a point

24   when you're in the business that we are in that you have to

25   have enough staff to be able to handle cases when they came in,

C8DMKADT                    Romano - direct

1    and we hoped that they would start coming in again.  So we had

2    gotten lean as we felt we could on the employee side.  And so

3    then we started looking at leases.  Could we renegotiate

4    leases.  We put a hold on all software and hardware purchasing,

5    those kinds of things.

6              MS. KLEIN:  I'll come back to this, your Honor,

7    because it's going to get into the issue of the attorney-client

8    privilege.  For now if I can skip this and then I'll come back

9    in just a couple of minutes.

10   Q.  Before we get to some additional questions on that, I would

11   like to talk about, is there a difference between the way

12   compensation is paid to the professional and nonprofessional

13   staff?

14   A.  Yes.

15   Q.  Is there different benefits, paid time off, that sort of

16   thing?

17   A.  Yes.

18   Q.  What types of I'll call them perks or things does the

19   professional staff get that the nonprofessional staff does not

20   get?

21   A.  They get what we call comp time, which is if you work a lot

22   of hours, we say take the day off and just put it down as comp

23   time, you don't have to come to work, but obviously you're

24   still getting paid for it.

25   Q.  Did Ms. Kadden, was she given comp time?

1    A.  Yes.

2    Q.  Would she have gotten that comp time if she was not an

3    exempt employee?

4    A.  No.

5    Q.  Are there any other types of things that exempt staff gets

6    that nonexempt doesn't?

7    A.  Well, what do you mean, any types of things?

8    Q.  Are there any other distinguishing factors in the amount of

9    their compensation, things of that sort?

10   A.  The professional staff obviously have much higher salaries

11   than the nonprofessional staff.

12   Q.  Do you know approximately how much different?

13   A.  Considerably different, 30 or $40,000.

14   Q.  You've had an opportunity to review Ms. Kadden's time

15   sheets?

16   A.  Yes.

17   Q.  Were there times that she improperly characterized her paid

18   time off?

19   A.  Yes.

20   Q.  Can you just give us an example of that?

21   A.  I think there was a time where she characterized something

22   as holiday and it wasn't a holiday.  There was times when she

23   characterized something as sick time and it said, you know, car

24   trouble.  There are times she put things down administrative

25   time and it was snow day.  She couldn't get in because of the

C8DMKADT                        Romano - direct

1    snow.

2    Q.  Were the other employees, did they report to work on those

3    days?

4    A.  On -- sometimes -- there is a difference between when there

5    was a snow day and we closed the office and there was a day

6    when there was snow and the office was opening and other people

7    were there and Adina was not able to make it in because she

8    lived pretty far away.

9    Q.  For all of this time that you have now seen was improperly

10   entered, was she compensated?

11   A.  Yes.

12   Q.  Would she have been compensated if she was an hourly

13   employee?

14   A.  No.

15           MS. KLEIN:  Your Honor, at this time, in light of the

16   fact we are not going to make the decision about the work, the

17   only way I see it is for me to question the witness about the

18   good faith.  And if that's the case, I guess maybe we should go

19   off of the record for a couple of seconds and I give the

20   documents to Mr. Risk.  Is that appropriate?  I want him to

21   have an opportunity to see it.

22           THE COURT:  Sounds good.

23           MS. KLEIN:  Your Honor, can I ask one very specific

24   thing.  Obviously, the attorney-client privilege is such a

25   highly important privilege.  Is the waiving of it limited to

C8DMKADT                         Romano - direct

```
 1    the issue concerning --
 2              THE COURT:  It is, absolutely.  It's a narrow waiver.
 3    It's limited solely to the document or documents that we have
 4    already discussed and I've ruled on.  That's it.  It is court
 5    ordered.
 6              MS. KLEIN:  It's not an open waiver?
 7              THE COURT:  No.
 8              MS. KLEIN:  Thank you, your Honor.
 9              Mark, do you want to take a break and see the
10    documents or do you want to see the doctor?
11              MR. RISK:  May we take a five-minute break, your
12    Honor?
13              THE COURT:  I guess so.
14              (Recess)
15              THE COURT:  Are we ready?
16              MS. KLEIN:  Yes.
17              MR. RISK:  I just got the documents.
18              THE COURT:  I'm just asking.
19              MR. RISK:  Sorry, your Honor.  Ms. Klein can proceed.
20    I have given them the once over.
21              THE COURT:  Good.  Okay.
22    Q.  Ms. Romano, was there any time during Ms. Kadden's
23    employment that she was not allowed to interact with clients?
24    A.  No.
25    Q.  Were there any restrictions on her acting as a consultant?
```

C8DMKADT                        Romano - direct

1   A.  No.

2   Q.  Did she regularly, as part of her duties and

3   responsibilities, review all of the background material that

4   you testified about today in the same manner that you did?

5   A.  Yes.

6   Q.  Was she expected to consult in the same manner that you

7   did?

8   A.  Yes.

9   Q.  Was she expected to provide consulting about the images in

10  the same method as Kim Nawyn?

11  A.  Yes.

12  Q.  Was Kim Nawyn Ms. Kadden's boss?

13  A.  No.

14  Q.  We talked about before things that led up to your Visualex

15  having to make a business decision to change the compensation,

16  is that correct?

17  A.  Yes.

18  Q.  And at some point a decision was made?

19  A.  Yes.

20  Q.  And what was that decision?

21  A.  That we were going to suspend paying overtime incentive

22  compensation.

23  Q.  And did you do that blindly as a business decision?

24  A.  Blindly?  I wouldn't say blindly.  I weighed all of the

25  options.  We weighed all of the options, we meaning the owners.

C8DMKADT                        Romano - direct

1    Q.  And can you explain to the Court what steps -- let me

2    retract that.  Do you believe that graphic consultants are

3    exempt?

4    A.  Yes.

5    Q.  Can you explain to us why you believe that?

6    A.  Because I worked as a graphic consultant myself for 20

7    years and was always paid as an exempt employee.  Every other

8    graphic consultant I have ever come in contact with at every

9    company in this industry was paid as an exempt employee.

10   Q.  And were there any other reasons?  Strike that.

11           So there came a point in time where you made the

12   decision to change the compensation structure?

13   A.  Yes.

14   Q.  And before doing that did you consult with anybody?

15   A.  Yes.

16   Q.  Did you take any independent steps?

17   A.  Yes.

18   Q.  Can you explain to the Court exactly what the process was

19   of what you did?

20   A.  Well, the first thing I did was contact an attorney, and

21   really my question at that point was, have these offer letters

22   that say that these at-will employees are going to get overtime

23   compensation because that's in their offer letter, do I have

24   to -- am I allowed to change that?

25   Q.  Did you speak with an attorney?

1   A.  Yes.

2   Q.  Who did you speak with?

3   A.  Traycee Klein.

4   Q.  And what, if anything, else was discussed?

5   A.  Actually, what Ms. Klein told me was that it wasn't an

6   employment contract and that because these professionals were

7   at-will employees that wasn't the issue that I had to be

8   concerned about.  I had to make sure that legally that the

9   characterization was correct as exempt employee that I

10  believed.

11  Q.  Was that separate and apart from whether or not you had a

12  contract that required you to pay something?

13  A.  Yes.

14  Q.  And continue explaining to us what happened, to the best of

15  your knowledge.

16  A.  To the best of my knowledge -- this is a little bizarre,

17  but Ms. Klein said she was busy and I could go to the

18  Department of Labor and there would be summaries about, you

19  know, what are the things that would characterize an employee

20  as exempt versus nonexempt and that I should review that and,

21  you know, basically there were little, you know, tests you can

22  do to go to the site and complete the test or the checklist.

23  Q.  Do you recall whether or not in those conversations, was

24  that the only advice you got or that was just something you

25  started with until we spoke later?

1   A.  Just starting with, yes.

2   Q.  And did you proceed to the Department of Labor website?

3   A.  Yes, I did.

4   Q.  And did you follow what I believe is called E laws and the

5   E advisor?  Did you go through the tests?

6   A.  Yes, I did.

7          MR. RISK:  Objection, leading.

8          THE COURT:  It's all been leading since this is an

9   area of attorney-client advice, but I think that's appropriate

10  to make sure that the waiver is narrow.  It is leading, but I

11  am going to allow it.  Go ahead.

12  Q.  Did you look for only specific exemptions or did you do it

13  based on just the actual job of the consultant?

14  A.  Just the job of it.  There was a bunch of different stuff

15  and I actually, from what I remember, I did all of them.

16  Q.  And as a result of your own going through that process,

17  what, if anything, did you conclude based on the Department of

18  Labor information?

19  A.  I concluded that the characterization as an exempt employee

20  was the correct characterization.

21  Q.  And did you at that point just decide to change the

22  compensation?

23  A.  No.

24  Q.  Was there further inquiry and steps taken?

25  A.  Yes.

C8DMKADT                          Romano - direct

1  Q.  What is the next thing that happened?

2  A.  I am not sure if we spoke on the phone, but we did have

3  a -- I think it was both phone conversations and e-mails where

4  you requested that I send you any type of, you know,

5  descriptions, offer letters, any relevant information that

6  would enable you to evaluate it independently of what I had

7  already done.

8  Q.  And did you ultimately send information over?

9  A.  Yes.

10 Q.  And was there any additional verbal discussion about what

11 the job was?

12 A.  Yes.  There was clarifications of things, sure.

13 Q.  And did you explain what the job of the consultant was that

14 Ms. Kadden did?

15 A.  Yes.

16 Q.  Do you remember what happened next?

17 A.  I believe you said you wanted to review it on your own and

18 that you were also going to speak to -- I am not sure if it's

19 somebody else who works at your firm or I know that they had

20 been a prosecutor for the Department of Labor, and you were

21 going to run it by them as well so that they could evaluate the

22 information that I sent.

23 Q.  And did you ultimately get information back?

24 A.  Yes.

25 Q.  And what were you told?

1   A.  I was told that it was the correct characterization.

2   Q.  As a result of that, did you make any business decisions?

3   A.  Yes.  We decided to suspend the overtime incentive

4   compensation pay.

5   Q.  Did you make that announcement in writing?

6   A.  Yes.

7   Q.  After that announcement was distributed, what employees did

8   that impact?

9   A.  The professional staff, which at the time was Adina Kadden,

10  Kim Nawyn, Lance Sperring and Gerry Mooney.

11  Q.  What is Lance Sperring's job?

12  A.  Art director.

13  Q.  And what is Mr. Moony's job?

14  A.  Director of motion graphics.

15  Q.  And Kim Nawyn?

16  A.  Consultant.

17  Q.  And the same position as Ms. Kadden?

18  A.  Yes.

19  Q.  After that announcement was made, was there an

20  understanding that employees from that point forward would only

21  work 40 hours a week?

22  A.  No.  And it wasn't just -- sorry to interrupt, but it

23  wasn't that I just put a letter in somebody's paycheck.  I

24  called each one individually into my office, handed them the

25  written communication, and I explained to them why we were

C8DMKADT                        Romano - direct

1  doing it and that it was a difficult decision, but explained

2  exactly why we had made the decision.

3  Q.  And did you have a conversation with Ms. Kadden?

4  A.  Yes.

5  Q.  And do you recall advising her during that discussion that

6  her annualized base salary was going to cover all of her hours

7  worked?

8  A.  Yes.

9        MR. RISK:  Objection, leading.

10        THE COURT:  We discussed that.  It is leading, but

11  because it's the advice, I'm allowing it.

12        MR. RISK:  If I may, your Honor, this goes to the

13  conversation between Ms. Romano and Ms. Kadden, and a predicate

14  is being laid that's going to be of legal significance.

15        THE COURT:  Objection to leading, now that you are

16  turning to that conversation, is sustained.

17        Would you rephrase.  You're going to basically ask her

18  what she said and what the other party said in the

19  conversation.

20  Q.  Can you tell us what happened at that meeting?

21  A.  Generally, yes.  I don't obviously remember the exact words

22  that were spoken.  It was several years ago.  But what I

23  explained is that, you know, when times were good and we were

24  able to pay incentive compensation, we did so, and we did so

25  happily because we knew we wanted to keep employees, and we

1    wanted to make sure they were incentivized along the way.  But

2    that when we didn't -- we no longer had the money to be able to

3    make payroll, basically, let alone the additional incentive

4    compensation, that we were all going to have to tighten our

5    belts to get through this.

6    Q.  And what did you understand or Visualex understand at that

7    point the $75,000 was going to be for?

8    A.  For her duties that she performed as a consultant for the

9    year.

10   Q.  Was it restricted in any way based on the amount of time

11   she worked?

12   A.  No.

13            MS. KLEIN:  Your Honor, I have no further questions.

14            THE COURT:  Mr. Risk.

15            MR. RISK:  Your Honor, I have some cross-examination.

16   I would like to have the night to think of some cross --

17            THE COURT:  I'm sure you won't finish the rest of it

18   in one hour.  We don't even have an hour.  We have 45 minutes.

19            MR. RISK:  Can I take two minutes before we start the

20   cross?

21            THE COURT:  Didn't you just have a break?

22            MR. RISK:  I did.

23            THE COURT:  We are going to be stopping early.  I

24   don't think I can stay until quarter after.  We are going to

25   stop at 4, quarter after, for the reasons previously discussed.

C8DMKADT                          Romano - direct

1    CROSS-EXAMINATION

2    BY MR. RISK:

3    Q.   Ms. Romano, you have a bachelor's degree from CW Post

4    College?

5    A.   Correct.

6    Q.   In psychology?

7    A.   Correct.

8    Q.   You have a master's degree from Hofstra University?

9    A.   Correct.

10   Q.   In applied research and evaluation?

11   A.   Correct.

12   Q.   You obtained that in one year?

13   A.   Yes.

14   Q.   And applied research and evaluation is industrial

15   psychology, is that right?

16   A.   It was in the industrial psychology program, yes.

17   Q.   And that's the scientific study of employees, workplaces

18   and organizations?

19   A.   Yes.

20   Q.   Then you took some education courses after that to be a

21   teacher?

22   A.   Yes.

23   Q.   And you have no schooling after that?

24   A.   No.

25   Q.   You have worked for many years in litigation graphics

C8DMKADT                         Romano - cross

1    consulting?

2    A.  Yes.

3    Q.  First at Litigation Sciences?

4    A.  Yes.

5    Q.  And then at FTI?

6    A.  Yes.  Well, Pixel before FTI.

7    Q.  Then at Pixel and then at FTI?

8    A.  Yes.

9    Q.  In 2000, you formed Visualex, started Visualex?

10   A.  In 1999, the end of 1999.

11   Q.  And you're the senior graphics consultant at Visualex?

12   A.  Yes.

13   Q.  Your hourly rate is higher than the hourly rate of the

14   other consultants?

15   A.  Yes.

16   Q.  It's by about $100?

17   A.  Yes.

18   Q.  And then your rate for services after 6:00 or on the

19   weekend would be 50 percent higher than your regular rate?

20   A.  Yes.

21   Q.  So that's in the high fours?

22   A.  Tell me that again.

23          THE COURT:  What is your regular rate?

24          THE WITNESS:  325.  I never charge premium for my

25   time.

C8DMKADT                          Romano - cross

1              THE COURT:  You don't charge premium?

2              THE WITNESS:  I don't.

3    Q.  Your rate for consulting activities was 325 when Ms. Kadden

4    was with Visualex, is that right?

5    A.  Yes.

6    Q.  And her rate for consulting activities was 225?

7    A.  Yes.

8    Q.  Now, the clients of Visualex are principally law firms?

9    A.  Yes.

10   Q.  And some are major law firms?

11   A.  Yes.

12   Q.  And some of the litigation Visualex works on are large

13   litigations?

14   A.  Yes.

15   Q.  Your clients include Stroock Stroock & Lavan?

16   A.  Yes.

17   Q.  King & Spalding?

18   A.  Yes.

19   Q.  Dechert?

20   A.  Yes.

21   Q.  Paul Hastings?

22   A.  Yes.

23   Q.  Williams & Connolly?

24   A.  Yes.

25   Q.  DLA Piper?

C8DMKADT                      Romano - cross

1    A.  Yes.

2    Q.  And these are not only firms located in New York, is that

3    right?

4    A.  That's correct.

5    Q.  You have clients, major law firms in other cities around

6    the country?

7    A.  Correct.

8    Q.  And Visualex supplies litigation graphics for cases being

9    tried all over the country?

10   A.  Yes.

11   Q.  You supplied graphics recently for a case that was tried in

12   France, is that right?

13   A.  For an arbitration, yes.

14   Q.  In 2008, you retained the Cowen Group to find you a new

15   graphics consultant?

16   A.  Yes.

17   Q.  Cowen Group worked for Visualex?

18   A.  No.

19   Q.  Well, they were hired -- go ahead.

20   A.  Do you understand what a headhunter is?  You don't hire

21   them.  We basically had three or four headhunters.  They send

22   you candidates.  Once you choose one of their candidates, you

23   pay them a fee, but you don't hire them.

24   Q.  You paid a fee --

25   A.  If you choose one of the candidates.

C8DMKADT                          Romano - cross

1        THE COURT:  You did.

2        THE WITNESS:  Yes.

3   Q.  And Visualex prepared a job description for the position?

4   A.  Yes.

5   Q.  And then gave it to the Cowen Group?

6   A.  Yes.

7   Q.  Did you also give it to others?

8   A.  The job description?  I don't think so.

9   Q.  Is it the same job description that in 2009 you showed to

10  Ms. Klein when you consulted counsel about whether you had to

11  pay overtime to the graphics consultants?

12  A.  There are a couple of job descriptions.  I don't know if it

13  was that particular one.  It was whatever one I had on my

14  computer.  But it probably was, yes.

15        MR. RISK:  Your Honor, may I approach the witness to

16  show her Plaintiff's Exhibit 2?  That's going to require me to

17  show one to the Court as well.  Should I hand you my book or

18  you will just take Plaintiff's 2?

19        THE COURT:  Whatever.

20        MR. RISK:  I'll give you one book at a time.

21        THE COURT:  Okay.

22        Are you going to be offering Plaintiff's Exhibit 2?

23        MR. RISK:  Yes, I am.

24        THE COURT:  Any objection, Ms. Klein?

25        MS. KLEIN:  I would just ask the witness if she wrote

C8DMKADT                    Romano - cross

1   this document.

2          THE COURT:  Let's start with, do you recognize this

3   document?

4          THE WITNESS:  I recognize it because I have seen it in

5   the production.

6          MR. RISK:  Your Honor, may I be heard on this?

7          THE COURT:  I don't know that anybody has to be heard

8   yet.

9          You do recognize it?

10         THE WITNESS:  Yes.

11         THE COURT:  Is it a Visualex document?

12         THE WITNESS:  Yes.

13         THE COURT:  It's prepared by your company?

14         THE WITNESS:  Um-hum.

15         THE COURT:  It's going to be admissible.

16         MS. KLEIN:  I have no objection.

17         THE COURT:  Exhibit 2 is received.

18         (Plaintiff's Exhibit 2 received in evidence)

19         THE COURT:  You didn't personally draft it.

20         THE WITNESS:  I don't think I did.

21         MR. RISK:  It's covered in admissions that I will

22   introduce later.

23         THE COURT:  What's covered in admissions?

24         MR. RISK:  The relationship between Ms. Romano and

25   Exhibit 2.

C8DMKADT                    Romano - cross

```
 1              THE COURT:  What was the relationship between the two?
 2    Tell me now because she is not denying it's a Visualex
 3    document.  That's the defendant in this case and therefore it's
 4    a statement of the defendant and therefore it's admitted.  I
 5    don't understand.
 6              MR. RISK:  I'll proceed.
 7    Q.  Ms. Romano, do you see about halfway down Exhibit 2 it
 8    says:  While we prefer applicants with experience in the field,
 9    we are willing to train strong candidates?
10    A.  Yes.
11    Q.  And that's the field of litigation graphics?
12    A.  Yes.
13    Q.  And Ms. Kadden, who was ultimately hired, had experience in
14    the field?
15    A.  Yes.
16    Q.  And Kim Matthiesen --
17    A.  Nicole Matthiesen.
18    Q.  Nicole Matthiesen, who was a graphics consultant prior to
19    Ms. Kadden, she had experience in the field?
20    A.  Yes.
21    Q.  I'd like to show you another document that's been marked as
22    Plaintiff's Exhibit 12.
23              MR. RISK:  Your Honor, I think that's already in under
24    another name.
25              THE COURT:  It is.  I recognize it.  It is.  What's
```

C8DMKADT                         Romano - cross

1    the question about it?

2              MR. RISK:  I have to find my copy, your Honor.

3              THE COURT:  This is the gal who has got a master's in

4    English literature?

5              MR. RISK:  Yes.

6    Q.  Let me give you the official one, Ms. Romano.  I'm sorry.

7              Ms. Matthiesen had experience in trial graphics?

8    A.  Yes.

9    Q.  She had that over two years, between 2004 and 2006?

10   A.  Yes.

11   Q.  And she worked on a major litigation, didn't she?

12   A.  Yes.

13   Q.  And what litigation was that?

14   A.  The U.S. v. Jeffrey Skilling and Kenneth Lay case.

15   Q.  That's the Enron litigation, isn't it?

16   A.  Yes.

17   Q.  And she worked on graphics for the prosecution in that

18   lawsuit?

19   A.  Yes.

20             MS. KLEIN:  Your Honor, I object.  The document speaks

21   for itself.

22             THE COURT:  It does.  I don't know why anybody wants

23   to waste my time.

24             MR. RISK:  I won't, your Honor.

25             THE COURT:  Good.  It says right there, most recently

C8DMKADT                    Romano - cross

1   worked as primary consultant with the prosecution in U.S. v.

2   Jeffrey Skilling and Kenneth Lay, right there.

3   Q.  I am going to show you Exhibit 9.  I put before you Exhibit

4   9, Ms. Romano.

5           THE COURT:  This is also in evidence under a different

6   exhibit number, but this is the Kim Nawyn résumé.

7           MR. RISK:  Right.

8   Q.  I don't think we talked about it on your direct exam, but

9   Ms. Nawyn has experience in the field as well, doesn't she?

10  A.  Yes.

11  Q.  She worked at Doar?

12  A.  Correct.

13  Q.  Immediately prior to her joining Visualex?

14  A.  That's correct.

15  Q.  And I am going to put before you what's been marked as

16  Plaintiff's Exhibit 3.

17          THE COURT:  You are offering this, right?

18          MR. RISK:  Yes, your Honor.

19          THE COURT:  Any objection to 3?  That's the offer

20  letter, offer letter signed by Ms. Romano, accepted by Ms.

21  Kadden.  Any objection?

22          MS. KLEIN:  No, your Honor.

23          THE COURT:  3 is received.

24          (Plaintiff's Exhibit 3 received in evidence)

25  Q.  Turning to the second page of Exhibit 3, there are some

C8DMKADT                    Romano - cross

1   bullet points listing some job duties, Ms. Romano.  You see

2   where it says all new employees are subject to a three-month

3   probationary period and later it says:  By that time you will

4   be expected to be at least 50 percent billable, able to fulfill

5   the following job requirements with minimal supervision.

6          You see that?

7   A.  Yes.

8   Q.  The first bullet point:  Take direction directly from

9   clients on revisions to existing graphics as well as additional

10  graphics that may be requested.

11         Is that a skill that Visualex can train someone

12  without experience?

13         THE COURT:  You are asking her that?  I'm sorry.  Wait

14  a minute.  Forget that I said that.  That is the correct person

15  to ask.  Forget that I said that.

16         Can you answer that?

17         THE WITNESS:  Yes.

18  A.  What we train our consultants to do is to be able to filter

19  what clients tell them and then decide how you are going to

20  proceed on that.  That's the whole thing that I explained going

21  through the graphics is that, yes, part of what we do is we

22  have to make sure that every client, no matter who they talk

23  to --

24         THE COURT:  That wasn't his question.  The question

25  is, can you train someone with no experience to do that?

C8DMKADT                        Romano - cross

1          THE WITNESS:  Yes.

2    Q.  I'm really going back to Visualex's statement in Exhibit 2

3    that we are willing to train strong candidates.  Communicate

4    these revisions, additions accurately to the art directors.

5    Was that something Visualex can train a strong candidate with

6    no prior experience in the field?

7    A.  Yes.

8    Q.  Proofread the creative layouts with zero tolerance for

9    errors, that's something Visualex can train a candidate with no

10   prior experience?

11   A.  Yes.

12   Q.  Follow-up to ensure that client deadlines and requests are

13   met.  If the candidate is the appropriate candidate, Visualex

14   can train them in that?

15   A.  Yes.

16   Q.  Be sure that you manage client's expectations and

17   communicate the urgency of deadlines to the staff.  Is that a

18   duty that Visualex can train an appropriate candidate with no

19   experience?

20   A.  Yes.

21   Q.  Demonstrated ability to proactively provide solutions to

22   unexpected problems that may arise during a project that allow

23   a deadline to be met.  That skill you can train the appropriate

24   candidate who lacks prior experience?

25   A.  Honestly, my honest reaction to that is, you can try to

C8DMKADT                        Romano - cross

1    train somebody, but you have to have a knack for that.  Either

2    you're a proactive person or you are not.  If you're not a

3    proactive person, I can't make you be one.

4    Q.  How about the next bullet point, provide the requisite

5    leadership and accurate instructions/information to the studio

6    to ensure an efficient flow of work product so that all

7    deadlines can be met using the appropriate amount of billable

8    time.  Is that something that Visualex can train an appropriate

9    candidate with no prior experience in the field?

10   A.  Again, I think if -- it's the same thing.  I can try to

11   train them.  Whether or not they are trainable is a question.

12   So, yes.

13   Q.  So a candidate without prior experience in the field could

14   be hired by Visualex and you would attempt to train them in

15   that bullet point?

16   A.  Absolutely.

17   Q.  Turning to the bullet points in Plaintiff's Exhibit 2,

18   unless I took that away from you, Ms. Romano.  I hope I didn't.

19           MS. KLEIN:  Your Honor, I would like to note my

20   objection to this entire line is calling for speculation.

21           THE COURT:  No.  She is running the company.  I'll

22   allow it.

23           Anyway, it has to do with this whole issue of this

24   so-called requirement.  It's not speculation and it is

25   relevant.

1              Do you have Exhibit 2?

2              THE WITNESS:  Yes.

3    Q.  You see the bullet points, Ms. Romano, below the heading

4    primary responsibilities?

5    A.  Yes.

6    Q.  Look at the first bullet point.  I'll read it with you:

7    Read case materials and work with attorneys to identify key

8    case concepts.  Is that something Visualex can train a strong

9    candidate without prior experience?

10   A.  We can attempt to train them, sure.

11   Q.  The next bullet point:  Collaborate with our team of

12   designers and animators to execute high-quality, error-free

13   graphics.  Is that something that Visualex is willing to train

14   a strong candidate without prior experience in the field?

15   A.  Yes.

16   Q.  And the third one:  Schedule trial technicians and

17   courtroom equipment, that's something Visualex can train a

18   candidate without prior experience in the litigation graphics

19   field?

20   A.  Yes.

21   Q.  Finally, project management and client interaction, that's

22   something that Visualex is willing to try to train strong

23   candidates without prior experience in the field?

24   A.  Yes.

25   Q.  You see a little bit below, Ms. Romano, in Exhibit 2, it

1   says:  This is not, in all capitals, a graphic design position?

2   A.  Yes.

3   Q.  There is no dispute that Ms. Kadden is not a graphics

4   designer?

5   A.  None whatsoever.

6   Q.  Not trained as one?

7   A.  No.

8   Q.  Not qualified to be one?

9   A.  Right.

10  Q.  And the graphic designers at Visualex have a different kind

11  of education, don't they?

12  A.  Yes.

13  Q.  They have bachelor's degrees in graphics fields?

14  A.  Yes.

15  Q.  And what would those fields be, graphics?

16  A.  Design.

17  Q.  Graphics design, animation?

18  A.  Yes.

19  Q.  Medical illustration?

20  A.  Yes.

21  Q.  Or related graphics fields?

22  A.  Yes.

23  Q.  Do all your designers have a degree in graphics or a

24  related art field?

25  A.  Yes.

C8DMKADT                         Romano – cross

1   Q.  Would you high hire someone as a graphic designer who

2   didn't?

3   A.  I would have to see what they bring to the table.

4            MS. KLEIN:  Your Honor, I would like to note my

5   objection.  It's irrelevant.  The regs and the statute, it

6   doesn't require that every employee have an advanced degree.

7   It's why was Ms. Kadden hired.  That's what the regulations --

8            THE COURT:  I don't understand most of that argument.

9   It doesn't matter.  I don't know.  You said the graphic

10  designers?

11           MR. RISK:  Yes.

12           THE COURT:  Why do I care about the designers?

13           MR. RISK:  Because Visualex is arguing the creative

14  exemption for Ms. Kadden, based on her relationship to the

15  slides, and I'm making a record that she is not a designer and

16  the designers have graphics degrees.

17           THE COURT:  She will right now stipulate that she is

18  not a designer, right?

19           MS. KLEIN:  Correct.  She is not a graphic artist.

20           THE COURT:  She is not a graphic artist and they don't

21  have to have a graduate degree.

22           MS. KLEIN:  Maybe some of them.

23           THE COURT:  To the extent it is part of this case

24  because he wants to argue it, some do some don't and she is not

25  a graphic artist or designer.

 1              MS. KLEIN:  Correct.

 2    Q.  Who is Heather Moran?

 3    A.  She was a graphic consultant.

 4              MS. KLEIN:  Your Honor, I am going to object to this

 5    line of questioning.  It's irrelevant.

 6              THE COURT:  Overruled.  She is the replacement.

 7              THE WITNESS:  Right.

 8              THE COURT:  She earns $75,000 so she doesn't get

 9    overtime.  She is considered by you exempt.  We get all that.

10    She has no advanced degree.  She is the paralegal.

11              THE WITNESS:  Right.

12              MR. RISK:  Your Honor, you're making it look easy.

13              THE COURT:  We should be going faster than we are.

14    I'm not blaming you.  Ms. Klein should have gone faster, I

15    should make you go faster, everything should happen faster, but

16    it's not that way today.

17              MR. RISK:  I am going to try to go a little faster by

18    giving the witness Exhibits 13 and 14 together.

19              THE COURT:  13 is Ms. Moran's offer letter, right?

20              THE WITNESS:  Yes.

21              THE COURT:  And 14 is her résumé, right?

22              THE WITNESS:  Correct.

23              THE COURT:  You are offering both?

24              MR. RISK:  Yes.

25              MS. KLEIN:  Your Honor, I do object because they are

C8DMKADT                         Romano - cross

 1   irrelevant.

 2            THE COURT:  Overruled.  Go ahead.  13 and 14, they are

 3   both received.

 4            (Plaintiff's Exhibits 13 and 14 received in evidence)

 5   Q.  You hired Ms. Moran in March of 2011?

 6   A.  Yes.

 7   Q.  She started with Visualex within a couple of days after you

 8   terminated Ms. Kadden?

 9   A.  Yes.

10   Q.  Moran had no prior experience in the graphics consulting

11   field?

12   A.  No.

13   Q.  She was a paralegal?

14   A.  Yes.

15   Q.  She had no advanced degree?

16   A.  No.

17   Q.  You decided, as we discussed, that Ms. Moran was a strong

18   candidate that you were willing to train?

19   A.  No.  I decided to hire Heather Moran.

20   Q.  Well, back to Exhibit 2, we prefer applicants with

21   experience in the field.  We are willing to train strong

22   candidates.

23            Ms. Moran had no experience in the field?

24   A.  That's correct.

25   Q.  So you decided you would train her along the lines we

C8DMKADT                          Romano - cross

1   discussed?

2   A.  I decided to hire her, yes.

3          THE COURT:  If you hired her you had to train her,

4   right.

5          THE WITNESS:  Yes.

6   Q.  You interviewed her?

7   A.  Yes.

8   Q.  You made the hiring decision?

9   A.  Yes.

10  Q.  You told her you would train her?

11  A.  Yes.

12  Q.  And you thought she was a strong candidate?

13  A.  You don't know what I thought.

14         THE COURT:  He is asking that question.  He meant to

15  say, did you think she was a strong candidate, yes or no?

16         THE WITNESS:  I thought that she was someone that I

17  was willing to hire.  I don't know that I would consider her a

18  strong candidate, but she was someone that I thought that could

19  fill a void at that point in time.

20  Q.  Well, you knew that she would have to be trained in your

21  field?

22  A.  Everyone has to be trained in my field.

23         THE COURT:  Even if they have done it for ten years at

24  competing companies?

25         THE WITNESS:  They have to be trained the way we do

C8DMKADT                          Romano – cross

1   it.  We do it a little bit differently.

2   Q.  How do you do it differently?

3   A.  As I explained previously, the way we separate ourselves is

4   that we are not wrists and we are true consultants, and there

5   is more to it than just being able to regurgitate what a client

6   is asking for.  You have to be able to assess, evaluate,

7   recommend.

8   Q.  Turning back to Exhibit 2, under qualifications, do you see

9   the bullet point, graduate degree referred, e.g., social

10  sciences law, et cetera?

11  A.  Yes.

12  Q.  So Visualex at the time of the search for Ms. Kadden's

13  position, Visualex preferred a graduate degree?

14  A.  Yes.

15  Q.  And examples of the graduate degrees you preferred were law

16  and social science?

17  A.  Yes.

18  Q.  And there is an et cetera there.  What does et cetera mean?

19  A.  Nicole Matthiesen had a graduate degree in English.

20  Obviously, she is articulate, she can formulate, craft titles,

21  articulate what needs to be communicated, so a graduate degree

22  in a field that is going to give you the skill sets that you

23  need to perform this job.

24  Q.  Kim Nawyn's degree, master's degree was in criminal

25  justice?

C8DMKADT                         Romano - cross

1   A.  Correct.

2   Q.  Is that the study of the criminal justice in the penal

3   system?

4   A.  I assume so.  I never took a criminal justice, but I assume

5   so.

6   Q.  And is that within the category of graduate degrees that

7   Visualex prefers?

8   A.  Yes.

9   Q.  And how about sociology?

10  A.  Yes.

11  Q.  How about political science?

12  A.  Yes.

13  Q.  How about economics?

14  A.  Yes.

15  Q.  How about history?

16  A.  Yes.

17  Q.  How about art history?

18  A.  I mean, you can name any graduate degree.  When I evaluate

19  a candidate, obviously, the graduate degree shows that they

20  have the critical thinking necessary to be able to evaluate

21  materials, understand complex concepts, and come up with ways

22  of communicating those complex concepts to the trier of fact.

23  Q.  You would consider someone with a Ph.D.?

24  A.  Of course.

25  Q.  In natural sciences?

C8DMKADT                          Romano - cross

1  A.  I don't know.  I would have to look at the candidate.  I

2  can't make this in a vacuum.

3  Q.  It would depend on the individual candidate?

4  A.  Of course.

5  Q.  And if that candidate had experience in litigation graphics

6  consulting, that would be a plus factor?

7  A.  Yes.

8  Q.  And if they had the right experience in litigation graphics

9  consulting, you might take their Ph.D. in mathematics into

10  account in that context?

11  A.  I take the entire package into consideration.

12  Q.  You're looking at the whole person?

13  A.  Yes.

14  Q.  Education and experience?

15  A.  Yes.

16  Q.  And you prefer experience in the graphics consulting field?

17  A.  Yes.

18  Q.  And you prefer a graduate degree?

19  A.  Yes.

20  Q.  In Ms. Moran's case you looked at the whole package and

21  found her a good candidate?

22  A.  Yes.

23  Q.  Even though she had no graduate degree?

24  A.  She was taking graduate courses, yes.  So I thought she was

25  advancing her education.

1   Q.  And no experience in litigation graphics consulting?

2   A.  But she had experience in the litigation industry, so I

3   thought that was a plus.

4   Q.  As a paralegal in companies and law firms?

5   A.  Uh-huh.  And she also had graphics courses as well, so that

6   was another added thing to consider.

7   Q.  Is Exhibit 3 still before you, Ms. Romano, or should I

8   assist you?

9   A.  I don't think --

10          THE COURT:  It's the offer letter to Ms. Kadden.

11  Q.  I would like you to look at Exhibit 3, Ms. Kadden's offer

12  letter against Exhibit 13, Ms. Moran's offer letter.

13          THE COURT:  What's the difference, Mr. Risk?  They are

14  both in evidence.

15          MR. RISK:  They are almost exactly the same.

16          THE COURT:  Point out the difference to me.

17          MR. RISK:  Sorry, your Honor?

18          THE COURT:  Point out the difference to me.

19          MR. RISK:  The difference is --

20          THE COURT:  Looks like the two personal days.

21          MR. RISK:  I think the difference is, real difference

22  is on the overtime, your Honor, if you are asking me.

23          THE COURT:  I am asking you.  The documents are in

24  evidence.  Personal days and vacation days look different.

25          MS. KLEIN:  Your Honor, I believe the biggest change

C8DMKADT                        Romano - cross

```
 1   is the second paragraph.
 2              THE COURT:  Second paragraph on the first page?
 3              MS. KLEIN:  Yes.
 4              THE COURT:  I see that.  Okay.
 5   Q.  Ms. Romano, these offer letters were almost exactly the
 6   same, aren't they?
 7   A.  Yes.
 8   Q.  Ms. Moran was hired for the same position that Ms. Kadden
 9   occupied?
10   A.  Yes.
11   Q.  Ms. Romano, there are two consultants assigned to every
12   matter at Visualex, is that right?
13   A.  At least two.
14   Q.  One performs a lead role, right?
15   A.  No.
16   Q.  The other provides backup support, right?
17   A.  No.
18              THE COURT:  When there is two assignments, is there
19   any difference between the two?
20              THE WITNESS:  As I previously testified, one is the
21   primary contact with the attorney who has that name, but that
22   is the purpose of putting the three names, that everybody is
23   smart is on the case.  Just like I'm on the case, there is a
24   name that you have to call.  If I'm not there, it goes to
25   whoever else is there.
```

1            MR. RISK:  Sorry, your Honor.  I have a document on

2     this.

3     Q.  I'd like to show the witness Defendant's Exhibit A.

4            MR. RISK:  Your Honor doesn't have one.

5            THE COURT:  My clerk does.  We got books this morning,

6     so it should be okay.  Thank you.

7     Q.  Take a moment, Ms. Romano, to familiarize yourself with

8     Exhibit A.  Let me know when you are ready for a question.

9     A.  Okay.

10    Q.  Exhibit A is a proposal that Visualex prepared for the

11    Stroock law firm, is that right?

12    A.  That's correct.

13    Q.  And it provides a detailed account of the work Visualex

14    does and how it does it?

15    A.  No.  It's in response to a request for a proposal and it's

16    a specific response to the questions that were asked in the

17    request for a proposal.  It has nothing to do with how we do

18    our work for other clients other than Stroock.

19    Q.  Well, can you look at page VIS 00350, about midway through

20    the packet.

21    A.  Yes.

22    Q.  You prepared Defendant's Exhibit 8, didn't you, Ms. Romano?

23    A.  Actually, it was a very collaborative effort.  As I recall,

24    all of the consultants, myself, Adina, and Kim helped put it

25    together, the art directors were involved.  It was a huge

C8DMKADT                        Romano - cross

1    undertaking.

2    Q.  Heavily vetted, passed around between a lot of your people.

3            THE COURT:  Obviously, I see that the first sentence

4    on that page says:  Two consultants are assigned to every

5    matter, one performed a lead role and the other provided backup

6    support.

7            THE WITNESS:  It's at least two because I only bill

8    for two, but there is actually internally all three consultants

9    are reading the documentation.  I just didn't want them to

10   think that I was going to overstaff the case.  I am trying to

11   get their work.

12           THE COURT:  I understand.

13           As bad luck would have it, we do need to stop a little

14   earlier today.  Usually we go to 4:30, but we have to stop.

15   See you tomorrow, hopefully at 10:00 tomorrow morning.

16           (Adjourned to Tuesday, August 14, 2012, at 10:00 a.m.)

17

18

19

20

21

22

23

24

25

```
 1                         INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   LILLIAN ROMANO

 4   Direct By Ms. Klein  . . . . . . . . . . . .38

 5   Cross By Mr. Risk  . . . . . . . . . . . . 145

 6                       PLAINTIFF EXHIBITS

 7   Exhibit No.                            Received

 8    2   . . . . . . . . . . . . . . . . . . 150

 9    3   . . . . . . . . . . . . . . . . . . 153

10    13 and 14  . . . . . . . . . . . . . . . 161

11                       DEFENDANT EXHIBITS

12   Exhibit No.                            Received

13    AA    . . . . . . . . . . . . . . . . . .47

14    CC    . . . . . . . . . . . . . . . . . .47

15    Y   . . . . . . . . . . . . . . . . . . .49

16    W   . . . . . . . . . . . . . . . . . . .51

17    Z   . . . . . . . . . . . . . . . . . . .52

18    C   . . . . . . . . . . . . . . . . . . .57

19    E   . . . . . . . . . . . . . . . . . . .63

20    G3   . . . . . . . . . . . . . . . . . . .94

21    I and J1 excerpt   . . . . . . . . . . . 105

22

23

24

25
```