C8EMKADT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ADINA KADDEN,

          Plaintiff,

      v.　　　　　　　　　　　11 Civ. 4892 (SAS)

VISUALEX LLC,

          Defendant.

------------------------------x

                            New York, N.Y.
                            August 14, 2012
                            10:00 a.m.

Before:

               HON. SHIRA A. SCHEINDLIN,

                            District Judge

                  APPEARANCES

MARK RISK
    Attorney for Plaintiff

EPSTEIN BECKER & GREEN
    Attorneys for Defendant
BY:  TRAYCEE E. KLEIN
    MARGARET C. THERING

C8EMKADT

1              (Trial resumed)

2              THE COURT:  Ms. Romano is still on the stand.

3              MS. KLEIN:  Yes.

4              Do you want her to take the stand?

5              THE COURT:  Yes.

6              You understand you are still under oath?

7              THE WITNESS:  Yes.

8     LILLIAN ROMANO, resumed.

9    CROSS-EXAMINATION (cont'd)

10   BY MR. RISK:

11   Q.  Ms. Romano, I am going to hand you two documents which have

12   been marked Plaintiff's Exhibit 11 and 15.

13              Beginning with Plaintiff's 11, Ms. Romano --

14              THE COURT:  Let's go slowly.  Are you offering these

15   two?

16              MR. RISK:  Both of them.

17              THE COURT:  Ms. Klein, do you object to 11 or 15?  11

18   is the letter to Ms. Matthiesen and 15 is a letter from Ms.

19   Romano to Ms. Kadden.  I don't think you would have any

20   objection to 15.

21              MS. KLEIN:  I have no objection to either.

22              THE COURT:  11 and 15 are both received.

23              (Defendant's Exhibits 11 and 15 received in evidence)

24              MR. RISK:  I will take them back.  I have nothing

25   further about them.  They speak for themselves.

1                THE COURT:  Wait a second.  I'm reading 15.

2                MR. RISK:  Sorry, your Honor.

3                THE COURT:  Okay.  Go ahead.

4    Q.  Ms. Romano, when we broke yesterday I had showed you the

5    Defendant's Exhibit 1, the Stroock request for proposal, and we

6    had talked about the lead and the backup consultants.

7                Do you recall that?

8    A.  I don't remember using those words, no.

9                THE COURT:  You don't remember what?

10                THE WITNESS:  Saying lead and backup.

11                THE COURT:  You saw them in the document?

12                THE WITNESS:  No.

13                THE COURT:  We saw those words in the RFP.

14                THE WITNESS:  But it didn't say lead and backup.

15                THE COURT:  It did.

16                MR. RISK:  I can show the witness the document.

17                THE COURT:  It did, but real fast.  That's where the

18    lawyer got questioned.

19    Q.  This is a copy, Ms. Romano, of Defendant's Exhibit A.  Can

20    you look at page VIS 350 in response to question 22?

21    A.  Yes.

22    Q.  Two consultants are assigned to every matter, one

23    performing a lead role and the other providing backup support.

24    You see that?

25    A.  Yes.

1   Q.  Is that correct?

2   A.  It's correct in response to the question, which is asking

3   about project management and in that respect, yes, it's

4   correct.

5   Q.  And when you are assigned to a matter you always have the

6   lead role?

7   A.  No.

8   Q.  Almost always have the lead role?

9   A.  I am a primary contact for people, they have my name.  I've

10  been doing this for 25 years.  These clients know me.

11  Q.  And so when you handle any matter at Visualex you are, in

12  your words, the primary contact?

13  A.  I am the primary contact and we all perform the same

14  consulting function within Visualex.

15  Q.  Ms. Romano, we talked at your deposition and in your

16  testimony yesterday we talked about your decision to change

17  what you called the compensation practices and policies at

18  Visualex in 2009.  You conducted a Google search in connection

19  with your review of that matter?

20  A.  Yes.

21  Q.  And you also consulted an attorney, Ms. Klein?

22  A.  Yes.

23  Q.  I am going to hand you an offer as Plaintiff's Exhibit 28.

24          MR. RISK:  And I apologize, your Honor, because these

25  are the documents I just got yesterday.  I just clipped them

C8EMKADT                         Romano - cross

1   all together.  These were the attorney-client material.  I just

2   clipped them all together, the totality, and I offer it as

3   Plaintiff's 28.

4   Q.  Take a moment, Ms. Romano, to review the documents and tell

5   me when you are ready for a question.

6   A.  Okay.  I'm ready.

7   Q.  Again, I'm sorry these pages aren't numbered, so I am going

8   to try to do them in the number they appear.  About four pages

9   in, past the privilege log is the first e-mail that says

10  attorney-client privilege communication.  And that appears to

11  be Ms. Klein suggesting to you to go to the Department of

12  Labor's website.  Are we on the same page?

13  A.  Yes.

14  Q.  And do you remember her suggesting that to you?

15  A.  Yes.

16          MS. KLEIN:  Objection, your Honor.  The document

17  speaks for itself.

18          THE COURT:  It does.

19          MR. RISK:  I am trying to work with what I have just

20  received, your Honor.  I have had no discovery about it other

21  than these.

22  Q.  And you went to the Department of Labor's website?

23  A.  Yes.

24  Q.  And was that before or after you did the Google search?

25  A.  I truly do not remember.

1   THE COURT:  I can't hear you.

2   THE WITNESS:  I don't remember.

3   Q.  And you also asked for a legal opinion from Ms. Klein?

4   A.  Yes.

5   Q.  And I gather from the e-mails she is someone you knew

6   before?

7   A.  Yes.

8   Q.  She is a friend of yours?

9   A.  Yes.

10  Q.  And was this something she was doing as a favor for you?

11  A.  A favor?

12  THE COURT:  Initially.  In other words, was she

13  retained to explain this or just initially just a quick

14  question?

15  THE WITNESS:  Yeah.  Initially, it was.

16  Q.  Turning a few pages in, you sent her by e-mail of March 13,

17  2009, you sent her a copy of Ms. Kadden's offer letter, is that

18  right?

19  A.  Yes.

20  Q.  And also the job description?

21  A.  Yes.

22  Q.  And that's the same job description that we marked and

23  talked about yesterday as Plaintiff's Exhibit 2?

24  A.  Yes.

25  Q.  Now, turning -- I don't know how to describe it.  Turning

C8EMKADT                         Romano - cross

1   past the other offer letters, several pages past, I want you to

2   look with me at Ms. Klein's e-mail to you dated Tuesday, March

3   24 at 1 a.m.

4           By the way, Ms. Romano, was your initial idea that you

5   wanted to pay the consultants straight time wages after 40

6   hours?

7   A.  I don't know what that means.

8   Q.  Well, that you wanted to stop paying time and a half and

9   instead pay them at their regularly hourly rate after 40 hours?

10  A.  No.  To pay a salary.  I can't find the 1 a.m. e-mail in

11  this.

12  Q.  Would it help you if I -- it's getting toward the back.

13  Keep going.

14          MS. KLEIN:  Counsel, what does it say on it?

15          MR. RISK:  The top of the page is -- why don't I just

16  show it to you, Ms. Klein.

17  Q.  Are we on the same page, Ms. Romano?

18  A.  No.

19  Q.  That page has an exchange of e-mail between you and

20  Ms. Klein on March 24?

21  A.  Yes.

22  Q.  And Ms. Klein said to you:  Long story short.  I'm looking

23  at her e-mail to you in the middle of the page.  Long story

24  short.  If the consultants are paid on straight salary other

25  than the overtime issue, i.e., that you don't dock them for

C8EMKADT                          Romano - cross

1    coming in late, leaving for doctor, et cetera, I believe they

2    are exempt and not entitled to overtime.

3            You see that?

4    A.  Yup.

5            MS. KLEIN:  Your Honor, it speaks for itself.  If he

6    is going to ask her what I meant --

7            THE COURT:  No, he didn't.

8    Q.  Do you recall receiving that advice?

9    A.  Yes.

10   Q.  You've heard in trial we have discussed several exemptions.

11   Do you recall any conversation with counsel about which

12   exemption you were being advised Ms. Kadden fell under?

13   A.  No.

14   Q.  And you did your own research on Google and the Department

15   of Labor website?

16   A.  Yes.

17   Q.  And you made your own conclusion that Ms. Kadden was

18   exempt?

19   A.  Yes.

20   Q.  Do you recall which exemption you concluded that she fell

21   under?

22   A.  I don't think I was picking and choosing.  I think my

23   recollection is that I thought it fell under several of the

24   different categories.

25   Q.  Do you remember which ones?

C8EMKADT                    Romano - cross

1   A.  It was a long time ago.  I don't.

2   Q.  And you have testified that at the Department of Labor

3   website there was some sort of interactive Q and A in which you

4   could supply information --

5   A.  Yes.  It was some kind of like scrolling thing that you

6   did, next, next, you answered certain questions.

7   Q.  I am going to hand you what I've just marked as Plaintiff's

8   Exhibit 29.

9           MR. RISK:  Your Honor, did I give you 28?

10          THE COURT:  You didn't.

11          MR. RISK:  Why don't I do that.  Sorry.

12          MS. KLEIN:  Your Honor, I object to this document.  It

13  hasn't come in before.  It wasn't marked.

14          MR. RISK:  I'll lay a foundation, your Honor.  I

15  didn't put a 28 on it.  I'm sorry.

16          THE COURT:  I know what it is.  That's Plaintiff's 28?

17          MR. RISK:  The attorney-client material is Plaintiff's

18  28 and I have just handed Plaintiff's 29.

19  Q.  I'll represent to you, Ms. Romano, that Plaintiff's 29 is a

20  document I pulled off the Department of Labor website this

21  morning following the link given to you by Ms. Klein in

22  Plaintiff's 28.

23          MS. KLEIN:  Your Honor, I would just note that I

24  object that this is 2009 we are talking about.

25          THE COURT:  I'm aware of that.  He said he pulled it

C8EMKADT                          Romano - cross

1   off this morning and I know it's 2012.  In fact, I know it's

2   August 14.  Let's move on.

3             You used the same link, though?

4             MR. RISK:  Yes.

5   Q.  The website calls for the person accessing it to go to one

6   of these exemption sections --

7             THE COURT:  Actually, you see that's the problem.  You

8   don't know that it did that in 2009.  All you can do is say, do

9   you recall whether in 2009 it was set up the same way as you

10  see here where it says main menu.  And then you have these

11  choices of compensation requirements and the executive employee

12  section, administrative employee section, professional

13  employees section.

14            Does it look at all familiar to you?  I trust you are

15  under oath.  You will tell me the truth.

16            THE WITNESS:  I remember I was able to click on

17  different things.  I don't specifically recall if it was

18  exactly the same thing.

19            THE COURT:  That's the best she is going to be able to

20  say three or four years later.

21  Q.  Do you recall inquiring then about multiple exemptions?

22  A.  I clicked on several things.

23  Q.  You concluded that she was exempt in several different

24  ways?

25  A.  Yes.

1   Q.  Did you enter information indicating that a graduate degree

2   was required for Ms. Kadden's position?

3   A.  As I sit here today, I don't remember what the questions

4   were asked or what I responded to them.  All I know is that at

5   the end I was satisfied that I was correct, that she was

6   categorized as an exempt employee.

7   Q.  And turning back to Exhibit 28, Ms. Romano, did you ever

8   receive a written analysis from counsel about whether Ms.

9   Kadden was exempt, other than what's set forth in Exhibit 28?

10  A.  I would consider that a written analysis, but other than

11  that, no.

12  Q.  Can you point me to what part of Exhibit 28 you considered

13  to be a written analysis?

14  A.  Actually, you pointed me to it.

15  Q.  The part we just discussed?

16  A.  In the March 24 1 a.m. e-mail, if the consultants are paid

17  on straight salary other than the overtime issue, i.e., don't

18  dock them for coming in late, leaving for doctor, et cetera,

19  which I don't -- I believe they are exempt and not entitled to

20  overtime.

21          MR. RISK:  Sorry, your Honor.  I'm not as nimble with

22  this new exhibit as I would like to be, but I'm almost

23  complete.

24  Q.  Can you turn most of the way back in Exhibit 28, Ms.

25  Romano, the same page.  I want to look at your e-mail of 9:22

C8EMKADT                    Romano - cross

1   a.m. of March 24 to Ms. Klein on the same page.  You see it?

2   A.  Yes.

3   Q.  You wrote:  I did not dock employees for coming in late,

4   which I have noticed has become an everyday occurrence.  People

5   stroll in at 9:30 a.m. and then put in overtime at 6:01 p.m.

6   Unbelievable.

7            Do you recall writing that?

8            MS. KLEIN:  Objection.  The document speaks for

9   itself.

10            THE COURT:  I know.  He can ask if she recalls.

11            MS. KLEIN:  Normally, you would refresh a

12   recollection --

13            THE COURT:  Look, Ms. Klein, there is judges, there is

14   lawyers, there is rulings.  That's it.

15            Do you remember writing that, yes, no?

16            THE WITNESS:  I obviously wrote it.  I don't remember

17   specifically writing it.

18            MR. RISK:  I have nothing further.  Thank you.

19            THE COURT:  Any redirect?

20            MS. KLEIN:  Yes, your Honor.

21   REDIRECT EXAMINATION

22   BY MS. KLEIN:

23   Q.  Good morning, Ms. Romano.

24   A.  Good morning.

25   Q.  Do you still have that document in front of you, the packet

1    of information that Mr. Risk gave you?

2               THE COURT:  You mean 28?

3               MS. KLEIN:  Yes.

4    A.  Yes.

5    Q.  If you can turn back to that last page you just testified

6    about, which has on the top of it an e-mail from you, Lillian

7    Romano, to myself at 9:22 a.m.?

8    A.  Yes.

9    Q.  On the bottom of that page did you receive an e-mail from

10   me advising you that I wanted to speak with you about the two

11   job categories?

12   A.  Yes.

13   Q.  And did we speak?

14   A.  Yes, several times.

15   Q.  And can you tell me what we spoke about?

16   A.  We spoke about why you were telling me that you thought

17   that I was correct in categorizing those employees, the

18   professional employees, as exempt.

19   Q.  And were you asked questions about the job that Ms. Kadden

20   performed?

21   A.  Yes.

22   Q.  And do you remember whether I shared with you information

23   from an expert from the Department of Labor?

24   A.  Yes.

25   Q.  And what did I share with you?

1    A.  That you had run the information, the letters, and the job

2    descriptions, and also explanations of things that we talked

3    about when you were asking me exactly what do they do by

4    somebody that had been a prosecutor for the Department of Labor

5    for 25 years.

6    Q.  And what was the conclusion of that person?

7    A.  That he also thought that we were correct in categorizing

8    these professional staff as exempt.

9    Q.  Now, yesterday you were asked some questions about Heather

10   Moran, correct?

11   A.  Yes.

12   Q.  In your over 25 years of being a graphic consultant, how

13   many graphic consultants have you hired in the entirety of your

14   career?

15   A.  Oh, jeez, a lot.

16   Q.  Approximately.  What is a lot?

17   A.  In the entirety of my career, probably over 20.

18   Q.  And of that over 20, how many people have you hired that

19   did not have an advanced degree?

20   A.  None.

21            MR. RISK:  Objection, relevance, to the extent the

22   question calls for information about people anywhere other than

23   at Visualex.

24            THE COURT:  Let's start with Visualex.  Do you

25   remember any of the people at Visualex that you hired to not

1    have an advanced degree?

2              THE WITNESS:  Not other than Heather Moran.

3              THE COURT:  You think all the rest did?

4              THE WITNESS:  I know in fact they did.  Consultants.

5    Consultants.  Of course, I have designers --

6              THE COURT:  Graphic consultants?

7              THE WITNESS:  Right.

8              THE COURT:  Of the 20 or so you think you hired in

9    your career, how many of those are at Visualex?

10             THE WITNESS:  Eight other than myself.

11             THE COURT:  So the question is, the other 12 that you

12   hired when you were with the other company, do you recall if

13   they all had advanced degrees?

14             THE WITNESS:  In LSI it was a requirement, and then at

15   FTI it was the same kind of a thing, preferred, and my

16   recollection is that I did not hire anybody other than advanced

17   degree, because I had just come from LSI.

18   Q.  And, in your opinion, what is the reason that you have

19   hired predominantly people with advanced degrees?

20   A.  I think, as I mentioned earlier, it's because people with

21   advanced education had the critical thinking and the skill sets

22   that enable them to get up to speed quickly on really, really

23   complex information, and that is just -- that is the kind of

24   thing -- it's a skill set that is the basis for being able to

25   perform the job successfully.

1   Q.  If you had to summarize, what is it in its most basic form

2   that the graphic consultant at Visualex and Ms. Kadden did?

3   A.  In its most basic form it is to use your creativity, your

4   imagination, your knowledge, your discretion to sift through

5   the voluminous amounts of information that you are given in

6   writing or verbally, and to pick out the things that you think

7   need to be supported visually.  And then once you identify

8   those, to come up with creative ways, strategic ways of not

9   only how to depict the information in individual graphics, but

10  also to kind of make sure that you're creating a visual

11  framework that is going to help the trial team advance their

12  case in the most effective way possible, obviously, with the

13  goal to help them win their case.

14  Q.  And does anybody else at Visualex have the responsibilities

15  to do the job we just discussed?

16  A.  Now?

17  Q.  Any other job category do the things --

18  A.  No.  It's just the graphic consultants.

19          MS. KLEIN:  I have no further questions, your Honor.

20          THE COURT:  Thank you.  Anything further for this

21  witness?

22          MR. RISK:  No, your Honor.

23          THE COURT:  Thanks.  You are done.

24          (Witness excused)

25          THE COURT:  Your next witness, Ms. Klein?

C8EMKADT

 1          MS. KLEIN:  I am going to call Adina Kadden to the

 2     stand.

 3          MR. RISK:  Your Honor, this is a witness not named in

 4     the pretrial order.

 5          THE COURT:  You didn't do that, Ms. Klein?

 6          MS. KLEIN:  I didn't put her name.

 7          THE COURT:  Then you'll have to wait for cross-exam.

 8          Do you have any other witnesses you want to call?

 9          MS. KLEIN:  At this time no.  We will have possibly a

10     rebuttal witness.

11          THE COURT:  Mr. Risk.

12          MR. RISK:  At this time I'll make a Rule 60 motion,

13     your Honor.

14          THE COURT:  Go ahead.

15          MR. RISK:  Well, stated very simply, because we have

16     had a lot of legal argument, the plaintiff bears the burden on

17     three exemptions.

18          THE COURT:  The defendant, you mean?

19          MR. RISK:  I'm sorry.  The defendant bears the burden

20     on three exemptions.  We have discussed those three exemptions.

21          They have not submitted sufficient evidence to make a

22     prima facie case on any of those exemptions.  I think we have

23     established that Visualex does not meet the education prong of

24     the professional exemption.  We have established she was not

25     working in the creative arts for the creative professional

C8EMKADT

1    exemption.  Finally, we have established that her primary work,

2    as testified quite ably by Ms. Romano, is to do billable work

3    for clients and, as such, is not covered by the administrative

4    exemption.

5              THE COURT:  I will reserve decision.  You can call

6    your first witness.

7              MR. RISK:  We will call Ms. Kadden.

8              MS. KLEIN:  Your Honor, may I just ask, do you want on

9    the record my opposition?

10             THE COURT:  I don't think it's necessary right now.  I

11   think you probably made it in your briefs and you'll make it

12   again in your closing arguments on a fuller record.  I'm not

13   planning to rule from the bench in plaintiff's favor.  At this

14   point I want to hear all the evidence.  That's why I reserve

15   decision.

16    ADINA KADDEN,

17        the Plaintiff, called as a witness on her own behalf,

18        having been duly sworn, testified as follows:

19   DIRECT EXAMINATION

20   BY MR. RISK:

21   Q.  Ms. Kadden, when did you work for Visualex?

22   A.  I began I believe in May of 2008, and I was terminated in

23   March of 2011.

24   Q.  I'm having a little trouble hearing you.

25             THE COURT:  Me, too.  Maybe you can just raise the

C8EMKADT                      Kadden - direct

1    mic.  That's great.

2    Q.  You're seeking overtime compensation in this case for what

3    period?

4    A.  The period from April 2009 through March 2011.

5    Q.  Ms. Kadden, I want to ask you about your background, but

6    your résumé is already in evidence, so I am going to try to

7    move quickly.  Can you just briefly your education?

8    A.  I have a bachelor's degree in liberal arts and technology

9    with a concentration in psychology from Villa Julie College.

10            THE COURT:  Where is that?

11            THE WITNESS:  It's located in Maryland, just outside

12   of Baltimore.  It has undergone a name change since I

13   graduated.  It's now called Stevenson University.

14   Q.  You have additional education?

15   A.  I do.  I have a law degree from Cardozo.  I received that

16   in 2001.

17   Q.  Are you admitted to the bar in any state?

18   A.  No, I am not.

19   Q.  You worked in the summer during law school at the New York

20   State Attorney General's office?

21   A.  Yes.

22            MS. KLEIN:  Objection.  These questions are leading.

23            THE COURT:  I'm not at all troubled.  Go ahead.

24   Q.  What summer was that during law school?

25   A.  I believe that was the summer of 2000.

1        THE COURT:  First year, second year?

2        THE WITNESS:  Sorry.  Second summer.  Between second

3   and third years.

4   Q.  What did you do there?

5   A.  I worked specifically on one case, it was called CFE v.

6   State of New York.  I was assisting the trial team with

7   whatever they needed pretty much to get ready for the closing

8   argument.  The judge gave a break to get ready for closing, and

9   I ended up largely working on the visual presentation for that

10  closing.

11  Q.  Did you have any background in graphics or design work?

12  A.  No, I did not.

13  Q.  Later you worked for a time at Doar Consulting, is that

14  right?

15  A.  Yes.

16  Q.  What is Doar Consulting?

17  A.  It's litigation consulting firm.  They are located in Long

18  Island.  They are a good size firm.  At the time I worked there

19  there were about 200 people.  I worked in the analytic

20  graphic -- analytic graphics division.  We were creating

21  graphics for trials.

22  Q.  And how long were you there?

23  A.  I was there about ten months.

24  Q.  And was that job --

25        THE COURT:  What year was that?  Do you remember?

1          THE WITNESS:  That was from January 2006 to October

2     2006.

3          THE COURT:  What did you do before that, between the

4     end of law school and Doar?

5          THE WITNESS:  I worked for a law firm, Steven J. Kay

6     Associates.

7          THE COURT:  Doing what.

8          THE WITNESS:  I was hired as a first year associate

9     and then I shifted into a management role and ended up becoming

10    the general manager of the firm for about four and a half

11    years.

12         THE COURT:  Then you went to Doar?

13         THE WITNESS:  That's correct.

14    Q.  What did you do in your job as analytic graphics consultant

15    at Doar?

16    A.  Worked extensively with the trial team to prepare graphics

17    for the trials, attended a lot of conferences and face-to-face

18    meetings with them to plot out what they were going to be doing

19    and showing at the trials, worked closely, very collaboratively

20    with the graphic designers themselves to create the graphics

21    for the trial.  I staffed war rooms before and during the

22    trials.

23    Q.  In what ways, if any, was your job at Doar different from

24    the job you later had at Visualex?

25    A.  The job was very different.  At Doar I had much more close

1    contact with the trial team working face to face with them.

2                THE COURT:  The trial team from the law firm?

3                THE WITNESS:  From the law firms, that's correct.  I

4    worked directly also closely collaboratively with the graphic

5    designers themselves that didn't have to go through like an art

6    director.  I traveled -- we went to mock trials.  I attended

7    the trials.

8    Q.  Why did you leave Doar?

9    A.  The company did a general reorganization and I got

10   downsized out.

11   Q.  And what was your next job after Doar?

12   A.  After Doar I went to work for Integra Data Business and

13   Technology Solutions.

14   Q.  Very briefly, what did you do there?

15   A.  I was hired as the business manager.  They were a rapidly

16   growing consulting firm in the financial sector.

17   Q.  That work did not involve litigation consulting?

18   A.  Not at all.

19   Q.  Your next job after Integra Data was at Visualex?

20   A.  Yes.

21   Q.  How did you hear about Visualex?

22   A.  I heard of them through the Cowen Group.

23   Q.  What is that?

24   A.  They are a headhunting firm.

25   Q.  What happened?

C8EMKADT                    Kadden - direct

1   A.  I found them through an Internet search and submitted a

2   résumé, and they contacted me.  I met with them in their

3   offices.  I don't recall whether or not I had responded

4   specifically to this ad or if they showed me this ad once I was

5   already in contact with them, but they showed me the job ad for

6   the job at Visualex.

7   Q.  Ms. Kadden, I am going to put before you a document that's

8   already been admitted into evidence as Plaintiff's Exhibit 2.

9           Have you seen Exhibit 2 before, Ms. Kadden?

10  A.  Yes.

11  Q.  What is it?

12  A.  This is the job ad that I received from the Cowen Group

13  about the Visualex job.

14  Q.  Did you discuss with the Cowen Group the compensation for

15  this job?

16  A.  Yes.

17  Q.  And what was said?

18  A.  They informed me that the compensation was $75,000 a year,

19  and I was disappointed with that.  I had been making

20  significantly more than that.

21          MS. KLEIN:  Your Honor, I object to this.  It's

22  irrelevant.  There is no dispute that she was offered $75,000

23  plus overtime.

24          THE COURT:  What's the relevance?  Take your time.

25  You have one job and I have one job.  You don't rule.  What's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C8EMKADT                    Kadden - direct

 1    the relevance of this?

 2          MR. RISK:  In a moment I believe the witness will

 3    testify about the conversation about overtime.

 4          THE COURT:  Maybe you should get to that.  I don't

 5    really care that she was disappointed about what she earned at

 6    Doar.  That's irrelevant.

 7    Q.  Bearing that in mind, Ms. Kadden, did you discuss the

 8    compensation scheme at Visualex?

 9    A.  Yes.

10    Q.  What was said?

11    A.  So I was informed --

12          MS. KLEIN:  Objection, your Honor.  It's hearsay.

13          THE COURT:  It's not.  She is going to give us a

14    statement of the defendant.

15          MS. KLEIN:  No.

16          THE COURT:  Visualex.

17          MS. KLEIN:  No.  She is talking about the Cowen Group

18    that she spoke with.

19          THE COURT:  This is not going to be a Visualex

20    statement.

21          Were you talking to someone at Visualex about your

22    compensation?

23          THE WITNESS:  I did that as well.

24          THE COURT:  Let's get to that because you can't put in

25    the statement of Cowen Group.

1              Can you tell me what Visualex said to you?  That's

2      what I want to know about.  That's what I am going to hear

3      about.

4              THE WITNESS:  Sure.

5              THE COURT:  Cowen Group is a headhunter.  They put

6      people together.

7              What did Visualex say to you and who said it?

8              THE WITNESS:  I had an interview with Lillian Romano

9      and salary was discussed.  She informed me that the base salary

10     was 75 and then there was this overtime which she indicated

11     could end up being significant.  She stated that a consultant

12     in a previous year had made about $30,000 in overtime.  And I

13     think that had been in response to my concern if we could bump

14     the salary up a little bit more because I had been making more

15     previously, but that would have bumped me to the area where I

16     was hoping to make my salary.

17             THE COURT:  Did she tell you when the overtime kicked

18     in?

19             THE WITNESS:  What do you mean by --

20             THE COURT:  Over X hours, when did you get overtime?

21             THE WITNESS:  Yes.  Over 40 hours a week.

22     Q.  You had an in-person meeting with Ms. Romano?

23     A.  Yes.

24     Q.  Where was that held?

25     A.  At Visualex's office in Dobbs Ferry.

C8EMKADT                    Kadden - direct

1    Q.  Had you been extended a job offer yet at that point?

2    A.  No.

3    Q.  And do you remember anything else you discussed with Ms.

4    Romano at that meeting?

5    A.  Yes.  We discussed my position at Doar, we discussed the

6    position that I had at the Attorney General's office, and we

7    discussed the Visualex job that she had an opening for.

8    Q.  Do you recall anything Ms. Romano said to you about Doar?

9    A.  She stated that they were a very, very different firm than

10   Doar and they did things very differently.

11   Q.  They, Visualex?

12   A.  Yes.

13   Q.  Do you remember what she said was done differently?

14   A.  She said that they staffed war rooms a lot less.  I think

15   that it was a cost-saving measure to get less involved on that

16   level.  I was going to be working through an art director and

17   not as collaboratively with the designers themselves.  It was

18   more giving a written description, not doing as much sketching

19   things out on my own.  That's what I can recall at the moment.

20   Q.  Did you meet with anyone else at Visualex prior to

21   receiving a job offer there?

22   A.  Yes.  I met with Kim Nawyn.

23   Q.  Was that at the same time that you met with Ms. Romano?

24   A.  Right afterward.

25            THE COURT:  Was she a graphic consultant?

C8EMKADT                          Kadden - direct

1          THE WITNESS:  Yes.

2     Q.  And do you remember any of your discussion with Ms. Nawyn?

3     A.  Yes.  She reiterated several times about the overtime

4     involved in the job.

5     Q.  Of overtime work?

6     A.  Of overtime hours required, that I would be working late

7     and working weekends extensively.  She had previously herself

8     worked at Doar, so she talked about some of the differences

9     from Doar.  That's what I can recall.

10    Q.  And after those interviews, what happened next in terms of

11    your employment at Visualex?

12    A.  An offer was made.

13    Q.  How was it made to you?

14    A.  I would imagine -- I don't recall specifically.  I think it

15    must have come through the Cowen Group.

16    Q.  I am going to put before you the document that's marked as

17    Exhibit 3 in evidence.

18          What's Exhibit 3, Ms. Kadden?

19    A.  Exhibit 3 is the offer letter that I received and did sign.

20    Q.  Can you describe the hours of work at Visualex?

21    A.  Yes.

22          MS. KLEIN:  Your Honor, I object to this.  What is the

23    relevance?  She worked overtime.  We have admitted and conceded

24    that she worked over 40 hours.

25          THE COURT:  It would be interesting to know what hours

C8EMKADT                    Kadden - direct

1    she worked, if she worked until midnight or until 10, did she

2    work on weekends.  There is nothing wrong with it.

3              MR. RISK:  Your Honor --

4              THE COURT:  I ruled in your favor.  What's the

5    problem?

6              MR. RISK:  Your Honor, we heard the Court yesterday

7    and we are planning a very crisp exam.

8              THE COURT:  That's good.

9    A.  What was the question?

10             THE COURT:  Describe your hours.

11   A.  Visualex, it's a unique sort of industry where you can have

12   your work hours which were set at 9 a.m. to 6 p.m. where you

13   may not have much work going on sometimes during that time if

14   there was no active case work going on.  Often when we were

15   working with teams that were in trial, if they are in court all

16   day, they can't be communicating with us about revisions or

17   changes or any new graphics they want.  A lot of that would

18   take place when they got back from trial.  So we might not hear

19   from a trial team until 6 or 7 p.m., and that's when like the

20   work might kick in.  That's not saying we didn't do work from 9

21   to 6.  We did.  It often required extensive overtime.  I was

22   certainly there until 10 p.m., midnight.  I saw sunrise on the

23   way home sometimes.  I worked extensively on Saturdays and

24   Sundays as well.

25   Q.  Did you have a computer at Visualex?

C8EMKADT                         Kadden - direct

1    A.   Yes.

2    Q.   And did you have Adobe Illustrator software?

3    A.   No.

4    Q.   Did you have any special graphics software?

5    A.   No.

6    Q.   When a law firm hires Visualex, please describe the process

7    after a law firm has hired Visualex for a project that results

8    in completed graphics being created.

9              MS. KLEIN:  Objection, your Honor.

10             THE COURT:  I didn't hear the end of the question.

11   Q.   Please describe the process after a client retains Visualex

12   that results in the completion of graphics.

13             THE COURT:  You object to that?

14             MS. KLEIN:  I object just to the fact that he hasn't

15   yet established that it's always the same.  There may be a

16   specific thing, if he wants to ask her about, or ask her if

17   it's always the same.  Because I believe there is always

18   different scenarios.

19             THE COURT:  Overruled.  Basically, he is saying

20   describe your job, describe what you did.  Go ahead.  Tell us

21   the process.

22             THE WITNESS:  After a law firm had retained us, there

23   would be a lead consultant assigned, which was in most cases

24   Lillian Romano.

25             THE COURT:  Was that the word used or was it primary

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    contact?

2              THE WITNESS:  In the office we usually called it the

3    lead and the backup.

4              Certainly we didn't call it primary.  We didn't use

5    the term primary contact.

6              Generally, that lead would be Lillian Romano.

7    Sometimes it would be Kim Nawyn.  I generally served in the

8    role as the backup consultant.  There were a few times where I

9    served in the role of lead.

10             Once the case, we were retained, the lead consultant,

11   usually Ms. Romano, would attend meetings face to face with the

12   client.  There would be phone calls with the client that I, as

13   the second, did not attend.  Then Ms. Lillian would draft out

14   and sketch out what she thought the strategy was going to be,

15   and she would then write that up on a cover sheet that would

16   kind of give the overview of what the client was, the client

17   matter, all the details, and then she would have a briefing

18   meeting with the art director.  Generally, as the second, the

19   backup, I was not involved in that briefing scenario either.

20             The art director would then himself or have designers

21   under him create the actual graphics.  Once the graphic was

22   completed, he would print it out and he would tape onto the

23   front of it a tissue paper flap on the front, and he would sign

24   his initials on it to show that he had reviewed it.  He would

25   then turn it over to Abdul Johnson, who was our production

C8EMKADT                    Kadden - direct

1    manager, and he would then review it and put any changes that

2    he saw with his initials, and then it would go to whoever was

3    serving as the backup, it could be me or it could be Kim, who

4    would then review it, write in any changes, put in their

5    initials, and then it would go to whoever-- I could have been

6    third string as well if all three of us were on the case.  Then

7    it would eventually work its way up to the lead, who would then

8    decide, looking at the changes that had been put on there, do I

9    want to make those changes or not.

10   Q.  Ms. Kadden, at the point the backup consultant's changes

11   were noted on the tissue paper?

12   A.  Correct.  And then Lillian would put the graphic back into

13   the studio to the graphic designer and she would then make

14   those changes, and the process would start again.  Once that

15   was completed and Lillian had signed off, this is final, the

16   production manager, Abdul Johnson, would then save it into a

17   Power Point, like a viewer, and e-mail it or put it on our FTP

18   site for the client to see --

19   Q.  Ms. Kadden, before Johnson made it a Power Point, the

20   slides existed as Adobe slides?

21   A.  Generally.  I'm not even sure I would even know

22   specifically which programs were used.  There were other

23   programs were used at times.  Flash was used or animation.

24   Q.  Why did Mr. Johnson convert the slides to Power Point?

25   A.  Because most of our clients probably don't have

C8EMKADT                        Kadden - direct

1   illustrator, or whatever it is, on their computers to view it.

2   Q.  What happened then?

3   A.  Once the client had the exhibit, the demonstrative, they

4   would then decide if they wanted to make changes.  If they want

5   to make changes, it would usually come in one of three forms,

6   either an e-mail, which would list a detailed description of

7   the changes, it could be a phone call, with, again, the

8   detailed description of the changes, or the third way they

9   would sometimes do it was they would print out the graphic,

10  they would handwrite changes onto the graphic, scan the graphic

11  in like a PDF, and then send it over to us that way.

12  Q.  And however the client sent their comments or changes, to

13  whom did they send them?

14  A.  It usually went to the lead consultant, but other people

15  could be CC'd on that e-mail.  The lead consultant would then

16  decide whether they are going to implement and write up the

17  revisions themselves or have the second backup consultant write

18  up the revisions.

19  Q.  What happened next?

20  A.  Once the revisions were written up, they were written on

21  that tissue paper flat again, they would go back into the

22  studio and that whole process would begin again.

23  Q.  How were you assigned your cases?

24  A.  Generally, Lillian would, you know, complete the retainer

25  agreement for the case.  And once we had the case, she would

C8EMKADT                          Kadden - direct

1     then assign a lead and a backup, and I was generally -- I was

2     almost always in the backup role if I was assigned on a case.

3     Q.  Could you describe the differences in the role of the lead

4     consultant and the backup consultant?

5     A.  The lead consultant was much more involved in the front

6     evidence of the case and discussing with the client what the

7     case actually is, what are the issues, what's the strategy,

8     working with the trial team on that.  On rare occasions I did

9     attend conference calls on that, but that was generally done by

10    the lead.  They would then sketch out those initial graphics

11    and get that into the studio, get the project going.  I, as the

12    second or the backup, would come in more on the revision phase

13    of things.  I did a lot of proofing.  Most of my time was spent

14    on the proofing phase of things.  I also did some things like

15    review the Power Point.

16            Once Abdul would make revisions into Power Points,

17    they would have to be proofed quickly before they went to the

18    client.  I did things like speak with the trial technicians to

19    get them scheduled for trial.  If we needed printers in the war

20    room, get that scheduled.  Not that I attended the war room,

21    but I could do the scheduling for that.  I did -- I'm trying to

22    think what else.  That was it.

23    Q.  If you think of anything else, we can come back to it, but

24    I'll move on.

25            Did you ever function as the lead consultant?

C8EMKADT                         Kadden - direct

1   A.   There were a few occasions where I stepped in as lead when

2   Lillian was not available, and there was sort of one chunk of

3   time where Lillian was kind of in and out of the office a bit

4   and I stepped in, and those were mostly involving the Mirror

5   World's case and the Sobieski case.

6   Q.   Why was Ms. Romano in and out of the office during that

7   period?

8             MS. KLEIN:   Objection, your Honor.   What is the

9   relevance?

10             THE COURT:   I don't know.   What is the relevance?

11             MR. RISK:   I'm trying to show the exceptional

12   conditions under which Ms. Kadden occupied the lead role

13   temporarily.

14             THE COURT:   Go ahead.

15             MR. RISK:   I promise you a crisp exam.

16   A.   What was the question I was answering at this point?

17   Q.   You testified that you stepped into the lead role on

18   occasions during a period when Ms. Romano was out of the

19   office.   Generally, why was she out of the office?

20   A.   She was having significant medical problems.   She had back

21   issues, had several procedures on her back, and she had a death

22   in the family, I believe, as well.

23   Q.   When was that, approximately?

24   A.   It was in the fall, early winter of 2010.

25   Q.   How does Visualex make its money, Ms. Romano?

C8EMKADT                         Kadden - direct

1  A.  By billing client law firms for the time that its employees

2  worked on their cases.

3  Q.  And your time worked on cases was billed time?

4  A.  Yes.

5  Q.  I am going to put before you what has been marked as

6  Plaintiff's Exhibit 7.

7            THE COURT:  Is that all the time sheets?  Is that all

8  her time sheets?

9            MR. RISK:  I was going to ask her that.

10           THE COURT:  That is.

11           MR. RISK:  Time records.

12           THE COURT:  Any objection to this?

13           MS. KLEIN:  Your Honor, I don't have it in front of me

14  to see if I have an objection.

15           MR. RISK:  It's in the pretrial order.

16           MS. KLEIN:  I just didn't have it in front of me.  I

17  just want to know what I'm not objecting to.

18           THE COURT:  The time records.

19           MS. KLEIN:  I believe it's missing one page, at least

20  the way I'm looking at it right now.  You've marked the first

21  page as 161.  Are you representing it's everything throughout

22  her employment?

23           MR. RISK:  Yes.

24  Q.  Ms. Kadden, do you have 160 on the top of the exhibit?

25  A.  The first page here is VIS 00161.

1    Q.  Perhaps I have left out a page in the photocopying, which

2    I'll try to substitute.

3              MS. KLEIN:  Other than that, if it's all of them, I

4    don't want to do it page by page, but I assume it's accurate.

5              THE COURT:  You have no objection?

6              MS. KLEIN:  No objection.

7              THE COURT:  Exhibit 7 is received.

8              (Plaintiff's Exhibit 7 received in evidence)

9    Q.  What is Exhibit 7, Ms. Kadden?

10   A.  This is a printout from the QuickBooks software that I use.

11   This is my records for my time in the office recording what I

12   did.

13   Q.  Can you show the Court how you recorded time on Exhibit 7?

14   A.  Sure.  On the far left, the first column it says customer

15   job.  When you looked at it on the screen, there would be a

16   little drop-down arrow.  And when you clicked on that you could

17   choose from a long list of clients and matters.  You choose the

18   client.  Under the service item there was a list of items that

19   you could choose from.  It was, you know -- you were limited to

20   what was there listed.  Generally, I did my work under the

21   consulting category.  The next role, the payroll item role,

22   that never changed.  That stayed as is.  The notes column was a

23   blank column.  That was where you could type in a bit more of a

24   description of what you were doing.  And then the columns

25   Monday through Sunday was where you entered your actual time

C8EMKADT                    Kadden - direct

1    in, and that was entered in tenths of an hour.  And then I

2    didn't enter the total column.  That was automatically

3    calculated.

4    Q.  And Visualex used the QuickBooks system to send its bills,

5    to prepare its bills for its clients?

6            MS. KLEIN:  Objection, your Honor.  He hasn't laid a

7    foundation.

8            THE COURT:  Do you really object?

9            MS. KLEIN:  I do object.

10           THE COURT:  Why.  Don't you know that these time

11   sheets are used to prepare the billing?

12           Shall I recall Ms. Romano for one second.

13           Ms. Romano, please stand.  You are under oath.  Were

14   these used to prepare bills for the client?

15           MS. ROMANO:  Yes.

16           THE COURT:  Thank you.

17           We got to get practical here.  You don't have a jury,

18   Ms. Klein.  There is in point objecting just for the sake of

19   the word.  Everybody knows these are used to prepare bills.

20           Next, Mr. Risk.

21   Q.  Ms. Kadden, how did you account for your time in the office

22   that was not charged to a billable matter?

23   A.  Generally, that would go under the administrative

24   activities category that I have listed.  Like on this top page,

25   the 160 on the very first one on there is administrative

1  activities, and that was what I was told when I first started

2  there to use to cover time.

3          THE COURT:  Which column is that?

4          THE WITNESS:  In the second column called service

5  item, and the first one on there, it was an example where it

6  says administrative activities.  And that I had asked in my

7  first few days there how to record that time when you weren't

8  actually working on a case and was to told to do it as that.

9  Q.  That's the line item on top of 161 that shows 1.5 hours on

10  the Friday?

11  A.  Correct.

12  Q.  So there is no description in the notes?

13  A.  That was my first week.  I don't know if I had fully

14  figured the system out.  If you flip through later, usually at

15  the top there is administrative activities and I usually called

16  it general.

17  Q.  Were there requirements at Visualex as to when and how

18  often you had to be in the office?

19  A.  Yes.  I had to be there Monday through Friday from 9 a.m.

20  to 6 p.m. for standard work hours, and then I was supposed to

21  be there any hours outside of that that were required by client

22  work.

23  Q.  So the administrative general time would, by definition, be

24  between 9 and 6?

25  A.  Yes.

C8EMKADT                    Kadden - direct

1   Q.  What would happen if you had down time while waiting for

2   revisions on a client project at night or on the weekend?

3   A.  That would still be listed as billable time.  I would list

4   it under consulting.

5   Q.  You had different hourly rates for night and weekend time?

6   A.  Yes.  That was paid at the overtime rate of time and a

7   half.

8   Q.  To clarify, you had different rates for your time to be

9   charged to clients?

10  A.  Sorry.  Yes.  For billing purposes, yes.

11  Q.  What was your understanding of that for billing purposes?

12  A.  My understanding was that between the hours of 9 and 6 I

13  was paid -- I was billed out at a rate of 225 an hour.  And for

14  all overtime hours I was billed out at 337.50 an hour.

15  Q.  Ms. Kadden, I am going to put before you Plaintiff's

16  Exhibit 6 and offer it into evidence.

17          THE COURT:  Who prepared this summary?  Do you know,

18  Mr. Risk, who prepared it?

19          MR. RISK:  My office prepared Exhibit 6.  It's based

20  on the documents that are Exhibit 7.

21          THE COURT:  You have seen this before?

22          MS. KLEIN:  Yes, I have.

23          THE COURT:  Any objection to it?

24          MS. KLEIN:  I don't have an objection that it

25  accurately represents the number.  I object that these are not

C8EMKADT                      Kadden - direct

1   accurately recorded in the time sheets, but we will go over

2   that after.

3           THE COURT:  What's not accurate?  The time sheets

4   aren't accurate?

5           MS. KLEIN:  This is a summary of what the bottom line

6   of this other document.  The time sheets is what I am saying,

7   we do not agree that there is 416 productive hours.  I agree

8   that these documents, he has taken something and summarized a

9   bottom line number.  These don't account for, nor do these,

10  whether she came in at 11:00.  She accounted for eight hours,

11  no matter what, even when she wasn't there.

12          THE COURT:  No objection to Exhibit 6.  It's the

13  summary of Exhibit 7.  So Exhibit 6 is received.

14          (Plaintiff's Exhibit 6 received in evidence)

15  Q.  Ms. Kadden, Exhibit 6 shows the total overtime hours you

16  were planning?

17  A.  Correct.

18  Q.  I want to put before you --

19          THE COURT:  Just so I understand it, Mr. Risk, because

20  this is nonjury, the overtime hours from February '09 to July

21  '09, they are only going to be admissible if there is bad

22  faith?

23          MR. RISK:  No, your Honor.

24          THE COURT:  How does this work?  Because you put two

25  years statute of limitations for the 303 hours.

1          MR. RISK:  This lawsuit was filed July 15 a year ago.

2     On the federal claim we can reach back only two years unless

3     your Honor finds it is willful.

4          THE COURT:  That's what I just said.

5          MR. RISK:  I didn't understand your Honor saying it.

6     We have a state claim in the larger amount.  I'm sorry.

7          THE COURT:  On the federal side, unless it's willful,

8     it's only the two years?

9          MR. RISK:  That's right.  It reflects, your Honor, 303

10    hours.

11         THE COURT:  I understood it.

12    Q.  Ms. Kadden, I am going to put before you what's been marked

13    as Plaintiff's Exhibit 5 and offer that into evidence.

14         THE COURT:  What is 5?

15         MR. RISK:  5 is the totality of the plaintiff's

16    paycheck stubs.

17         THE COURT:  Pay stubs.  Okay.

18         Any objection to 5?

19         MS. KLEIN:  No, your Honor.

20         THE COURT:  5 is received.

21         (Plaintiff's Exhibit 5 received in evidence)

22    Q.  Ms. Kadden, when you were at Visualex, how were the

23    employees paid?

24    A.  They were paid, I think it was like the 1st of the month

25    and the 15th of the month.

C8EMKADT                         Kadden - direct

```
 1   Q.  And when you were paid during the period prior to March 31,

 2   2009, how was your pay expressed on the stubs?

 3              MS. KLEIN:  Objection, your Honor.  It's irrelevant.

 4              THE COURT:  I didn't hear it.  Say it again.

 5              MR. RISK:  I asked her to explain the pay stubs for

 6   the period prior to March 31, 2009.

 7              MS. KLEIN:  When she was receiving overtime.  There is

 8   no dispute, she received overtime.

 9              THE COURT:  I don't know what you mean by explain the

10   pay stubs.

11              MR. RISK:  I want her to show you what it says, your

12   Honor.  This was a subject of a motion in limine.

13              THE COURT:  I'll look at it, if I can see it.  It's

14   very small.  Where do I look.

15   Q.  Can you call the Court's attention to one of the early pay

16   stubs, Adina, and just show the Court what it says.

17   A.  On the very first page, VIS 00070, on the left side, it

18   says earnings and hours.  It's about the second section down.

19   So under there you have an hourly regular rate and the rate is

20   36.06 and that's what I was paid per hour.  And underneath that

21   it says overtime hourly rate.  And then under the rate it says

22   $54.09.  That was my overtime rate.  On this particular pay

23   stub there was overtime that I was paid for.

24              THE COURT:  The 31 hours?

25              THE WITNESS:  31.25 hours.
```

```
 1              THE COURT:  54 is time and a half of 36?

 2              THE WITNESS:  Correct.

 3              THE COURT:  That's what you wanted to ask her?

 4              MR. RISK:  That's all, your Honor.

 5              THE COURT:  Thank you.

 6    Q.  Ms. Kadden, moving on, did you do any work for Visualex

 7    other than billable work?

 8    A.  Yes.

 9    Q.  What did you do?

10    A.  One of the things that I worked on was sending out some

11    marketing letters and brochures.

12    Q.  Please describe how that came to be.

13    A.  Sure.  I think that was maybe December of 2008.  Lillian

14    came to me and said that, you know, business had gotten pretty

15    slow and there was a lot of down time, and if I could send out

16    some letters and brochures to pick up some potential new

17    clients.  I then took -- there already had been marketing done

18    at the firm.  I took a couple of different letters and

19    brochures that we had and kind of compiled them together into a

20    letter.  Lillian approved that letter before I sent it out.

21              And then I generally used LexisNexis to run searches

22    for cases that were either recently filed or were soon going to

23    trial.  And then I would put together a list of a bunch of

24    cases and I would give the list to Lillian, and she would

25    choose from there which firms and which cases she wanted me to
```

C8EMKADT                          Kadden - direct

1   send letters on, and then I would send letters to the attorneys

2   on those that she chose.

3   Q.  Did you hear back from any of the attorneys you sent those

4   materials to?

5   A.  Minimally.  I got three or four e-mails back, thanks, we

6   will keep you in mind sort of thing.

7   Q.  And how did you record your time for that work?

8   A.  In QuickBooks one of the drop-down category items that you

9   could choose was called marketing.  And so I would choose that

10  tab.  And then under the notes column I would usually write

11  that it was either research or, you know, sending out letters

12  or e-mails or that sort of thing.

13  Q.  Would you ever do the marketing work if there was billable

14  work to do?

15  A.  Absolutely not.

16  Q.  I want to move to the events of March 31, 2009.

17          What happened that day?

18  A.  I don't recall if it was that day specifically, but on or

19  about there, Lillian came into my office and stated that, based

20  on the fact that we hadn't had a lot of work going on, she was

21  going -- she was no longer going to be paying for overtime and

22  she handed me a letter which stated pretty much that.

23  Q.  Did you say anything?

24  A.  No.

25  Q.  I want to put before you what's been marked --

1              THE COURT:  Did she say she was?

2              THE WITNESS:  We didn't have clients coming in, so

3      there wasn't billable work going on, so there was no money

4      coming into the firm.

5              THE COURT:  Did she say there were any other options

6      other than layoffs?

7              THE WITNESS:  I don't recall her saying that.

8              THE COURT:  Are you working now?

9              THE WITNESS:  Yes.

10             THE COURT:  Where?

11             THE WITNESS:  I moved to Maryland and I am working for

12     a firm called Weinstock Friedman & Friedman.

13             THE COURT:  What is that?

14             THE WITNESS:  They are a law firm.  And I'm working in

15     their -- they have got a contract with the bank and I'm helping

16     to manage a program that they are running for the bank.

17     Q.  I am going to put before you, Ms. Kadden, what's been

18     marked as Plaintiff's Exhibit 16 and offer that into evidence.

19             THE COURT:  That's the last one in my book.

20             MR. RISK:  Last one, until we give you volume 2, your

21     Honor.

22             THE COURT:  Ms. Klein, any objection to this one?

23             MS. KLEIN:  I don't have an objection that it is what

24     he is claiming on the top, that it is billable hours by

25     contract, stuff that was billed and went to clients.  It does

1    not accurately represent all of the time that was not billed to

2    clients voluntarily for the consulting work she did.  This is

3    picking and choosing and it's not representative of her work

4    there.

5             THE COURT:  Does it record the hours for these

6    particular clients?

7             MS. KLEIN:  No.  Only if it was the business decision

8    was made to pass that off to a client.  For example, I cannot

9    write Ms. Thering's time on a bill.  This is in what we would

10   call a pro forma.  So it doesn't represent all of the

11   consulting work that she did.  There was many --

12            THE COURT:  These were the amounts that were billed to

13   the client?

14            MS. KLEIN:  That was billed -- I don't actually know.

15   This is not based -- no.  This is not based on what was billed

16   to clients.  This comes from what Ms. Kadden put into the

17   QuickBooks.  This, by no means, is the underlying bill --

18            THE COURT:  It's the summary of what's in the

19   QuickBooks records that she herself inputted into her computer?

20            MS. KLEIN:  Right.  Which then may not have been --

21            THE COURT:  I understand.

22            MR. RISK:  It's another summary based on Exhibit 7.

23            THE COURT:  I understand now.  I'll admit Plaintiff's

24   16 as a summary exhibit of what's in her time sheets, the

25   accuracy of which defendant questions.  I understand.  But it's

C8EMKADT                      Kadden - direct

1    a summary of the time sheets.  Okay.

2              (Plaintiff's Exhibit 16 received in evidence)

3    Q.  Ms. Kadden, how many billable matters did you work on

4    during your almost three years at Visualex?

5    A.  I believe it was over 50.

6    Q.  And do you have an understanding of what Exhibit 16 shows?

7    A.  Certainly.

8    Q.  What is it?

9    A.  Exhibit 16 shows the breakdown of the hours that were

10   recorded in QuickBooks by me for the specific cases.

11   Q.  Now, Ms. Kadden, that's in the category -- the left-hand

12   column is what?

13   A.  That's the name that we would call a case within our

14   office.  It's not obviously the official case title.

15   Q.  And the second column, recorded hours, is what?

16   A.  That's how many hours that I recorded into QuickBooks that

17   I worked on that case.

18   Q.  And the third column, proofing hours, what is that?

19   A.  That's the number of hours that I recorded as having

20   proofed graphics in my QuickBooks time sheets.

21             MS. KLEIN:  Your Honor, may I just for one second ask

22   the Court to inquire of Ms. Kadden.  She has proofing billed

23   under separate categories.  When she is proofing, I believe for

24   just checking, not consulting, she didn't bill that --

25             THE COURT:  Why don't you wait for cross-examination.

1   You ask her.  I am not going to do it.  I am not going to do it

2   now.  You ask her.  That's what cross is.

3        Go ahead, Mr. Risk.

4   Q.  What does the category proofing hours include, Ms. Kadden?

5   A.  In the QuickBooks time sheets -- can I pull back that

6   exhibit?

7   Q.  Exhibit 7.

8   A.  That's Exhibit 7.  Under the notes -- in the service item

9   column I would click on the consulting category.  And then in

10  the notes column I would make a note about what sort of

11  consulting work I was doing, and I would often write in there

12  proofing or revisions proofing.  That's what this third column,

13  the proofing hours column is reflective of.

14  Q.  And quickly, briefly, Ms. Kadden, what about the fourth

15  column, time entries related to new graphics?

16  A.  Back in the QuickBooks time sheets, another option that I

17  would do when I would choose the consulting category is under

18  notes I would sometimes write that I worked on a new graphic.

19  If I worked on a new graphic where I was writing up the cover

20  sheet, I would enter that time usually with the note, new

21  graphic, and that time is recorded in this fourth column, time

22  entries related to new graphics.

23  Q.  What about the fifth column, other?

24  A.  So, again, when I would choose under the service item

25  column the category of consulting, there were other things that

C8EMKADT                     Kadden - direct

1    could get put in notes, things like reviewing a Power Point or

2    managing the FTP site where we posted files for the client,

3    things along that nature.  That time is recorded.  It's like

4    the miscellaneous hours would get -- are recorded in this final

5    column.

6    Q.  I want to turn with you, Ms. Kadden, to the cases that you

7    testified you had an increased role on.

8           MR. RISK:  First, I want to give the Court a fresh

9    book of exhibits.

10   Q.  Ms. Kadden, I am going to ask you about a case called

11   Sobieski.  What was that case?

12   A.  This is a case regarding a Polish liquor and an

13   advertisement for it that went viral that shouldn't have.

14   Q.  And you came to take more of a lead role in the Sobieski

15   case?

16   A.  That's correct.

17   Q.  What happened exactly?

18   A.  When the case came in, Lillian was the lead on it and had

19   the initial discussions and conferences with the clients.  She

20   started the first several graphics on it.  As she had to take

21   some time off out of the office, I stepped in and took some of

22   that lead role for the time that she wasn't there.

23   Q.  I am going to hand you what's been marked as Plaintiff's

24   Exhibit 25 and offer that into evidence.

25          THE COURT:  That's the largest one.  What is 25?

1          THE WITNESS:  25, this is e-mails between the trial

2     team on the Sobieski case and Visualex for -- it looks like the

3     revisions portion or the creation of the graphics, e-mails.

4          THE COURT:  Over what period of time?  What's the

5     earliest and what's the latest?

6          THE WITNESS:  I believe this whole case was worked on,

7     it was a little less than two weeks.  It was from early

8     November of 2010, it looks like November -- these started about

9     November 4.

10         THE COURT:  These e-mails?

11         THE WITNESS:  These e-mails.

12         THE COURT:  When do they end?

13         THE WITNESS:  I think they end around the 12th or

14    13th.  Let me see if I see anything later on that.  November

15    14.

16         THE COURT:  Ten-day period, all those e-mails?

17         THE WITNESS:  Yes.

18         THE COURT:  Any objection, Ms. Klein?

19         MS. KLEIN:  No objection.

20         THE COURT:  Exhibit 25 is received.

21         (Plaintiff's Exhibit 25 received in evidence)

22    Q.  These were e-mails produced by Visualex and they are

23    e-mails involving you in this matter, correct?

24    A.  Correct.

25    Q.  You've reviewed Exhibit 25?

C8EMKADT                    Kadden - direct

1    A.  I have.

2    Q.  Are they typical of what you were doing on the Sobieski

3    matter?

4    A.  For the Sobieski matter, yes.

5    Q.  I just want to look at a few of them with you quickly.  Can

6    you turn -- they are in number order.  Can you turn to VIS 635

7    just near the top of packet.

8    A.  Yes.

9    Q.  Take a look and then tell us what's happening in VIS 365.

10   A.  The lower portion of the page is an e-mail from Stroock,

11   from someone on the trial team of Stroock to me and it is

12   referring to lockup.  This is where they probably wrote on a

13   graphic we had originally sent them or they may have handwrote

14   a sketch on their own.  They sent detailed instructions about

15   changing an image, revisions on a graphic that had already been

16   created.

17   Q.  Can you turn to 641.

18   A.  Yes.

19   Q.  Take a look.  When you are ready, tell us what was

20   happening in 641.

21   A.  This appears to be an e-mail from the trial team again,

22   giving -- attaching five page -- the attachments are not

23   included here, but there was an attachment of five pages

24   giving, again, detailed instructions on revisions they wanted

25   made to the graphics.

1   Q.  Can you turn to 656.

2   A.  Okay.

3   Q.  What was happening in 656, Ms. Kadden?

4   A.  This is an e-mail from the Stroock team giving another

5   mark-up, meaning they have sketched up what revisions they

6   wanted on a graphic and giving really specific detailed

7   instructions of how they wanted a revision to be made.

8   Q.  661.  What's happening in 661?

9   A.  This is an e-mail from Stroock again asking for, again,

10  very detailed changes.  They want to remove a highlighting on a

11  graphic.

12  Q.  668.

13  A.  This is another e-mail from Stroock on the same Sobieski

14  case.  They are asking for minor edits, and they gave very

15  detailed descriptions of what changes they wanted me to make on

16  a graphic.

17  Q.  If you turn to 700, that's one that was discussed by Ms.

18  Romano yesterday, isn't it?

19  A.  Yes.

20  Q.  What was happening there?

21  A.  The trial team had asked for a revision, and I sent an

22  e-mail responding that I didn't recommend that we make that

23  revision.

24  Q.  Was that typical of your interactions with clients at

25  Visualex?

C8EMKADT                    Kadden - direct

1   A.  On the Sobieski case I did do some work like this, but

2   that's not generally the role that I filled on most cases.

3   Q.  Why not?

4   A.  That was filled by Lillian in the lead role or sometimes

5   Kim in the lead role.

6   Q.  I am going to put before you in a moment, Ms. Kadden, one

7   of the exhibits that Ms. Romano testified about yesterday

8   related to the Sobieski case.

9          MR. RISK:  Not to hold up the Court, I am going to

10   hand up my copy of the document that was marked excerpt 1.

11          THE COURT:  I might have gotten confused which is 1

12   and which is 2.  What is the front page?

13          MR. RISK:  1103.

14          THE COURT:  Got it.

15   Q.  I'm putting before you what is in evidence as excerpt 1

16   from Exhibit J.

17          Ms. Kadden, take a moment.  This was introduced

18   yesterday by the defendant.  Take a moment to look at excerpt

19   1.  I would like you to explain to the Court what excerpt 1 is

20   and take the Court through.

21   A.  Okay.  1103 is an e-mail from the client, the trial team,

22   about a graphic that they wanted produced.  It's sent to

23   Lillian as she was the lead on that case.

24   Q.  Are you on that page?

25   A.  I'm sorry?

1   Q.  1103.

2   A.  1103.

3   Q.  I'm sorry.  Was the e-mail on 1103 sent to you?

4   A.  No.  The e-mail is not to me.  I was not lead on this case.

5   It's possible I had already been assigned as the backup, I

6   don't know, but I'm not included in those initial e-mails and

7   discussions.

8           The next page is 1105 and 1104.  They kind of go

9   together.  This is the cover sheet that goes with each graphic

10  that we create, and this one is in Lillian's handwriting.  It

11  explains that it's for the opening, it gives the title and what

12  she wants the designer to do.  And since Lillian was leading on

13  this case, it's in her handwriting.  The next page, 1100, is

14  the first draft, as we saw yesterday from the client.  1102 is

15  where the client sends the revision.  Apparently, in this

16  instance I don't personally recollect it, but if you look at

17  the next page, 10 --

18          THE COURT:  1102.  Whose handwriting is that?

19          THE WITNESS:  That's from the client.  That's the

20  client.  On 1099, Lillian must have asked me to make this

21  revision because on 1099, on the far left where it says swap

22  this image, that's in my handwriting.  And where it says toward

23  the center in that --

24          THE COURT:  Wait a minute.  11 --

25          THE WITNESS:  1099, on the far left.

C8EMKADT                      Kadden - direct

1           THE COURT:  Far right.

2           THE WITNESS:  I'm sorry.  Far right.  On the far

3      right.

4           THE COURT:  I thought it was me, but it's you.

5           THE WITNESS:  Sorry about that.  Swap this image.

6      That's in my handwriting.  Towards the center of the page it

7      says in the arrow in the center, it says Bokowski licensing

8      agreement.  It's got some dates.  That's my handwriting.  After

9      I wrote the revision the on the tissue paper flap, I must have

10     given it to Lillian because she put some handwriting on the far

11     left side of the page.

12          If you turn the page to 1098, that's the revisions

13     incorporated in the graphic.  If you turn to 1097, that's the

14     graphic with the flap on it.  And you can see the designer had

15     given it first to Abdul Johnson in the center on the far right,

16     there is initials.  That's Abdul Johnson's handwriting.  None

17     of the rest of the handwriting is his, so he obviously hadn't

18     made any changes.

19          THE COURT:  Who is the rest of the handwriting?  Do

20     you know?

21          THE WITNESS:  I do know.  Where it says larger text in

22     the center, larger text, bolded three times, that's in my

23     handwriting.  And in the bottom right corner it says 2010,

24     that's in my handwriting.

25     Q.  Where are your initials?

1   A.   Then I initialed it on the far right to show that I was

2   completed and then I gave it over to Lillian.  You see on the

3   upper left, it says revise LR, that's Lillian.  The rest of the

4   handwriting on here is Lillian giving instructions to the

5   designer.  1095, again, it's not Abdul's initials on it.  It's

6   got my initials and it's got Lillian's handwriting.  She didn't

7   sign her initials, but clearly she reviewed it and made some

8   revisions.

9           If we flip to 1101.

10          THE COURT:  Is that backward or forward?

11          THE WITNESS:  It's further back, two pages later.

12  1101.  This comes from the client.  You can see the revisions

13  are written directly on the graphic, not on tissue paper.  So

14  this is the client's revisions that they sent over.  And then

15  Lillian must have asked me to handwrite them in because the

16  next page, 1093, I literally copied word for word pretty much

17  the revisions from the client onto the tissue paper flap for

18  the designer and then gave this into the studio to be revised

19  yet again.

20          The next page --

21  Q.   Ms. Kadden, there are some sets of initials on 1093.  Can

22  you identify them?

23  A.   1093 has Abdul's initials.  I apparently didn't initial it,

24  but I obviously did work on it.

25  Q.   Where are Mr. Johnson's initials?

C8EMKADT                    Kadden - direct

1    A.  He is on the far right towards the center of the page.

2    Q.  Are there anyone else's initials on there?

3    A.  I don't see any, no.

4    Q.  How about in the middle of the page?

5    A.  I'm sorry, yes, in the middle there are initials from

6    Lillian.

7    Q.  What does that say?

8    A.  Okay.  So that's from previous to my handwriting on these

9    changes, the prior revision she had given the okay on it before

10   it was sent to the client for review.

11   Q.  So that says okay LR, as you understand it?

12   A.  Yes.

13   Q.  You may proceed.

14        THE COURT:  What do you mean, you may proceed?

15   Q.  Is there anything further you want to say --

16   A.  The next page in the packet, 676, these contain -- this

17   contains further e-mail changes from the client to me, for

18   things like changing the word Gdansk Gdynia and things of that

19   nature.  Those are typical of the types of changes that would

20   come through on the many, many revisions we did to each

21   graphic.

22        I think that's about all.

23        THE COURT:  We are finished with excerpt 1.  We will

24   take our morning recess now and reconvene in ten minutes at a

25   quarter to 12 on that clock.  I don't know what your watches

C8EMKADT                    Kadden - direct

1    say, but about ten minutes.

2            (Recess)

3            THE COURT:  Mr. Risk.

4            MR. RISK:  Your Honor, before I resume with Ms.

5    Kadden, I would like to offer into evidence Plaintiff's Exhibit

6    1, which is defendant's responses to plaintiff's first request

7    for admissions.

8            THE COURT:  Received.

9            (Plaintiff's Exhibit 1 received in evidence)

10   Q.  Ms. Kadden, trying to move along, I am going to hand you

11   together Plaintiff's Exhibits 20, 21, 22, and 23.

12           Turning first to 21, Ms. Kadden --

13   A.  I'm sorry.  21?

14   Q.  20.  What case is 20 from, Ms. Kadden?

15   A.  This is also from the Sobieski case.

16   Q.  And can you describe how Plaintiff's Exhibit 20 fits into

17   the process of creating the graphics that you testified about?

18   A.  Sure.  This is an e-mail that I sent to the trial team as

19   we were getting to start working on closing graphics.  Many

20   times the closing graphics involved either deposition or trial

21   transcript testimony, and we kind of had like a template that

22   we always used that we could put that in.  And this was an

23   e-mail I sent in anticipation of those transcript kind of cases

24   asking them to give us some specific directions about what they

25   wanted from those and how they should send us the files.

1           There is no objection to this going into evidence?

2           MS. KLEIN:  No, there is not.

3           THE COURT:  20 received.

4           (Plaintiff's Exhibit 20 received in evidence)

5   Q.  Turning, Ms. Kadden, to Exhibit 21, can you describe

6   Exhibit 21?  And take the Court through it, as you did earlier.

7           THE COURT:  Let's make sure it's in evidence.  Are

8   these some graphics that were used at trial?  Is that what

9   these are or these are the creation of graphics?

10          THE WITNESS:  Yes.

11          THE COURT:  Creation of graphics for that case?

12          THE WITNESS:  Yes.

13          THE COURT:  Any objection?

14          MS. KLEIN:  So long as the witness created them, I

15  don't have a problem.  Otherwise, I don't think she has a basis

16  to testify about them.

17          THE COURT:  I don't now about that being accurate.

18          Did you create those?

19          THE WITNESS:  Yes.

20          THE COURT:  Does that satisfy you?

21          MS. KLEIN:  Yes.

22          THE COURT:  You are satisfied.  So 21 is received.

23          (Plaintiff's Exhibit 21 received in evidence)

24          MR. RISK:  May I offer 22 and 23, which are of the

25  like kind, at the same time?

 1              THE COURT:  Take a look at 22 and 23.  These are

 2     deposition excerpts that you were turning into slides, but

 3     anyhow for summation.

 4              Any objection to 22 or 23?

 5              MS. KLEIN:  No objection to 22, your Honor, and no

 6     objection to 23.

 7              THE COURT:  22 and 23 received.

 8              (Plaintiff's Exhibits 22 and 23 received in evidence)

 9     Q.  Ms. Kadden, let's look together at Plaintiff's Exhibit 21.

10              What is Plaintiff's Exhibit 21?

11     A.  21 is a graphic that was created for a closing in the

12     Sobieski case.  The very first page states on it that it gives

13     the case number and the matter number and that it's closing.

14     This is the outside of the envelope that the cover sheet and

15     the graphic would be contained in, and then you have to flip

16     toward the end.  That's actually the last page of the packet.

17     It's page 1252.  That's the cover sheet for the graphic that is

18     drafted by the consultant.  At this point that was me.  This is

19     in my handwriting, 1252.  And that tells the designer what to

20     do with this graphic.

21              The attachment that was given to the designer along

22     with this cover sheet is the preceding page, 1251, which is a

23     piece of trial transcript.  Either the trial team would give us

24     the full transcript at the very beginning of this process and

25     tell us which page and then we would simply pull the page and

1    line, or sometimes they would send us an e-mail and just

2    dropping the text into the e-mail.  I've highlighted on 1251

3    what I want the designer, the text that I want the designer to

4    put in the graphic, and I've put a box and written SHL, which

5    is super highlight, and they wanted to highlight the word zoom.

6    That's the direction I gave the graphic and this is very kind

7    of routine.  We have this kind of template that we use again

8    and again.

9         And then you can look through -- 1240 is the original

10   version of it, and there is -- 1241 has a tissue paper overlay

11   and some revisions written on it.  1242 would be another

12   version coming back from the graphic designer.  1245 shows the

13   revisions that the client -- I'm sorry.  Bear with me a moment.

14   I actually don't see the client one in this one.  In any event,

15   1245 is the revision made by me that came from the client, and

16   I think that might be shown in one of the other two exhibits

17   and it was like a global change where instead of saying trial

18   testimony across the top they wanted it in the title bar down

19   the side, and that would then apply consistently throughout

20   these very typical sort of graphics.

21   Q.  Ms. Kadden, did you pick the pages of the trial testimony

22   that would be put on slides for the closing?

23   A.  No.  That came from the trial team.

24   Q.  Is Exhibit 25, the e-mail, is that still before you

25   somewhere?

1   A.  25?

2   Q.  Yes.

3   A.  The Sobieski e-mails.

4   Q.  Can you take a look at Exhibit 25 and tell the Court

5   whether there is e-mail correspondence about the testimony and

6   graphics.

7   A.  Yes.

8   Q.  Where is that?

9   A.  There is one that starts on the bottom of 795 and goes to

10  796 on Exhibit 25.  And at the bottom of 795 there is an e-mail

11  from the trial team saying testimony of Tom Gessler, and then

12  he gives the transcript, e-mail section of the transcript that

13  they wanted in the slide.

14  Q.  When you work on a slide like Exhibit 21, is that

15  considered a revision or an original draft?

16  A.  This would be an original graphic.

17  Q.  Why?

18  A.  Because I wrote up a cover sheet for it and gave it a

19  graphic number.  This one is graphic number 13.

20  Q.  I am going to skip 22 and 23, Ms. Kadden, and try to finish

21  with you on a couple of other matters.

22          You heard Ms. Romano testify yesterday about a case

23  called Wells Fargo?

24  A.  Yes.

25  Q.  Did you work on that?

C8EMKADT                    Kadden - direct

```
 1   A.  Yes.

 2   Q.  What did you do?

 3   A.  A lot of revision work.

 4   Q.  Were you involved in making a strategy?

 5   A.  No, I was not involved in the strategizing.

 6   Q.  You heard testimony yesterday about a case called SCOR.

 7   Did you work on that?

 8   A.  I did.

 9   Q.  What did you do?

10   A.  Again, a lot of proofing was done on that.

11   Q.  And do you have an understanding about what the issues were

12   in those cases?

13   A.  Somewhat.  I actually think I learned more about the issues

14   in the case yesterday in court than I did at the time I was

15   working on the actual trial since I was not -- I did not sit in

16   on the initial conferences with the attorneys to learn what the

17   case was about, so I didn't have that information necessarily

18   at the time.

19   Q.  Without that information, how do you do the proofing?

20   A.  The proofing is just from that one -- it's from that one

21   graphic to see if it's a correct graphic.

22   Q.  Were you involved in the hiring of any employees while you

23   worked at Visualex?

24   A.  No.

25   Q.  Were you involved in the firing of any employees?
```

C8EMKADT                          Kadden - direct

1   A.  No.

2   Q.  Were you involved in the disciplining of any employees?

3   A.  No.

4   Q.  Were you in discussions to set anyone's compensation?

5   A.  No.

6   Q.  Did you sometimes tell studio personnel when to be in the

7   studio?

8   A.  I would let them know when we had client work to do, yes.

9   So if the client said we had to be there at 10 p.m. on a

10  Tuesday, I would let the studio know and he would be there at

11  10 p.m. on Tuesday.

12  Q.  How did you find out when the client needed people?

13  A.  Either via e-mail or phone conversations.

14  Q.  Were you the supervisor of the studio people?

15  A.  I'm sorry?

16  Q.  Were you the supervisor of any of the studio people?

17  A.  No.

18          MR. RISK:  Your Honor, I have nothing further.

19          THE COURT:  Thank you.

20          Ms. Klein.

21  CROSS-EXAMINATION

22  BY MS. KLEIN:

23  Q.  Ms. Kadden, during the time that you were employed at

24  Visualex, you kept track of your time personally for yourself,

25  correct?

C8EMKADT                    Kadden - cross

1   A.  Correct.

2   Q.  And you chose how to record that time, correct?

3   A.  I inputted it into QuickBooks.  Is that what you are

4   asking?

5   Q.  You had a variety of options that you could pick to

6   describe the task that you were doing, correct?

7   A.  Correct.

8   Q.  And you had the opportunity to pick project management,

9   correct?

10  A.  I believe that was an option, yes.

11  Q.  You billed project management, correct?

12  A.  I believe so.

13  Q.  And you also had the opportunity to describe the work you

14  were doing as client revisions, correct?  That was one of the

15  drop-down menus.

16  A.  No.  I don't recall seeing that.  I don't know that I ever

17  used that drop-down.

18  Q.  But if it was there you could have used it, correct?

19  A.  I was never instructed to use that.

20  Q.  Did anybody ever instruct you how to record your time?

21  A.  Yes.

22  Q.  Who instructed you?

23  A.  Kim Nawyn.

24  Q.  And what did Kim Nawyn tell you?

25  A.  Kim Nawyn and I had a discussion in I want to say my first,

C8EMKADT                        Kadden - cross

1    second week working there because I was confused about what

2    categories things fell into, and she was the one who told me

3    that, which categories to use.

4    Q.  So you knew which categories to use after a couple of days

5    of working, based on what Kim Nawyn told you?

6    A.  Correct.  I think there were four, five.  There weren't

7    very many that I used.

8    Q.  You used the same four or five of about how many options,

9    about 25 options?

10   A.  Sounds about right.

11   Q.  During your employment you chose to distinguish between

12   proofing and categorizing that as project management and

13   proofing and charging that as consulting, correct?

14   A.  Proofing was always under consulting, as far as I know.

15   Q.  Really?  Because you have hundreds of hours under project

16   management of proofing.

17   A.  Proofing of graphics or of Power Points?

18   Q.  Well, if you were just proofing the way the production

19   manager does, you would put that under project management.

20   A.  Proofing as in the actual graphics with the flaps?

21   Q.  When you were working --

22          THE COURT:  Let me try this.  When would you not put

23   proofing under project management?

24          THE WITNESS:  When a graphic was finalized and ready

25   to be sent to a client, Abdul Johnson would place it into a

C8EMKADT                          Kadden - cross

1    Power Point presentation, which is on the computer to be sent

2    to the client.  Once he created that Power Point, which could

3    have numerous slides in it, he would let me know and I could

4    then look at that on the screen, and then on my lap I would

5    have the actual paper copy to see if this is the right version

6    because there were so many versions of the graphic we wanted to

7    make sure we were sending the correct version.  That's proofing

8    as well, but that's proofing of the Power Point to make sure

9    it's the correct --

10             THE COURT:  My question was, when would you not bill

11   proofing as project management?

12             THE WITNESS:  When I was proofing those Power Points.

13             THE COURT:  What would you call that?

14             THE WITNESS:  I believe I called that project

15   management.

16             THE COURT:  You're not answering my question.  When

17   did you not bill proofing as project management?  What other

18   billing?

19             THE WITNESS:  When I was proofing on the flapped

20   copies on the revision of the graphic.

21             THE COURT:  What would you call it?

22             THE WITNESS:  Consulting.

23             THE COURT:  Some of the proofing went into the

24   consulting box and some of the proofing went into the project

25   management box and those are the only two choices of proofing.

1              THE WITNESS:  Correct.

2              MS. KLEIN:  Your Honor, there was also time entries

3     under client revision, a separate section, but we will go

4     through those.

5     Q.  Let's go back, Ms. Kadden.  You testified in your direct

6     that you worked at the Attorney General's when you were in law

7     school, correct?

8     A.  Correct.

9     Q.  You got that job because you were in law school, correct?

10    A.  I would assume.

11    Q.  You would assume or it was only opened to law students?

12    A.  I would assume.  I don't know.  I don't recall if the

13    job -- I applied -- I don't even remember how I applied,

14    truthfully.

15    Q.  And your primary job there was to work on crafting visual

16    strategy and conception regarding a very important closing,

17    correct?

18    A.  That I began working on the closing.

19    Q.  I would like you to answer my question.

20             THE COURT:  She may not understand it.  I don't

21    understand it.

22             You weren't hired for that purpose.  You were a summer

23    associate and that got to be her assignment.

24             That's what your assignment was once you showed up.

25    You didn't know that when you got the job in law school.

1          THE WITNESS:  Not at all.

2     Q.  Let's start back at your job at Visualex.  You accepted the

3     job, obviously, correct?

4     A.  Correct.

5     Q.  You were compensated for your work, correct?

6     A.  Correct.

7     Q.  And you received a base salary throughout the entirety of

8     your employment, correct?

9     A.  Correct.

10    Q.  And it was $75,000 gross?

11    A.  Correct.

12    Q.  And other than for health insurance deductions, your base

13    salary was never reduced?

14    A.  Correct.

15    Q.  And it was not reduced if you didn't come into work?

16    A.  Correct.

17    Q.  And it wasn't reduced if you left early?

18    A.  Correct.

19    Q.  And you earned approximately $1500 a week, is that correct?

20    A.  I actually don't know.

21    Q.  But it would be $75,000 divided by 52 weeks, correct?

22    A.  Okay, yes.

23    Q.  And you understood when you spoke to the Cowen Group that

24    you were interested in applying for a job as a graphic

25    consultant, correct?

C8EMKADT                          Kadden - cross

```
 1    A.  Correct.

 2                MR. RISK:  Object to the form of the question.

 3                THE COURT:  I'll allow it.  It is what you were

 4    looking for, right?

 5                THE WITNESS:  Correct.

 6    Q.  You understood what graphics consultants did as a result of

 7    your experience both at the Attorney General's office and at

 8    Doar Consulting, correct?

 9    A.  Correct.

10    Q.  And Doar Consulting is a competitor of Visualex, correct?

11    A.  Correct.

12    Q.  And while you were at Doar you worked as a graphics

13    consultant, correct?

14    A.  Correct.

15    Q.  And you did not work by yourself on cases at Doar; you

16    worked in teams, correct?

17    A.  Correct.

18    Q.  And when you accepted the job at Visualex you understood

19    that the job of graphic consultant was to figure out, based on

20    complex information, visual strategy to help your clients win

21    the cases, correct?

22    A.  That's what I was told, yes.

23    Q.  Is that not what the job of the graphic consultant was?

24    A.  That's how it was presented.

25                THE COURT:  Then she is saying, was that the
```

C8EMKADT                          Kadden - cross

1    actuality, too?  Was that the reality?

2               THE WITNESS:  Not all the time.

3    Q.  Was it some of the time?

4    A.  Yes.

5    Q.  And you held the same position as Kim Nawyn, you were both

6    graphic consultants, that was your title, correct?

7    A.  Correct.

8    Q.  And your attorney offered the offer letter of Kim Nawyn

9    before and she was paid $75,000 when she started, correct?

10   A.  I have no idea.

11   Q.  Was Kim Nawyn a consultant, do you believe?

12   A.  Was Kim Nawyn a consultant?

13   Q.  Yes.

14   A.  Yes.  But I don't know what her salary was.

15   Q.  Do you dispute in this lawsuit that she worked legitimately

16   as a consultant creating visual strategy?

17   A.  I don't.

18   Q.  Do you dispute the fact that Lillian Romano's job was to

19   create visual strategy?

20   A.  I don't.

21   Q.  And you admit, correct, that the three of you have the same

22   title?

23   A.  Correct.

24               THE COURT:  Ms. Romano also ran the company, right?

25               THE WITNESS:  She was president.

C8EMKADT                        Kadden - cross

1            THE COURT:  In addition to whatever consulting she

2       did, she ran the company, right?

3            THE WITNESS:  Yes.

4            THE COURT:  It was her company?

5            THE WITNESS:  It was her company.

6            THE COURT:  You didn't have the same overall duties?

7            THE WITNESS:  Correct.

8       Q.  And the time that you recorded, did you do that on a daily

9       basis?

10      A.  Into QuickBooks?

11      Q.  Either by hand or into QuickBooks.

12      A.  Yes, it was daily.

13      Q.  We heard you testify about a couple of times where you were

14      the lead, as you called it, and suggesting on the other

15      occasions you were not acting as a consultant, is that correct?

16      Is that your testimony today?

17      A.  No.

18      Q.  Were you acting in the role of a consultant to help perfect

19      visual strategy during the times that you were working at

20      Visualex?

21      A.  Yes.

22      Q.  Do you have the time sheets still in front of you, the

23      QuickBooks time sheets?

24           THE COURT:  Exhibit 25.  No.  That wasn't 25.

25           THE WITNESS:  It's 7.

C8EMKADT                    Kadden - cross

 1            THE COURT:  I was wrong.
 2   Q.  Do you have that big stack of documents in front of you?
 3            THE COURT:  We do.  Just give us a minute.  We both
 4   have it as 7.  Okay.
 5   Q.  Do you have Plaintiff's 7 in front of you?
 6   A.  I do.
 7   Q.  When you recorded research articles, headlines under
 8   consultant, what were you doing?
 9   A.  I'm sorry?
10   Q.  When you described your work as consulting research
11   articles and headlines, what were you doing?
12   A.  I don't recall that specifically, but I was probably
13   researching some sort of article that's a newspaper article or
14   something.
15   Q.  You were looking at headlines to help you craft titles for
16   demonstrative exhibits?
17   A.  I don't know that.  I could have been.  We were going to
18   use an article in the actual graphic.  I don't know.
19   Q.  So you talked about the couple of cases.  You talked about
20   Sobieski where you were the lead, correct?
21   A.  At times I was the lead.
22   Q.  And you did graphic consulting work on Sobieski?
23   A.  That's correct.
24   Q.  And you did graphic consulting work on Derea?
25   A.  That's correct.

1   Q.  And you also wrote up graphics for a case called 3 Par?

2   A.  I don't recall that, but I have seen reference to that.

3   Q.  Why don't we look at your time entry for February 24, 2011.

4   A.  Okay.  Page 316.  Just make sure we are on the same page.

5   Q.  You're looking at 316?

6   A.  Correct.

7   Q.  If you look at 316, you wrote up graphics for a case called

8   Dechert 3 Par, correct?

9   A.  Yes.

10  Q.  You wrote up the graphics for that case?

11  A.  It appears so.

12  Q.  I would like you to take a look at -- before we have to go

13  through this painstakingly, do you recall working on new

14  graphics for a case called AlphaPharma v. Purdue?

15  A.  I don't recall.  It's quite possible that I don't recall.

16  Q.  Did you work on that case?

17          THE COURT:  She just said, it's quite possible I did,

18  but I don't recall.

19          MS. KLEIN:  She doesn't recall, I'm assuming, writing

20  the graphics.

21  Q.  But do you recall working on the case?

22  A.  I believe I did.

23  Q.  Can you take a look at your time entry for 7/12/2010.

24          MS. KLEIN:  That would be July 12, 2010, for the

25  record.

C8EMKADT                        Kadden - cross

1    Q.  Were you the lead consultant on AlphaPharma v. Purdue?

2    A.  I don't believe so, no.

3    Q.  Looking at that document, do you recall now that you did

4    new graphics in connection with that case?

5    A.  Bear with me one moment.  I'm just reviewing.  I don't

6    recall, but I did record -- but I did do work on new graphic.

7    Q.  That would mean that you created new graphics, correct?

8    A.  Probably, yes.

9    Q.  And, again, you also have an entry that you consulted and

10   worked on new graphics on 7/13/2010 for AlphaPharma Purdue.

11            Do you see that entry?

12   A.  I do, yes.

13   Q.  And, again, that was another case that you worked on and

14   you weren't the lead, but you created new graphics, correct?

15   A.  If we are looking at the same line item, which would be

16   the -- I'm on page 283 and if it's the first one in their --

17   that fall -- the first consulting entry on the page.  If we

18   follow it across, it says proofing/editing/new graphics.

19   Q.  Correct.

20   A.  If you follow it across, yes, some of that time was on a

21   new graphic.

22   Q.  There was also some of the time on that same day that was

23   for PPT review, correct, and that wasn't billed as consulting

24   work.  That was project management, right?

25   A.  Yes.  That's further down and that must have been reviewing

C8EMKADT                          Kadden - cross

1   those Power Points to send to the client.

2          THE COURT:  It says Power Point review.

3          THE WITNESS:  Yes.

4   Q.  That's charged at a much lower rate, your project

5   management work?

6   A.  I believe it's about $25 cheaper.

7          THE COURT:  The rate is right there, it says 200,

8   right?

9          THE WITNESS:  Yes.

10         THE COURT:  As opposed to 225.

11  Q.  Let me ask you, in regards to the difference between what

12  we are looking at, during your job at Visualex, were you

13  responsible for reviewing bills that went to clients?

14  A.  No.

15  Q.  So you have no idea if any of this time was ever billed to

16  clients?

17  A.  That's correct.

18  Q.  You do not know?

19  A.  Yes.  I do not know what was billed or what was not billed.

20  Q.  And you were just told to record your time as accurately as

21  you could?

22  A.  Correct.

23  Q.  So if you go down to your entries for July 18, 2010.

24  A.  Okay.

25  Q.  And if you look there you also have consulting work that

1    you did, correct, for AlphaPharma?

2    A.   Correct.

3    Q.   And here you worked on new graphics, correct?

4    A.   For July 18, I worked, yes, my notes say new

5    graphics/proofing.

6    Q.   That wasn't Lillian that was working on the new graphics;

7    that was your time, correct?

8    A.   Yes.

9    Q.   And also it wasn't Kim Nawyn's; that was you working on new

10   graphics?

11   A.   That only records my time.

12   Q.   You also worked on a case called CIEA, correct?

13   A.   Yes.

14   Q.   And you were required to review materials related to that

15   case, correct?

16   A.   I don't recall, but quite possibly.

17   Q.   Maybe this will help refresh your recollection.  If you

18   look at December 2, 2009.

19   A.   I'm sorry.  December 2, 2009.

20   Q.   Can you see by looking at that page whether or not you

21   reviewed materials in connection with a case that was called

22   CIEA v. Jackson Labs?

23   A.   I do see that.

24   Q.   Do you recall reviewing materials?

25   A.   I don't.

1   Q.  Do you know what that case was about?

2   A.  Yes.

3   Q.  What was it about?

4   A.  That was a case that involved lab rats.  It was mice.  It

5   was about the breeding of mice with certain characteristics.

6   Q.  And you provided consulting work on that case?

7   A.  Yes.

8   Q.  And you were not the lead?

9   A.  No.

10  Q.  You weren't the primary?

11  A.  No.

12  Q.  You were just one of the three consultants, correct?

13  A.  That's correct.

14  Q.  Did anybody else other than the graphic consultants review

15  materials related to the case?

16  A.  Not that I know of.

17  Q.  And you were required to review things like expert reports?

18  A.  Yes.

19  Q.  And you reviewed pleadings?

20  A.  At times, yes.

21  Q.  And you reviewed depositions?

22  A.  At times, yes.

23  Q.  You were reviewing it to understand the case, correct?

24  A.  Correct.

25  Q.  And you needed to understand the case so that you could

1  make a recommendation about how to visually present the case,

2  correct?

3  A.  Yes.  I mean, it was to understand and grasp what the case

4  was about, what subject matter this was, yes.

5  Q.  But if the client was just telling you what to do, you

6  didn't need to understand anything, did you?

7  A.  It helps to have a background for what you're working on,

8  but it was to understand the case.

9  Q.  The client wasn't paying Visualex for your time for you to

10 understand the case for no reason?

11 A.  No.

12 Q.  And they were expecting the consultants to give their

13 opinions about how to visually strategize putting these

14 difficult concepts into pictures?

15 A.  Yes.  But on this case I don't recall serving in a lead

16 role or conceptualizing.

17 Q.  I'm sorry.

18 A.  I don't recall serving in a leading role where I was

19 drafting out the conceptual aspects of the case.

20 Q.  I'm not disputing that you didn't write graphics for every

21 single case.  There were three consultants, correct?

22 A.  Correct.

23 Q.  And the work was divvied up amongst you, correct?

24 A.  We all worked on different cases.

25 Q.  That's right.  And many times or all of the time for the

C8EMKADT                    Kadden - cross

1  most part, every e-mail that came in, irrespective of what case

2  it was for, went to the three of you so you could cover each

3  other, correct?

4  A.  No.  If I wasn't serving as a second or third string on

5  them, I was not necessarily.

6  Q.  Were you familiar with the CSX cases?

7  A.  Yes.

8  Q.  And did you provide true consulting services on the CSX

9  cases?

10  A.  Yes.

11  Q.  And those cases involved the railroad?

12  A.  I'm sorry?

13  Q.  Those cases involved what, the railroad?

14  A.  Railroad, yes.  I'm sorry.  I didn't hear what you said.

15  Q.  In connection with those cases did you take the primary or

16  the lead role?

17  A.  No.

18  Q.  Did you ever?

19  A.  I don't recall doing that, no.

20  Q.  Did you write up new graphics for it?

21  A.  At times, usually, those cases --

22          MS. KLEIN:  Your Honor, I would ask the witness to

23  answer.  Did she write up any graphics for it?

24          THE COURT:  Any graphics for it.  All right.  From

25  scratch.  Did you do any of the graphics on that?  You don't do

C8EMKADT                          Kadden - cross

1    graphics.

2              MS. KLEIN:  Yes, she does.  She conceptualizes.

3              THE COURT:  You prepared the graphics from scratch?

4              THE WITNESS:  The graphic design work, no.

5              THE COURT:  What did you do from scratch in that case?

6              THE WITNESS:  It's possible I did write up some of

7    those cover sheets to go into the studio.

8    Q.  And you reviewed background materials, medical reports

9    specifically with CSX, correct?

10   A.  Yes.

11   Q.  And if you remember at your deposition you told me that you

12   reviewed those medical records so you could figure out a visual

13   way to put information that would be helpful to your client in

14   the demonstrative exhibits, correct?

15   A.  That was the data collection.

16   Q.  That's right.  And you were looking through it and trying

17   to analyze and interpret and figure out ways to show that the

18   injuries that the plaintiffs were claiming were from something

19   other than working at the railroad?

20   A.  Yes.  That was Kim's directions.

21   Q.  But you read it and reviewed it independently?

22   A.  Yes.

23   Q.  And you picked out the medical information that you

24   believed would advance your client's case?

25   A.  Correct.

C8EMKADT                    Kadden - cross

1   Q.  And you believe that that was important for purposes of

2   helping the visual strategy?

3   A.  Yes.  I mean, this was set out by Kim, but yes.

4   Q.  But you were doing the work, correct?

5   A.  Correct.

6   Q.  Kim was more senior than you, she has more experience than

7   you as a graphic consultant?

8   A.  Significantly more.

9   Q.  Let's go back to your time sheets, please.

10          Do you recall doing work on a case called CNH Kinze

11  Manufacturing?

12  A.  We called it Kinze, yes.

13  Q.  And you did review of background material on that case?

14  A.  I don't recall.  It's possible.

15  Q.  Why don't we look at your entries for November 16.

16  A.  Of which year?

17  Q.  I'm sorry.  November 16, 2010.

18  A.  Okay.  I see that.

19  Q.  Does this refresh your recollection as to whether or not

20  you did background reading?

21  A.  Yes.  It says background reading right on there.

22  Q.  And you wouldn't have lied on your time sheets, right?

23  A.  No.

24  Q.  And did Abdul Johnson do background reading?

25  A.  Not as far as I know.

1  Q.  And I think you testified on your direct that you only

2  worked on cases when Lillian was out for personal reasons?

3  A.  No.  It's not that I only worked on cases when Lillian was

4  out, I worked on cases -- I was referring to the lead role.

5  Q.  But did you work as a consultant when Lillian was in the

6  office?

7  A.  Yes.

8  Q.  Did you regularly work as a consultant when Lillian was in

9  the office?

10  A.  Yes.

11  Q.  Let's turn to February 1, 2010.  I'd like to point your

12  attention to the cases that you have billed under CSX Blake.

13  A.  This is 252.  Is that where I am?  What was the date?  Was

14  it February --

15  Q.  February 1, 2010.

16  A.  Okay.

17  Q.  And on this date you put down that you did consulting work

18  for CSX, correct?

19  A.  Yes.

20  Q.  And part of the consulting work that you were performing

21  was new graphic writeups?

22  A.  Yes.  It's listed and there is proofing, editing and new

23  graphic writeups.

24  Q.  When you wrote new graphic writeups, you were writing up

25  your concept of what the demonstrative exhibits should convey,

1    correct?

2    A.   Not necessarily my concept.

3    Q.   When you wrote new graphic writeup, what were you doing?

4    A.   I was writing up the cover sheet for a graphic that was

5    going to go in the studio, but I don't have a way of knowing

6    from here what that graphic was.  It could have been one of

7    those transcripts that we looked at earlier where there is not

8    a lot of conceptualization on my part.

9    Q.   Let's get to those transcripts, and we will go over them

10   after in a little bit more depth.  On that chart that you fill

11   out and you identified before, it was your handwriting on it?

12   A.   Which chart?

13   Q.   On the testimony you showed before.  You gave testimony

14   about a deposition transcript and made it sound like you just

15   take the deposition transcript and you hand it to the graphic

16   artist, and they just make the words and put them on a page, is

17   that correct?

18   A.   I testified earlier about -- I'm not following what the

19   question is.

20   Q.   I want to make sure we understand.  Was your testimony that

21   the attorneys would send to the consultants the relevant pages

22   of the trial testimony?

23   A.   Yes.

24   Q.   And that your job, in sum and substance, was to basically

25   have some type of tracking mechanism to know that it came in,

C8EMKADT                    Kadden - cross

1   and that you were to then turn it over to the studio?

2   A.  I am not sure --

3   Q.  You were an intermediary, right?  You were just taking it

4   off and handing it off to the graphic artists.  They knew what

5   to do.  There were templates.

6   A.  We still had a procedure that was followed.

7   Q.  There was no role for you in that procedure, right?

8   A.  Yes.

9   Q.  What was your role?

10  A.  An envelope had to be created for each graphic, a cover

11  sheet had to be written up.  Whether or not if the client

12  wanted to take out the word objections or something like that,

13  there could be some -- something along those lines.  A title

14  would have to be written on it, the first page of the

15  transcript when the date was.  That would all get written on

16  the cover sheet.  And then the cover sheet along with the page

17  of trial transcript would then be given into the studio.

18  Q.  The graphic artists know how to do all that because you do

19  it for every case, right?

20  A.  They know how to do all what?

21  Q.  All of the stuff that you just testified about that was

22  done before it went into the studio.

23  A.  I wouldn't know what they know how to do, their

24  capabilities.  I know what they did.

25  Q.  And when you had those occasions where trial testimony came

C8EMKADT                    Kadden - cross

1   in and it was being created into a demonstrative exhibit, you

2   chose, did you not, most of the time what the caption was going

3   to be, the title?

4   A.  Yes.  That would be written by the consultant, which would

5   be me.

6   Q.  And you would craft that by reading through the deposition

7   or the trial testimony and would you make the decision as to

8   what you thought the important point of what your claim needed

9   to convey?

10  A.  Yes, absolutely.

11  Q.  The client didn't tell you what to put on the title?

12  A.  They sometimes might have.

13  Q.  In fact, they would correct it, isn't that true?  If you

14  started and there was something that was not accurate, for

15  example, when you say plaintiffs concede that, and you equated

16  that to a particular witness, there were times, correct, in the

17  Sobieski case, the lawyers at the end would come back and tell

18  you, Ms. Kadden, you were wrong from a legal perspective, that

19  the plaintiffs didn't concede something but the particular

20  witness conceded something?

21  A.  I don't have a recollection of that, but something like

22  that, a scenario like that could go on and then we would make

23  the revision.

24  Q.  But you crafted the original takeaway, correct?

25  A.  Correct.

1   Q.  And you were, in deciding what words to use as the

2   takeaway, thinking what will have the most impact in advancing

3   your clients' cases?

4   A.  Yes.

5               MS. KLEIN:  Your Honor, I'm happy to, if we have to,

6   go through -- there are tons and tons of the witness entering

7   new graphic writeups, much more than she testified on her

8   direct.  And I don't want to force the Court to have -- I guess

9   what I would ask at this point Mr. Risk if he's willing to

10  agree that these records are what they are, I'm more than

11  happy --

12              THE COURT:  He is going to agree these records are

13  what they are.  Of course they are what they are.  What's your

14  point?

15              MS. KLEIN:  My point is, again, that the witness

16  testified in her direct that she only worked on a couple of

17  cases and suggesting that if you were not called a primary or

18  lead, you didn't do any writeups, you didn't come up with any

19  of the new graphics.  And these documents make clear, it's

20  replete with Ms. Kadden doing new graphics on cases that she

21  wasn't the lead.  I'm just suggesting or asking -- I'm happy to

22  go through the entire thing.  It's going to be painstaking.

23              THE COURT:  It's horrible.  What's your point?  Are

24  you saying does he agree that the document says what it says?

25  Yes.  But if you are saying instead of her saying I can go

1  through the document and look for the words new graphic

2  writeup?  I can look for the word new graphic writeup.  Every

3  time I see it I can draw a yellow line, or you can submit a

4  marked copy.  You do it.  Take the exhibit, every time you see

5  the word new graphic, yellow highlight it and give it to me.

6  That would be very helpful.

7          MS. KLEIN:  Okay.

8  Q.  Do you remember doing work, Ms. Kadden, on a case called

9  Honeywell v. Fuji?

10 A.  I don't recall specifically the work, but I know I did work

11 on that case.

12 Q.  In connection with that work you also did new graphics?

13 A.  I don't recall.

14 Q.  If it's reflected in your time sheets, that would be

15 accurate, correct?

16 A.  Yes.  I would have no reason to think not.

17 Q.  If you weren't doing consulting work on that case, you

18 would have categorized the time based on the service that you

19 were providing at the time that you were doing it, correct?

20 A.  I don't understand the question.

21 Q.  When I'm looking at your time sheets on that case you have

22 a variety of things written down.  Sometimes you bill project

23 management, sometimes you bill for consulting work.  You have a

24 variety of things.  You have some administrative activities?

25 A.  Administrative on the actual case?

C8EMKADT                    Kadden - cross

1    Q.   Um-hum.

2    A.   What's the question?  I don't recall.

3    Q.   My question is, simply, if you chose to record your time as

4    consulting on a particular case, you would agree you were

5    providing consulting services at that time?

6    A.   Yes.

7    Q.   When you weren't acting in the role of a consultant, you

8    properly itemized it as what you were doing, project

9    management?

10   A.   Yes.  I entered the times I had been instructed to enter

11   time.

12   Q.   Who instructed you when to enter time as project manager?

13   A.   That was part of the discussions that I had with Kim Nawyn

14   at the beginning of my employment.

15   Q.   And Kim Nawyn told you that when you are not doing

16   consulting work you should put it in the proper category,

17   correct?

18   A.   I guess in sum and substance.  We had discussed specific.

19   We had pulled the list up and went, when you do this, bill it

20   as this or rather record it as this.  When you do that, record

21   it as that sort of thing.

22   Q.   You also testified in your direct that Lillian Romano was

23   the person who predominantly -- and you make it sound like it

24   was throughout your entire employment, gave the directions to

25   the art director, correct?

1    A.  Correct.

2    Q.  But you yourself gave direction to the art director?

3    A.  On occasions, yes.

4    Q.  On occasions throughout your employment, correct?

5    A.  Correct.

6    Q.  And when you are giving the art director direction you were

7    conveying to him what you had created and imagined that what

8    the demonstrative exhibit should look like?

9    A.  Possibly.  It could have been just a revision.

10   Q.  But you don't recall as you sit here on particular days

11   which it was?

12   A.  Which it was -- if I recorded it as briefing with an art

13   director, do I recall exactly what?  No, I don't recall.

14   Q.  You wrote on numerous entries, directions to the art

15   director?

16   A.  There were times when I sit in with Lillian and I would

17   take her writeups and give them -- brief the art director.

18   Q.  There were times that you didn't, correct, go in and give

19   them directions from Lillian?

20   A.  Yes.  Some of them came from me.

21   Q.  It's fair to say, you don't dispute that Lillian Romano has

22   a lot more experience than you, is that correct?

23   A.  That's correct.

24   Q.  And she was training you to be successful in this job?

25   A.  I don't know that I felt she was training me.

C8EMKADT                    Kadden - cross

1   Q.  She would have you review things, correct, and do writeups?

2   A.  Okay.  Yes.

3   Q.  Do you remember doing research on board of ed.?

4   A.  I don't recall, but I know I did do work on board of ed.

5   Q.  Do you recall Lillian asking you to do the writeups?

6   A.  I think there were like mockups.  I don't believe they

7   actually went into the studio.

8   Q.  She was asking you to do it because she wanted to see how

9   you were able to visually strategize, correct?

10  A.  Possibly, yes.

11  Q.  Now, all of the work that you did on Derea where you were

12  the lead or primary consultant, that occurred during the time

13  that you're asking for overtime, correct?

14  A.  I believe so, yes.

15  Q.  And you were the lead consultant during that time?

16  A.  I believe so, yes.

17  Q.  The Sobieski matter, also, you were the lead or primary

18  consultant and that occurred after the change in compensation,

19  correct?

20  A.  It occurred after the change in compensation and I was lead

21  on that case at times.  It was only a week, week and a half.

22          THE COURT:  Week and a half that you were in the lead

23  position?

24          THE WITNESS:  The whole case.  The case was from

25  November 4 to 14.

1          THE COURT:  You showed us the e-mails before.  You

2     said you were only the lead for part of that ten days.

3          THE WITNESS:  Only on days when Lillian did not come

4     into the office.

5     Q.  But were the lead on Derea?

6     A.  Correct.  I think that was about two days or so.

7     Q.  And throughout your employment where you have all this

8     other consulting time billed, you were, as you already

9     testified, providing a consulting services, whether as the

10    lead, the primary, or the backup, correct?

11    A.  Correct.

12    Q.  When you received from the trial team in the heat of a

13    trial the transcript, you as the consultant were responsible

14    for evaluating the information and deciding how to best

15    visually present it, correct?

16    A.  I am not sure I understand.  When we received a transcript,

17    meaning like a trial transcript?

18    Q.  Yes.

19    A.  I would be told to look at a certain page.  I didn't read

20    the whole thing and decide which pages.

21    Q.  But you were given a block of testimony and you would make

22    the decision, at least at the get-go, of, for example, to put

23    an elliptical, to take out certain parts.  You would read it

24    and trying to figure out what part here is advancing our

25    client's point?

C8EMKADT                         Kadden - cross

1  A.  That usually came from the client.

2  Q.  That didn't come from you?

3  A.  I can't say it never did, but generally if we are pulling

4  out -- if you're skipping testimony, that usually would come

5  from the client.

6  Q.  You would choose very often where to put a highlight,

7  correct?

8  A.  That's possible, yes.

9  Q.  That's because you were trying to make sure that you were

10  conveying the takeaway?

11  A.  That could be, yes.

12  Q.  And the clients didn't for the most part tell you on the

13  initial drafts what to highlight, did they?

14  A.  They sometimes did.

15  Q.  Many times they didn't, though, correct?

16  A.  Correct.

17  Q.  You testified before that was your handwriting, telling the

18  studio to highlight?

19  A.  Correct.

20  Q.  I'd like you to take a look -- I don't know that we have

21  introduced this yet, Exhibit K.

22          THE COURT:  What is this big fat exhibit?  Do you have

23  K?  I can give her my copy.

24          MS. KLEIN:  For convenience, I selected a couple of

25  pages so you don't have --

```
 1          THE COURT:  What is the fat exhibit?  Take a look at
 2    whole thing and tell me what it is.
 3          MS. KLEIN:  Your Honor, may I approach and give you
 4    this?  It's just a couple of pages.
 5          THE COURT:  I want to know what that big thing is.
 6    What is K?
 7          THE WITNESS:  This appears to be -- I can't tell if
 8    it's all the same graphic -- no.  It looks like it's multiple.
 9    From the Mirror World case, which I did work on.
10          THE COURT:  All one case?
11          THE WITNESS:  It looks like from one case.
12          THE COURT:  What is the word you used?
13          THE WITNESS:  The name of the case is Mirror World.
14          THE COURT:  These are a portion of it?
15          MS. KLEIN:  Yes.
16          THE COURT:  Have you marked them in some way or just
17    by the Bates number?
18          MS. KLEIN:  It just has the Bates number.  It's part
19    of that bigger thing.  If we can do it maybe as an excerpt.
20          THE COURT:  You can call it Bates whatever.
21          Today I have an early lunch appointment.  We need to
22    stop.
23          What's the problem, Mr. Risk?
24          MR. RISK:  I was waiting for my copy, not knowing it
25    was the lunch hour.
```

1              THE COURT:  You were going to get it.  It's Bates 17,

2    12, and 13 for the record.

3              To be realistic I am not going to get back until 10

4    after 2.  10 of 1 until 10 after 2.

5              MS. KLEIN:  Are we still likely going to finish at 4

6    today?  We are going to go to 4:30?

7              THE COURT:  Yes.  I am not going anywhere.

8              MR. RISK:  How late does your Honor --

9              THE COURT:  4:30.

10             MR. RISK:  I have another witness coming.  I asked her

11   to come after lunch.

12             (Luncheon recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

                        AFTERNOON SESSION

                           2:10 p.m.

 1

 2

 3          MR. RISK:  May I advise your Honor before we proceed,

 4     plaintiff has one additional witness, Ms. Moran.  She is a

 5     subpoenaed witness and she is coming to court this afternoon.

 6          THE COURT:  When she gets here we can interrupt and

 7     take her out of order.

 8          You will know when she gets here.

 9          MR. RISK:  I hope so, yes.

10     BY MS. KLEIN:

11     Q.  Ms. Kadden, before we broke you testified on your direct

12     that you did not have software while working at Visualex, is

13     that correct?

14     A.  I didn't have graphics software.

15     Q.  I apologize.  I meant to say that.

16     A.  Yes.

17     Q.  And you didn't need graphics software to perform your job

18     as a consultant, correct?

19     A.  Correct.

20     Q.  And the reason that you didn't need graphic software was

21     because you were creating the visual imagery in your head,

22     correct?

23     A.  No.

24     Q.  So explain to me, when you read material and you were

25     figuring out a way to visually depict it, which is what you

C8EMKADT                          Kadden - cross

1   testified to before, you didn't need to put that on a computer,

2   did you?

3   A.  No.

4   Q.  It came from your head and it went onto a piece of paper

5   that is a chart type sheet, correct?

6   A.  Correct.  I would handwrite my instructions.

7   Q.  And your instructions about your idea, your visual idea was

8   put on the chart and you then handed that off to somebody in

9   the studio, the art director or the graphic artist, for them to

10  bring to life your mental concept?

11  A.  On the occasions that I did that, yes.

12  Q.  That's the job of the consultant, correct?

13  A.  One of.  It's not what I did all the time.

14  Q.  Listen.  I'm a lawyer and I'm in court every day.  Is that

15  what your primary job was as a consultant?

16  A.  That's not what I -- if you are asking like most of the

17  time did I do that?

18  Q.  I'm asking, what was your primary job that you were hired

19  to do?

20          THE COURT:  She didn't know what is in somebody else's

21  mind.

22          But the primary thing you did all day was what?

23  A.  Not what you seem to be saying.

24  Q.  What did you do?

25  A.  Most of the job usually involved the revision stage of the

1   graphics.

2   Q.  As a professional consultant, which you were, correct, when

3   you were doing revisions, you were supposed to be looking at

4   the client's revisions and thinking about them critically,

5   correct?

6   A.  Correct.

7   Q.  And you were analyzing whether or not in your expertise

8   that revision should be done or it might not have the effect

9   that it was intended to?

10  A.  Correct.

11  Q.  So you weren't just following direction and seeing if it

12  ended up on a piece of paper; you were thinking?

13  A.  Well, it would depend.  I didn't always write -- I wasn't

14  always the consultant that wrote it on the paper.  When it came

15  through I would look at it and continue to do as we had said

16  earlier, do the job of what it was supposed to do.

17  Q.  And whether you were the lead, the primary, the third, you

18  were supposed to render your opinion to your colleagues if it

19  was not doing what it was supposed to do?

20  A.  Correct.

21  Q.  Do you know what a sense break means in your business?

22  A.  Yes.

23  Q.  What is a sense break?

24  A.  Sense break is -- it's where you are going to break the

25  line of text, if I recall correctly.

1   Q.  And what is the purpose of that?

2   A.  I guess it's for the visual -- how it's going to look in

3   the end product.

4   Q.  And as a consultant you care what the end product is going

5   to look like, correct?

6   A.  Correct.

7   Q.  And you care because of the fact that that will have an

8   impact on whether or not the trier of fact understands the

9   message you were trying to send?

10  A.  It's a factor.

11  Q.  I'm sorry?

12  A.  It's a factor, yes.

13  Q.  What are the other factors?

14  A.  There is a lot -- the sense break is not going to

15  necessarily make or break your graphic.  It's a piece of it.

16  It's a factor.

17  Q.  And the other factors that are incredibly important are the

18  title?

19  A.  Yes.

20  Q.  The takeaway?

21  A.  Yes.

22  Q.  The color?

23  A.  Those can all have an impact.

24  Q.  And as the consultant your job at all times was to be

25  looking critically at those revisions or new graphs, to make

1   sure that those things were consistent with what you believed

2   was the best visual presentation?

3   A.   Correct.

4   Q.   So I'd like you --

5          MS. KLEIN:  Can I have Exhibit M, please.

6          Your Honor, may I approach?

7          THE COURT:  You don't need to ask.

8          MS. KLEIN:  I figure I have to at least ask once a

9   day.  I asked yesterday.

10  Q.   Ms. Kadden, can you please just take a look at that and

11  tell the Court whether or not you recognize what that is?

12         THE COURT:  While she is doing that, just before the

13  break you handed up 1712 and 1713, two pages, another exhibit,

14  and we never used them.

15         MS. KLEIN:  I will get to them.  If you hold onto it,

16  it's the next one.  Thank you for reminding me.

17         THE COURT:  Now we are looking at M, right?

18         MS. KLEIN:  M.  We are looking at M.

19  Q.   Do you recognize what the bunch of documents is?

20  A.   Yes.

21  Q.   I would like -- what is it?

22  A.   It appears to be the file from the Father Derea case.

23  Q.   In Father Derea is a case that you were the lead or primary

24  consultant, as you would call it?

25  A.   Yes.

C8EMKADT                    Kadden - cross

1   Q.  And your job in connection with this particular assignment

2   was to take a Power Point presentation that had been created by

3   Pillsbury, the law firm, correct?

4   A.  Correct.

5   Q.  And do you remember how many pages when it started?

6   A.  I don't.

7   Q.  Is it fair to say that it was around 55 pages?

8   A.  Sounds about right.

9   Q.  And your job was to figure out a way to make it more

10  effective?

11  A.  We were putting it into the Visualex format.

12  Q.  Do you remember giving a deposition in this case?

13  A.  Yes.

14  Q.  Do you remember testifying that the job you were given in

15  connection with that was to make it more persuasive?

16  A.  Yes.

17  Q.  So that is what your job was, was to figure out a way to

18  take Pillsbury's work and how to make it more persuasive,

19  correct?

20  A.  Correct.

21  Q.  And that was to advance your client's case, correct?

22  A.  Correct.

23  Q.  I'd like you to turn to page VIS 01740.

24          You were able to get the 55 pages down to a much

25  shorter presentation, correct?

C8EMKADT                    Kadden - cross

1   A.  I don't know.  I still haven't found your page.  It's 017,

2   you said?

3   Q.  I'm sorry.  01740.

4   A.  01740, yes.

5   Q.  That's your handwriting, correct?

6   A.  Yes.

7   Q.  And tell us on the right-hand side why you wrote this

8   squiggly line where it says:  Cultivating a relationship of

9   trust and fear and then you put some symbol there.  What's that

10  symbol?

11  A.  That's about what you mentioned earlier, the sense break.

12  This was a revision that I was writing and I wanted the

13  designer to move the Father down to Derea to be on the same

14  line.

15  Q.  Why did that matter?

16  A.  Because that's the title.  It's his name.

17  Q.  Why does it matter that it's on one line?

18  A.  It should go together.  It seemed that was what I was --

19  what I thought -- how I thought it should look, the name would

20  be on one line.

21  Q.  How about on the bottom where you write:  Too close to

22  bottom -- does that say edge?

23  A.  Too close to bottom edge, question mark.

24  Q.  Was that your belief, that you thought the way it looked,

25  it was too close to the edge?

1   A.  Yeah.  I felt that usually we left a larger margin at the

2   bottom.

3   Q.  When you say usually, there are never graphics that are

4   exactly the same, are there?

5   A.  No.  No two graphics are exactly the same.

6   Q.  And you testified at your deposition, right, when you kept

7   using the word templates, really what you were referring to is

8   the essential equivalent of a letterhead?  You start out with

9   certain things, right?

10  A.  I don't know that I would compare it to a letterhead, no.

11  Q.  So tell me --

12  A.  A letterhead doesn't change at all.  The letterhead is

13  always the letterhead.

14  Q.  Is there any templates that you have used that have the

15  exact same content inside them?

16  A.  No.  The content has to change.

17  Q.  And it depends on what you have provided the graphic artist

18  with, right?

19  A.  Correct.  It would drop into the form.

20  Q.  So you are deciding what to put into the form?

21  A.  Not necessarily.

22  Q.  On occasions while you were working it was your

23  responsibility to determine what to put in the form?

24  A.  On occasion.

25  Q.  And it was on the occasion when you weren't doing the job

1   you were supposed to be doing as a consultant?

2   A.   Yes.   Sometimes it came from the client.

3   Q.   Sometimes you agreed with the client, correct?

4   A.   Yes.

5   Q.   So, for example, if you've already gone through ten

6   revisions and a client sees that you spelled the name wrong,

7   you would agree to change it to have the correct spelling,

8   correct?

9   A.   Yes.

10   Q.   But before you got there, when it went through several

11   revisions, before you ever gave it to the client, they were

12   your decisions as the consultant?

13   A.   Correct.

14   Q.   So going back to Derea, you were able to get this

15   approximately 55-page Power Point presentation down to

16   approximately 27 pages, is that correct?

17   A.   No recollection, and I saw this, but I never counted the

18   pages, so I don't know.

19   Q.   Do you recall as you sit here today rewriting parts of the

20   presentation?

21   A.   No, I don't.

22   Q.   You don't?

23   A.   I don't recall that.

24   Q.   Are you testifying that you did not do it?

25   A.   No, I don't recall doing it.  Also, the time frame seemed

C8EMKADT                    Kadden - cross

1   short to do that much revision.

2   Q.  If I was to give you the final presentation and it was

3   under 30 pages and we started at 55, you were able to get rid

4   of approximately how many pages?

5   A.  I don't know that that was me.

6   Q.  Who else worked on Derea?

7   A.  There was a consultant Donald Kane that was involved, so it

8   may have come from him.  I don't recall.

9   Q.  At the end, Donald gave you a couple of final comments

10  about changing the word abuse to child or vice-versa, correct?

11  A.  Referring to the title?

12  Q.  Yes.

13  A.  Yes.

14  Q.  And the majority of the other stuff, that was done was by

15  you, correct?

16  A.  There was not a lot of revision, I recall.

17  Q.  There was not a lot of revision, so you shouldn't have

18  charged for consulting work, correct?

19          MR. RISK:  Objection.

20  A.  No.  There were about five hours of consulting work and I

21  think that was valid.

22          THE COURT:  Let me interrupt.  Is that Ms. Moran?

23          MR. RISK:  Yes.

24          MS. KLEIN:  Do you want to take a break?

25          THE COURT:  It would be best.  The plaintiff has to be

C8EMKADT                    Kadden – cross

1    here anyway.  Ms. Moran has come from work.

2              We will interrupt your testimony now.

3              Ms. Moran, we will take you right away so hopefully

4    you will be started and finished.

5     HEATHER MORAN,

6          called as a witness by the Plaintiff,

7          having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MR. RISK:

10   Q.  Ms. Moran, good afternoon.

11   A.  Good afternoon.

12   Q.  You are here pursuant to a subpoena in this case?

13   A.  Yes, I am.

14   Q.  I am going to hand you what's already in evidence as

15   Exhibit 14.  Take a minute, take a look at it, and then I am

16   going to ask you about it.

17              What is Exhibit 14, Ms. Moran?

18   A.  It's my résumé as it was in 2010.

19   Q.  And, if you know, is that the version of your résumé that

20   you submitted to Visualex?

21   A.  Yes.

22   Q.  Can you briefly describe your professional background prior

23   to joining Visualex?

24   A.  I had been a paralegal, litigation paralegal for quite a

25   few years.  I was a legal assistant prior to that while I was

1    working on my paralegal certificate.  That's pretty much what

2    I've been doing my whole career for the most part.

3    Q.  I am going to ask you to turn the mic a little bit toward

4    you.  I'm having a little bit of trouble hearing you.

5    A.  Sorry.

6    Q.  What were you doing immediately prior to your joining

7    Visualex?

8    A.  I was working at a law firm as a senior paralegal at Smith

9    Buss & Jacobs in Yonkers.

10          THE COURT:  Where do you work now?

11          THE WITNESS:  Smith Buss & Jacobs.  I went back to the

12   same firm.

13   Q.  How did you come to get a job at Visualex?  When did you

14   join Visualex?

15   A.  I believe it was in March.

16   Q.  Of?

17   A.  2011.  Because I just went back to my -- in 2012, yes.

18   Q.  Can you describe how it came to be that you took a position

19   at Visualex?  What happened first?

20   A.  A friend of mine who is an attorney in Dutchess County had

21   suggested that I upload my résumé onto LinkedIn.

22   Q.  What's LinkedIn?

23   A.  LinkedIn is a professional networking site, and she just

24   thought it would be a good way for me to have some contacts, so

25   I had filled in the information and within three days I had a

1    staffing agency contact me via e-mail through LinkedIn about an

2    opportunity.

3    Q.  Who contacted you?

4    A.  Kate Potters.

5    Q.  And did you speak to Ms. Potters?

6    A.  Not initially.  The first time she had e-mailed me I just

7    e-mailed her back that I wasn't interested, and then she had

8    e-mailed me back again and I spoke to her on the phone after

9    that.

10   Q.  Why weren't you interested the first time you heard from

11   Ms. Potters?

12   A.  Because I was happy at the law firm I was at.  I wasn't

13   really looking for a new job at that time.  So I had joined

14   LinkedIn because it was something that was recommended I do,

15   but it wasn't necessarily because I was looking for work at

16   that time.

17   Q.  And when she contacted you the second time, was that by

18   e-mail or telephone?

19   A.  It was via e-mail again and then I gave her my phone

20   number.

21   Q.  Then you spoke on the phone?

22   A.  Then we spoke on the phone.

23   Q.  What did you learn about the position from Ms. Potters?

24   A.  She had basically said that it kind of was -- it was in the

25   litigation field.  It also brought in graphics and it was

1  graphics that was done during trial.  And she said it was kind

2  of a different vain, something I had never done before.  But

3  she thought that I might be a good fit.  And it was kind of a

4  way to advance my career because I had kind of plateaued as a

5  paralegal, so it would be something new I could try.

6  Q.  And what happened next?

7  A.  So I had sent her this résumé.  I had e-mailed her this

8  résumé.  And within -- she asked me if she could, first of all,

9  forward this along to Visualex.  She said, if you sent me your

10 résumé, would it be okay to forward it along.  I sent her my

11 résumé.  I had spoken to my boss about what was going on, so he

12 was somewhat aware.  And she had called me back pretty quickly

13 and told me to schedule an interview if I was interested.

14 Q.  And did you have an interview with Visualex?

15 A.  Yes.  With Lillian.  I had met with Lillian.

16 Q.  You met with Ms. Romano in person?

17 A.  Yes.

18 Q.  Where was that?

19 A.  It was in New York City at the Concord.  I believe it's an

20 apartment or condominium complex.

21 Q.  And was anyone else at the meeting?

22 A.  No.  It was just the two of us.

23 Q.  How long did it last?

24 A.  Maybe about an hour or so.

25 Q.  And do you know whether Ms. Romano had seen your résumé?

1    A.  Yes, she had a copy of it when I got there.

2    Q.  And what do you remember was discussed at that meeting?

3    A.  Just kind of, she explained the day in, day out of kind of

4    how the office in general worked, what the job was, what kind

5    she would like me to do.

6    Q.  What did she say the job was?

7    A.  Basically, it was a consulting position.  You work with her

8    and with clients and you read through various court documents

9    so you can familiarize yourself with the case, and then come up

10   with visual graphics to help strengthen either experts' points

11   or witnesses' points or opening, closing, so preparing graphics

12   for them to use in trial.  Also sending out letters trying to

13   get in new clients, things like that, basically help out

14   wherever needed.  Making Power Point presentations, edits, that

15   kind of thing, e-mailing with clients if needed.

16   Q.  Were you familiar with the field of litigation graphics

17   consulting prior to your discussions with Visualex?

18   A.  No.  And, honestly, I didn't even really know anything like

19   that existed because I never worked in firms where they were

20   large enough to use anything like that, so I never really

21   thought about it in general, about a job like that.  I didn't

22   know it existed.  I didn't think about it.

23   Q.  So you had no --

24   A.  No experience, I had no experience.  I didn't even really

25   know what the job was.

1  Q.  And did you discuss with Ms. Romano the fact that you had

2  no experience in litigation graphics?

3  A.  Yes.

4  Q.  What did you say?

5  A.  Is it a problem that I have absolutely no experience, and I

6  also expressed that with Kate Potters, because it was a concern

7  to me that I was leaving a stable job and going to something

8  new that I had no experience in.  In a bad economy I was

9  nervous about making the jump if it wasn't going to be a good

10  fit.

11  Q.  Do you recall what, if anything, Ms. Romano told you about

12  your concern that you had no experience in the field?

13  A.  She was aware that I had no experience, but she said that

14  it would be okay, that she could talk to me and teach me things

15  and kind of mentor me and teach me the way that she learned,

16  and there is also another girl that was there, Kim, and that

17  Kim could also work with me and help me.

18  Q.  Do you remember anything else from your meeting with Ms.

19  Romano?

20  A.  Just that I came off with a good feeling.  I was excited.

21  Q.  Why were you excited?

22  A.  Because it was a kind of new adventure, and I wasn't

23  exactly sure what I was getting into, but it sounded exciting.

24  Q.  What was exciting about it?

25  A.  Just some of the really big cases, being involved in really

1   big cases, traveling, going to client meetings, things like

2   that.

3   Q.  What was said to you about traveling?

4   A.  That sometimes you have to travel for jobs, would that be a

5   problem.  I'm not married.  I don't have children.  We

6   discussed that.  So that wouldn't be an issue.

7   Q.  I am going to show you what is already in evidence marked

8   as Exhibit 13.  Take a minute and take a look at that.

9          Do you recognize Exhibit 13, Ms. Moran?

10  A.  Yes.

11  Q.  What is it?

12  A.  It was my offer letter that came in a folder that was

13  mailed to me with all of employment documentation.

14  Q.  And you signed it and mailed it back?

15  A.  Yes.

16  Q.  Do you remember when you started work at Visualex?

17  A.  I don't remember the exact date off the top of my head.

18          THE COURT:  What year was it?

19          THE WITNESS:  It was 2011.

20          THE COURT:  How long were you there all together?

21          THE WITNESS:  Almost exactly one year.

22          THE COURT:  Why did you leave.

23          THE WITNESS:  Because I realized that I enjoyed being

24  a paralegal better.  I just wasn't -- I just didn't really like

25  the job in and of itself.

1   Q.  And what happened when you arrived on your first day at

2   Visualex?

3   A.  I went into the office that was set out for me and I had

4   business cards and BlackBerry and everything was kind of all

5   ready for me.  I was introduced to everybody else.  I sat with

6   Kim, I believe.  I sat with Brian, just kind of going over what

7   the job was, what the company was, what they did, where

8   litigation graphics came, the history of it.

9   Q.  Were they aware that you were coming to work that day?

10  A.  I don't know off the top of my head.  I don't believe so,

11  no.  Because a few people said that they were surprised.  Two

12  people had commented to me that they were surprised.  They

13  didn't know I was arriving.  That's what they had told me that

14  day, at least.

15  Q.  You worked for Visualex about a year.  Can you describe the

16  hours of work at Visualex?

17  A.  It was overtime as the jobs would come in, but when there

18  wasn't a job going on there was a lot of downtime.  And then

19  when there was a job going on it was basically at the beck and

20  call of the attorneys, nights, weekends, whatever was needed.

21  Sometimes it would be until 11 or 12, sometimes it would be to

22  2 or 3.  Sometimes it would only be to 9 or 10.  Every job was

23  different.

24  Q.  And you didn't receive any overtime compensation at any

25  time during your employment at Visualex?

C8EMKADT                          Moran - direct

1   A.  No.

2   Q.  Now, you testified about how the job was described to you

3   at your interview.  Did the job turn out as it had been

4   described to you?

5   A.  I didn't feel that it did, no.  I felt it was described a

6   little bit more glamorously than it actually was.

7   Q.  What did you principally do on this job?

8   A.  For the most part, I would proofread revisions that would

9   come in, write up small revisions here and there based off of

10  phone calls or e-mails.  Sometimes I would explain the

11  revisions to the designers, just basic, this is being changed

12  to this word or this is being changed.  That was mainly it,

13  really.  Mostly revisions.  I used to drop initial graphics

14  sometimes as practice, but none of my original graphics were

15  ever used, I don't believe.  So it was mostly revisions,

16  proofreading previsions.

17  Q.  Did you have contact with Visualex's clients?

18  A.  Yes.

19  Q.  In what way?

20  A.  Mostly via e-mail.  But sometimes if they were calling in

21  changes that were a little bit more extensive or something

22  confusing or if they had a question, then you would do it over

23  the phone and kind of go over everything over the phone with

24  them that they wanted slide by slide.

25  Q.  It's your testimony that your contacts with clients were in

1    connection with revision matters?

2    A.  Yes.  I never had a client come to me for a new job or

3    anything, no.

4    Q.  Did you ever meet any clients?

5    A.  I think I met one at two meetings, but I was with Lillian.

6    I wasn't by myself going to meetings.  She brought me to kind

7    of show me how a meeting would be run.

8    Q.  Are you familiar with the idea of a lead and a backup

9    consultant at Visualex?

10   A.  Nothing was ever like stated about that, but, yes.  I mean,

11   Lillian was the lead on everything.  She was the owner.  And we

12   were kind of backup.  The rest of the consultants were backup.

13   Q.  What was the difference between what she did and what you

14   did?

15   A.  She did a lot of the original graphics, she created most of

16   the graphics, whereas my job was mostly just revisions and

17   proofreading.

18   Q.  Now, you testified about the issue of your inexperience.

19   Did you receive any formal training at Visualex?

20   A.  Nothing really formal, nothing really consistent, kind

21   of -- there were books in the office.  I would read some of the

22   books.  Kim had given me some books.  Lillian gave me one

23   visual book.  Reading articles that I would find and just kind

24   of going through old graphics that were done and seeing how

25   they were written up and where ideas came from and stuff like

1   that.

2   Q.  Prior to coming to Visualex you did have some courses in

3   the graphic arts, didn't you?

4   A.  Yes, I did.

5   Q.  Did that put you on par with the graphic designers at

6   Visualex?

7   A.  No.

8           THE COURT:  What do you mean by put her on par?

9   Q.  Did that give you training and skills equal to that of

10  graphics designers?

11  A.  No, absolutely not.

12  Q.  You are smiling.  Why?

13  A.  They were way more talented.  I know basic.  It was only

14  about a year worth of course work.  I knew basic things about

15  graphics, but not to the extent that the artists did.  They

16  were phenomenal.

17  Q.  Can you describe how you came to leave the job at Visualex?

18  A.  I just -- I wasn't enjoying the job.  I just didn't like

19  going to work every day.  I didn't like what I was doing.  I

20  didn't like the environment.  And I had always maintained a

21  friendship with my old boss, and he had an opening back at the

22  firm, so he had said to me, would you ever consider coming back

23  and the timing kind of worked out perfectly.  I said yes.  I

24  told him, I said, you know, yes, that would work out great to

25  come work for you again.

C8EMKADT                    Moran – direct

1    Q.  How did you resign from Visualex?

2    A.  I had submitted a letter, resignation letter, basic

3    resignation letter.

4    Q.  Did you give notice?

5    A.  Yes.  Two weeks.

6    Q.  To whom did you submit the resignation letter?

7    A.  To Lillian.

8    Q.  Did you have any conversations with Ms. Romano at the time

9    of or after you submitted your resignation?

10   A.  No, nothing.

11   Q.  Did you work the two weeks?

12   A.  Yes.

13          MR. RISK:  I have nothing further, your Honor.

14          THE COURT:  Thank you.

15          Do you earn the same salary back at the law firm that

16   you did at Visualex?

17          THE WITNESS:  I do now, yes.

18          THE COURT:  Not when you first went there?

19          THE WITNESS:  When I first was there the first time, I

20   was making considerably less than I was making at Visualex.

21          THE COURT:  You went back at the same salary as

22   Visualex?

23          THE WITNESS:  Within about $5,000, yes.

24   CROSS-EXAMINATION

25   BY MS. KLEIN:

1    Q.  Good afternoon, Ms. Moran.

2    A.  Good afternoon.

3            THE COURT:  How large a firm is that?

4            THE WITNESS:  I think there is probably -- I don't

5    know exactly how many attorneys there are because there is a

6    real estate department downstairs, but there are 15 attorneys

7    and then paralegals and legal assistants.

8    Q.  Ms. Moran, you testified before that you didn't have any

9    experience before you went to Visualex, correct?

10   A.  Yes.

11   Q.  But you did have experience in the arts, correct?

12   A.  I had taken courses in the arts, yes.

13   Q.  And you had formal education in the arts and in psychology,

14   correct?

15   A.  Yes.

16   Q.  And you have a degree in graphics arts, correct?

17   A.  I have what's equivalent to about an associate's degree.

18   Q.  You have taken classes towards a master's?

19   A.  I have taken almost a year.

20           THE COURT:  When did you do that?

21           THE WITNESS:  I did that when I graduated in 1999.  I

22   had gone onto University of Hartford for clinical psychology,

23   but I left the program in my second semester about midway

24   through because I knew I didn't want to study any further, and

25   I still could get money back from the school for leaving early.

C8EMKADT                    Moran - cross

1  Q.  When Lillian was speaking with you about the job when you

2  were interviewing for it, did you discuss psychology?

3  A.  Honestly, I can't recall.  We might have, maybe.  If it

4  was, it wasn't anything enough that it would stick in my mind.

5  It wasn't a long enough conversation that I would remember it

6  exactly.

7  Q.  As you sit here today do you think you know what the job of

8  a graphic consultant is?

9  A.  I know what the job of a graphic consultant --

10 Q.  Yes or no.  Do you know what it is?

11        MR. RISK:  Let the witness answer the question.

12 A.  I would say no, I don't know.  If you need yes or no, then

13 just no.

14 Q.  You never observed Lillian interacting with clients?

15 A.  Yes, I did sometimes when I went to go to meetings with

16 her.

17 Q.  And you never observed Lillian speaking to the art

18 directors?

19 A.  Yes, I would hear that.

20 Q.  And you never observed Lillian having discussions with

21 clients about visual strategy?

22 A.  Sometimes I would, yes, sometimes.

23 Q.  Did you ever observe Lillian talking to clients about

24 revisions?

25 A.  Not really about revisions, no.  Revisions were usually,

1  like I said, done via e-mail or usually no, because they were

2  secondary.

3  Q.  I'm not asking usually.  You never saw Lillian talk to a

4  client about revisions that she believed would not work?

5  A.  Not that I recall, no.

6  Q.  How about Kim Nawyn, did you ever see her talk to clients

7  about revisions?

8  A.  To Kim, yes.

9  Q.  And you saw her interact with clients either via e-mail or

10  her telling them that she didn't believe that the revisions

11  were going to be effective?

12  A.  I never saw Kim say anything like that.

13  Q.  Kim just took blind direction?

14  A.  She might have said something like that, but I wasn't privy

15  to it.

16  Q.  And you weren't privy to a lot of the work that was done?

17  A.  Some I was and some I wasn't.

18  Q.  In the short time that you were working at Visualex, you

19  read background material?

20  A.  Yes.  That was in the office.

21  Q.  And you were told by Lillian that you were reviewing

22  background material for what purpose?

23  A.  I wasn't actually told by Lillian I was reviewing

24  background material.  I just didn't really know what the job

25  was, so I thought it was -- knowing from my education, reading

1    sometimes helps, reading and taking notes.  I thought I could

2    familiarize myself with.

3    Q.  When you started the job, nobody at Visualex told you at

4    any point that you had to read background material on cases

5    that you were working on?

6    A.  Oh, yes, but I thought you were talking about background

7    materials as far as reading books.

8    Q.  I'm asking while you were working did you review background

9    material on cases?

10   A.  Yes.

11   Q.  You reviewed pleadings?

12   A.  Yes.

13   Q.  Expert reports?

14   A.  Yes.

15   Q.  What were you reviewing them for?

16   A.  I was highlighting them and I would usually write up

17   graphics, show Lillian, and they were usually wrong.

18   Q.  So you are not great at it.  Good.  You chose another

19   profession, but you were learning, right?

20   A.  No.  I was more confused than anything the entire time I

21   was there.

22   Q.  You were trying to figure out how to visually present legal

23   documents?

24   A.  Yes.  I couldn't do it.

25   Q.  You weren't successful, but you were trying, right?

1    A.  Yes, I was trying, yes.

2    Q.  You tried hard?

3    A.  Yes, I did.

4    Q.  And when you were reviewing and highlighting things, what

5    were you highlighting for?

6    A.  Things to me that stuck out that might be important.

7    Q.  Important for what purpose?

8    A.  Because I used to draw graphics and show Lillian what I was

9    taking from what I was reading.

10   Q.  I'm asking, what were you making a decision on, based on

11   what's important to what?

12   A.  What I thought was important to the case.

13   Q.  Why does that matter?

14   A.  Because I was trying to learn the job.

15   Q.  And do you have any idea if you did a better job than Ms.

16   Kadden did?

17   A.  I have no idea.  I didn't work with her.  I don't know what

18   she did or didn't do.

19   Q.  And you don't have a legal background, right?

20   A.  Just paralegal.

21   Q.  You don't have a JD like she does?

22   A.  No.

23   Q.  You have no idea whether or not her having a JD made her

24   better at the job?

25   A.  I have no idea.  I don't know how she was at the job.  I

C8EMKADT                          Moran - cross

1   don't know.

2   Q.  When you talk about, you sat idly a lot of time, correct?

3   A.  Yes.

4   Q.  And there was a lot of time that people worked late,

5   correct?

6   A.  Yes.

7   Q.  Ms. Romano regularly works late, right?

8   A.  She works with us, yes, late, yup.

9   Q.  She didn't leave you there just to do the little bit of

10  piddly work that was left, right?

11  A.  She would usually leave Abdul and I there and usually one

12  artist, and we would be the ones sending out the final things

13  an hour or two before.

14  Q.  And many times she would come back to the office and still

15  be there at midnight, correct?

16  A.  If I wasn't there I don't know.

17  Q.  And Kim Nawyn, when you worked with her, she was there

18  late?

19  A.  Yes.

20  Q.  Again, it wasn't the junior people that were left there to

21  just do it on their own?

22  A.  It was usually me and Kim together.

23  Q.  So the consultants were there and they were making sure

24  that the project was going to be completed, correct?

25  A.  Yes.  Whatever needed to be completed for that day at

1   least.

2   Q.  Do you acknowledge or do you know when the clients hire

3   Visualex, are they hiring them for two separate things?

4   A.  Usually, it's for the graphics and then sometimes they will

5   hire for trial technicians as well.

6   Q.  How about, do they hire them ever just for consulting, not

7   to produce exhibits?

8   A.  Hire Visualex?

9   Q.  Yes.  Aren't there times that the law firms themselves

10  don't want to spend the money and they do their own graphics?

11  A.  Yes.

12  Q.  And they are hiring just the consultants?

13  A.  Well, if they do their own graphics usually they would send

14  us what they did and they would want changes off of what they

15  did sometimes.

16  Q.  When they are not asking you for changes, there are many,

17  many times that the consultants were just looking at somebody

18  else's work and consulting and giving their opinion, correct?

19  A.  I never did that, no.

20  Q.  You didn't do that?

21  A.  No.

22  Q.  Is that the what the consultants did?

23  A.  I never saw anyone do that, no.

24  Q.  You said before you tried to draft graphics, but they

25  weren't -- you don't think they were utilized, right?

C8EMKADT                          Moran - cross

1    A.  I know they weren't utilized, because I never saw them

2    through production.

3    Q.  Didn't you tell my associate that you think one of yours --

4    A.  I think one animation was, not a graphic; an animation,

5    yes.

6    Q.  One of your recommendations in your young career there was

7    used?

8    A.  Yes.  But it was really described what to do for me.  I

9    just wrote it out.  I took it as my graphic because I wrote it

10   out.  That's how I interpreted it.

11   Q.  When you were hired, were you hired to be a proofreader?

12   A.  No.  I was hired as a graphic consultant.

13   Q.  And you spoke to Ms. Potter about the position?

14   A.  Yes.

15   Q.  And she explained to you that the job was for consultants

16   to advise on individual strategy in order to have a certain

17   effect on the trier of fact?

18         MR. RISK:  Objection.  The question calls for a

19   hearsay answer.

20         THE COURT:  Sustained.

21   Q.  What do you understand that trial graphics are used for?

22   A.  As I had said earlier, I feel like they are used for

23   opening or for experts to basically exemplify their

24   testimonies.

25   Q.  When it's not testimony, when there is actually pictures

1   that are being depicted, is it meant for persuasive purposes?

2   A.  No.  I feel like it's just backup -- it's a visual point

3   that someone can see because sometimes, you know, they say that

4   jurors don't take in everything that's being said.  So visually

5   if there is something to look at they might remember it.

6   Q.  So there are different ways of learning?

7   A.  Yes.

8   Q.  From your psychology background, tell us what's the

9   different ways that jurors learn.

10  A.  From my psychology background?

11  Q.  Yes.

12  A.  I have no idea.  I didn't take any courses in psychology

13  related to anything like that.

14  Q.  I believe I heard you testify that some people, jurors can

15  read --

16  A.  That is what I had read in a book called Trial Consulting

17  that I had taken notes on.

18  Q.  You read the book and you took notes.  What do you recall

19  it saying is the purpose of demonstrative exhibits?

20  A.  To support a trial, to support a testimony.

21  Q.  Is it fair to say it's to persuade?

22  A.  I wouldn't use it in that term, but I guess so.  I don't

23  feel like it's persuasion.  I feel like it's backup.

24  Q.  Did you ever hear the phrase takeaway in the business?

25  A.  Takeaway, to take away from something.  I have heard that

C8EMKADT                         Moran - cross

1   comment before.

2   Q.  You never heard any of the consultants talking about the

3   intended takeaway?

4   A.  No.  I have never heard those two words together.

5   Q.  You don't have very much experience in the field, correct?

6   A.  No, not at all.

7   Q.  You didn't leave a very happy employee, correct?

8   A.  No.

9   Q.  In fact, Lillian told you she thought you weren't very

10  smart, correct?

11  A.  That's a nice way to put it, yes.

12  Q.  She told you in fact you weren't critical enough, you

13  weren't analytical enough?

14  A.  She never said that to me, no.

15  Q.  She spoke to you about your lack of talent, correct?

16  A.  That's a nice way to put it, yes.

17              MS. KLEIN:  I have no further questions, your Honor.

18              THE COURT:  Any redirect?

19              MR. RISK:  None, your Honor.

20              THE COURT:  Thank you for coming in.  We really do

21  appreciate it.

22              (Witness excused)

23              THE COURT:  Ms. Kadden.

24              MS. KLEIN:  Your Honor, can we take a one-minute break

25  to go to the rest room?

C8EMKADT

1           THE COURT:  Sure.

2           After Ms. Kadden, do you have any more witnesses for

3    the case?

4           MS. KLEIN:  We are calling Ron Daignult, and I also

5    plan on calling Ms. Romano back on a rebuttal witness on

6    something that was brought up by Ms. Moran.

7           THE COURT:  Who is Ron Daignult?

8           MS. KLEIN:  He is a client that worked with Ms.

9    Kadden.

10          THE COURT:  You knew about this?

11          MS. KLEIN:  He is on our list.

12          MR. RISK:  He is on the list for the initial case.  I

13   thought the case was complete and he wasn't called.

14          MS. KLEIN:  He is being called as a rebuttal.  She is

15   claiming that she just followed directions from him.  Again,

16   it's important.  I don't think it should be more than ten

17   minutes.

18          THE COURT:  Is this for tonight?

19          MS. KLEIN:  He would be here for tonight.  He could be

20   here in the morning.  I don't think we would be finished with

21   Ms. Kadden.  That's in an hour.

22          THE COURT:  I don't have another matter until 5.  We

23   can go until 5.

24          MS. KLEIN:  Let me see if I can have him get here

25   today.  Can we see how the next 45 minutes goes?  Let's see how

C8EMKADT

1   close --

2          THE COURT:  Could somebody either call or e-mail

3   him --

4          MS. KLEIN:  He is on hold.

5          THE COURT:  For today?

6          MS. KLEIN:  He could come either day or tomorrow

7   morning.  I just don't want to have him sit here.

8          THE COURT:  Somebody call him to say, stick around

9   until 4 at least so we can call you.

10          MS. KLEIN:  Yeah, absolutely.

11          May I also just ask what was the last question?

12          I am going to be calling one other rebuttal witness,

13   another employee that was hired after Ms. Moran, and he would

14   be our last witness.

15          THE COURT:  Who is that?

16          MS. KLEIN:  His name is David Mykel.

17          MR. RISK:  That's an employee who joined --

18          MS. KLEIN:  It's a rebuttal about what we just heard.

19          THE COURT:  Would you not get so excited.

20          MS. KLEIN:  Sorry.

21          THE COURT:  Apparently, this person came after

22   Ms. Moran.

23          MR. RISK:  This is someone who unfamiliar with

24   Visualex prior to 2012, and we are talking about Ms. Kadden's

25   duties between 2008 and early 2011.

C8EMKADT

```
 1          THE COURT:  She is only saying that's the one directly
 2    after Moran.  As useless as Moran was, I assume he will be
 3    equally useless.
 4          (Record read)
 5     ADINA KADDEN, resumed.
 6    CROSS-EXAMINATION (cont'd)
 7    BY MS. KLEIN:
 8    Q.  In your direct testimony you were looking at one of
 9    yesterday's exhibits that had an example of trial testimony
10    that is going to be made into an exhibit.
11          Do you recall that?
12    A.  Yes.
13    Q.  And are there times as the consultant that the lawyers give
14    you a lot of different testimony and you make recommendations
15    to them to not use it in the format that you saw, but instead
16    to maybe graphic it or map it?
17    A.  No, I'm not sure what you mean.
18    Q.  When you are given either deposition testimony or trial
19    testimony, does it always look like the format that we were
20    shown before?
21    A.  As I recall it.  I believe so.
22    Q.  You never made recommendations about visually graphing
23    certain testimony?
24    A.  I don't know what you mean by graphing.
25    Q.  Taking the words and doing a demonstrative of it, putting
```

1    it into a visual presentation.

2    A.  I don't recall.  I am not sure what you are referring to.

3    Q.  Well, the type of thing that you were testifying before

4    about was simply highlighting and enclosing words that somebody

5    used, correct?

6    A.  The testimony.

7    Q.  And there are other times, weren't there, that the

8    consultants would recommend that visuals be used, meaning

9    graphics, to express a point during closings?

10   A.  I don't recall that.

11   Q.  Do you recall working on the closing for Sobieski?

12   A.  I do.

13   Q.  And did you just pull testimony in connection with that

14   closing?

15   A.  What do you mean, pull testimony?

16   Q.  Did you just take the trial transcript testimony and put

17   those words on a page?

18   A.  I don't recall specifically.  I know -- we saw earlier some

19   trial transcript slides.

20   Q.  Do you remember working on anything else for that closing?

21   A.  I don't recall specifically.  It's possible.

22   Q.  Do you remember working on something that had a scale?

23   A.  There was -- yes, there was a graphic that involved

24   something of a scale.

25   Q.  And you came up with the idea of showing in the closing the

1   scale?

2   A.  No.

3   Q.  You didn't?

4   A.  No.  Not as I recall it.

5   Q.  Who came up with that?

6   A.  I feel like, as I recall, that might have come from the

7   client.

8   Q.  And was it your job when they might have suggested that if

9   it came from them, if you didn't think it was a good idea as a

10  consultant, were they paying you for your opinion?

11  A.  Yes.

12  Q.  Let's just go through the cases that you worked on as a

13  consultant quickly because you made it sound like you didn't

14  work on very many.  You worked on 3 Car, you've already

15  conceded, you worked on AIC and Sapco Insurance Co. doing

16  consulting work?

17  A.  Yes.

18  Q.  You also worked, I believe you testified, as a consultant

19  on AlphaPharma v. Purdue?

20  A.  Correct.

21  Q.  Expressing your opinions to the client if you didn't

22  believe the visual was the correct strategy?

23  A.  I don't recall that.

24  Q.  If you were doing your job as a consultant, you would have

25  been expressing your opinion if it didn't work visually?

C8EMKADT                    Kadden - cross

1          THE COURT:  The problem is, you said, if it didn't

2     work.  I don't know if that ever occurred.

3          Did you ever have an occasion in that case to express

4     an opinion that you didn't agree with something the client

5     wanted?

6          THE WITNESS:  I don't recall doing that.

7          MS. KLEIN:  What I am asking her is if it was her job

8     as the consultant to tell them she didn't agree.

9          THE COURT:  If you are asking her that it's not case

10    specific.  She said it never happened in that case as she can

11    recall.  If you want to ask generally, is it part of your job,

12    in general, if you disagree with the client to tell them I

13    disagree?

14         THE WITNESS:  Correct.

15         THE COURT:  That didn't happen in that case.  Once

16    you're case specific, you are going to get the answer from that

17    case.

18    Q.  You also provided consulting on a case called ASCAP v.

19    MobiTV?

20    A.  Yes, I did.

21    Q.  Do you remember any of the work you did on that case?

22    A.  Not specifically.

23    Q.  In that case you charged for project management, which

24    consisted of Power Point reviews?

25    A.  That's possible.

C8EMKADT                    Kadden - cross

1   Q.  And you also charged for proofing?

2   A.  You mean entered in QuickBooks?

3   Q.  Um-hum.

4   A.  Yes.  I don't recall, but I would imagine.

5   Q.  But if you wrote in your QuickBooks that you were proofing

6   as a consultant you were proofing it to make sure it conveyed

7   the intended takeaway?

8   A.  I don't recall specifically.

9   Q.  And what, if anything, do you remember about Baxter v.

10  Minrad?  That's a case that you consulted on?

11  A.  That is.

12  Q.  And that is a case that you worked on proofing and editing

13  as a consultant?

14  A.  I believe so.

15  Q.  You've already told us that you read all the background

16  material and was coming up with visual strategy for a case

17  called CIEA v. Jackson Labs?

18  A.  I'm sorry.  Can you repeat the question, that I came up

19  with?

20  Q.  That you reviewed all of the background material on CIEA v.

21  Jackson Labs.

22  A.  I don't know about all, but I saw in here that I reviewed

23  some at least.

24  Q.  And how about a case that was in QuickBooks as CNH v. Kinze

25  Manufacturing?

C8EMKADT                          Kadden - cross

1   A.  Correct.

2   Q.  In that case you also have a significant amount of time of

3   consulting?

4   A.  Correct.

5   Q.  And when you were suggesting in the billing system that you

6   were doing consulting work, you expected that to be billed to

7   Visualex's clients?

8   A.  I would imagine, yes.

9   Q.  And you were, right, performing consulting, correct, what

10  you believed was consulting?

11  A.  I was doing the work that was given to me, yes.

12  Q.  But there was project management as an option for you to

13  bill?

14  A.  Correct.

15  Q.  You didn't characterize your time as project management?

16  A.  I don't recall specifically, but whatever was in QuickBooks

17  I would go with.

18  Q.  That most closely describes the work that you were doing at

19  that time?

20  A.  Yes.

21  Q.  How about a case called CSX Blake, do you recall that case?

22  A.  I don't recall it specifically, but sure.

23  Q.  You have a lot of time on that for new graphic writeups and

24  reading background materials, so you were consulting in that

25  case?

C8EMKADT                    Kadden - cross

1    A.  Yes.

2    Q.  And you were in charge with -- at that point your job was

3    creating a visual strategy?

4    A.  I was working on whatever I was given, which was generally

5    the revision aspect of the case.

6    Q.  But you've already testified, correct, that even when you

7    got revisions, you were supposed to be critically thinking,

8    does it affect the takeaway?

9    A.  I was the proofing process.

10   Q.  Were you hired as a proofreader?

11   A.  No.  That was not the title.  That was a component of the

12   job.

13   Q.  Also, Abdul Johnson proofed?

14   A.  Correct.

15   Q.  And did you do the same job as him?

16   A.  No.  We had different jobs.

17   Q.  Essentially, though, do you think your jobs were the same?

18   A.  No.

19   Q.  You were paid a lot more money than him, correct?

20   A.  I don't know how much he was paid, but I would imagine.

21   Q.  Why would you imagine that you were paid a lot more?

22   A.  That's been referenced in this case.

23   Q.  If Lillian and Visualex were paying you $40,000 more than

24   they were paying Abdul Johnson, presumably, it was because they

25   expected something more from you, right?

C8EMKADT                    Kadden - cross

1   A.  I wouldn't know exactly --

2   Q.  You're an intelligent woman.  Do you think they were just

3   paying you?

4   A.  What do you mean, just paying you?

5   Q.  They were just paying you because they wanted to give you a

6   lot of money?

7   A.  I was doing a job.  I worked very hard.

8   Q.  I'm sure Abdul Johnson works very hard, also.

9           THE COURT:  What kind of question is that?

10          MS. KLEIN:  What I have heard in this whole case is

11  that she is saying that she did nothing more than act basically

12  as an operator, taking directions from a client and spitting

13  them out.  And I would like Ms. Kadden to explain in her mind

14  what would be the justification for paying her $40,000 more.

15          THE COURT:  She doesn't know why.  Why one employee is

16  paid one salary and another employee is paid another salary,

17  all she can tell you is what she reviewed.

18          Do you think the description that counsel just gave is

19  what the job was, taking orders?

20          MS. KLEIN:  Like a waitress takes an order.

21          THE COURT:  Did you think you were just taking orders.

22          THE WITNESS:  Those were not my words.

23          THE COURT:  Again, how would you describe your job

24  again?

25          THE WITNESS:  A lot of it was facilitating the process

1   of getting the graphics through the studio.  I did a lot of

2   work, like I've mentioned, on the proofing and the revisions,

3   less on the conceptual stage, which went on more at the

4   beginning.  On those very few instances where I had the

5   opportunity did I get to do any more of the conceptual side of

6   things.

7   Q.  Isn't it true, Ms. Kadden, that during every instance that

8   you were doing the revision it was within your authority to

9   tell the client, I think we should do a new graph here?

10  A.  No.

11  Q.  Anybody ever tell you you couldn't do that?

12  A.  That wasn't the role that I was filling.

13  Q.  Well, the role that you were filling was a graphic

14  consultant?

15  A.  Correct.

16  Q.  And your job as the graphic consultant, which you conceded

17  at your deposition, was to give your opinion about whether or

18  not a certain exhibit should be used to express something

19  visually, to enhance the visual presentation?

20  A.  Generally, that aspect was handled by the lead on the case.

21  Q.  I'm asking you, did anybody ever tell you when you were

22  doing revisions that you should not suggest to a client, hey,

23  maybe we should do a new graph?

24  A.  That wasn't the way it was structured.  I didn't have

25  contact with the client on that level.

1   Q.  You didn't because there is tons of your work that are

2   revisions that came -- I'm sorry, that new graphs that came

3   after an original graph started.  Where did those come from?

4   A.  Which cases are we talking about?

5   Q.  All the cases that you worked on.  You worked on over 50

6   cases, didn't you?

7   A.  Yes, I did.  But on many of them I didn't have direct

8   e-mail contact with the client.

9   Q.  But for some of them you did, right?

10  A.  Yeah, some of them I did.

11  Q.  You worked on Baxter?

12  A.  I did.

13  Q.  You had contact with people there?

14  A.  That one I did.

15  Q.  You worked on Derea?

16  A.  Yes.

17  Q.  And you worked on Sobieski?

18  A.  Correct.  These were all in that same time frame.

19  Q.  But you are not saying that you were not involved as a

20  consultant on all the other cases or that you billed the time

21  for, are you?

22  A.  I was.

23  Q.  And you were not billing as proofing on the drop-down menu

24  for client revisions.  You could have picked that if that

25  accurately described your work and you didn't?

C8EMKADT                    Kadden - cross

1   A.   That was -- I don't recall that even being on the

2   drop-down, but I am not going to say that it wasn't because I

3   don't know.  I know that in the first few weeks that I was

4   there I was instructed about how to list the time that I spent

5   doing the revisions and proofing and it was supposed to be

6   listed under consulting, and with your own little discussion of

7   proofing -- little description of proofing revisions or

8   editing.

9   Q.   Other than the cases that you just testified about, did you

10  ever sit in on any client calls?

11  A.   I did sit in on some client phone calls.  I couldn't tell

12  you.  I couldn't just give you a list of them.

13  Q.   But you did participate in those calls?

14  A.   I don't know if I participated.  I sat in and listened.

15  Q.   And what was your purpose of you listening?

16  A.   I guess to understand what was going to be going on in the

17  case.

18  Q.   And why do you need to understand what's going on in the

19  case if you are just simply taking a client revision?

20  A.   For I guess the same reason I did the background, to get a

21  fuller sense of what the case is about.

22  Q.   What did you need to do that for to do your job?

23  A.   That was what I was told to do.  It made sense to sit in on

24  the meetings.  It was helpful.

25  Q.   It was helpful for what purpose?

C8EMKADT                    Kadden - cross

1   A.  To understand the concept of what was going -- that were

2   being portrayed of what was going on.

3   Q.  That was important to understand if you were a consultant,

4   right?

5   A.  Yes.

6   Q.  Ms. Kadden, do you have in front of you, Exhibit I?

7   A.  I don't think so.

8   Q.  If not, let me hand you this.

9   A.  I don't have something that big up here.

10  Q.  I am only going to make you look at two pages.

11          I would like you to turn to page 1139, VIS 01139.

12  A.  Yes.

13  Q.  And this is your handwriting?

14  A.  That's correct.

15  Q.  And this is a chart type that you wrote up as an original?

16  A.  Yes.

17  Q.  And in this case do you remember why you wanted a map to be

18  drawn as a graphic?

19  A.  I don't recall specifically, no.

20  Q.  Is it possible that you wanted the map drawn because you

21  knew it was important to the case for the jury to understand

22  where the different parties were located?

23  A.  That's possible.

24  Q.  And is this your drawing on the bottom?

25  A.  Part of it.  You know, I don't know that any of it is.

1   Q.  This is your handwriting, correct?

2   A.  Above the map -- from the map above it is definitely my

3   handwriting.  The map itself, I don't think that's mine.

4   Q.  Whose do you think it is?

5   A.  I would guess that that would be -- my guess would be Lance

6   Sperring, who was the art director on it, but I couldn't swear

7   on it.  I don't usually draw little iconic things like that.

8   Q.  Is the square yours around the little icon?

9   A.  I am going to say probably not.

10  Q.  But you are not sure?

11  A.  I am not sure.  I don't think so.  It's in a different pen

12  or whatever.  It doesn't appear it was at the same time.

13  Q.  That looks like a different pen to you?

14  A.  Yeah.  It's not as dark.  I don't have the original here.

15  It actually looks like it might be pencil, but I don't know for

16  certain.

17  Q.  We will be able to get the original at some point.

18          Let me show you, if you could please look at these.

19  Before we went on a break it was the two-page document that the

20  judge referred to before, VIS 01712, and that's part of Exhibit

21  K.

22  A.  Okay.

23  Q.  Do you have that in front of you?

24  A.  Yes.  Can I close up this big one or we are still working

25  on it?

C8EMKADT                         Kadden - cross

1   Q.  You can close that.

2            This is your handwriting on here, correct?

3   A.  On the first page?  You're only asking the first page.

4   Yes.

5            THE COURT:  I'm sorry.  Which case is this one?  I

6   forgot.

7            THE WITNESS:  This is from the Mirror World case.

8   Q.  And here you write on, I guess if you are looking at it

9   with the Bates stamp number, the bottom left, if it's turned

10  sideways, you are writing, darker blue for heading, lighter

11  blue for claim language background, correct?

12  A.  Correct.

13  Q.  You were telling that to the graphic artist?

14  A.  Probably the art director, yes.

15  Q.  You are telling that you want that done?

16  A.  Correct.

17  Q.  Then right under it you are writing darker gray for

18  heading, lighter gray for claim -- what does it say?

19  A.  L-a-n-g for language.

20  Q.  Then in the center of the page you are directing them to

21  remove highlight?

22  A.  Correct.

23  Q.  And then on the right side, if we are still looking at it

24  from a portrait, where it says white, you are directing them to

25  change the word Apple Spotlight Store?

1   A.  I don't know that -- I don't think I'm telling them to

2   change the word.  I think I'm changing the text color, maybe.

3   Q.  To white?

4   A.  Yes.

5   Q.  And this is your initials on the far side of the document?

6   A.  Yes.

7   Q.  This is fairly typical of documents that have your initial

8   on them?

9   A.  I am not sure what you mean fairly typical.  This is a

10  revision that I wrote up, yes.

11          THE COURT:  I guess she is saying, did you do that

12  kind of work often?

13          THE WITNESS:  Yes.  We had had conversations with the

14  trial team about the visibility.  I think when they went to

15  court to try it out, in real time sort of thing and it wasn't

16  working as it was done, so they made this global change.

17          THE COURT:  This is not atypical for your workday, you

18  did this kind of thing often?

19          THE WITNESS:  Yes.

20  Q.  Ms. Kadden, when you worked as a graphic consultant at Doar

21  you did not receive overtime, correct?

22  A.  I did not receive overtime.

23  Q.  And you also did not know anybody at Doar that worked as a

24  graphic consultant that didn't have an advanced degree?

25  A.  That's correct.

C8EMKADT                       Kadden - cross

```
 1              THE COURT:  How many other graphic consultants did you
 2    know at Doar?
 3              THE WITNESS:  There were six of us total, so five
 4    others.
 5              THE COURT:  And you know all five have advanced
 6    degrees in something?
 7              THE WITNESS:  In something, yes.
 8    Q.  I am going to go through a series of statements based on
 9    information you gave at your deposition, and I would like you
10    to tell the Court whether or not you agree with the statements.
11    Okay?
12    A.  Sure.
13    Q.  In the scheme of litigation the demonstrative exhibits have
14    a high importance?
15    A.  Okay.
16              THE COURT:  You say I agree or I disagree.
17    A.  Yes, I agree.
18    Q.  Demonstrative exhibits can impact the outcome of the
19    litigation.
20    A.  I agree.
21    Q.  How a graphic is laid out can matter for purposes of jury
22    persuasion.
23    A.  I'll agree.
24    Q.  The colors you choose for a graphic has an impact on the
25    jury.
```

1    A.  I'll agree.

2    Q.  And if a client is a corporation that has a recognizable

3    color scheme, you, as the consultant, may want to repeat its

4    colors.

5    A.  I'll agree.

6    Q.  And colors that the consultant chooses are important

7    because they evoke certain responses in humans?

8    A.  I'll agree.

9    Q.  When you applied for the position of graphic consultant at

10   Visualex you understood that Visualex was looking to recruit

11   someone to come up with demonstrative exhibits to present an

12   idea or theory to the jury?

13   A.  I agree that's what I thought.

14   Q.  And part of the duties and responsibilities of the graphic

15   consultant was at times to conceptually conceive how an exhibit

16   should look?

17   A.  Agree at times.

18   Q.  It was your responsibility as a graphic consultant to be

19   able to explain the visual strategy to the graphic artist at

20   times?

21   A.  Agree.

22   Q.  You were the lead consultant on cases?

23   A.  On some cases.

24   Q.  Just yes or no?

25          THE COURT:  No.  She is allowed to correct the

1    statements.  On some cases she was.

2    Q.  And on the job where you were the lead consultant you would

3    visually come up with a strategy on individual graphics?

4    A.  Correct.  Agree.

5    Q.  Part of your duties and responsibilities as a graphics

6    consultant at Visualex was to explain to the trier of fact the

7    takeaway of a case?

8    A.  One more time.  I'm sorry.

9    Q.  Part of your duties and responsibilities as a graphics

10   consultant at Visualex was to explain to the trier of fact the

11   takeaway of a case.

12   A.  Okay.  Agree.

13   Q.  You agree that that was part of your job?

14   A.  I'm agreeing that that was -- I thought you were asking if

15   I agree with these statements that were made from the

16   deposition.

17   Q.  Yes.  At your deposition I asked you, when you were working

18   as a consultant at Visualex, was it part of your duties and

19   responsibilities to be able to explain to the trier of fact the

20   takeaway of a case?  Do you recall what your answer was?

21   A.  Yes.

22   Q.  What was your answer?

23   A.  I'm sorry.  I was answering it.

24   Q.  Yes, that was your job?

25   A.  That was my job at times, on occasion.

C8EMKADT                    Kadden – cross

1   Q.  Your testimony was just, yes, it wasn't on occasion.  Would
2   you like us to read that back to you?
3            THE COURT:  You mean her deposition testimony?
4            MS. KLEIN:  Yes.
5            THE COURT:  You can impeach her with that, the usual
6   routine.  Do you recall deposition taken on a certain day, do
7   you recall being oath, do you recall being asked the following
8   question and the following answer.  Now read the following
9   question and the following answer.
10  Q.  You recall being at my office for a deposition on February
11  14, 2012?
12  A.  Yes.
13  Q.  And do you recall me asking you questions?
14  A.  Yes.
15  Q.  And you recall being sworn?
16  A.  Yes.
17  Q.  And you recall giving truthful statements?
18  A.  Yes.
19  Q.  And do you recall me asking you the following question and
20  you giving me the following answer:
21           MR. RISK:  Page number, please?
22           MS. KLEIN:  190 to 191, line 24 and line 25.
23  Q.  Do you recall me asking you the following question:
24  "Q.  When you were working as a consultant at Visualex, was it
25  part of your duties and responsibilities to be able to explain

C8EMKADT                    Kadden - cross

1   to the trier of fact the takeaway of a case?

2   "A.  Yes."

3            MR. RISK:  Your Honor, I am going to request that

4   counsel also read lines 6 through 10 which immediately follow.

5            THE COURT:  You remember that question and answer that

6   you just heard?

7            THE WITNESS:  I don't remember it specifically, but,

8   yes.

9            THE COURT:  Go ahead.  Would you also read 6 through

10  10, please.

11           MS. KLEIN:  Of course.

12  Q.  "QUESTION:  In connection with these cases that you

13  testified that you were the lead consultant, did you work on

14  things related to the takeaway?

15  "A.  Yes."

16           THE COURT:  Thank you.

17  Q.  And you also while working at Visualex came up with

18  intended takeaways on your own, correct?

19  A.  Correct, at times.

20  Q.  And when revisions were done you would analyze how the

21  revisions would impact the ultimate takeaway.  You already

22  testified to that today?

23  A.  Yes.

24  Q.  There were times that you didn't necessarily sketch your

25  ideas, but in fact you gave verbal instruction to the art

C8EMKADT                          Kadden - cross

1    director, correct?

2    A.  I don't know that I would have given verbal without

3    something written.

4    Q.  Maybe you wrote up the chart, a name that you wanted for

5    the takeaway, the title?

6    A.  At least that, yes.

7    Q.  At least that.  And then at times you would give it to him

8    and you would also explain to him what it was that you wanted,

9    correct?

10   A.  Correct.

11   Q.  And you presented the art director with your idea about how

12   the demonstrative exhibits should look in order to have an

13   effective impact on the trier of fact?

14   A.  Are you reading from a transcript or that was just a

15   question?

16   Q.  I'm asking if that's a truthful statement?

17   A.  Yes.

18          MS. KLEIN:  Excuse me.  Just bear with me for one

19   minute, Judge.  I'm trying to expedite this.

20   Q.  Visualex did a lot of work on patent cases?

21   A.  Yes.

22   Q.  And were they fairly complicated matters?

23   A.  I think so.

24   Q.  And it was important in doing your job to understand the

25   background material?

C8EMKADT                    Kadden - cross

1   A.  Sometimes.

2   Q.  And in connection with your job as a graphic consultant you

3   did research at times?

4   A.  At times.

5   Q.  And at times you reviewed patents?

6   A.  Yes.

7   Q.  Part of your job as the graphics consultant was managing

8   the expectations of the clients?

9   A.  Yes.

10  Q.  And it was to share with them your opinion if something

11  that they wanted to do wasn't, in your opinion, correct?  Let

12  me strike that.  I didn't understand the question.

13      If a client gave you a direction and you did not agree

14  with it, that it was the most effective thing to do, you would

15  express that to them?

16  A.  Correct.  On occasions that happened, yes.

17  Q.  When Visualex stopped in April 1 of 2009 paying overtime to

18  what they understood to be professionals like yourself, you

19  understood at that point that your salary was $75,000, correct?

20  A.  Yes, I understood that.

21  Q.  And after that happened your work remained the same,

22  correct?

23  A.  Correct.  There was no change in duties.

24  Q.  So your job as the graphic consultant for all intents and

25  purposes was the same before April 1, 2009 as it was after

1    April 1, 2009?

2    A.  Correct.

3    Q.  And you have since April 1 of 2009 prepared résumés for

4    yourself, correct?

5    A.  Correct.

6    Q.  And in that résumé or résumés you've had opportunity to, in

7    your own words, describe what you do for a living, correct?

8    A.  Sure.

9    Q.  And what you did while you were employed at Visualex?

10   A.  Correct.

11   Q.  And you have represented to the world, outside of this

12   courtroom, but everyone else, that you were a consultant during

13   the time that you were working at Visualex, correct?

14   A.  Correct.

15   Q.  And do you remember how you explained the first line of the

16   most important thing on your résumé, what you said that you did

17   as a consultant at Visualex?

18   A.  No, I don't.

19   Q.  I'm sorry?

20   A.  No, I don't recall.

21   Q.  Were you truthful in what you wrote in your résumé?

22   A.  Yes, I believe so.

23   Q.  Do you remember what you told the Cowen Group you did at

24   Visualex?

25   A.  Not specifically.

C8EMKADT                       Kadden – cross

1   Q.  When you were interested in leaving Visualex you went back

2   to the Cowen Group, the same company that placed you the first

3   time, right?

4   A.  I was in contact with them, yes.

5   Q.  You forwarded them your updated résumé?

6   A.  Yes.

7   Q.  Let me read something to you and tell me if you think that

8   that is correct.  I received this from the Cowen Group, your

9   résumé, and it says --

10          MR. RISK:  Is the document in evidence?

11  Q.  Without looking at the document, Ms. Kadden, you

12  represented that you were consulting the top-tier law firms to

13  develop and implement demonstrative graphics to aid and

14  educating jurors in trial subject matter?

15  A.  That was regarding Visualex?

16  Q.  Yes.

17  A.  Okay.  Yes.

18  Q.  Is that a truthful statement?

19  A.  Yes.

20          MS. KLEIN:  Your Honor, may I just have one minute?

21          Your Honor, at this time I have no further questions.

22  I would just like to ask the Court, to get the other witness, I

23  don't know how long --

24          THE COURT:  Do you have any redirect?

25          MR. RISK:  Not more than one minute, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          MS. KLEIN:  It may take him around -- he is like on

2     50th Street.

3          THE COURT:  He's on where?

4          MS. KLEIN:  He is on 50th Street, but we will have him

5     a car there in five minutes.

6          THE COURT:  A car is the worst way to travel in New

7     York.

8          MS. KLEIN:  The other thing we can also do is while we

9     are waiting, I have Ms. Romano I am going to call on the Moran

10    stuff, just on the redirect.

11         THE COURT:  But you also had another woman --

12         MS. KLEIN:  A man.

13         THE COURT:  The replacement?

14         MS. KLEIN:  He came right after her, correct.

15         THE COURT:  There was somebody else, lawyer -- two

16    men?

17         MS. KLEIN:  Two men.

18         THE COURT:  Are there two men on the way?

19         MS. KLEIN:  I don't have them tonight, two men.  I was

20    going to get one of them here.  I thought between Ms. Romano

21    finishing the redirect and him, that should bring us until that

22    time, and we will have one more witness in the morning and then

23    we are done.

24         THE COURT:  All right.  Okay.

25    REDIRECT EXAMINATION

1   BY MR. RISK:

2   Q.  Ms. Kadden, were there requirements about the number of

3   hours that Visualex employees had to be in the office?

4   A.  Yes.

5   Q.  What were those?

6   A.  We had to be in the office, we had to log into QuickBooks a

7   minimum of 40 hours every week.

8   Q.  And what would happen if your QuickBooks sheet turned

9   out -- didn't add up to 40?

10  A.  If I made an error and it didn't add up to 40?

11  Q.  Okay.

12  A.  Then every I think it was two weeks, Debbie Marshall, who

13  was the bookkeeper, would go through and review all of the

14  records and create the invoices.  So she would catch any

15  errors, such as that, like if I had only logged 36 hours into

16  QuickBooks, and she would immediately come to me and say,

17  you're missing hours, and she would come with any

18  inconsistencies she found in the record immediately every two

19  weeks.

20  Q.  Ms. Kadden, the three cases that you testified you were the

21  lead on --

22  A.  At times.

23  Q.  At times.  Were they all trials?

24  A.  No.

25  Q.  Which were and which weren't?

C8EMKADT                    Kadden - redirect

1   A.  The Derea case was not a trial.  It was a settlement

2   conference that we worked on for about a day, day and a half.

3   I think it was about five or so hours of work.  The Sobieski

4   case was a trial.  We worked on the opening and the closing and

5   that was the one that took about a week, week and a half or so.

6   And then the Mirror World trial, I believe we worked on the

7   entire trial, the opening, the actual witnesses and experts and

8   the closing as well.

9           THE COURT:  Two of them were trials?

10          THE WITNESS:  Two of them were trials, yes.

11          MR. RISK:  I have nothing further.

12          MS. KLEIN:  Your Honor, may I just ask two quick

13  questions?

14          THE COURT:  Sure.

15  RECROSS EXAMINATION

16  BY MS. KLEIN:

17  Q.  Ms. Kadden, you didn't record every day when you had lunch,

18  correct?

19  A.  I don't believe so.

20  Q.  But you took lunch most days, correct?

21  A.  Yes, I ate lunch every day.

22          THE COURT:  She didn't ask if you ate lunch.  Did you

23  leave the office?

24          THE WITNESS:  No.

25          THE COURT:  Did you work during lunch or did you take

1   an hour?

2            THE WITNESS:  If I worked during lunch, that time is

3   logged in QuickBooks, absolutely.  If I didn't work during

4   lunch, like billable hours, then I didn't log the time, but I

5   didn't necessarily leave the office during lunch.

6   Q.  But you would have lunch there and you would be eating your

7   lunch uninterrupted at times?

8   A.  Interrupted.

9   Q.  You chose at times to eat lunch at work?

10  A.  Yes.

11  Q.  You ate lunch?

12  A.  Most of the time.

13  Q.  There were many times when you were eating lunch that you

14  weren't doing any work and that's not reflected in the time

15  sheets, your downtime, because your pay didn't change every

16  week, so it wasn't reflected?

17  A.  Correct.

18  Q.  Also, you got terminated from Visualex, correct?

19  A.  Correct.

20  Q.  And you got let go because your work was not satisfactory,

21  correct?

22           MR. RISK:  Objection.  That's a question for the

23  employer.

24           THE COURT:  Is that what you understood?

25           THE WITNESS:  What I recall -- I recall her telling me

1  two different things.  I can't recall the second.  The first

2  one is that there was a marketing report, because I used to

3  have to report to her what marketing letters went out, and I

4  had not turned it in.

5  Q.  You don't recall her telling you that she was unhappy with

6  your consulting abilities?

7  A.  I don't recall her saying that in terminating me.

8          MS. KLEIN:  I have no further questions, your Honor.

9          THE COURT:  Anything further?

10          MR. RISK:  Nothing, your Honor.

11          THE COURT:  Thank you.

12          (Witness excused).

13          THE COURT:  While we are waiting for this person, you

14  want to call Ms. Romano?

15          MS. KLEIN:  Yes.

16          THE COURT:  You understand you are still under oath?

17          THE WITNESS:  Yes.

18   LILLIAN ROMANO, recalled.

19  DIRECT EXAMINATION

20  BY MS. KLEIN:

21  Q.  Ms. Romano, you heard Ms. Kadden testify about that she

22  claimed the majority of her job was doing revisions, did you

23  not?

24  A.  Yes, I did.

25  Q.  And can you explain to me what the job of the consultant

1   was when they were doing revisions?

2   A.   When you are doing revisions or if you are doing an initial

3   graphic, there is no difference.  When you're a consultant,

4   you're a consultant, you're a consultant.  As a consultant you

5   are constantly evaluating, listening to what information is

6   being provided by the client to come up with the best way, the

7   best visual presentation that you can that is going to advance

8   their case.  There is no delineation between a new graphic or a

9   revision.  A revision can spawn new graphics.  It can change

10  the original layout to something completely different.  It's

11  not like all of a sudden our clients expect that we stop

12  thinking just because it's a revision.  We are constantly

13  thinking.  That's why they hire us.  We are constantly

14  evaluating and using discretion as to the best way to convey

15  the information that they are providing to us.

16  Q.   And if Ms. Kadden was doing what she described and simply

17  the cases where she, quote unquote, called herself lead, if she

18  was simply taking the direction, there was a problem with that?

19  A.   Oh, absolutely.

20  Q.   Can you explain to us why?

21  A.   The problem would be, she was misrepresenting what she was

22  doing by putting it down as consulting, not only to her

23  employer, but also to our clients.

24  Q.   You hired Heather Moran?

25  A.   I did.

1   Q.  Can you tell us why you hired Heather Moran?

2   A.  I was not happy with the way Ms. Kadden was performing her

3   position.  I was recovering from back surgery.  I was only

4   working part time.  And I felt I needed to get somebody in who

5   could -- who was able to provide the level of consulting that

6   our clients expected from us.

7   Q.  And was Ms. Moran able to fill that position?

8   A.  No.

9   Q.  Can you explain to us in your opinion why not?

10  A.  It sounds terrible and callous, but she just really wasn't

11  very smart.

12  Q.  And as a result of that experience, Ms. Moran was the only

13  person you ever hired that didn't have an advanced degree,

14  correct?  You testified about that earlier?

15  A.  That is correct.

16  Q.  Have you made any decisions as to whether or not you would

17  hire ever again?

18  A.  I would never.  It was an experiment and it did not work.

19  Q.  Have you hired any consultant since Ms. Moran?

20  A.  Yes.

21  Q.  And does -- he or she?

22  A.  He.

23  Q.  Is it more than one person?

24  A.  It's just one.

25  Q.  What is his name?

1   A.  David Mykel.

2   Q.  And does Mr. Mykel --

3   A.  M-y-k-e-l, which is a little out of the ordinary.

4   Q.  And does Mr. Mykel have an advanced degree?

5   A.  Yes.

6   Q.  And does he perform the same job that Ms. Kadden was

7   supposed to be performing?

8   A.  Yes.

9   Q.  Can you explain to us what his job is?

10  A.  His job is to read and evaluate case background for the

11  purpose of being able to assess what works and what doesn't

12  work within the visual strategy that we are developing to

13  communicate case themes and advance the client's position.  He

14  is hired to interact with clients.  Whether that be through

15  e-mail or through verbal communications or if you're sitting in

16  the same room with somebody, the interaction does not change.

17  It is to evaluate constantly what they are requesting, asking

18  what their concerns are, asking what things that they think are

19  not being accomplished with the images that are being provided,

20  and to then give them options, recommendations of what other

21  things that we can provide, what other things that can be done,

22  what other visuals can be developed, created, what we envision

23  that would be able to communicate their case more effectively.

24  Q.  And are you consulting to make them better lawyers?

25  A.  Of course.  Because it gives them an arsenal of resources

C8EMKADT                         Romano – direct

```
1    that they can use that they wouldn't have available to them

2    without our expertise.

3              MS. KLEIN:  I have no further questions.

4              MR. RISK:  I have no questions.

5              THE COURT:  Thank you.

6              (Witness excused)

7              THE COURT:  We really have a whole hour.  We could

8    have gotten both these men in and been done today.

9              Where is the other one?  Which one did you call down?

10             MS. KLEIN:  Ron Daignult.

11             THE COURT:  Where is this guy Mykel, at the office?

12             MS. KLEIN:  Yes.

13             THE COURT:  He's in Dobbs Ferry.  He is not going to

14   make it from Dobbs Ferry.

15             MS. KLEIN:  Your Honor, I believe that Mr. Daignult

16   should be here in just probably within 10 to 15 minutes.  He

17   was getting right on the subway so he shouldn't hit any traffic

18   and be right here.

19             THE COURT:  You can have a ten-minute recess because

20   nothing is going to happen.

21             (Recess)

22             MS. KLEIN:  Your Honor, we call Ron Daignult to the

23   stand.

24    RONALD DAIGNAULT,

25        called as a witness by the Defendant,
```

 1          having been duly sworn, testified as follows:

 2     DIRECT EXAMINATION

 3     BY MS. KLEIN:

 4     Q.   Good afternoon, Mr. Daignault.

 5     A.   Good afternoon.

 6     Q.   Can you please tell us what you do for a living?

 7     A.   I'm an attorney.

 8     Q.   Where do you practice?

 9     A.   Robins Kaplan Miller & Ciresi.

10     Q.   Before you were at Robbins, were you at any other firms?

11     A.   Stroock & Stroock & Lavan, Jones Day, and Pennie & Edmonds.

12     Q.   And do you focus in any particular area of the law?

13     A.   Intellectual property litigation, primarily patent and

14     trademark litigation.

15     Q.   During the course of your professional practice, have you

16     had opportunity to work with graphic consultants at Visualex?

17     A.   Yes.  Two times, I believe.  Two I know of and I think

18     that's it.

19     Q.   And do you remember what the types of cases were that you

20     engaged them for?

21     A.   The first case was a patent infringement case involving

22     patents relating to transgenic mice, and the second case was a

23     trademark infringement jury trial.

24     Q.   And do you make the decision or at least in those two cases

25     whether or not to retain outside assistance with demonstrative

1  exhibits?

2  A.  Yes.  In those cases I did.  I was the partner on the case,

3  lead counsel on the cases.

4  Q.  And was the reason that you retained assistance, was it to

5  assist you with these two particular cases?

6  A.  Yes.

7  Q.  And can you tell the Court what it was that you were

8  looking to hire Visualex to do?

9  A.  So in the first case involving the transgenic mice we had

10  to present a tutorial to the judge about the human immune

11  system and also about transgenic mice.  So we obviously had to

12  create demonstrative graphic visual ways of expressing that to

13  the judge, and so I worked with Lillian and her team

14  extensively to put together that tutorial.  Also, claim

15  construction materials as well, slides and graphic

16  presentations for the claim construction hearing.  That was the

17  first case.

18  Q.  I'm sorry.

19  A.  The second case was, we had a jury trial in front of Judge

20  Baer, trademark infringement case.  We were the defendants.

21  And so we used Visualex again to create graphic presentations

22  of our evidence and also for the purposes of opening and

23  closing statements, arguments.

24  Q.  When you retained Visualex, do you retain them for more

25  than one purpose?

1   A.  Well, there are a variety of purposes.  Sometimes firms,

2   and we at Robbins Kaplan can create some things in-house, but

3   in the case I was involved in, when you get to a certain stage,

4   you really want to, you know, go to firms, go to companies that

5   have expertise in this area because you want the best work

6   product, best quality stuff that you can use.  So what we did,

7   obviously, you need these firms to construct the graphics, to

8   actually put them together, but we also work with these kinds

9   of firms, like Visualex, and this is why I worked with Visualex

10  as well, to basically talk about the ideas of how to present

11  the evidence.  It was kind of a back-and-forth consultation,

12  really.  We worked together to put together the work product.

13  Q.  And when they consult with you and go back and forth, is it

14  fair to say that it's for the purpose of helping you present a

15  better case?

16              MR. RISK:  Objection, leading.

17              THE COURT:  Yeah, it was leading.  Sustained.

18              The purpose of your hiring this company graphic

19  consultant is what?

20              THE WITNESS:  I won't be a lawyer.  It is exactly to

21  help better present the evidence to a judge or a jury.  That's

22  exactly what it is.  Because every litigator knows today that

23  you have to be able to visually depict your evidence as well as

24  have evidence through testimony and documents, and people

25  are -- people have been studying these things for years and

1   years.  We all know that as lawyers and litigators, people

2   retain evidence in different ways.  It's part of every trial to

3   have graphic demonstrative materials that are used for

4   evidentiary purposes.

5   Q.  During the times that you've worked with Visualex you have

6   worked with several consultants, correct?

7   A.  Yes.

8   Q.  And do you know who Adina Kadden is?

9   A.  I remember working with Adina and other people on her team,

10  and I know that other people on my team as well did.

11  Q.  And did she provide consulting services?

12  A.  Yes.

13          MS. KLEIN:  I have no further questions, your Honor.

14          THE COURT:  When you say she provided consulting

15  services, can you try to describe specifically the interaction,

16  what she did for you?

17          THE WITNESS:  So, for example, your Honor, we would

18  have, let's say, a slide that we wanted to talk about several

19  points, sort of a summary type slide.  Let's start with that

20  example.  We would communicate with Adina or other people on

21  her team the ideas and the points that we would want to convey.

22  They would come back with an example of how to do that.  At

23  times they would offer suggestions.  They would say, well, this

24  is a little bit too cluttered, or, you know, maybe we could do

25  this in a build slide type format.  So that's an example of

C8EMKADT                    Daignault - direct

1   maybe working with summary type things.

2           Other times, for example, closing argument in the

3   Sobieski case, we created a scale of justice because we wanted

4   to convey to the jury that really the plaintiffs in the case

5   didn't meet their burden of proof.  So we worked to put

6   together this building scale of justice where we showed that

7   what the plaintiffs were offering as evidence really wasn't

8   evidence at all because it didn't move the scale.  It was all

9   based on speculation, assumptions, not real evidence.  And then

10  we put forward our facts that we established through our

11  evidence and showed that in fact the opposite was true in the

12  case.

13          And so we worked with them closely to build this scale

14  of justice type closing argument presentation for that purpose,

15  and then with respect to opening arguments, I remember we were

16  trying to convey to the jury the differences between

17  distributor, a manufacturer, an importer, and a retailer and

18  where the different responsibilities fell from where our client

19  was in Poland to when the product showed up in the United

20  States, and so they came up with ideas of how to visually

21  depict that.  They would come forward with images, suggested

22  images to use, so we would talk that over.  It was a back and

23  forth collaborative approach.

24          Same thing with the transgenic mice tutorial.  Lillian

25  came to Boston several times to meet with our expert

1   immunologist, and we worked on how to show T cells and B cells

2   and natural killer cells flowing through the body and attacking

3   antigens and how it all works.  We also showed what happens

4   when you take those cells away, which is what happens to

5   transgenic mice.  When these mice have no immune system, we

6   showed what that actually does.  And so, again, it was a

7   collaborative team approach where we had ideas, they had ideas,

8   and we did what we thought was the best way of putting it

9   together.

10          THE COURT:  Was Ms. Kadden the primary consultant on

11  either of these cases or was it Ms. Romano?

12          THE WITNESS:  I would say on the transgenic mice case

13  it was Ms. Romano.  On the Sobieski case it was Ms. Kadden.

14          THE COURT:  On that case did you also work with

15  anybody else?

16          THE WITNESS:  I believe Ms. Kadden had people on her

17  team that we --

18          THE COURT:  That's the case with the ten days of

19  e-mails.

20          Ms. Romano was copied on every e-mail, right?

21          THE WITNESS:  I believe so.

22          THE COURT:  Why was that?

23          THE WITNESS:  It's her company, I guess.  I think she

24  sort of keeps her head and eyes on everything.  But, you know,

25  our primary contact for -- I know our primary contact for the

C8EMKADT                          Daignault - direct

1    Sobieski case was Ms. Kadden.

2              MS. KLEIN:  Your Honor, I have one last question.

3    Q.  When you're retaining Visualex for the consulting do you

4    expect the same services from any of the consultants?

5    A.  Yes.  Basically, you know, if I remember correctly, when I

6    approached Lillian about the Sobieski case I think she had

7    other things going on and so I think she mentioned, I've got

8    other people here that can help you do this.  Because we were

9    in a pretty tight spot.

10             Judge Baer, he said, you are going to trial.  We had a

11   month and a half to prepare for trial.  And we had just come on

12   as new counsel in the case.  And that date was not moving.  So

13   we were in a bit of a jam.  And as I mentioned before, I

14   believe Ms. Romano was also tied up.  So we were referred to

15   Ms. Kadden to be our lead person from Visualex to work with us,

16   to be the one.

17             MS. KLEIN:  I have no further questions, your Honor.

18             THE COURT:  Mr. Risk.

19   CROSS-EXAMINATION

20   BY MR. RISK:

21   Q.  Mr. Daignault, my name is Mark Risk.  I represent Ms.

22   Kadden.  You never met Ms. Kadden?

23   A.  No.

24   Q.  She didn't come to Boston on the transgenic mice case?

25   A.  No.

C8EMKADT                        Daignault - cross

1   Q.  You didn't meet with her in person in connection with the

2   Sobieski matter?

3   A.  I believe that's correct.

4   Q.  I just heard your testimony and I know you had an

5   impressive victory in the Sobieski case.  I think I just heard

6   your testimony that Stroock was retained just a month and a

7   half before the trial?

8   A.  If I meant to say that, that's not what happened.  We came

9   on the case I think in January of that year, and we were

10  waiting for motions to dismiss to be decided.  We filed some

11  sort of renewed motion in August.  Judge Baer denied

12  everything.  Then everybody was thinking about continuing

13  discovery.  He said nope.  You can take your expert discovery

14  in a few weeks and trial is sticking on November 6, or whatever

15  day he had in his calendar.  When I say we came on, I meant

16  getting ready for the trial, which happened after he denied

17  everyone's motions and said move forward.

18  Q.  The retention of Visualex was within about a two-week

19  period on the eve of trial?

20  A.  I don't recall the exact time period, but that sounds

21  correct.  Again --

22          THE COURT:  We had e-mails earlier in the trial that

23  went from November 4 to 14.

24          THE WITNESS:  That sounds like the time period.

25  That's when the trial was.

1              MR. RISK:  Thanks, Mr. Daignault.  I have nothing

2     further.

3              MS. KLEIN:  I have no questions.

4              THE COURT:  Thank you.

5              (Witness excused)

6              THE COURT:  Is it correct, Ms. Klein, we have one last

7     witness?

8              MS. KLEIN:  Yes.  He will be fast in the morning.

9              THE COURT:  You don't have any witnesses, right?

10             MR. RISK:  No, your Honor.

11             THE COURT:  I'm just thinking if that's really all we

12    have, why shouldn't I have an easier morning.  Let's meet at

13    10:30.  We have one witness and closing arguments.

14             MS. KLEIN:  Yes.

15             THE COURT:  No reason to stress.

16             MS. KLEIN:  Thank you very much, your Honor.

17             MR. RISK:  Your Honor, will we be submitting posttrial

18    briefs?

19             THE COURT:  I hope not.  Don't you think you can cover

20    most everything in oral arguments?

21             MR. RISK:  There is a lot of exhibits that we didn't

22    put testimony in that we may want to quote from.  That's my

23    concern.

24             THE COURT:  I appreciate that.  But it's expensive to

25    prepare posttrial memoranda, too.

C8EMKADT

1          MR. RISK:  I know, your Honor.

2          THE COURT:  Maybe we can keep it very lean and just do

3     proposed findings of fact where you annotate to an exhibit or a

4     page of the transcript.

5          Did you order the transcript?

6          MR. RISK:  We haven't, but we will.  I would be happy

7     to submit something and keep it lean, although we did submit

8     pretrial --

9          THE COURT:  That's true.  But they weren't annotated,

10    the exhibits or the pages.

11         MR. RISK:  I'd like an opportunity to write something

12    to work with the exhibits.

13         THE COURT:  I don't think we need more legal

14    arguments.  If you want to take the original proposed findings

15    that you made and annotate it to the exhibits or the page

16    number, do it promptly, within ten business days, that would be

17    fine.

18         MR. RISK:  Also, there is some additional legal

19    authority cited.

20         THE COURT:  What was the additional --

21         MR. RISK:  The SmithKlein case we have not dealt with

22    and your Honor was asking further about one of the exemptions

23    yesterday.  Perhaps we will address it tomorrow.  Thanks, your

24    Honor.

25         THE COURT:  I would like to keep it lean in pages and

C8EMKADT

```
 1   short in time.
 2              MS. KLEIN:  Your Honor, also just to make sure
 3   everybody is on the same page, we are going to continue with
 4   what we spoke about yesterday, which is, depending on the
 5   Court's finding, if it's found that she is not exempt, then we
 6   will submit the damages, the offset, and not to burden the
 7   Court.
 8              THE COURT:  When you say submit, you mean live?
 9              MS. KLEIN:  Not live.  We had talked yesterday about
10   doing it based on the documents which comes from the evidence
11   here about the offsets.
12              THE COURT:  We wouldn't have to reopen the trial.
13              MS. KLEIN:  No.  And it would not be relevant.
14              THE COURT:  I understand that.  Thank you.  See you
15   tomorrow at 10:30.
16              (Adjourned to Wednesday, August 15, 2012, at 10:30
17   a.m.)
18
19
20
21
22
23
24
25
```

```
 1                          INDEX OF EXAMINATION

 2    Examination of:                              Page

 3    LILLIAN ROMANO

 4    Cross By Mr. Risk  . . . . . . . . . . . . . 172

 5    Redirect By Ms. Klein  . . . . . . . . . . . 182

 6    ADINA KADDEN

 7    Direct By Mr. Risk . . . . . . . . . . . . . 188

 8    Cross By Ms. Klein . . . . . . . . . . . . . 234

 9    HEATHER MORAN

10    Direct By Mr. Risk . . . . . . . . . . . . . 276

11    Cross By Ms. Klein . . . . . . . . . . . . . 287

12    ADINA KADDEN

13    Cross By Ms. Klein . . . . . . . . . . . . . 300

14    Redirect By Mr. Risk . . . . . . . . . . . . 325

15    Recross By Ms. Klein . . . . . . . . . . . . 326

16    LILLIAN ROMANO

17    Direct By Ms. Klein  . . . . . . . . . . . . 328

18    RONALD DAIGNAULT

19    Direct By Ms. Klein  . . . . . . . . . . . . 333

20    Cross By Mr. Risk  . . . . . . . . . . . . . 339

21

22

23

24

25
```

345

PLAINTIFF EXHIBITS

Exhibit No.                                              Received

7 . . . . . . . . . . . . . . . . . . . . . 206

6 . . . . . . . . . . . . . . . . . . . . . 210

5 . . . . . . . . . . . . . . . . . . . . . 211

16 . . . . . . . . . . . . . . . . . . . . 217

25 . . . . . . . . . . . . . . . . . . . . 220

1 . . . . . . . . . . . . . . . . . . . . . 228

20 . . . . . . . . . . . . . . . . . . . . 229

21 . . . . . . . . . . . . . . . . . . . . 229

22 and 23 . . . . . . . . . . . . . . . . 230

DEFENDANT EXHIBITS

Exhibit No.                                              Received

11 and 15 . . . . . . . . . . . . . . . . 172