C8FMKADT

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ADINA KADDEN,

4                  Plaintiff,

5            v.                              11 Civ. 4892 (SAS)

6   VISUALEX LLC,

7                  Defendant.

8   ------------------------------x
                                         New York, N.Y.
9                                        August 15, 2012
                                         10:30 a.m.
10
    Before:
11
                      HON. SHIRA A. SCHEINDLIN,
12
                                         District Judge
13
                            APPEARANCES
14
    MARK RISK
15       Attorney for Plaintiff

16  EPSTEIN BECKER & GREEN
         Attorneys for Defendant
17  BY:  TRAYCEE E. KLEIN
         MARGARET C. THERING
18

19

20

21

22

23

24

25

C8FMKADT

 1            (Trial resumed)

 2            THE COURT:  You have a witness, Ms. Klein?

 3            MS. KLEIN:  Yes, I do.  Your Honor, we would like to

 4    call David Mykel to the stand.

 5            MR. RISK:  Your Honor, may I say briefly that I think

 6    Mr. Mykel is a newly-hired consultant at Visualex.  I have not

 7    been given his offer letter or résumé.  I think that's within

 8    the discovery.  I'm not interested in doing anything to delay

 9    the completion of this proceeding except to note that.

10            THE COURT:  Do you have the offer letter and résumé,

11    Ms. Klein?

12            MS. KLEIN:  I just forwarded -- thank you.  I do have

13    it.  I just now read it.  I'll share a copy, of course.  I

14    don't believe we have the offer letter.  We have the résumé.

15            THE COURT:  Is there an offer letter?

16            MS. KLEIN:  There is an offer letter.

17            THE COURT:  Where is it?

18            MS. KLEIN:  I don't have it with me, your Honor.

19            THE COURT:  Call your office and have it faxed to my

20    office right away:  Let me give you the fax number.

21     DAVID MYKEL,

22         called as a witness by the Defendant,

23         having been duly sworn, testified as follows:

24    DIRECT EXAMINATION

25    BY MS. KLEIN:

C8FMKADT                    Mykel - direct

1    Q.  Good morning.

2    A.  Good morning.

3    Q.  Mr. Mykel, are you currently employed?

4    A.  Yes.

5    Q.  Where are you employed?

6    A.  Visualex LLC.

7    Q.  And for how long have you been employed by Visualex?

8    A.  Since June 17.

9          THE COURT:  Of 2012?

10         THE WITNESS:  Of this year.

11   Q.  What position were you hired for?

12   A.  Litigation graphics consultant.

13   Q.  Do you have familiarity with a litigation graphics

14   consultant?

15   A.  Yes, I do.

16   Q.  And have you been a litigation graphic consultant prior to

17   joining Visualex?

18   A.  Yes, I have.

19   Q.  Can you briefly tell the Court what your educational

20   background is?

21   A.  I have a dual degree in psychology and criminal justice

22   from the University of Albany and I have a master's degree from

23   forensic psychology from Marymount University.

24   Q.  Can you tell the Court what a litigation graphic consultant

25   at Visualex does?  What you do as a litigation graphics

C8FMKADT                          Mykel - direct

1    consultant?

2    A.  As a litigation graphics consultant for Visualex I work

3    with clients on a daily basis, essentially digesting the

4    complex subject matter they have that's coming in from their

5    cases, filtering it through my own background and experiences,

6    applying my analytical skills as well as critical thinking

7    skills in order to produce graphics and case persuasion and

8    strategy that will persuade and communicate properly our

9    intended message to the trier of fact.

10   Q.  Is your experience in going about doing your job as a

11   graphic consultant the same at Visualex as it has been in your

12   prior experiences?

13           MR. RISK:  Objection.

14   A.  Yes.

15           THE COURT:  I'll allow it.  Is it the same as the

16   other companies?

17           THE WITNESS:  Yes, it is.

18           THE COURT:  Which other companies were you at?

19           THE WITNESS:  I was previously at my own company

20   called the Art of Trial Sciences.  Prior to that I worked for a

21   company called Courtroom Sciences; and prior to that, a company

22   called Litigation Communications; prior to that, a company

23   called Jury Research, Inc.

24           THE COURT:  And at all those places it's the same

25   technique used pretty much at Visualex?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C8FMKADT                      Mykel - direct

1        THE WITNESS:  Yes.  There is some variation, but

2   essentially you are using the same skill set to provide value

3   to your client, which is our ultimate goal.

4        THE COURT:  How many years does that total when you

5   take us back to that first one in the series?

6        THE WITNESS:  It will be coming up on 11 years in

7   November.

8   Q.  And, Mr. Mykel, in all those experiences that you just

9   talked about, have you had occasion to come across other

10  litigation graphic consultants?

11  A.  Yes.

12  Q.  And are you a member of any professional organizations?

13  A.  Yes.  I'm a member of the American Society of Trial

14  Consultants, the American Psychological Association, and the

15  American Judicature Society.

16  Q.  Of all of the graphic consultants that you have known -- is

17  it 11 years that you said you've been in the industry?

18  A.  Almost.

19  Q.  In your 11 years in the industry, do you know what the

20  typical educational background is?

21  A.  It varies.

22        MR. RISK:  Objection.  No foundation.

23        THE COURT:  You talked to these other graphic

24  consultants over the years.

25        THE WITNESS:  Absolutely.

 1              THE COURT:  How many people have you met, do you

 2      think?

 3              THE WITNESS:  Hundreds.

 4              THE COURT:  I'll allow it.

 5              MR. RISK:  The foundation element wasn't typicality,

 6      your Honor?

 7              THE COURT:  Sorry?

 8              MR. RISK:  The question was what's their typical

 9      education.

10              THE COURT:  I heard that.

11      Q.  In your experience, what is their education?

12      A.  Every consultant that I know and have ever worked with and

13      known has at least some sort of master's, Ph.D., or law degree,

14      so advanced degrees.

15      Q.  And can you explain the main part of your job that you do

16      on a daily basis?

17      A.  I would say the main part -- it varies, as most consultant

18      roles do.  You speak with the client, understand what their

19      case is about, request case materials from them, read the case

20      materials, draw up graphic and case strategy recommendations

21      based on that.  Again, communicate with the client to see if

22      they have any suggestions or if we are going in the right

23      direction from what they have come up to at this juncture, and

24      then start drawing up the graphic recommendations and working

25      with our art team in order to create those for the client.

1    Q.  And in your experience at Visualex, how are litigations or

2    projects staffed?

3    A.  They are staffed typically with two consultants and then we

4    have our support staff of administrative people as well as

5    graphic artists and animation artists.

6    Q.  When you say two consultants, does that account for all of

7    the consultants that work at Visualex?

8    A.  Currently, yes, because there is only two of us.

9          THE COURT:  Who are the two?

10          THE WITNESS:  Myself and Ms. Romano.

11          THE COURT:  That's it right now.

12          THE WITNESS:  Currently, yes.

13    Q.  You both work on all of the cases?

14    A.  Yes.

15    Q.  Are you familiar with what it means as a litigation graphic

16    consultant when you use the word proofing?

17    A.  Yes.

18    Q.  Do you record your activities during the workday?

19    A.  Every day.

20    Q.  And have you done that for most of your career?

21    A.  All of my career.

22    Q.  And in performing your role as a graphic consultant, have

23    you had occasion to describe your work as proofing?

24    A.  I'm sorry.  Could you repeat that question?

25    Q.  Yup.  You report your time?

1    A.  Yes.

2    Q.  Have you ever had occasion to report your consulting time

3    as proofing?

4    A.  Yes.

5            THE COURT:  Proofreading?

6            THE WITNESS:  Yes.

7    Q.  Proofreading or proofing?

8            THE COURT:  Which is it?

9            THE WITNESS:  It's the same.  They are synonymous.

10   Q.  Proofreading and proofing are the same?

11   A.  Yes.

12   Q.  When a consultant or when you are proofing, what are you

13   doing?

14   A.  A variety of things.  Going over the documents and the

15   graphics, making sure that they adhere to the themes that we

16   developed by reviewing the case materials, ensuring that the

17   message that we are trying to convey is coming through in a

18   persuasive manner, that the message can be communicated clearly

19   to the trier of fact, making sure the content is accurate, both

20   factually and phonetically, spelling, layout, design, ensuring

21   that everything that we put into that piece of work carries the

22   quality and integrity that I intended when I first created it.

23   Q.  And is there a different process if you didn't create the

24   original idea for the demonstrative?

25   A.  Not necessarily.

C8FMKADT                    Mykel - direct

1   Q.  Can you explain what difference there is, if any?

2   A.  There really isn't much of a difference.  Either way, every

3   graphic that comes across my desk I'm looking at it from my

4   analytical perspective to ensure that knowing the case, that

5   from the reading all the case materials, regardless if I have

6   two or three or however many consultants are working on the

7   case with me, I'm looking at it with a critical eye, analytical

8   eye to address the things that I just previously mentioned in

9   my last answer, and to ensure that everything is put in front

10  there.

11         The only slight difference would be that I may have to

12  ask a question of the other consultant to make sure that I'm

13  thinking on the right track to say, okay, is this what we are

14  trying to convey with this graphic.

15  Q.  In those scenarios when you do that do you consider

16  yourself not to be acting as a consultant?

17  A.  No.

18  Q.  Why is that?

19  A.  Because I'm essentially doing every job duty that I was

20  hired for as a consultant.  In any industry a consultant role

21  takes on a variety of hats.  And no matter what you are doing

22  or what you are looking at, you are always deemed a consultant

23  and should be working accordingly.

24  Q.  And when you are doing proofing of revisions, as I've heard

25  that word used throughout this litigation, are you acting as a

C8FMKADT                        Mykel - direct

1    proofreader in the sense of somebody who is just comparing one

2    thing to another?

3    A.   That is part of the job, yes.

4    Q.   And is there anybody else that does that job?

5    A.   Yes.  The entire staff.

6    Q.   And is it fair to say that by the time it gets to the

7    consultant is it the final pair of eyes?

8    A.   Yes, should be.

9    Q.   And, again, in your perspective, at all times, what is the

10   primary responsibility of your job?

11   A.   I would say the primary responsibility of my job is to

12   ensure that we put out the best quality work product and that

13   we are adding value to our client.  That's what they are paying

14   us for.

15   Q.   And does it matter if you are having face-to-face contact

16   with clients?

17   A.   No.  The job is still the same.

18   Q.   And in your 11 years of experience is a lot of the

19   consulting part of the work done through various forms of

20   communication?

21   A.   Yes.

22   Q.   Can you tell us what those are?

23   A.   Sometimes they are face-to-face meetings, sometimes they

24   are e-mails, sometimes they are telephone conversations,

25   sometimes they are conference calls with multiple attorneys or

C8FMKADT                     Mykel - direct

1   clients on the line.

2              MS. KLEIN:  Your Honor, I have no further questions.

3              THE COURT:  Thank you.

4              Did you reach your office?

5              MS. ROMANO:  Yes.  They are faxing it.

6              MR. RISK:  I can try to start.

7              THE COURT:  It has not arrived yet.  I don't know why.

8              You want to start or not?

9              MR. RISK:  I will.  I won't be very long.  I may soon

10  be finished.  Let me do what I can do.

11             I'll try, your Honor.

12  CROSS-EXAMINATION

13  BY MR. RISK:

14  Q.  Mr. Mykel, we met a minute ago.  I'm Mark Risk.  I

15  represent Adina Kadden who is a former employee of Visualex.

16             So you are just about up to your two-month anniversary

17  at Visualex?

18  A.  Correct.

19  Q.  And you do consulting work apart from your work at

20  Visualex?

21  A.  I'm sorry.  I don't understand your question.

22  Q.  What is DM Consulting, LLC?

23  A.  That is a company that I own.

24  Q.  And do you do work in that company now?

25  A.  No, I do not.

C8FMKADT                          Mykel - cross

1   Q.  So your sole source of income is from your work at

2   Visualex?

3   A.  Correct.

4           THE COURT:  Does that company still exist?

5           THE WITNESS:  Yes.  It's under an umbrella that the

6   Art of Trial Sciences now, but the company still does exist.

7           THE COURT:  It doesn't generate anything for money.

8           THE WITNESS:  It's a sole proprietorship.  If I'm

9   working for Visualex, part of my agreement to become a

10  consultant with Visualex was to not compete.  Therefore, I

11  cannot have my own side business.

12          THE COURT:  Is the business defunct?

13          THE WITNESS:  I would say it's in a holding pattern, I

14  guess.

15          THE COURT:  It's not operating?

16          THE WITNESS:  No.

17  Q.  You were working for yourself as a trial consultant?

18  A.  Prior to Visualex, correct.

19  Q.  And now you are working for Visualex?

20  A.  Correct.

21  Q.  Full time?

22  A.  Yes.

23  Q.  You work with trial teams in your job?

24  A.  Yes.

25  Q.  And trial teams are groups of lawyers and paralegals at a

C8FMKADT                    Mykel - cross

1   law firm that are working on a case?

2   A.  In addition to, yes.

3           THE COURT:  In addition to?

4           THE WITNESS:  There is always a corporate client

5   involved, corporate in-house counsel.

6   Q.  And the trial team is representing the corporation?

7   A.  Typically.

8   Q.  And they have in-house counsel?

9   A.  Typically.

10  Q.  And typically, in your experience, the ultimate payer of

11  your fee is the corporation?

12  A.  No.

13          THE COURT:  It's the law firm?

14          THE WITNESS:  It could be either one.

15  Q.  Mr. Mykel, I am going to hand you what I am going to mark

16  as Plaintiff 30.  Is the Plaintiff's 30 your LinkedIn page,

17  Mr. Mykel?  I know it's hard to read and I just heard you were

18  coming and did the best I could.

19  A.  Yes, it is.

20  Q.  Why isn't last name on the LinkedIn page?

21  A.  I'm sorry?

22  Q.  You see it says David W. M.  Do you know why that is?

23  A.  Yes.  Because I believe you have to pay for the services to

24  see people's last names.  I also see it's see full name,

25  hyperlink right next to it that I'm sure if you clicked on it

C8FMKADT                    Mykel - cross

1    you would probably see my full name or ask you to pay for a

2    service so you can see my full name.

3    Q.  You didn't do anything to restrict access to your name?

4    A.  Not that I'm aware of.

5    Q.  Down at the bottom of the page -- did you write this

6    information onto LinkedIn?

7    A.  Yes.

8    Q.  And down at the bottom of the page there is a description

9    of your job at Visualex, isn't there?

10   A.  Yes, there is.

11   Q.  And you have the large type edition, Mr. Mykel.  Let me try

12   to read it from mine.  June 2012 to present, litigation

13   communications consultant who assists trial teams with the

14   development and visual approach that incorporates case strategy

15   and maximizes impact through the integration of persuasion,

16   communication, and presentation techniques as well as

17   technology.

18           Did I read that correctly?

19   A.  Yes, did you.

20   Q.  That's what you wrote?

21   A.  That's correct.

22   Q.  Now, you have your job title in all caps, litigation

23   communications consultant?

24   A.  It's not in all caps.

25   Q.  Initial caps.  Litigation communications consultant.  Why

1   did you capitalize that?

2   A.   Just for readability.

3   Q.   That's your title at Visualex, litigation communications

4   consultant?

5   A.   Currently, yes.

6   Q.   You testified a moment ago that in your experience over

7   this 11 years, your company's bill is either paid by the law

8   firm or the law firm's ultimate client, is that right?

9   A.   Yes.

10   Q.   And when it's paid by the law firm you don't know whether

11   they seek reimbursement from the ultimate client?

12   A.   I assume they do.

13          MR. RISK:   I am just waiting at this point for the

14   offer letter, your Honor.

15          THE COURT:   It's here.   What's the problem now?

16          MR. RISK:   I think they are missing a page now.

17          MS. KLEIN:   That letterhead from the second page is on

18   the first page.

19          THE COURT:   Is that the whole thing?

20          MR. RISK:   No.

21          MS. KLEIN:   It looks like it's cut off.

22          MR. RISK:   Let me see what I can do.

23          THE COURT:   We can call them, come up here, use our

24   phone and have it faxed right away.   Obviously, they have it

25   right away.

361

C8FMKADT                           Mykel - cross

1              We have a better version.

2    Q.  Mr. Mykel, you signed a written offer letter with Visualex,

3    yes?

4    A.  Yes.

5    Q.  On June 18?

6    A.  I believe so.

7    Q.  You were living in Texas at the time?

8    A.  Dallas, yes.

9    Q.  And you're paid at a base salary of $100,000, is that

10   right?

11   A.  Yes.

12   Q.  You got a $5,000 relocation stipend, is that right?

13   A.  Correct.

14   Q.  You got a signing bonus of $5,000.

15   A.  Is that a question?

16              THE COURT:  It's a question.

17   A.  Yes.

18   Q.  You're eligible to receive incentive compensation, is that

19   right?

20   A.  Correct.

21   Q.  Based on Visualex's incentive compensation plan, yes?

22   A.  Correct.

23   Q.  What's that?

24   A.  That's basically, I would say, a bonus structure.  Based on

25   the amount of work that you bring in, you are compensated back

C8FMKADT                    Mykel - cross

1    a certain percentage of that work.

2    Q.  And do you have client relationships that you hope to bring

3    to Visualex?

4    A.  Yes.

5    Q.  May I ask you how much business you are hoping to bring to

6    Visualex?

7              THE COURT:  You mean in dollars?

8              MR. RISK:  In dollars.

9              MS. KLEIN:  Hoping and speculation?

10             THE COURT:  I understand that.  I think the point he

11   is trying to make, and it's a fair one, that he expects to be a

12   bit of a business getter, which was probably never the

13   expectation of Ms. Kadden, who was new to the business.

14             MS. KLEIN:  Your Honor, she wasn't new to the

15   business.

16             THE COURT:  Please.  She was a summer associate at the

17   Attorney General's office and had one job for a year.  This man

18   has been in the business for ten years.  He has a business

19   base.  He had his own business.  He is a business guy.  I think

20   it's a fair question.  There is a clear distinction.  Ten years

21   in the business?  What's your hope in terms of bringing in

22   business?  Would you hope to bring in $100,000 of business, $1

23   million of business?

24             THE WITNESS:  I would hope to bring in millions of

25   dollars.

C8FMKADT                      Mykel – cross

1            THE COURT:  What's your realistic hope for your first

2     year here in New York?

3            THE WITNESS:  It's difficult to tell because you have

4     different markets, different economies.

5            THE COURT:  Somebody who has been recently in

6     business, if you did less than 100,000, would that be

7     disappointing, let's say, to you?

8            THE WITNESS:  As a person, yes, my personality, it

9     would.

10           THE COURT:  That's your minimum hope, is that it?

11           THE WITNESS:  Yes.

12           THE COURT:  You hope to do even better than that?

13           THE WITNESS:  Of course.

14    Q.  If you brought $100,000 of business to Visualex in a year,

15    what would you receive under the terms of your agreement?

16           THE COURT:  What percentage of that 100,000?

17           THE WITNESS:  3 percent, if I'm correct.

18           THE COURT:  Is that 31 that you are marking?

19           MR. RISK:  Yes.  As you know, there is only one copy,

20    and I am going to show it to the witness and that's that.

21           THE COURT:  Did you offer 30, by the way, the LinkedIn

22    pages?  Did you wish to?

23           MR. RISK:  Yes.  I'm sorry.  I want to offer 30,

24    Plaintiff's 30.

25           THE COURT:  Any objection to Plaintiff's 30, which is

C8FMKADT                    Mykel - cross

```
 1 │ the LinkedIn pages?
 2 │          MS. KLEIN:  I don't have it.
 3 │          MR. RISK:  True.
 4 │          THE COURT:  My clerk is giving you our copy so you can
 5 │ look at it the same time.
 6 │          In the meantime, do you object to 31, which is the
 7 │ offer letter?
 8 │          MS. KLEIN:  I don't object to it.  It is what it is.
 9 │ I don't believe it's relevant.
10 │          THE COURT:  That's a different objection.  Overruled.
11 │ 31 is received.
12 │          (Plaintiff's Exhibit 31 received in evidence)
13 │          MS. KLEIN:  I don't have any objection as long as it's
14 │ what the witness says it is, just a portion of his LinkedIn
15 │ page.
16 │ A.  It's redacted in a form because if you notice the top pages
17 │ are actually cut off.
18 │          THE COURT:  It is what it is.  The material in it is
19 │ accurate.  You put it there.
20 │          THE WITNESS:  The material I was questioned on is
21 │ accurate.
22 │          THE COURT:  30 is received, 31 is received.
23 │          (Plaintiff's Exhibit 30 received in evidence)
24 │ Q.  Mr. Mykel, I have just put before you our only copy of
25 │ Plaintiff's Exhibit 31.  Is that your offer letter with
```

C8FMKADT                         Mykel - cross

1    Visualex?

2    A.  Yes, it is.

3    Q.  And does it bear your signature?

4    A.  Yes, it does.

5         THE COURT:  By the way, I don't have it in front of

6    me.  Tell me.  3 percent for anything you bring in.  Does that

7    rise with the quantity?  What I mean by that, do you get a

8    bigger percentage if you bring in more dollars, or is it always

9    3?

10        THE WITNESS:  Not according to their current contract.

11        THE COURT:  It's always 3?

12        THE WITNESS:  It's 3 and then 2 and 1.

13        THE COURT:  You get less the more you bring in?

14        THE WITNESS:  According to this.  Just to make sure --

15        MR. RISK:  If I may.

16   A.  I don't believe it's in here, actually.

17   Q.  There is an incentive plan referenced in there.  Can I just

18   ask Mr. Mykel, how you happen to get the job at Visualex?

19   A.  Through a recruiter.

20   Q.  Who was the recruiter?

21   A.  Josh Sacks.

22   Q.  Did you meet with Ms. Romano before you were offered the

23   job?

24   A.  Yes.

25   Q.  You flew here to New York and met with her?

1   A.  No.  We did a Skype interview.

2   Q.  When you came to Visualex this was the first time you had

3   actually met her?

4   A.  Yes.

5   Q.  What discussion did you have with Ms. Romano about your

6   ability to bring business to Visualex?

7   A.  We discussed if I had prior clients and if, you know, I

8   would obviously stay in contact with them with the hope of

9   bringing business to Visualex.

10  Q.  Did you tell her some of the clients you hoped to stay in

11  touch with?

12  A.  I did not mention the specific names, no.

13          MR. RISK:  I have nothing further, your Honor.

14          THE COURT:  Anything further for this witness,

15  Ms. Klein?

16          MS. KLEIN:  Yes, your Honor.

17  REDIRECT EXAMINATION

18  BY MS. KLEIN:

19  Q.  Mr. Mykel, are you a business partner of Visualex?

20  A.  No.

21  Q.  Are you an employee?

22  A.  Yes.

23  Q.  And at times is your work billed out?  What I mean by that,

24  there are times when your consultant work is passed on to

25  clients.

1    A.  As in they pay the bill?

2    Q.  Yes.

3    A.  Yes.

4    Q.  Do you know what your hourly rate is for your consulting

5    services at Visualex?

6    A.  I believe it's $225 an hour for flat regular time.

7    Q.  And that's for your consulting time?

8    A.  Correct.

9         THE COURT:  And then if it's over a certain hour, it

10   goes to one and a half?  Does it become 337 or something?

11        THE WITNESS:  Yes.

12        THE COURT:  When does it become 337?

13        THE WITNESS:  It depends on the contract that we have

14   with the client.  But if you have extended hours that go into

15   the wee hours of the morning.

16   Q.  Were you instructed anything at Visualex when you first

17   started working about generally how you should categorize the

18   consulting time in regards to whether it be the premium time or

19   the straight time?

20   A.  Yes.

21   Q.  What were you told?

22   A.  I was told that pretty much everything I will do is going

23   to fall under consulting, and then there is a few other

24   categories like conference calls and things like that that

25   would be further broken down.

C8FMKADT                    Mykel - redirect

1    Q.  Were you ever instructed that if you were not doing

2    consulting work that it should be billed under a certain

3    category?

4    A.  Can you repeat the question.  I'm sorry.

5    Q.  Were you ever instructed that if you were not doing

6    consulting work that it should be billed under a certain task?

7    A.  If I wasn't doing consulting work I would be told to put it

8    under whatever task it is associated with, admin or training or

9    marketing or whatever else it would be.

10   Q.  Are you aware whether or not there is a category item on

11   the program that you use that is called project management?

12   A.  There may be.  We have a lot of entries in there.  I have

13   never used the project management entry.  I've always used

14   consulting for what I've done.

15   Q.  Why is that?

16   A.  Because my title of my job is a consultant, and everything

17   that I do falls under that umbrella, whether it's proofreading,

18   whether it's reading, checking content, reviewing graphics,

19   talking to the art director, reviewing case materials.  Those

20   were all hats that a consultant wears.

21   Q.  And do you know, does anybody else that works at Visualex

22   read the materials that you just talked about other than the

23   consultants?

24   A.  No.

25   Q.  No, you don't know?

1   A.  No, they do not.  Currently, Lillian and I are the only two

2   people that read the materials.

3   Q.  And is it necessary for a graphic consultant to do their

4   job for them to be familiar with materials?

5   A.  Absolutely.

6   Q.  And why is that?

7   A.  Because what the client is paying for and your value is

8   added to understand and digest the case materials, break them

9   down into simple subject matter that people can understand, and

10  be able to visually communicate that to your audience.

11  Q.  And if you were working on a revision and a client said to

12  you in either an e-mail or verbally, David, change the color of

13  that and move that all to the right, is your job as a

14  consultant to just do that?

15  A.  No.  There would be some questions I would have.  First, I

16  would ask them why they would like to do that, and then,

17  depending on their reasons, I would tell them why we do it this

18  way, why it needs to stay this way.  And if we change it, it's

19  going to change our strategy, our presentation techniques, and

20  then ultimately the persuasiveness of the graphic.

21           THE COURT:  Of course, ultimately the client will

22  decide.

23           THE WITNESS:  Yes.  But the more that you let them

24  know this is what you are hiring me for, please allow me to do

25  this for you.  Typically, they will give way to us, unless it's

1   something that's content factually based.

2           THE COURT:  At the end of the day the client is going

3   to decide what the graphic is?

4           THE WITNESS:  They will decide what they present, yes.

5           THE COURT:  One would think.  Okay.

6           MS. KLEIN:  No further questions.

7           THE COURT:  Anything further of this witness?

8           MR. RISK:  No, your Honor.

9           THE COURT:  Thank you for coming in.  All set.

10          THE WITNESS:  Thank you, your Honor.

11          (Witness excused)

12          THE COURT:  Any more witnesses from either side?

13          MS. KLEIN:  No, your Honor.

14          MR. RISK:  No, your Honor.

15          THE COURT:  That closes the evidentiary portion,

16  unless there are more documents either side had planned to

17  offer.  Were there?

18          MR. RISK:  No, your Honor.

19          THE COURT:  Then at the end of the day can you

20  resubmit your books with just the admitted exhibits?  Because I

21  know it was very good of you to prepare these books, but they

22  probably had more exhibits than you used.  I just want the ones

23  that are actually in evidence.

24          MS. KLEIN:  Your Honor, for the ones that are quite

25  extensive, and we only used several pages, do you want the

C8FMKADT

1     excerpts?

2          THE COURT:  Yes.  Except for the one of all her time

3     sheets.  I think those I really wanted to look through it

4     anyway.

5          Is there anything else you want me to look through

6     every page of, of the big ones?

7          MS. KLEIN:  Again, what is in there right now is just

8     a very small representative portion of her work.  As you can

9     see from her time sheets, there is over 55 cases that she

10    worked.  I would fill this courtroom if we brought all of her

11    work in.  So that is just a sample of the cases.  So, again, if

12    you are looking for samples of her work, again, that's parts of

13    it, the bigger one of, I believe it's I and J or J and K.

14         MR. RISK:  At this point what's been offered and is in

15    is in and what has not been offered and is in is not in.

16         THE COURT:  Except for a couple of those big fat

17    exhibits.  I think she offered all of J, but then to speed up

18    the testimony she only went through small excerpts.

19         MR. RISK:  I don't think any of those, correct me if

20    I'm wrong, were exhibits that we had stated an objection to in

21    the pretrial order.

22         THE COURT:  That may be right, too.  To the extent you

23    need to fix these binders to slim them down to what was

24    actually received in evidence, I can have them given back to

25    you.

C8FMKADT

1          MS. KLEIN:  Sure.

2          THE COURT:  And resubmit them at the earliest possible

3    time.

4          With that, the evidentiary portion of the trial

5    closed, if you are prepared to make brief closing arguments,

6    I'm happy to hear them.

7          MR. RISK:  Your Honor, in what order would you like us

8    to do that?

9          THE COURT:  She went first.  She gets to go last on

10   the burden, so you will go first.

11         One second, we are still distributing notebooks back.

12   It's extraordinary how much paper there is in the digital age.

13   You think there would be one CD, that's it, DVD, one DVD.

14         MS. KLEIN:  Some of the courts still like the actual

15   hard copy.

16         THE COURT:  I know.  I just think it's funny.  You

17   think we have transitioned, but we really are in a intermediate

18   area.  Another five or ten years I guess it will all be DVD.

19         Mr. Risk, I'm ready.

20         MR. RISK:  I begin by reminding your Honor of the

21   Supreme Court's directive which has been reechoed by the Second

22   Circuit as recently as Young v. Cooper Cameron, that the FLSA

23   exemptions are, quote, to be narrowly construed against the

24   employers seeking to assert them and their application limited

25   to those established as plainly and unmistakably within their

1   terms and spirit.

2            When Adina Kadden first contacted me a little more

3   than a year ago, I would have never imagined that I'd be here

4   today.  Partly because I don't think I have ever had a matter

5   that proceeded from complaint to federal trial in 13 months,

6   and I should pause just for a nanosecond to say that the

7   professional experience of trying a case in this courthouse is

8   a precious professional experience for me.  I think it is for

9   Ms. Kadden and I'm certain it is for the Visualex team and that

10   aspect has been remarkable.

11            But really what I couldn't have imagined when Ms.

12   Kadden first called me in is that it would ever get anywhere

13   like this because the reason is that when she first talked to

14   me she showed me two documents.  Your Honor talks about bring

15   just one CD.  Maybe I should have left all the boxes home and

16   brought two documents, the job description and the offer

17   letter.

18            And I thought 13 months ago that all I would have to

19   do is take those and show them to Visualex and that matter

20   would be resolved quickly.

21            She sent me Exhibit 2, the job description, which,

22   more than any document I have ever seen, reads like it was

23   written for a law school exam on FLSA exemptions.  It's quite

24   remarkable.  It's now been confirmed that it's the real thing

25   and words chosen by Visualex.  It's admitted to in the requests

C8FMKADT                    Summation - Mr. Risk

1    for admission, and we heard Ms. Romano testify about it.  And

2    it was written by Visualex before the trial, before the

3    complaint, before Ms. Kadden was terminated.

4              THE COURT:  I think I need to interrupt.  Can I get my

5    notebook back with Exhibit 1 and 2.  I want to follow along.  I

6    know what they are, of course, but I just want to look at both

7    1 and 2 while you are speaking.

8              Thank you.  I apologize for that.

9              MR. RISK:  I think I won't have to give you volume 2,

10   your Honor.

11             THE COURT:  I know.  I just wanted to stare right at

12   them while you speak.

13             MR. RISK:  Exhibit 2, it's the carefully-crafted job

14   description by Visualex given to the headhunter to specifically

15   recruit Ms. Kadden's position when they had not even heard of

16   Ms. Kadden, much less changed her compensation, much less

17   terminated her, much less been sued by her.  These are the

18   words.

19             And on two of the exemptions I think it's pretty quick

20   and clean and clear.  We already know from Exhibit 2 that there

21   is no specific educational requirement for this job.  A

22   graduate degree is preferred.  Some vague examples are given

23   and an et cetera is added.  And Ms. Romano testified quite

24   forthrightly that she does prefer someone with a graduate

25   degree in -- I think the testimony confirmed what Exhibit 2

1    says, which is a graduate degree in anything and sometimes a

2    graduate degree in nothing will be acceptable for this job.

3          Turning quickly -- let me hold onto that.  It's hard

4    to imagine a stronger statement that the position for which Ms.

5    Kadden was hired was not a graphics design position.  Visualex

6    chose to render that in capital letters, so it was clear.

7          And when I first talked to Ms. Kadden, it wasn't hard

8    to figure out what the job was about and what the primary

9    responsibilities are, because it was specifically denominated.

10   Now we have had layers and layers of testimony, including by

11   Mr. Mykel, about what the responsibilities are.  Here they are

12   under the heading primary responsibilities, colon.

13         Visualex says throughout, and I think incorrectly,

14   that the question before the Court is whether Ms. Kadden was

15   hired because she had a law degree.  And the case law and the

16   regs just don't sustain that.  The focus of the inquiry is on

17   academic requirements of the position at issue.  That's what

18   the Second Circuit said in Young V. Cooper Cameron in 2009.

19   It's an explicit Second Circuit holding in that case.  We hold

20   that employee is not an exempt professional unless his work

21   requires knowledge that is customarily acquired after a

22   prolonged course of specialized intellectual instruction.

23   There is nothing wrong with Visualex looking for someone with a

24   certain level of education, but that's not what the FLSA

25   contemplates.  It's not.  It's quite clear that there is no

1   specific educational training required for this job.

2          The regulations say, quote, speaking of the learned

3   profession equal exemption that it's not available for

4   occupations that customarily may be performed with only the

5   general knowledge acquired by an academic degree in any field.

6          Where are those regulations?  I have them.

7          What I did, your Honor, we were talking about the

8   regulations the other day and I printed up a set on the

9   administrative exemption which I'll get to in a minute.  I just

10  made it a little larger for us to talk about it.

11         THE COURT:  Thank you.

12         MR. RISK:  I'm not up to that exemption, but I know

13  the Court is interested in that and I want to look at it with

14  your Honor.

15         So under the learned professional exemption we never

16  get to the mishmash of which side the duties fall or don't

17  fall, although I remind the Court, if we do, the question is

18  what Ms. Kadden's primary duties are, not her sometimes duties

19  when she is stepping in as lead consultant.  And the burden is

20  on the employer.  So if it's black, it's one.  If it's white,

21  it's the other.  But if it's gray, then Ms. Kadden is

22  nonexempt.

23         I've already briefed the education prong in our

24  pretrial brief which I looked at again and it holds up pretty

25  well from the trial testimony.

1              I just want to quickly say that the cases cited in

2     there are very relevant.  The Solis case from the Ninth Circuit

3     in 2011 looked at the stated job description.  In that case

4     they were public social workers and there was a very public --

5     it was an internal document which the employer said what

6     degrees they were looking for or not, and there was some play

7     in that, some flexibility, and the Court found those social

8     workers nonexempt.

9              The Eighth Circuit in 1999 in Fife v. Harmon looked at

10    air field operations specialists and there the advertisement

11    called for someone with a BA in aviation or related field or

12    equivalent experience.  The Eighth Circuit found that to be a

13    nonexempt position and it reminds us very much of the way Ms.

14    Romano described her process when she is looking for in this

15    job.

16             The Eleventh Circuit in 1991, in the Deibeck case

17    looked at probation officers.  There, a supervisor was on the

18    stand and said in a more colorful manner that a BA in any field

19    would qualify.  I think in the Deibeck case the supervisor said

20    a BA in basket weaving would also be amongst the degrees to

21    qualify.  A little more colorful, but very similar to what Ms.

22    Romano said here.  We never reached the duties test.  If we do,

23    we still think we do fine.

24             Exhibit 16, which is at the back of the book, your

25    Honor, was our chart based on the time records that are Exhibit

1    7, and you'll recall all we tried to do there is separate out

2    proofing.  Exhibit 16 is our chart in which we took all the

3    billable hours by category and it shows quite clearly that the

4    vast majority of Ms. Kadden's time was recorded as proofing.

5    And we separated out any time she did anything related to

6    preparation of a new graphic, which sometimes included the

7    proofing of those.  That's the tale of the tape.  That's how

8    she spent her time.  I know various things have been said about

9    the art of proofing and what's done, but it's still proofing,

10   and much of it is proofing on deadline.  And we think that

11   because of the way Congress and the statute have allocated the

12   burden, if it's gray, she is nonexempt.

13          There are lots of questions and lots of testimony

14   about what Ms. Kadden occasionally did or sometimes did, but

15   that's not the focus of the FLSA.  It doesn't matter if she

16   once pulled the sword out of the stone.  The question is what

17   her primary duties were.  And it seems, it was proofing and

18   checking the revisions.  And if she made comments on the flap

19   sheet, it went to Ms. Romano, the lead consultant.

20          To the creative exemption.  I don't want to spend more

21   than a moment on the creative exemption.  To be a creative

22   professional the work must be performed, quote, in a recognized

23   field of artistic or creative endeavor.  That's the regs at

24   Section 541.302.  That includes the graphic arts, but we knew

25   last June, from Exhibit 2, that this is not a graphic arts

1   position.

2          I don't think any more need to be said about whether

3   Ms. Kadden is a creative artist.  And I imagine that Visualex

4   would say that the person who said to Salvador Dali, why don't

5   you paint some clocks that were melting would qualify for the

6   creative arts exemption.

7          Now to the administrative exemption, and we did talk

8   about that in court the other day, which prompted me to make

9   the regs bigger.  And partly, after a couple of long days here,

10  it is harder to see the smaller version for me, your Honor.

11  It's quite clear and this goes right from the headings.  The

12  primary duty must be the performance of work, quote, directly

13  related to the management or general business operations of the

14  employer or the employer's customers.  And it's that little

15  prong I think that your Honor had raised the other day we were

16  looking at.

17         Even Visualex, as I understand it, does not contend

18  now that Kadden was an administrator at Visualex.  I think

19  that's off the table.  She was there to do work for his clients

20  for which she billed them.  I think Visualex is now arguing

21  that Kadden was an administrator for its clients.

22         Now, the regs provide that a consultant is exempt when

23  she is consulting on the management or general business

24  operations of the customer.  If the primary duty is acting as

25  an advisor of the consultant to the employer's customers, then

1   the consultant might be exempt.  And that is on the second page

2   of what I've handed your Honor in 541.201(c) and I apologize.

3   I happen to have a mark on that line.  I think that's what

4   Visualex keeps talking about when they say, very matter of

5   factly, well, consultants are exempt.

6          C follows B, which states:  The kinds of

7   administrative positions that qualify for the administrative

8   exemption, but it's clear that in every case it should be about

9   the management or general business operations of the employer

10  or its customer.  C says:  Thus, for example, employees acting

11  as advisors for consultants to their employer's clients or

12  customers, as tax experts or financial consultants, the first

13  two items in B above, for example, may be exempt.

14         But the consulting still has to be related to

15  management or general business operations of the customer if

16  the customer is Stroock Stroock & Lavan or if it's deemed to be

17  Stroock Stroock & Lavan's corporate client or any of the other

18  law firms that are represented.  Perhaps I should have proposed

19  that we subpoena the managing partner of Stroock Stroock &

20  Lavan and ask him under oath if Adina Kadden had given

21  management or general business advice to Stroock Stroock &

22  Lavan.  I'm afraid your Honor would have called the marshals

23  for me had we proposed to do that.

24         We heard it again from Mr. Mykel.  This word has been

25  bandied around a lot and we haven't heard much about it.  Trial

1   teams.  Mr. Mykel says we worked with trial teams.  Ms. Romano

2   said we worked with trial teams.  Other witnesses, trial teams.

3   Mr. Daignault yesterday, my team, her team.  We work with

4   Adina's team and our team.  Visualex is hired to work with

5   teams of lawyers and paralegals on specific cases, usually

6   trials.  Mr. Mykel talked about the retainer letters today.

7   They retained to work on cases, not to provide general business

8   advice to Stroock Stroock & Lavan.  For all of the times we

9   heard about trial teams, not once in this trial in two days did

10  I hear words like the management committee, the managing

11  partner, the firm administrator, the controller, the marketing

12  officer, the recruiting coordinator, the HR person.  Those are

13  the administrative personnel inside the law firms, and Visualex

14  is not hired to consult with them on how to run their law

15  firms.  Visualex has nothing to do with the management of the

16  general business operations of these firms.

17          In view of that, when you look at the discretion and

18  independent judgment prong of the administrative exemption

19  which follows, with respect to Ms. Kadden's role, it's even

20  more clear.  Was Ms. Kadden exercising "discretion and

21  independent judgment with respect to matters of significance"

22  in the management or general business operations of Stroock

23  Stroock & Lavan, or was she assisting lawyers who had a client

24  going to trial?  I think that a close look at the

25  administrative exemption regs makes all that clear, without

C8FMKADT                    Summation - Mr. Risk

1    even getting to the Second Circuit cases which support it,

2    including Davis v. JP Morgan, which is the one that most

3    recently affirms the production administration distinction and

4    says, we know modern businesses are not so simple anymore, they

5    are service businesses and we move the production

6    administration to those.  I'll stop there.  And I think the

7    regs are the answer.

8            Briefly, your Honor, on the liquidated damages, under

9    the FLSA, as your Honor knows, we are entitled to liquidated

10   damages.  They are presumed.  And they are not -- of course,

11   they mean something different in the state law than the federal

12   law.  In the federal law they are not a penalty.  They are

13   really an interest equivalent to make up for the time lost

14   without the money.  So the presumption is that we are entitled

15   to it.  I think it's the Barfield case in which Judge Raggi of

16   the Second Circuit says it most recently, most clearly, we are

17   supposed to get them.  But your Honor has discretion not to

18   give them upon a showing of good faith and reasonable basis.

19           Let me just say that we heard that Ms. Romano did a

20   Google search.  We heard Ms. Romano look at a DOL website.  And

21   she concluded Kadden and others were exempt.  She claimed that

22   was industry practice, somewhat ironically, because Ms. Romano

23   had a company for eight years paying overtime to all the

24   consultants.  And odd testimony from her about what the

25   industry practice is.  She e-mailed a friend who is an

1   attorney.  She sent to that attorney Exhibit 2, Kadden's job

2   description.  You know what Exhibit 2 says.  The lawyer

3   apparently agreed that Kadden was exempt, but Ms. Romano was

4   unable to recall which exemption or what theory, either from

5   her own research or from what counsel told her.

6          Apparently, counsel told Romano that she had spoken

7   with someone who had worked at the Department of Labor for 25

8   years.  I guess it's federal, but maybe it's the New York State

9   Department of Labor, for many years, and that person had said

10  that Kadden was exempt.  I don't know who that person is or

11  whether they ever saw the job description.  Apparently, that

12  person never spoke to Romano directly and certainly did not

13  interview the employees.  25 years at the Department of Labor

14  is a commendable career worthy of our respect.  But for what we

15  are doing here, 45 minutes with these regs would have been much

16  more useful.

17         The liquidated damages under the FLSA are not a

18  punishment.  They are intended to make up the lost time without

19  the wages, which in this case has gotten to be a few years.

20         The halftime method is the last issue on the table,

21  your Honor.  We have briefed it.  It's technical.  I remind the

22  Court that in this case we had a written agreement, Exhibit 3.

23  That clearly provided for the overtime.  Couldn't have been

24  more clear.  Exhibit 5, the pay stubs state the hourly rate at

25  36.04 or 36.06 and the overtime hourly rate 54.09, one and a

1    half times.  The hourly rate stayed on the pay stubs for the

2    remainder of Kadden's employment calculating her pay, vacation

3    time, sick time.  That was always the hourly rate.  It's ironic

4    to take someone who is getting $54 in overtime, if the Court

5    were to conclude they are entitled to overtime, and then put it

6    back at only a third of that amount.

7            They didn't make an agreement with Kadden.  The

8    testimony was quite clear.  They called her in and said there

9    would be no more overtime.

10           Now, for people who like FLSA legal issues, it's a

11   lively issue, the halftime method and when it should be

12   applied, and Visualex is correct that under certain

13   circumstances it's been applied by the Second Circuit and

14   elsewhere.  In the Perkins case, Perkins v. SNET, cited in our

15   brief, most recently was a really strong rejection of it across

16   the board by, I think it was Judge Hall in the District of

17   Connecticut.  It's cited in my pretrial proof.  That's taking

18   it on directly and in that case the Court in Connecticut

19   rejected the halftime method last year.

20           THE COURT:  Do you remember the basis for that

21   rejection?  What was it?

22           MR. RISK:  Rejected it across the board.

23           THE COURT:  It never applied?

24           MR. RISK:  That was a really strong rejection.  But,

25   first, your Honor, in Connecticut, the judge said, as many of

1    these courts are saying, wait a minute, when it's in the

2    regulations, it's a method to pay overtime prospectively.  If

3    you say to an employee when you hire them, I'm giving you

4    $75,000, your hours are going to fluctuate and that's straight

5    time pay for your fluctuating hours, be they low or high, and

6    we are going to pay you a half premium, that's the halftime

7    method as imaged in the regulations.

8            So courts that rejected it say, the regulation is not

9    a remedy in a misclassification case at all.  There is some

10   authority that skirts around, including the Seventh Circuit,

11   skirts around the regulation and says, in the Overnight Motor

12   case in 1942, it's applied without the regulation.  The Seventh

13   Circuit accepted the analysis about the regs that I have

14   presented but said we can take authority directly from

15   Overnight Motor.  It's not exactly clear when they would apply

16   that, but I think the notion still is where the employee had an

17   agreement or an understanding about what the straight time pay

18   would be.

19           And in this case, Ms. Kadden had a written agreement.

20   She had the pay stubs.  She didn't make an agreement to change

21   her compensation.  It just doesn't seem to me the worst

22   possible case to fit those facts.  There seems to be no

23   rationale for application of the halftime method.

24           More broadly than that, this is the quintessential

25   remedial statute of the FLSA and the halftime method cuts the

C8FMKADT                    Summation - Mr. Risk

1    remedy by, you would think, by two-thirds.  It's actually more

2    than two-thirds because it results in a recalculation of the

3    hourly rate.  It cuts it to pieces.  And so it seems an odd

4    application in a remedial statute unless the circumstances are

5    here.

6         The question I would be asking Visualex about the

7    halftime method is, where does their rationale end?  If any

8    employer can call a salaried employee in and say, you are not

9    getting overtime, well, that employee, like Ms. Kadden -- Ms.

10   Kadden left the meeting with Ms. Romano, she had a clear

11   understanding she wasn't getting any more overtime.  There was

12   no doubt about that.  If that's all you need for the halftime

13   method, then it applies in every case where an employer says,

14   I'm telling you what you are getting, I'm breaking the law.

15        The question is, where would it not apply?  It would

16   gut the remedial statute.  By the way, to the extent it's

17   applied where there are -- the quintessence of it, is it's

18   employed with fixed salaries and up and down hours.  There is

19   some aspect of that in this job, there is no doubt about that,

20   except that you heard the testimony, Visualex has office hours,

21   9 to 6 and there is a requirement of eight hours a day.  And

22   Debbie Marshall, the bookkeeper, comes to Ms. Kadden and says,

23   you don't have 40 hours this week.  What's wrong?  What are you

24   going to put in?  Did you have a sick day whatever it is?  So

25   it's not really a fluctuating situation.

1          I'll stop there, unless your Honor wants me to speak

2     about anything extra, because we have plenty of the Court's

3     time.  I think that the regulations are a pretty good guide in

4     this case today, just as they were a year ago, and I think that

5     the reading of the regs that I hear from Visualex is a driveby

6     reading, a quick reading that relies on a word here and a word

7     here and it's not what they say.  Thank you.

8          THE COURT:  I'll find out more when I hear the defense

9     summation because as the trial evolved I am not so sure the

10    administrative exemption, after all, is the best for them.  One

11    of the other two might be the one that they now focus on more.

12    We will see.  If I have any more questions from you after that

13    I will come back to you.

14         MR. RISK:  I hope it's not the creative exemption.

15         THE COURT:  We will see.  I don't know which one they

16    are going to really press the most on.  Up until now the

17    position has sort of been, all three apply, that's that.  You

18    would think they might have a priority order.  This is our

19    favorite.  If you don't find that, this is our second.  If you

20    don't find it, this is our third.  I'm hoping Ms. Klein tells

21    me that.

22         Ms. Klein.

23         MS. KLEIN:  Your Honor, first of all, I also, just

24    like Mr. Risk, would like to thank you the Court for its

25    patience over the last couple of days.  I know at times I have

C8FMKADT                     Summation - Ms. Klein

1    been agitated.  I know at times I have been anxious, and I know

2    at times the Court has thought that I was acting as the judge

3    as opposed to just the advocate.  And I want to express to the

4    Court and make sure the Court understands, there was never a

5    disrespect intended.

6          But what it was, it didn't come from a place of

7    disrespect.  It came from a place of my gut.  And I tell you

8    why.  I take great pride in our profession.  I take great pride

9    not in being a lawyer, but in justice.  And what this case

10   comes down to is very, very simple.  This is a matter of trying

11   to rewrite history.  As Mr. Risk just made very, very clear to

12   us, Ms. Kadden came to him with a piece of paper and showed him

13   an offer letter.  This case is not about a breach of contract,

14   this is not an unjust reliance or detrimental reliance.  Yes,

15   he has a piece of paper that said to an at-will employee, this

16   is the compensation that I am going to give you.

17         THE COURT:  Of course, it said the overtime thing.

18         MS. KLEIN:  It's never been a dispute and there is

19   also no dispute that the Department of Labor and the federal

20   and the state laws allow an exempt employee to receive

21   overtime.  That's okay.  It's bonus money.  You are allowed, if

22   you are so kind and wanting to as an employer, to share wealth

23   and give money, you are allowed to.  And it doesn't make you

24   obligated for life.  It doesn't mean that somebody who is in an

25   exempt position all of a sudden magically transforms into a

1    nonexempt employee.  And that's what, I really believe in my

2    heart, is what started this case.

3         Ms. Kadden, she worked as a graphic consultant before.

4    She didn't get overtime there.  She didn't sue them for not

5    getting overtime.  She did the exact same job that she did

6    here.  She admitted at her deposition that she worked in teams

7    there.  She represented on her résumé, just like she said at

8    her deposition, what the primary job was, to create persuasive

9    graphics, to give -- I'm sorry.  I believe it was help

10   attorneys develop trial strategies.  She is a critical thinker.

11        THE COURT:  Would that put you in the greatest

12   exemption?  Which of these three boxes does this argument put

13   you in?

14        MS. KLEIN:  It actually falls under them.  I will get

15   to that.  I know your Honor indicated just a couple of minutes

16   ago, it would have been helpful to the Court if we prioritized.

17        THE COURT:  I want to know what your strongest

18   argument is.

19        MS. KLEIN:  It's not a stronger argument.  The

20   Department of Labor has made very clear, you don't fall

21   necessarily into one, two, or three.  You in fact can fulfill

22   parts of one, parts of two, and none completely, and you are

23   exempt.

24        THE COURT:  Would you run that past me again.  You

25   cannot be qualified under any exemption yet be exempt?

C8FMKADT                    Summation - Ms. Klein

1          MS. KLEIN:  No.  For example, you have, let's say, the

2     criteria for each one, right.

3          THE COURT:  Yes.

4          MS. KLEIN:  The full puzzle, I'll call it.  You can

5     satisfy portions of one, portions of another one, none of them

6     completely, and you are still exempt under the law.  It's

7     called a combination exemption and it's in our brief.  So you

8     don't have to just say I am an administrative --

9          THE COURT:  I didn't recall that.  There is a new one

10    called the combination --

11         MS. KLEIN:  It has always been.

12         THE COURT:  It's a new one for these oral arguments.

13    I had not heard it in oral argument.  You said it's in your

14    brief, I appreciate that.  I don't remember every brief I read.

15    It wasn't in the oral argument Monday.

16         MS. KLEIN:  It is in the brief and it, of course, very

17    important because our burden is not to prove that she matches

18    one perfectly.

19         What this case is about, let's not lose sight of --

20         THE COURT:  How do I read about the combination

21    exemption?  Is that in the regs?

22         MS. KLEIN:  It's right in the regs and it's in our

23    brief and we can give you the section.

24         THE COURT:  Give me the section.

25         MS. KLEIN:  I can get a copy.

1              THE COURT:  I would like to read about the combination

2      exemption.

3              You didn't comment on that at all, Mr. Risk.

4              MR. RISK:  No, I didn't, your Honor.

5              MS. KLEIN:  Should I continue and give you a copy of

6      it?

7              THE COURT:  No.  I'll wait.  Do you have it, Mr. Risk?

8              MR. RISK:  I am looking for the section of the regs --

9              THE COURT:  Good.

10             If she doesn't meet any of these three exemptions she

11     is still exempt.

12             MS. KLEIN:  If she qualifies --

13             THE COURT:  That sounds very amorphous.

14             MS. KLEIN:  I know the Court understands what the

15     history of the FLSA is and when it went in, and it was passed

16     in 1939, why it is so important and it is an inherent part of

17     understanding and interpreting the statute, and I think that

18     that was most recently made clear in Christopher v. SmithKlein

19     Beecham.  It is not a rigid statute.  The FLSA was passed to

20     make sure that the lowest earning members of our society are

21     not paid at a level that's below one that people can live at.

22     I did --

23             THE COURT:  It's true that the exemptions are to be

24     construed narrowly.  Courts have said that.

25             MS. KLEIN:  Interestingly referred and relied on and I

C8FMKADT                    Summation - Ms. Klein

1    believe the Second Circuit Mr. Risk recently mentioned, and we

2    also know the Second Circuit was just reversed by the Supreme

3    Court of the United States because of its finding that it

4    applied too rigid of an application.  This is a statute that is

5    meant --

6              THE COURT:  Which case was that?  That's Christopher?

7              MS. KLEIN:  Yes.

8              THE COURT:  That's the one where the Second Circuit

9    was reversed?

10             MS. KLEIN:  Yes.  There was a split among all of the

11   circuits.  In that case it's interesting, and I think what it's

12   going to be known for and remembered most for is not per se the

13   exemption that was being analyzed in that case.  I am sure your

14   Honor knows that case dealt with pharmaceutical sales reps who

15   would work for the pharmaceutical companies and they would go

16   to doctors offices and knock on the doors and have meetings

17   with them and befriend them and they would just drop samples

18   off.  The goal of it was to try to encourage these doctors that

19   whenever they were writing a prescription that they would write

20   the prescription with the medicine that was produced by their

21   company.  But there was never actually a transaction, a sales

22   transaction, because it's unlawful to sell drugs in that type

23   of situation.

24             When the Second Circuit and the other courts had

25   opportunity, the ones that declined to find that the sales reps

1    were exempt, they were focusing and looking in the very exact

2    language that was written in the statute.  And historically in

3    the industry those people, the sales reps, were considered

4    outside salesmen and there is an outside salesmen exemption, as

5    the Court knows.

6            And the Second Circuit rightly so, if literally

7    reading verbatim the statute, turned around and said, no, there

8    is no sale.  If you don't have a sale, how can somebody be

9    exempt as an outside salesperson?  They are not selling

10   anything.  And ultimately when it made its way to the Supreme

11   Court of the United States, the issue, because there were class

12   actions brought all over the United States, it opened up a

13   flood of discovery, which I think this case will do the same

14   thing in the world of trial graphics.  And what the Supreme

15   Court said is, we cannot be so rigid and not think about how

16   the world has evolved.  Sales transactions don't happen the

17   same way.  What is the intent and the purpose behind this?  And

18   really incredibly what the Supreme Court said was, forget about

19   outside sales, this, that, or the other.

20           The FLSA was not meant to cover people like these

21   sales reps.  The particular plaintiffs in the case that made it

22   up to the Supreme Court of the United States had an annualized

23   salary of $70,000.  The Supreme Court said, no way is that

24   meant to be covered by the statute.  In this case, Ms. Kadden

25   earned at a minimum $75,000 a year.

1          When we think about it, what is a professional?  Your

2     Honor, you are a very brilliant woman.  I know your background.

3     I admire you.  We know an exempt employee when we see one

4     without necessarily labeling.  The regs and the statutes

5     consider that somebody can't be exempt if they make less than

6     $455 a week.  Ms. Kadden made $1500 a week.

7               THE COURT:  Say that again.  The 455, what was that?

8               MS. KLEIN:  $455 a week is the lowest level for

9     somebody that can never be found exempt.  She made three times

10    that amount.  She made --

11              THE COURT:  There is no high end cutoff either.  If

12    you make more than X, you can never be nonexempt, right?

13              MS. KLEIN:  No.  But what they indicated and when you

14    look at the legislative history and the readings on the floor

15    when the bill was being passed, again, it was the concern that

16    there would be individuals that just say, and I use this not as

17    a section of the reg but label people professionals.

18              And the concern was that you would take somebody who

19    was getting an hourly rate and just say, oh, they are

20    professional because like your Honor said the other day,

21    everybody is professional.  Of course, that's not the way that

22    they are using the word professional.  It's not meant as a

23    derogatory comment about someone who does it.  Most nonexempt

24    employees are very professional and do their jobs very well.

25              But in this context of the law the question is, is

C8FMKADT                    Summation - Ms. Klein

1    somebody treated like a professional?  That's what you are

2    really supposed to look at.  What are they paid?  Are they paid

3    near the baseline of $7.25 an hour?  The minimum hourly wage is

4    $7.25 an hour.

5         Do you want to hear an amazing statistic?  If you took

6    a wage earner that earns the minimum wage in the United States

7    and they worked 24 hours a day, seven days a week, 365 days a

8    year, they would earn approximately $63,000, still far less,

9    $15,000 less than Ms. Kadden, who I promise you did not work

10   seven days a week, 24 hours a day.

11        Again, why is this important?  It's important in

12   understanding that we don't look at the regs like they don't

13   matter.  We have to remember what they are and what their

14   purpose is.

15        I'm sorry, but this case makes me think of the famous,

16   famous line from Justice Potter Stewart.  I can't define

17   pornography, but I know it when I see it.  And that's what this

18   is about.

19        You know what.  I look at Ms. Kadden's résumé and what

20   the Cowen Group said about her and the job she was hired for,

21   right.  She consulted.  A typical day for Adina involved

22   identifying strategic areas of concern in major litigation,

23   conducting extensive research to develop case theories,

24   developing and implementing demonstrative graphics to aid and

25   educating jurors on subject matters, managing work flow of a

1    team of consultants.  She has represented herself as a

2    professional.

3            THE COURT:  That may be.  I am just trying to

4    understand the word professional fitting into the regs.

5    Creative professional is one exemption that I knew about.

6            MS. KLEIN:  The learned professional.

7            THE COURT:  I understand.  I never saw just

8    professional.  That's why I asked which of these exemptions do

9    you want to focus on.  Then you said, I don't have to, you said

10   there is this thing called a combination exemption.  Ten

11   minutes ago I said, can you hand me that combination exemption

12   so I can look at it.

13           MS. KLEIN:  The combination exemption falls under 29

14   CFR Section 541.708.

15           THE COURT:  I think I'm being handed a copy of it.

16   I'll just read it.  It's short.  Employees who perform a

17   combination of exempt duties, as set forth in the regs in this

18   part for executive administrative professional outside sales

19   and computer employees, may qualify for exemption.  Thus, for

20   example, an employee whose primary duty involves a combination

21   of exempt administrative and exempt executive work may qualify

22   for exemption.  In other words, work that is exempt under one

23   section of this part may not defeat the exemption under any

24   other section.

25           What does that mean?  Work that is exempt under one

1   section will not defeat the exemption under any other section.

2   That's weird.

3           MS. KLEIN:  Your Honor, the FLSA has never written in

4   very clear language and I think that's why there has always

5   been difficulty.  The regs have helped to some degree in

6   defining them.

7           There is very little case law really talking

8   specifically about them other than the regs themselves.

9   Everyone sort of cites back to the combination reg and talks

10  about it.

11          One case that is interesting and one of the few is

12  Schmidt v. Eagle Waste & Recycling, which is 599 F.3d 626,

13  which is the Seventh Circuit Court of Appeals.  And in that

14  case they held:  We also agree with the district court that

15  even if Schmidt did not qualify for the outside salesperson

16  exemption on its own, she would fall within the, quote,

17  combination exemption to the FLSA.  Employees, quote, who

18  perform a combination of exempted duties as set forth -- I'm

19  sorry -- I'm sorry, your Honor.  I'm reading from my BlackBerry

20  and I just lost that section.  I'm sorry.

21          Then they cite the section.  It says:  Eagle argues

22  that to the extent Schmidt performed duties unrelated to

23  outside sales, these were largely exempt, quote, administrative

24  duties with all of the citations to the regs.  With the

25  exception of her first few months of employment, Schmidt's base

1    salary exceeded the $455 per week minimum.

2            When Schmidt was not actively pursuing sales, she

3    developed advertising and marketing plans, managed customer

4    complaints, administered the customer database, and dealt with

5    issues that would have been handled by Albi, that was somebody

6    else, there, had he been in the office, such as approving an

7    order of parts for broken machinery.  This office work was

8    directly related to the management and general business

9    operations of Eagle.  It goes on to ultimately conclude that a

10   combination of these things meant that the person was exempt

11   under the combination exemption.

12           What's very interesting, I think, that's come out from

13   the trial in the last two days is based on what Ms. Kadden

14   testified, and I totally do not believe that her testimony is

15   worthy of credibility about what her job is, and the reason I

16   say that is because the résumé that she most currently had used

17   represented that she was a consultant doing exactly what all of

18   our witnesses said a graphic consultant does.  And surely if

19   she wasn't a graphic consultant, but she was simply a

20   coordinator or a proofreader, she would describe herself as

21   that.

22           You can't have it both ways.  You can't represent to

23   the world you are one thing.  I could easily describe my work,

24   my daily work as proofing.  She didn't bill as proofing.  She

25   chose to charge Visualex's client under the consulting rate

C8FMKADT                    Summation - Ms. Klein

1  when she was not proofing as a consultant, she knew to not

2  record it that way, and she put that as project management.  So

3  she herself decided when she was doing consulting work.

4          A lot of people can say, you know, Ms. Klein, what's

5  the primary duties of an attorney?  You know what, if I thought

6  of the mundane crap that I have to do every day and the amount

7  of editing, reading, and proofing and answering emails, not

8  giving advice, doing things, you know what, I think that I am

9  entitled to overtime.  I am sure the Court would feel the same

10 way.  And Mr. Risk makes a big thing --

11          THE COURT:  I'll do without the overtime.  I just like

12 the living wage.

13          MS. KLEIN:  I think if we took my hours and divided

14 them into the rate, I also am not.  I am with you.

15          THE COURT:  I've done that.  Put it in an opinion

16 once.  It was not pretty.

17          MS. KLEIN:  And the other thing.

18          THE COURT:  I think it was approximately $30 an hour.

19          MS. KLEIN:  I couldn't agree more.  Listen.  There is

20 a lot that needs to be done in our society, and there is no

21 qualm for me about that.  I absolutely believe that everybody

22 is entitled to minimum wage, that they are entitled to time and

23 a half.  But those statutes are meant for people that are

24 walking around like robots.  I hate to say it, but their job is

25 really manual.  They are being told what to do.  They are not

1   thinking.  They are not being creative in doing their job.  Not

2   that they don't think.  Of course, they are human beings.  They

3   think, they have feelings.  But that is very different than

4   somebody that can choose to come in when they want.

5          Now, Mr. Risk seems to make a very big thing

6   throughout this litigation, especially these last two days,

7   Visualex wanted Ms. Kadden to be at work at 9:00.  Oh, I'm

8   assuming that your law clerk is expected to be here at a

9   certain hour on days because this court is open and it has a

10  business.  That does not make somebody nonexempt.  A doctor is

11  scheduled for a surgery at 9:30.  Would you expect him to be

12  there?  And the fact that he is told to report at 9:30, does

13  that make him nonexempt?  It is professional and when a

14  business' doors are opened it is expected that other business

15  taking you away from the office would expect that you would be

16  there.  He tries to make it sound like that is some horrible

17  thing that should control this case.

18         The one thing I didn't hear very much in this case,

19  what does a primary consultant do?  When I say that I didn't

20  hear it, I didn't hear it from the plaintiff.  Interestingly,

21  in all of her questions from her counsel, it was focused on the

22  minute -- again, if you focused on what I do, you would be

23  convinced that I am not an attorney, that I don't exercise

24  thought and discretion, that I don't have to creatively come up

25  with arguments.  The same thing could be said for Ms. Thering,

C8FMKADT                    Summation - Ms. Klein

1    an associate at my firm.  You know what, she doesn't go to

2    client meetings.  She doesn't interact face to face.  She is

3    there all hours of the night doing research and checking and

4    proofing.  Is she also nonexempt?

5          Because Ms. Kadden would like you to think, just

6    because maybe there is a named partner or there is somebody

7    that's the partner or that has more experience than you, it

8    makes her not a professional.

9          Well, interestingly, if she wasn't a professional, why

10   was she being paid as a professional?

11         THE COURT:  I understand that whole argument.  But the

12   problem is with the phrase, a professional, because you are

13   arguing that any professional is exempt.  I don't see that

14   exemption called a professional exemption.

15         MS. KLEIN:  There is the professional exemption.

16         THE COURT:  Where is that one?  We have not been

17   talking about it.  We have talking about the creative

18   professional, the learned professional, and then your

19   combination thing, but I have not seen the one called all

20   professionals are exempt.

21         MS. KLEIN:  That's the history of the statute and

22   everything behind these.  And then you get --

23         THE COURT:  You are arguing generalities.  I don't go

24   to legislative history until I have to.  That's the rule.  You

25   don't do it.

1           MS. KLEIN:  Yes.  If we go through these, and I'm

2      happy to address all of them separately again, although the

3      combination applies.

4           Getting back, we will talk about the administrative

5      exemption.  As the Court knows, the employee must be

6      compensated on a salary of not less than $455 a week, no

7      dispute there.  The parties agree.  Ms. Kadden has also agreed

8      that we have met the element of showing that she received that

9      salary all the time.  Her salary was not subject to deductions,

10     whether she worked 34 hours, whether she worked 23 hours,

11     whether she worked 40 hours.  She got the same paycheck,

12     baseline paycheck every week.

13          The next thing is, under the administrative exemption

14     the employee's primary duty must be the performance of office

15     or nonmanual work directly related to the management or general

16     business operations of the employer or the employer's

17     customers.  And the employee's primary duty includes the

18     exercise of discretion and independent judgment with respect to

19     matters of significance.

20          What I was just starting to say before was, you know,

21     having heard Ms. Kadden's testimony here, I think I guess my

22     thought process changed a little from how I was thinking

23     throughout this entire case.  For me there has never been a

24     question that a graphic consultant of what that job means at

25     Visualex is exempt for many reasons, because of a variety of

C8FMKADT                    Summation - Ms. Klein

1    things.  In the case of, for example, the consultants, we know,

2    based on the Department of Labor regulations, that consultants,

3    people that render advice, are exempt.  They specifically say

4    that.  We also know that you don't have to be the lead

5    consultant for that to be the case.  You can have tax advisors,

6    financial advisors, and there are groups of them that are

7    working in the office independently thinking, and they also are

8    exempt.

9         And we were always focusing on the administrative

10   exemption, on the fact that as the consultant she is exempt.

11   Also, that she did work on her primary duty that related to our

12   customers, the clients of Visualex.

13        We heard Mr. Daignault say that he relies on the

14   Visualex consultants, they make them better lawyers.  They are

15   helping them.  It's no different than when you bring in an

16   image consultant.  How do you improve the visibility of a

17   company?  How do you make it more desirable?

18        THE COURT:  That does seem to me to be the general

19   business operation of the company employed.

20        MS. KLEIN:  Isn't the general business operations of a

21   law firm --

22        THE COURT:  To do a trial presentation, no.

23        MS. KLEIN:  No.  The general business is providing

24   legal services.  If they are able to improve their legal

25   services by having consultants have them come in and help them

 1    explain --

 2              THE COURT:  That's not what I think is the

 3    administrative exemption is.  Let's why I asked you to focus on

 4    your favorite.  I no longer see that as applied by its plain

 5    language.  That's not running the business of the law firm.

 6    You want to try a case, you have to hire an expert witness,

 7    too.  If you expert witnesses that are a contractor, that may

 8    improve your presentation.  It may help you win the case and

 9    win a $100 million verdict.  That expert witness on some patent

10    issue is not running the general business of the company.

11              MS. KLEIN:  Your Honor, I respectfully disagree.

12    According to the Department of Labor, if an investment

13    brokerage firms hires somebody to come in and help them figure

14    out how to get a better deal in purchasing a competitor, that

15    person is specifically identified as exempt, as the consultant.

16    In fact, the Department of Labor --

17              THE COURT:  That happens to be a different example

18    than the one I chose or than the one you are arguing.  It won't

19    pay us to go through these examples.  It's a difficult thing to

20    categorize every business relationship to try to put it in a

21    box.

22              MS. KLEIN:  I think that's why I am suggesting to the

23    Court that it's so important to really understand and feel what

24    the Supreme Court has just made clear, again, that it is not a

25    literal-only reading.  You look at things, for example, which

C8FMKADT                    Summation - Ms. Klein

1    is what they just said in the Supreme Court when the statute

2    uses and the regs use words like includes but is not limited

3    to, which is right in the statute that we were talking about.

4              THE COURT:  I have yet to see a case that didn't have

5    it, includes but is not limited to.

6              MS. KLEIN:  A statute that didn't have that.

7              THE COURT:  They all have it.  That's a very common

8    phrase in the law.  Every contract has it.  Many regs have it.

9    It's construed a lot.

10             MS. KLEIN:  I am not disputing it, but I think it's

11   important in the context of what the Supreme Court has just

12   said, which is that, again, that's indicative that it is a

13   statute or a reg that's meant to be applied in today's real

14   world, that you look at what it is.

15             THE COURT:  Your general argument is certainly

16   contrary to the notion that the exemptions are narrowly

17   construed.  You give them the broadest possible construction

18   and essentially say anybody highly educated, anybody who is not

19   a manual laborer or anybody earning over the minimum wage,

20   these people should not be nonexempt.  They shouldn't be

21   getting overtime.  It's a very broad argument you are making

22   and I'm afraid of that.  If I bought your argument hook, line,

23   and sinker, there goes my next 20 cases.  Basically you are

24   saying all the professionals are out just by virtue of being a

25   professional.  I have a lot of FLSA cases.

1          MS. KLEIN:  I notice you've had a lot recently.  There

2     is a lot of implications.  Also, there is a huge implication

3     for the industry.  As we heard --

4          THE COURT:  This is a narrow industry compared to some

5     other cases I have.

6          MS. KLEIN:  Absolutely, relatively speaking to some

7     others.

8          There is other huge implications.  If the Court were

9     to ultimately conclude that litigation graphic consultants,

10    most of them with highly advanced degrees, are meant to be

11    nonexempt employees, the interesting thing is, you will see

12    salaries of the 75,000 go to where they should, nonexempt

13    employees receive $35,000 a year.  One has to be careful what

14    they wish for.

15         THE COURT:  I've thought of that in this case.

16         MS. KLEIN:  That's fine.  If Ms. Kadden wants to be,

17    if she was doing what she says she was doing, acting like a

18    robot, just following direction like a waitress, takes an

19    order, gives it to the chef, takes an order, then shame on us

20    and shame on her.  She should not have told us she was acting

21    as a consultant.  She should not have asked for $75,000 a year.

22    She should not have misrepresented on her time records what she

23    was doing and stolen from clients that paid bills.  I mean,

24    it's just not fair.

25         And when we get back to how I opened, about being

407

1   agitated, it's not fair.  You cannot expect somebody who got

2   paid that and then come in and say, oh, no, no, no, I didn't

3   really do anything, I wasn't thinking, I wasn't being creative,

4   I wasn't imaging anything.  I was just looking down.  And we

5   heard, she claims she only was entitled to do anything when

6   Lillian was out of the office because of a death in her family

7   or back surgery.  Really?  Because we understood --

8          THE COURT:  I think she was trying to say, she wasn't

9   the ultimate decision maker and that's true in a law firm, too.

10  Junior associate is not going to make any final decisions

11  unless you're completely unavailable.

12         MS. KLEIN:  She actually did make final decisions when

13  Ms. Romano was in the office.

14         THE COURT:  On some level.  You know what I'm saying.

15  The ultimate decision maker is the senior partner.  You're used

16  to that.

17         You've had a lot of time.  Is there anything you want

18  to cover that you have not?

19         MS. KLEIN:  Your Honor, there is unfortunately, I

20  guess, for you, there are other things that I --

21         THE COURT:  We got to move to them quickly.  Now I'm

22  in a time bind.

23         MS. KLEIN:  Your Honor, I think we need to look at all

24  of the things.  As I talked about, I don't think that we can

25  look at it so narrowly and rigidly.  But if you are going to do

C8FMKADT                    Summation - Ms. Klein

1    that, again, I think that the fact that she was a consultant

2    and if she was doing the job --

3              THE COURT:  Remember the word consultant is just a

4    title and we don't decide a case based on a title.  I'm not so

5    interested in her being a consultant, but rather what she did.

6              MS. KLEIN:  That's right.  And what the job was that

7    she was hired to do and what she was expected to do.  And we

8    know very clearly from the case law and from the regs that just

9    because somebody is not possibly good at their job and not

10   doing their job, that doesn't make them become nonexempt.

11             THE COURT:  I got that.  Can we move on.

12             If you want to cover the halftime argument, go for it.

13   If you want to cover the liquidated damages, go for it.  Those

14   are the only two.  I have got your argument on the exemption.

15             MS. KLEIN:  Your Honor, can I just address the

16   creative exemption, please.  Thank you.

17             The creative.  It seems like there has been a lot made

18   of, she was not a graphic artist.  The interesting thing is, a

19   graphic artist, not the graphic artist title at Visualex, they

20   are nonexempt employees.  They are not exempt.  They do not

21   fall under the creative.

22             Why don't they fall under the creative?  Because they

23   don't imagine what they are making.  They are told, like the

24   Salvador Dali example we were given, they are told by Ms.

25   Kadden what to do.  She creates it in her head, is this

C8FMKADT                    Summation - Ms. Klein

1   working, is this best visually depicted?  The complex

2   information that I have read doesn't work with what we are

3   trying to do for the client.  And she simply goes up to them

4   and tells them what to do and they are the production workers.

5   They make it.

6           What is she more comparative to?  She and the graphic

7   consultant -- let's not just talk about her -- they are the

8   equivalent of the executive chef and the line cooks.  If the

9   executive chef decides, what is it we want to create?  He

10  decides or she decides, what are we going to serve for dinner?

11  What is the plate going to look like when it comes out?  The

12  line cooks take the creation and the imagination --

13          THE COURT:  I understand.  They execute it.  Can we go

14  on past the exemptions and get to the remaining two issues,

15  liquidated damages and halftime if you wish to, very briefly.

16          MS. KLEIN:  In regards to the liquidated damages,

17  contrary to what Mr. Risk said, especially the New York

18  provision is actually a penalty.  It says it right in the

19  statute.

20          THE COURT:  That's the New York Labor Law.  Under the

21  FLSA?

22          MS. KLEIN:  With regards to the federal, I would plead

23  with the Court that this is not a case that liquidated damages

24  should ever be granted.  This is an industry that for 25, 35

25  years, I think we heard the industry, that has never had a

1  reason to think that people that do the jobs of not just the

2  title but actually do the job of graphic consultants, that they

3  were not exempt employees.

4          Mr. Risk sort of plays piddly piddly with what Ms.

5  Romano did, the steps that she took.  She went on a Google

6  search.  She did that and she went to the Department of Labor.

7  She reached out to a lawyer.  Should she be not entitled to

8  fairness because she called somebody who she knows?  The fact

9  that he has brought up that I know Ms. Romano is meaningless,

10  does that mean that I can't render --

11          THE COURT:  Don't waste time with that.  You're a

12  lawyer.  She consulted you.  Okay.

13          MS. KLEIN:  Not only did she consult with me, but, in

14  fact, because I understand that the FLSA is one that courts

15  struggle with all the time because of how unclear these regs

16  are, I did go one step further and I went to somebody who was a

17  prosecutor for the United States Department of Labor, and he

18  assured me, based on an explicit understanding of what they do

19  on a daily basis, that she was exempt under the three that we

20  have advanced, as well as the combination exemption.

21          The other thing he made clear, and we have pointed out

22  in our briefs, is, it is incorrect to think that because

23  Heather Moran was hired that the professional exemption, the

24  learned exemption does not apply.  What matters is why Ms.

25  Kadden was hired.  It's specific.  And I won't waste the

1    Court's time but simply to cite to the examples in the reg

2    about the paralegal.  Paralegals are generally nonexempt.

3    However, a paralegal that's hired because he has an engineering

4    background is exempt.  It doesn't apply across the board.

5    Again, Heather Moran was the one out of 25 years that

6    Ms. Romano was desperate and tried and didn't work.  I don't

7    think that can be held against her.

8              Your Honor, in summing up --

9              THE COURT:  I think you have covered liquidated

10   damages.  How about the halftime?

11             MS. KLEIN:  The halftime method, your Honor, first of

12   all, I would hope that we would never, never get there.

13   However, if we were going to get there, if the Court was so

14   inclined, what I would say is, it's nice that Mr. Risk is

15   pointing the Court we are relying on a District Court of

16   Connecticut.  With no disrespect to the District of

17   Connecticut, but there are numerous circuit courts that have

18   already decided this and the federal Department of Labor, which

19   said, in a misclassification case, it is absolutely appropriate

20   to use the halftime method.

21             We heard testimony from Ms. Kadden.  She understood

22   that as of April 1, she was told that the $75,000 was going to

23   compensate her for all her work.  She didn't dispute that.  If

24   she didn't like that, she could have left.  She was an at-will

25   employee.  She stayed for another two years.

1          Interestingly, also, if she wasn't doing the job that

2     she was hired to do and which she was told on these job

3     descriptions where it says we specialize in providing analytic

4     graphics, our litigation graphic consultants help attorneys

5     develop persuasive visual presentations, if she wasn't doing

6     that, doesn't one have to scratch their head and say, really,

7     she is a smart intelligent woman.  Why didn't she leave?  If I

8     was hired to do something and I was hired to be a consultant

9     and I was being given proofreading work, as you and I

10    understand proofreading work in a word processing department,

11    you know what, I would quit or I would voice my objection.  I

12    wouldn't sit there for three years.  That's simply just not

13    credible.  She was doing what a consultant does.

14          THE COURT:  I'm sorry.  You lost me on the halftime

15    thing.

16          MS. KLEIN:  Going back to the halftime, the Department

17    of Labor has said that that is the appropriate method to use in

18    a misclassification case.  She admitted, Ms. Kadden, that she

19    knew the $75,000 was from April 1, 2009 forward to cover her

20    for all hours worked.  Her base salary didn't decrease from

21    that point, so she doesn't lose the exemption.

22          THE COURT:  Was Judge Hall wrong --

23          MS. KLEIN:  I believe he was absolutely wrong.

24          THE COURT:  Have you happened to read that particular

25    case?

1           MS. KLEIN:  I have.  I don't remember the specific as

2    we sit here today.  But the concept behind the halftime, my

3    understanding of what the rationale by the Department of Labor

4    and all of the circumstance courts is the following.

5           If I, as your employer, you're an at-will employee,

6    say I am going to compensate you in this case $75,000 a year

7    for all hours worked in the year, and you stay there and you

8    are working, the understanding, if you end up being

9    misclassified and you should have been nonexempt later on, is

10   that all of the money that was paid is -- first of all, it was

11   understood that that was to cover you for all your regular

12   hours.  So you have been paid your regular hours and Mr. Risk

13   is correct.  It fluctuates, depending on the hours of that

14   week.

15          Again, there is no doubt that the law is very clear in

16   this area.  You can have somebody, so long as their hourly rate

17   doesn't dip below the minimum wage, based on the hours they

18   worked in that week, that it doesn't bring them down below

19   that, in which in this case it doesn't.  She was paid four

20   times or five times the amount of minimum wage.  Even if you

21   divide every single hour that she actually worked, everything

22   from the beginning, into her salary for the three years, she

23   still made five times the minimum wage.  So it doesn't dip.  If

24   she has already been compensated for her straight time, the

25   only argument that could be put forth is that if she is out of

1   pocket if she was misclassified is the halftime portion.

2          One last thing that I would like to bring to the

3   Court's attention is that in a circumstance like this, where

4   you have an employee that was treated as a professional, her

5   salary was never reduced, she came and went to the office as

6   she wanted, she exercised discretion and judgment in

7   interacting with clients and responding to e-mails and things

8   of that sort, what I would say is, fairness and justice, not

9   only from a due process standpoint, because of the fact that

10  never has there been anything issued from the Department of

11  Labor or any prosecutions brought by them against trial graphic

12  consultants, and they are very familiar with them, to suggest

13  this is an improper practice that's been going on.  There is

14  nothing.

15         And if the Court is now going to decide for the first

16  time, when nobody in the industry has had notice about this,

17  there is due process issues, a business has the right to rely

18  on statutes and to understand what it is to be a professional.

19  And if we are going to find that she was misclassified, not

20  only would I urge the Court that liquidated damages isn't

21  correct, but I would also urge the Court that the halftime

22  method is correct, and that we have to go one step further and

23  that there should be the equivalent of an offset.

24         I can't ask for the salary back.  $75,000 is what she

25  was paid.  Of course she wouldn't have been paid that if she

C8FMKADT                    Summation - Ms. Klein

1    was a nonexempt.  However, there is no doubt that she should

2    not get a windfall.  And we have not great records, because she

3    didn't keep them from every single day, but we have her own

4    handwritten records when she came in late.  She admits and

5    concedes that only the exempt employees got comp time, that

6    other nonexempts didn't get that.  The perks, again, it's not

7    that much.

8          At the end of the day, you know what, $5,000 or $4,000

9    to a small tiny company like Visualex is a lot.  And we started

10   this trial, I don't know if your Honor remembers, you looked at

11   me and you looked quite angry at me as you have several times

12   during this case and said, why hasn't this case settled?  Did I

13   not send you to a magistrate?  The implication -- I'm not

14   saying these were your words -- this is ridiculous, this is

15   such a small amount of money, you know what I would say, your

16   Honor, I don't know if you have ever been sued.  But if you've

17   been sued and you didn't do something wrong, I don't know that

18   you would put your hand in your pocket and pay somebody $10,000

19   or 20,000 or 30,000.  It will change everything.

20         We have every consultant that's ever been hired, we

21   have employees that currently work, not only consultants.  We

22   have art directors that manage and exercise the same

23   discretion.  It changes everything.  And this case is not

24   about, unfortunately, the money because you know what, the

25   money that Visualex has had to pay is unbelievable.  It will

1    damage them and harm them for years.  But it's also something

2    that they cannot just roll over.  This isn't like something

3    which, oh, it's a one off and we can just have a nonadmission.

4    You can't.  It changes the entire industry.

5         Your Honor, with all due respect, first of all, I

6    would like to thank the Court.  I appreciate the time that

7    you've given us and I truly urge the Court to think and look at

8    the statutes and what they were meant for and to look at Ms.

9    Kadden, being a lawyer, that role she was hired to do, what she

10   was doing.  I believe when that's done, the only fair and

11   rational conclusion is that she was meant to be an exempt

12   employee under these statutes.  Thank you.

13        THE COURT:  Thank you.  Ms. Klein.

14        MR. RISK:  May I have a minute or less?

15        THE COURT:  Really.  If you really stick to that.

16        MR. RISK:  90 seconds or less.

17        THE COURT:  I'm looking at the clock.

18        MR. RISK:  This case is not about the industry, other

19   companies.  It's about what Ms. Kadden's job was at Visualex.

20   I don't think there is any such thing as a litigation graphics

21   consultant.  Lo and behold, Mr. Mykel has a different title in

22   capital letters on his page and has testified that he had a

23   different title.  That's that.

24        The SmithKlein case, it doesn't reverse settled law

25   about how the FLSA is construed.  It's about construction of

C8FMKADT                    Rebuttal - Mr. Risk

1     the statutory term sales, not surprising that an employer is

2     going to be making this argument.  I think that's been fully

3     dealt with.

4             Ms. Kadden's $75,000 should be seen in the context of

5     the rest of her job, $75,000 with no benefits.

6             THE COURT:  What do you mean, no benefits?

7             MR. RISK:  Health insurance that is $400 that they

8     paid half of, and two weeks vacation.  In the SmithKlein case,

9     for example, the $70,000 marketing reps also had a significant

10    incentive compensation plan.

11            The combination method, your Honor, that your Honor

12    inquired about, I think it's meant to take exempt duties from

13    two categories and put them together to add up to over 50

14    percent.  Here we have no exempt duties because she can't meet

15    the threshold under any of these things.  That I think is what

16    the combination method is for, is to make the primary duty, to

17    get enough duties to make a primary duty of various exempt

18    duties.

19            To end with a small flourish, your Honor, I heard in

20    Visualex's case that Potter Steward knows a professional when

21    he sees one, our case is that Potter Stewart, if he was here,

22    would say, I know a learned professional, a creative

23    professional and an administrative employee when I see the regs

24    and the statutes and the cases.  Thank you.

25            MS. KLEIN:  I promise less than 60 seconds?

C8FMKADT

1          THE COURT:  What is it you want to say?

2          MS. KLEIN:  Two things.

3          Mr. Risk just mentioned about the primary duties and

4    the combinations.  Just to be clear, the CFR of the regs say

5    that you don't have to be doing the, quote, primary job more

6    than 50 percent of the time.  You could do it less than 50

7    percent if you're still exempt.  Again, she has acknowledged

8    what her primary job was as a consultant and that's what

9    matters, even if it was 30 percent, although her own time

10   sheets show she did consulting 80 percent of the time.  That's

11   the first thing.

12         The second thing, your Honor, is, in regards to the

13   administrative exemption, if you listen to what Ms. Kadden

14   said, that really her job was to just, as we started saying

15   before, take the order from the client and just give the order

16   to the graphic artists, well, then, in fact, she actually

17   clearly fits 100 percent into the administrative exemption

18   because she was helping Visualex with the administration and

19   running of their business, which was to get the demonstrative

20   exhibits produced.  So, in fact, her own testimony puts her

21   square within the exemption.  On the testimony here, no less on

22   what the consultant job is.

23         THE COURT:  Thank you.

24         When am I going to get the posttrial submissions?

25   They are pretty lean.  I think I set a schedule.

C8FMKADT

1          MR. RISK:  We talked about it, your Honor.  It kind of

2    depends on when the transcript would be available.  I think we

3    are prepared to do it after the transcript is available.   It

4    would help me if your Honor would let me know what --

5          THE COURT:  I thought you were going to annotate the

6    proposed findings of fact and conclusions of law to the actual

7    snippets or the transcript pages that support the proposed

8    findings.

9          MR. RISK:  That's fine.

10          THE COURT:  That's what we talked about and I think

11    maybe some other case -- we talked about like ten days or

12    something.

13          MR. RISK:  Yes.  We can't start until we get the

14    transcript.

15          THE COURT:  Depends on the method of ordering which is

16    a matter of money.  Super fast cost super much.

17          MR. RISK:  Is this a date that we need to set right

18    now, your Honor?  Can we let you know?

19          THE COURT:  I don't want to let it linger.  I have a

20    big FLSA case.  This better be out first.

21          MR. RISK:  I assume we will get the transcript in a

22    weekish.

23          THE COURT:  Depends how you order.  If you order the

24    slowish method, three or four weeks.

25          MR. RISK:  We won't do that.

C8FMKADT

1              MS. KLEIN:  We have resource issues on this side.

2              Your Honor, may I ask for clarification on one thing.

3      Is it going to be limited to just annotating and not adding new

4      arguments?

5              THE COURT:  I think you argued to death.

6              MS. KLEIN:  So do I.  If Mr. Risk is going to --

7              THE COURT:  You've had oral argument, you've had

8      pretrial briefing.  What more is there to say on the law side?

9      You cited cases.  You cited them again in the oral argument.

10     You can look them all up.  I was thinking not to have any more

11     legal argument.

12             MS. KLEIN:  I will consent and agree to that.

13             THE COURT:  Unless something really new has arisen

14     where you say I have never heard that legal argument before.

15             MR. RISK:  That's fine, your Honor.  Thank you very

16     much, your Honor.

17             (Trial concluded)

18

19

20

21

22

23

24

25

1                     INDEX OF EXAMINATION

2   Examination of:                              Page

3   DAVID MYKEL

4   Direct By Ms. Klein . . . . . . . . . . . 347

5   Cross By Mr. Risk . . . . . . . . . . . . 356

6   Redirect By Ms. Klein . . . . . . . . . . 366

7                     PLAINTIFF EXHIBITS

8   Exhibit No.                               Received

9    31    . . . . . . . . . . . . . . . . . 364

10   30    . . . . . . . . . . . . . . . . . 364

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25