**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------ X

**ADINA KADDEN,**

          **Plaintiff,**

   - against -

**VISUALEX, LLC,**

          **Defendant.**

------------------------------------------------ X

**OPINION AND ORDER**

**11 Civ. 4892 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

Adina Kadden brings this lawsuit against her former employer VisuaLex, LLC, pursuant to the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL").[1]  Kadden seeks to recover unpaid overtime in the form of one and one-half times her hourly rate for all hours per week worked above forty, plus interest.  She also seeks liquidated damages in an equal amount under the FLSA, twenty-five percent liquidated damages under the NYLL,

---

[1]     *See* 29 U.S.C. § 201 et seq.; NYLL §§ 198(1-a), 663.  The parties agree that the NYLL claims should be analyzed under the same standards as the FLSA claims.  *See* Plaintiff's Pretrial Memorandum of Law ("Pl. Mem.") at 14; Defendant's Trial Memorandum of Law ("Def. Mem.") at 2.  *Accord McClean v. Garage Mgmt. Corp.*, 819 F. Supp. 2d 332, 337 (S.D.N.Y. 2011).

attorneys' fees and costs.[2]

VisuaLex argues that Kadden was exempt from the FLSA's overtime requirements under three categories of exemption: the creative professional exemption; the learned professional exemption; and the administrative employee exemption, or a combination thereof.[3]  It argues that if Kadden was misclassified, it was done in good faith and liquidated damages are not appropriate.  Furthermore, VisuaLex argues that Kadden is only entitled to damages in the form of one-half hourly wage for hours worked over forty because Kadden's salary of $75,000 was meant to cover all hours worked, regardless of whether she worked more or less than forty hours per week.[4]

I held a bench trial from August 13, 2012 to August 15, 2012.  The parties made post-trial submissions on September 10, 2012.[5]  Pursuant to Rule

_____

[2]        *See* Complaint at 5; Pl. Mem. at 16-23.

[3]        *See* Answer at 5; Def. Mem. at 2.

[4]        *See* Answer at 5-6; Def. Mem. at 14-16.  VisuaLex also argues that if Kadden is found to be non-exempt, VisuaLex is entitled to an offset for all money paid to Kadden based on the understanding that she was an exempt employee.  *See* Answer at 5; Def. Mem. at 15.  I reserved the damages question pending resolution of liability and thus do not address the question of offsets here.  *See* 8/15/12 Trial Transcript ("Trial Tr.") at 343.

[5]        Counsel were directed only to submit annotated versions of the pre-trial proposed findings of fact and conclusions of law citing to the trial transcript and exhibits, and were admonished not to make additional legal arguments.  *See*

2

52(a) of the Federal Rules of Civil Procedure, I make the following findings of fact and conclusions of law.  In reaching these findings and conclusions, I heard the evidence, observed the demeanor of the witnesses, and considered the arguments and submissions of counsel.

## II.   FINDINGS OF FACT

### A.   Background of the Parties

#### 1.   Adina Kadden

In 1998 Kadden earned a Bachelor of Science from Villa Julie College in Maryland, and in 2001 she earned a Juris Doctor from Benjamin N. Cardozo School of Law in New York.[6]

From June 2008 through March 24, 2011 Kadden was employed by VisuaLex as a Litigation Graphics Consultant ("graphics consultant").[7]

#### 2.   VisuaLex, LLC

VisuaLex is a New York limited liability company, with its principal place of business at 225 Ashford Avenue, Dobbs Ferry, New York 10522, in

---

8/14/12 Trial Tr. at 342; 8/15/12 Trial Tr. at 420.  Defense counsel's post-trial submission violated this clear instruction.

[6]     *See* Defendant's Exhibit ("DX") C (5/8/08 Email from The Cowen Group to Lillian Romano attaching Adina Kadden's resume).

[7]     *See* 8/13/12 Trial Tr. at 188 (Kadden).

Westchester County.[8]

VisuaLex was started in 1999 as a "litigation support company" by Lillian Romano, president and graphics consultant, Brian Fennessey, vice president and creative director, and investment partner Joseph Romano.[9] VisuaLex provides graphics and trial support services to law firms in connection with large litigations.[10] VisuaLex generates its revenues from time recorded by consultants and other employees and billed, in Lillian Romano's discretion, to clients.[11] It has an annual business volume in excess of $500,000.[12]

**B.    The Role of Litigation Graphics Consultant at VisuaLex**

**1.    Primary Duties**

Lillian Romano testified that the "primary job of the consultants [at VisuaLex] is to review and analyze case materials and to create and develop the most effective visual strategy to help the trial teams communicate their case to the

---

[8]    *See* Complaint ¶ 3; Answer ¶ 3.

[9]    *See* 8/13/12 Trial Tr. at 30:17-25 (Romano).

[10]    *See* Answer ¶ 6.

[11]    *See* 8/14/12 Trial Tr. at 204-05; Plaintiff's Exhibit ("PX") 1 (Def's Admissions) ¶¶ 29, 30; PX 3 (Offer Letter).

[12]    *See* Answer ¶ 16.

trier of fact."[13]

VisuaLex's job description for graphics consultants (the "Job Description") listed as "primary responsibilities": (1) "[r]ead case materials and work with attorneys to identify key case concepts;" (2) "[c]ollaborate with our team of designers and animators to execute high quality, error-free graphics;" (3) "[s]chedule trial technicians and courtroom equipment;" and (4) "[p]roject management and client interaction."[14]

At least two consultants are assigned to every case, one as the "lead consultant" and one as the "back up consultant."[15]  The lead consultant, "communicate[s] to the client what we have decided is the best way to present something or communicate whether we don't agree with what they are asking us to do or if they have suggestions of what needs to be done.  It's basically the person

---

[13]    8/13/12 Trial Tr. at 40:20-23 (Romano).

[14]    Plaintiff's Trial Exhibit ("PX") 2 (Job Advertisement/Description). *See also* 8/13/12 Trial Tr. at 112-116 (Romano) (describing role of graphics consultant to include reading background, communicating with clients, proofing and editing, working with production staff).

[15]    *See* 8/13/12 Trial Tr. at 99:6-15 (Romano); 8/14/12 Trial Tr. at 199-204 (Kadden); *id.* at 285 (Moran).  Romano also referred to this position as the "primary contact," which identifies for the attorneys "who to ask for when they call the office if they need to get something done."  8/13/12 Trial Tr. at 99:3-5 (Romano).

who is the face."[16]

Kadden was identified as the lead on "a couple" cases.[17]  This occurred "when Lillian was not available and there was sort of one chunk of time where Lillian was kind of in and out of the office a bit and [Kadden] stepped in."[18] Romano testified that she generally occupied the lead role because "I've been doing this for 25 years.  These clients know me."[19]  In those limited cases where Kadden was the lead, Romano was copied on every email regarding edits.[20] Kadden was not generally included in emails between Romano and clients.[21]

---

[16]     8/13/12 Trial Tr. at 99:11-15 (Romano).

[17]     *Id.* at 101:20-25 (Romano).

[18]     8/14/12 Trial Tr. at 204:1-5 (Kadden).  On the "Sobieski" case, for example, Romano was initially the lead and had the communications with clients, to which Kadden was not a party.  *See id.* at 223:21-224:7 (discussing DX J (E-mail from client to Romano on Sobieski matter, Excerpt 1 at 1103-05)).  Kadden testified that an email communication for the Sobieski case in which "the trial team had asked for a revision, and I sent an e-mail responding that I didn't recommend that we make that revision" was not the role she filled on most cases – rather the lead consultant generally filled that role.  *See id.* at 222:21-223:5.

[19]     *Id.* at 174:9-10 (Romano).  *See also id.* at 200:10-18 (Kadden) ("[T]he lead consultant, usually Ms. Romano, would attend meetings face to face with the client," take "phone calls with the client" and "draft out and sketch out what she thought the strategy was going to be.").

[20]     *See id.* at 338:20-21 (Daignault).

[21]     *See* DX J (E-mail from client to Romano on Sobieski matter, where Kadden was not included).

When VisuaLex gets a new job, the graphics consultants begin by reading background materials, for example, expert reports, pleadings, depositions and medical records.[22]  The consultants identify information that "need[s] to be supported visually" and "come up with creative ways, strategic ways of not only how to depict the information in individual graphics, but also . . . creating a visual framework that is going to help the trial team advance their case."[23]

Next, the consultant obtains all necessary information from the client to create the exhibit and fills out a "chart type form" identifying the case number and "when you think its going to be used."[24]  The consultant creates a title for the exhibit "which is a really important thing."[25]  Kadden created some "new graphics" when serving as backup consultant which she testified meant that "[a]n envelope had to be created for each graphic, a cover sheet had to be written up . . . [a] title would have to be written on it.[26]  However, the new graphics were "not necessarily

---

[22]    *See* 8/13/12 Trial Tr. at 71:11-20, 112:5-7 (Romano).

[23]    8/14/12 Trial Tr. at 186:3-13.

[24]    8/13/12 Trial Tr. at 112:9-113:10.

[25]    *Id.* at 113:12-21.

[26]    8/14/12 Trial Tr. at 255:10-14 (Kadden).  *See also id.* at 232:18-19.

[her] concept."[27]

Once the consultant has the materials for the graphic from the client, the next step is a briefing session with the art director to explain "not only the overall strategy . . . of the case, but how this exhibit fits in and what the takeaway from this exhibit needs to be" and "where the necessary information is stored."[28] Kadden testified that she was generally not involved in meetings with clients or the briefing with the art director.[29]

After the briefing with the art director, "the art director goes back and either he creates the layout or he directs the designers to create the layout the way he wants it to be created."[30]  The art director then reviews it from "an aesthetic standpoint."[31]  Then the production coordinator checks to ensure that "all the things

---

[27]    *Id.* at 254:2-8 ("It could have been one of those transcript [exhibits] . . . where there is not a lot of conceptualization on my part.").

[28]    8/13/12 Trial Tr. at 114:23-115:2 (Romano).  *Accord* 8/14/12 Trial Tr. at 200:17-18 (Kadden) ("[Romano] would have a briefing meeting with the art director.").  *See also* 8/13/12 Trial Tr. at 113:15-21 (Romano) (The information sent over by the client and the fact "that the consultant feels the best way to portray this is kind of a flow chart with the dates up at the top, names of the companies at the next level" is communicated to the studio.).

[29]    *See* 8/14/12 Trial Tr. at 200:18-19 (Kadden).

[30]    8/13/12 Trial Tr. at 115:5-7 (Romano).  *See also id.* at 96:13-15 ("The graphic designers actually just create the layout in one of the software programs.").

[31]    *Id.* at 116:1.

that need to go out in this presentation" are there and proofs for "blatant errors."[32]

According to Kadden, the exhibit "would [then] go to whoever was serving as the backup . . . who would then review it, write in any changes . . . [t]hen it would eventually work its way up to the lead, who would then decide, . . . do I want to make those changes or not."[33]

Kadden explained that "as the second or the backup, [she] would come in more on the revision phase of things" with most of her time "spent on the proofing phase."[34]  Kadden's replacement, Heather Moran, testified that her principal job was to "proofread revisions that would come in, write up small revisions here and there based off of phone calls or emails" and sometimes "explain the revisions to the designers."[35]  All of her client contact was in connection with revisions.[36]

Romano explained that when consultants proof, they should be

---

[32]   *Id.* at 116:8-11.

[33]   8/14/12 Trial Tr. at 201:2-9 (Kadden).

[34]   *Id.* at 203:11-14.

[35]   *Id.* at 284:8-11 (Moran).

[36]   *See id.* at 284:25-285:3.

"evaluating the layout for the takeaway."[37]  "If the consultants all agree, yes, this is great, then we send the file, we tell the production coordinator . . . and he sends it to the client for review.[38]  **I**f the client has revisions, "the process starts all over again."[39]  As a consultant, "[y]ou never just blindly follow.  If you have questions, concerns, recommendations, you always let them know."[40]

Kadden also proofed PowerPoint presentations, which the production manager created once the graphics were finalized so that the client could view the work.[41]  This work, in contrast to proofing and editing the actual graphics, was billed as "project management" rather than "consulting."[42]  Kadden scheduled trial

---

[37]    8/13/12 Trial Tr. at 116:17-19 (Romano).  *Accord* 8/15/12 Trial Tr. at 353:14-22 (Mykel) (Proofing involves "making sure [the graphics] adhere to the themes that we developed by reviewing the case materials, ensuring that the message we are trying to convey is coming through in a persuasive manner . . . making sure the content is accurate . . . ensuring that everything that we put into that piece of work carries the quality and integrity that I intended when I first created it.").

[38]    8/13/12 Trial Tr. at 116:23-117:1 (Romano).

[39]    *Id.* at 118:16-17.

[40]    *Id.* at 122:14-17.

[41]    *See id.* at 201:15-18, 203:14-18.

[42]    *See id.* at 237:10-22, 246:7-10.  Project management was billed to clients at a rate of $200 rather than $225.  David Mykel testified that he never used this billing code.  8/15/12 Trial Tr. at 368:12-13 (Mykel).

technicians and logistics for the war rooms, but did not "attend[] the war room."[43]
Kadden noted that much of her role was "facilitating the process of getting the
graphics through the studio."[44]

When business was slow, Kadden sent out "some [marketing] letters
and brochures" at Romano's request.[45]  Kadden compiled "different letters and
brochures that we had" and researched new potential clients, and Romano
approved the letters and determined the recipients.[46]  These activities were never
done when there was billable work.[47]

Graphics consultants were required to be in the office "Monday
through Friday from 9 a.m. to 6 p.m. for standard work hours" and "any hours
outside of that that were required by client work."[48]  A summary of Kadden's hours

---

[43]    8/14/12 Trial Tr. at 203:18-21 (Kadden).

[44]    *Id.* at 307:25-308:1.

[45]    *Id.* at 213:16-17.

[46]    *Id.* at 213:18-20.

[47]    *See id.* at 214:9-14.

[48]    *Id.* at 208:19-22.  *See also* 8/13/12 Trial Tr. at 61:17-62:4 (Romano)
(Graphic consultants never "just work[ed] nights."  Rather, the work "starts at 9
and . . . it can go all night certainly, but we certainly don't sit there from 9 to 6 and
do nothing.").  *See also* 8/14/12 Trial Tr. at 283:17-20 (Moran) ("[W]hen there
wasn't a job going on there was a lot of downtime.  And then when there was a job
going on it was basically at the beck and call of the attorneys, nights, weekends,
whatever was needed."); *id.* at 198:20-24 (Kadden) ("That's not saying we didn't

show that, out of 1211.1 total recorded hours, 936.7 were billed as proofing, 89.3 were billed as related to "new graphics," and 185.1 were billed as "other."[49]

### 2.    Qualifications of Graphic Consultants at VisuaLex

VisuaLex's Job Description listed "Qualifications" of a graphics consultant as, inter alia: (1) "[e]xcellent critical thinking, project management and problem solving skills; (2) [s]trong communication/interpersonal skills; (3) [w]ell-organized, self-starter, able to meet tight deadlines; (4) [a]ttention to detail, strong editing and proofing abilities; (5) [g]raduate degree preferred (e.g. social science, law, etc.); (6) [w]illingness to work frequent overtime/occasional travel. Weekend work during peak periods."[50]

The typical educational background of a graphics consultant is "[a] postgraduate degree, social sciences, or a JD.  Any postgraduate degree, really."[51] Romano testified that "the graduate degree shows that [applicants] have the critical

---

do work from 9 to 6. We did. It often required extensive overtime. I was certainly there until 10 p.m., midnight. I saw sunrise on the way home sometimes. I worked extensively on Saturdays and Sundays as well.").

[49]    PX 16 (Kadden Billable Hours (by Project) (FRE 1006)).

[50]    Plaintiff's Trial Exhibit ("PX") 2 (Job Advertisement/Description).

[51]    8/13/12 Trial Tr. at 41:3-4 (Romano).  Romano testified that she was unaware of any individuals who worked as graphics consultants who did not have an advanced degree and that it was required at the other places she worked.  *See id.* at 43:4-5.  *See also* 8/15/12 Trial Tr. at 315:23-25 (Kadden) (All graphics consultants at Doar had advanced degrees "in something").

thinking necessary to be able to evaluate materials, understand complex concepts, and come up with a way of communicating those complex concepts to the trier of fact."[52]  The value of a law degree, Romano explained, is "if you are familiar with the legal industry and you kind of know how it works, that's always an advantage. You are going to be dealing with lawyers.  Obviously, if you have some knowledge of how the legal industry works, that's very helpful."[53]

Since its inception, VisuaLex has employed nine graphic consultants: Lillian Romano, Ted Gipstein, Theodore Walker, Marilyn Wesel, Kim Nawyn, Nicole Matthiesen, Adina Kadden, Heather Moran and David Mykel.[54]  Four of those graphics consultants had law degrees.[55]  Four had advanced degrees in a different field:  Romano had a Master's in "[a]pplied research and evaluation;" Kim Nawyn had a Master's in criminal justice; Nicole Matthiesen had a Master's in English literature; and David Mykel had a Master's in forensic psychology.[56]

---

[52]      8/13/12 Trial Tr. at 164:19-23 (Romano).

[53]      *Id.* at 41:24-42:3.

[54]      *See id.* at 45:12-15.

[55]      *See* DX AA (Ted Gipstein Resume), DX Y (Theodore Walker Resume), DX X (Marilyn Wesel Resume), DX C (Adina Kadden Resume).

[56]      *See* 8/13/12 Trial Tr. at 42:10-15 (Romano); DX W (Kim Nawyn Resume); DX Y (Nicole Matthiesen Resume); 8/15/12 Trial Tr. at 348:22-23 (Mykel).

Heather Moran, Kadden's replacement, had no graduate degree– she had a paralegal certificate.[57]

Of the nine graphics consultants, six of them, including Kadden, had some prior experience in the litigation graphics consulting field.[58]  From January 2006 through October 2006 Kadden worked as an "Analytic Graphic Consultant" at Doar Litigation Consulting, where she "[c]onsulted within a full service litigation consulting team working with top-tier law firms."[59]  Three of VisuaLex's graphics consultants had not previously worked as litigation consultants, but had some experience in the litigation industry.[60]

---

[57]     *See* Plaintiff's Trial Exhibit ("PX") 14 (Heather Moran's Resume).

[58]     Lillian Romano had nine years of experience as a graphics consultant for litigation support firms prior to starting VisuaLex. *See* 8/13/12 Trial Tr. at 38:15-20 (Romano).  Kim Nawyn, Nicole Matthiesen, Ted Gipstein and David Mykel also had prior experience as litigation graphics consultants.  *See* DX W; DX Z; DX AA; 8/15/12 Trial Tr. at 349:19-23 (Mykel).

[59]     DX C (5/8/12 Letter from Jared Coseglia of Cowen Group to Lillian Romano).  Kadden testified that her job at Doar was "very different. At Doar I had much more close contact with the trial team working face to face with them" and worked "collaboratively with the graphic designers themselves that didn't have to go through like an art director" and traveled and "attended the trials."  8/14/12 Trial Tr. at 191:25-22:7 (Kadden).

[60]     Marilyn Wesel had experience in graphic design, and was general counsel for a corporation and a magistrate in probate court.  *See* DX X (Marilyn Wesel's Resume).  Theodore Walker had over ten years of experience as an attorney.  *See* DX Y (Theodore Walker's Resume).  Heather Moran was a "litigation paralegal for quite a few years" and a "legal assistant prior to that." 8/14/12 Trial Tr. at 276:24-277:2 (Moran).

### C.     Kadden's Compensation at VisuaLex

### 1.     Compensation June 2008 Through March 2009

In 2008, VisuaLex began looking for a new graphics consultant.  It "retained a few headhunters" and posted on the American Society of Trial Consultants ("ASTC") website and Monster.com.[61]  One of the headhunters, The Cowen Group, submitted Kadden's resume for the "Litigation Graphics Consultant position."[62]  The cover letter explained that Kadden's base salary at IntegriDATA, where she worked as a Business Manager immediately prior to joining VisuaLex, was $90,000, but that Kadden was "looking to return to the Trial Graphics arena" and "is more than aware of the salary range for this position and is prepared to make the adjustment to her salary to accommodate such a move."[63]

After interviewing with Romano, on May 16, 2008, Kadden received a letter offering her the position of Graphics Consultant at VisuaLex (the "Offer Letter") starting June 2, 2008.[64]  The letter listed the starting salary as $75,000 per

---

[61]     8/13/12 Trial Tr. at 56:12-13 (Romano).  The ASTC is a professional association in which "trial consultants, jury consultants, and graphics consultants participate."  *Id.* at 55:15-16.

[62]     DX C (5/8/12 Letter from Jared Coseglia of Cowen Group to Lillian Romano).  The Cowen Group received a "finding fee" of $18,750 for its role in placing Kadden at VisuaLex. *See* DX E (Cowen Group Invoice).

[63]     DX C.

[64]     *See* PX 3 (6/2/08 Offer Letter to Adina Kadden).

annum and stated "[i]n addition, you will be paid time-and-a-half for overtime (hours above forty hours per week).[65]  The Offer Letter provided for two weeks vacation which, if unused, upon termination would be paid out at the "standard hourly rate," six sick days per year, two personal days per year, and a total of nine paid holidays.[66]  The Offer Letter stated that VisuaLex would pay fifty percent of health coverage.[67]

### 2.    VisuaLex Eliminates Kadden's Overtime Compensation

In March 2009, due to the economic downturn VisuaLex decided to suspend paying overtime incentive compensation to professional staff.[68]  Romano testified that she believed graphics consultants were exempt from the FLSA overtime requirement based on the fact that "[e]very other graphics consultant I have ever come into contact with at every company in this industry was paid as an exempt employee," her communications with an attorney, and independent research on the Department of Labor website.[69]

Kadden was informed of the decision to suspend overtime payment in

---

[65]     *Id.*

[66]     *See id.*

[67]     *Id.*

[68]     *See* 8/13/12 Trial Tr. at 137:21-22 (Romano).

[69]     *Id.* at 138:6-142:4.

a letter and in person by Romano.[70]  Romano testified that VisuaLex understood that the $75,000 Kadden received as salary was "[f]or her duties that she performed as a consultant for the year" and was not "restricted in any way based on the amount of time she worked."[71]  Kadden testified that she understood as of April 1, 2009 that her salary was $75,000.[72]

## III.   APPLICABLE LAW[73]

### A.   FLSA Exemptions

Subject to certain exemptions, the FLSA mandates overtime pay for employees for every hour per week worked over forty, in the form of one and one-half times their hourly rate.[74]  Otherwise eligible employees are exempt if they are "employed in a bona fide executive, administrative, or professional capacity" as defined in section 541 of the Code of Federal Regulations.[75]  At issue here are the

---

[70]    *See id.* at 143:23-144:3.

[71]    *Id.* at 144:6-12.

[72]    *See* 8/14/12 Trial Tr. at 321:19-20 (Kadden).

[73]    This Court has jurisdiction over plaintiff's FLSA claims under 29 U.S.C. § 216(b) and 29 U.S.C. § 1331.  It has jurisdiction over the state law claims under 28 U.S.C. § 1367(a).

[74]    *See* 29 U.S.C. § 207(a)(1).  It is undisputed that Kadden, if not otherwise exempt, would be entitled to overtime payment.

[75]    *Id.* § 213(a)(1).  The statute delegates rule-making authority to the Secretary to define such terms by regulation.  *See id.*  Those regulations "have the

exemptions for employees in a "professional capacity" either as a "learned professional" or a "creative professional"[76] and the exemption for "administrative employees."[77]

   The Supreme Court has cautioned that the FLSA exemptions are to be "construed narrowly against the employer seeking to assert them,"[78] and that the employer bears the burden of proving that employees are exempt.[79]  "A job title alone is insufficient to establish the exempt status of an employee."[80]  Rather, "[t]he exempt or nonexempt status of any particular employee must be determined on the bases of whether the employee's salary and duties meet the requirements of the regulations in this part."[81]  It is undisputed that Kadden meets the salary

---

force of law."  *Ramos v. Baldor Specialty Foods*, 687 F.3d 554, 559 (2d Cir. 2012) (quotation omitted).

  [76]  29 C.F.R. § 541.300.

  [77]  *Id.* § 541.200.

  [78]  *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).  *Accord Young v. Cooper Cameron Corp.*, 586 F.3d 201, 204 (2d Cir. 2009).

  [79]  *See Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 206 (1966); *see also Young*, 586 F.3d at 204.

  [80]  29 C.F.R. § 541.2.

  [81]  *Id.*

requirements for all of the alleged exemptions.[82]   Thus, the only question is

whether Kadden's "primary duty" was "the performance of exempt work."[83]

### 1.   Creative Professional Exemption

In order to establish that Kadden is exempt as a creative professional,

Visualex must prove that Kadden's primary duty is work "[r]equiring invention,

imagination, originality or talent in a recognized field of artistic or creative

endeavor"[84] as distinguished from "work that primarily depends on intelligence,

dilligence and accuracy."[85]   Recognized fields of artistic or creative endeavor

include "music, writing, acting, and the graphic arts."[86]   The requirement of

---

[82]      Kadden earned a salary above the per week minimum under the FLSA and NYLL and her salary was never decreased, regardless of quality, quantity or days worked, as required by the regulations.  *See id.* §§ 541.300(a)(1),(b); 541.200(a)(1),(b); NY Comp. Codes R. & Regs. Tit. 12, IIB, Part 142.  Kadden performed non-manual labor.  *See* 29 C.F.R. § 541.3(a).  The fact that Kadden was initially paid overtime does not waive the exemption.  *See id.* § 541.604(a).

[83]      *Id.* § 541.700(a).  "'[P]rimary duty' means the principal, . . . or most important duty that the employee performs [and] must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  *Id.*  "Factors to consider . . . include, . . . the relative importance of the exempt duties . . . ; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."  *Id.*

[84]      *Id.* § 541.300(a)(2)(ii).

[85]      *Id.* § 541.302(c).

[86]      *Id.* § 541.302(b).

"invention, imagination, originality or talent" is generally met by "actors, musicians, composers, conductors, and soloists . . . painters . . . cartoonists . . . essayists, novelists, short-story writers and screen-play writers . . . [and] persons holding the more responsible writing positions in advertising agencies."[87]

## 2.   Learned Professional Exemption

In order to establish that Kadden is exempt as a "learned professional," Visualex must prove that her "primary duty" is work requiring (1) "advanced knowledge" (2) "in a field of science or learning" (3) that is "customarily acquired by a prolonged course of specialized intellectual instruction."[88]

Work requiring advanced knowledge must be "predominantly intellectual in character" and include "the consistent exercise of discretion and judgment, as distinguished from performance of routine mental . . . work."[89]  It is generally used to "analyze, interpret or make deductions from  varying facts or circumstances" and "cannot be attained at the high school level."[90]  Recognized fields of science and learning include "traditional professions of law, medicine,

---

[87]   *Id.* § 541.302(c)

[88]   *Id.* § 541.301(a); *see also id.* § 541.300(a)(2)(ii).

[89]   *Id.* § 541.301(b).

[90]   *Id.*

theology, accounting, actuarial computation . . . and other similar occupations that have a recognized professional status," but exclude "skilled trades where in some instances the knowledge is of a fairly advanced type, but is not in a field of science or learning."[91]

   The exemption is restricted to professions "where specialized academic training is a standard prerequisite for entrance."[92] "The best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree."[93] Regardless of the duties performed, "[i]f a job does *not* require knowledge customarily acquired by an advanced educational degree . . . the employee is not an exempt professional under the FLSA."[94]

   Although the Second Circuit has not opined on the meaning of "specialized academic training" other circuits have made clear that "positions that do not require a particular course of intellectual instruction directly related to the

---

[91]   *Id.* § 541.301(c). "The areas in which professional exemptions may be available are expanding[ ] [a]s knowledge is developed, academic training is broadened, and degrees are offered in new and diverse fields." *Id.* § 541.302(e)(2).

[92]   *Id.* § 541.301(d).

[93]   *Id.*

[94]   *Young*, 586 F.3d at 206 (emphasis in original). *But see id.* ("[C]ustomarily" in this context makes the exemption applicable to the rare individual who, unlike the vast majority of others in the profession, lacks the formal educational training and degree.") (citing 29 C.F.R. § 541.301(d)).

employee's professional duties do not come within the 'learned professional'

exemption."[95]  The focus is not only on the level of academic degree but also the

specificity of the training.[96]

### 3.    Administrative Employee Exemption

In order to establish that Kadden is exempt as an administrative

employee, Visualex must prove that Kadden's primary duty (1) "is the

performance of office or non-manual work directly related to the management or

general operations of [Visualex] or [Visualex's] customers" and (2) "includes the

exercise of discretion and independent judgment with respect to matters of

---

[95]     *Solis v. Washington*, 656 F.3d 1079, 1084 (9th Cir. 2011).

[96]     *See Fife v. Harmon*, 171 F.3d 1173, 1177 (8th Cir. 1999) (cited
approvingly in *Young*, 586 F.3d at 206) ("Advanced knowledge from a general
academic education and from [experience]" rather than from "a prolonged course
of specialized intellectual instruction" does not qualify for the exemption.);
*Dybach v. State of Florida Dept. of Corrections*, 942 F.2d 1562, 1565-66 (11th Cir.
1991 (requirement of a bachelor's degree in any field, including "nuclear physics"
or "basketweaving" did not qualify as specialized intellectual instruction).
Although these cases involved bachelor's rather than master's degrees, nothing in
the opinions or the regulations suggest that where a master's degree is involved the
specificity requirement evaporates.  *Accord Levine v. Unity Health System* 847 F.
Supp. 2d 507, 512 (W.D.N.Y. 2012) (Requirement of "a master's degree in one of
four specific areas relevant to the primary duties of a [Primary Therapist]" plus
"licensure in a designated area, each of which requires the completion of its own
particularized course of study," "satisf[ied] the 'particularized course of study'
requirement.").

significance."[97]  "[A]pplying [the administrative employee] regulation . . . requires a thorough, fact-intensive analysis of the employee's employment duties and responsibilities."[98]

To meet the first requirement, "an employee must perform work directly related to assisting with the running or servicing of the business" as distinguished from the production or sales side of the business.[99]  Such work includes "quality control[,] . . . advertising[,] marketing[,] research[,] . . . personnel management . . . and similar activities."[100]  The key to this analysis is to "identify [Kadden's] job as either administrative or production."[101]  "[N]on-manufacturing employees can be considered 'production' employees in those instances where their job is to generate (i.e., 'produce') the very product or service that the employer's business offers to the public."[102]  An employee may also be exempt if

---

[97]     29 C.F.R. § 541.200(a)(2),(3).

[98]     *Schaefer-Larose v. Eli Lilly & Co.*, 679 F. 3d 560, 573 (7th Cir. 2012).

[99]     29 C.F.R. § 541.201(b).

[100]    *Id.*

[101]    *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 532 (2d Cir. 2009).

[102]    *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 9 (1st Cir. 1997) (citing *Reich v. New York*, 3 F.3d 581, 587-89 (2d Cir. 1993) (police investigators conduct or "produce" criminal investigations), *overrruled by implication on other grounds by Seminole Tribe v. Florida*, 517 U.S. 44 (1996).

her primary duty involves the running or servicing of the business operations of the employer's *customers* – "for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example)."[103]

The second requirement – that the employee exercise "discretion and independent judgment" – generally involves "the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."[104]  "The term 'matters of significance' refers to the level of importance or consequence of the work performed."[105]  "The exercise of discretion and independent judgment must be more than the use of skill in

---

[103]  29 C.F.R. § 541.201(c).

[104]  *Id.* § 541.202(a).  "Factors to consider . . . include, but are not limited to: whether the employee: (1) has authority to formulate, affect, interpret, or implement management policies or operating practices; (2) carries out major assignments in conducting the operations of the business; (3) performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; (4) has authority to commit the employer in matters that have significant financial impact; (5) has authority to waive or deviate from established policies and procedures without prior approval; (6) has authority to negotiate and bind the company on significant matters; (7) provides consultation or expert advice to management; (8) is involved in planning long- or short-term business objectives; (9) investigates and resolves matters of significance on behalf of management; and (10) represents the company in handling complaints, arbitrating disputes or resolving grievances."  *Id.* § 541.202(b).

[105]  *Id.* § 541.202(a).

applying well-established techniques, procedures or specific standards described in manuals or other sources."[106]

"'[D]iscretion and independent judgment' does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review."[107]  "The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action."[108]

### 4.   Combination Exemption

Additionally, "[e]mployees who perform a combination of exempt duties as set forth in the regulations . . . may qualify for exemption."[109]  In other words, "an employee performing duties that fall under more than one individual exemption, none of which separately represents her primary duty, may be exempt under the combination exemption if those duties, when combined, constitute her

---

[106]   *Id.* § 541.202(e).

[107]   *Id.* § 541.202(c).  *Accord Coleman-Edwards v. Simpson,* 330 Fed. Appx. 218, 220 (2d Cir. 2009) (The fact that someone else "possessed general supervisory authority" over the employee "does not mean [she] lacked discretion to make decisions in her own right . . . .").

[108]   29 C.F.R. § 541.202(c).

[109]   *Id.* § 541.708.

primary duty."[110]  The combination exemption provides an "alternative method for satisfying the primary-duty test, without abrogating the other requirements needed for the exemption to attach."[111]

### B.  Damages

#### 1.  Proper Measure of Overtime Damages

The FLSA requires employers to pay non-exempt employees one and one-half times their hourly pay for all hours worked over forty in any given week.[112]  Ordinarily, damages for unpaid overtime are calculated at this rate. However, in some cases, courts have found it appropriate to award only one-half times the regular rate in damages under the "fluctuating workweek" doctrine.

This doctrine applies where an employee is employed on a salary basis, has "hours of work which fluctuate from week to week," and the salary is paid "pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many."[113]  The rationale is that "[p]ayment for overtime

---

[110]    *IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 294 (4th Cir. 2007) (discussing an amicus brief submitted by the Secretary of Labor).

[111]    *Id.* at 293-94.

[112]    29 U.S.C. § 207(a)(1).

[113]    29 C.F.R. § 778.114(a).  *See also* Retroactive Payment of Overtime and the Fluctuating Workweek Method of Payment, Wage and Hour Opinion

hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement."[114]  Although the Second Circuit has never opined on the "fluctuating workweek" method, the First Circuit requires a "clear mutual understanding" that the salary is fixed regardless of how many hours the employee works, in order for the doctrine to apply.[115]  The First Circuit looked to the written agreements between the parties to ascertain whether these conditions were met where "neither party dispute[d] that the [employer] in fact paid the [employees] according to the terms of those agreements."[116]

### 2.   Liquidated Damages

#### a.   FLSA

Under the FLSA, an employer who violates the overtime requirements

---

Letter, FLSA 2009–3 (Dep't of Labor Jan. 14, 2009) ("because the fixed salary covered whatever hours the employees were called upon to work in a workweek . . . and the employees received and accepted the salary knowing that it covered whatever hours they worked," a retroactive payment of overtime using the fifty percent multiplier conforms with FLSA requirements.).

[114]    29 C.F.R. § 778.114(a).

[115]    *O'Brien v. Town of Agawam*, 350 F.3d 279, 288 (1st Cir. 2003) (citing 29 C.F.R. §§ 778.114(a), (c)).  *Accord Valerio v. Putnam Assocs. Inc.*, 173 F.3d 35, 40 (1st Cir. 1999) ("The parties must [] have reached a 'clear mutual understanding' that while the employee's hours may vary, his or her base salary will not.").

[116]    *O'Brien*, 350 F. 3d at 288.

is generally required to pay the employee "unpaid overtime compensation" as well as "an additional equal amount as liquidated damages."[117]  "Liquidated damages [under the FLSA] are not a penalty exacted by the law, but rather compensation to the employee occasioned by the delay in receiving wages due . . . ."[118]  However, if the employer establishes that she made the misclassification "in good faith" *and* with "reasonable grounds" for believing that the employee was exempt, "the court may, in its sound discretion, award no liquidated damages or award any amount not to exceed [the amount of unpaid overtime compensation]."[119]  The employer bears a "difficult" burden of showing that "it acted in subjective good faith with objectively reasonable grounds."[120]  "[D]ouble damages are the norm and single damages the exception."[121]

### b.    NYLL

Under the NYLL, employees improperly denied overtime compensation may receive liquidated damages of twenty-five percent of the total

---

[117]    29 C.F.R. § 216(b).

[118]    *Herman v. RSR Sec. Servs Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999).

[119]    29 U.S.C. § 260(b).

[120]    *Barfield v. New York City Health and Hospitals Corp.*, 537 F.3d 132, 150 (2d Cir. 2008) (quotation omitted).

[121]    *Id.*

amount of wages due.[122]  Prior to a November 24, 2009 amendment, liquidated

damages were only awarded if the violation was willful.[123]  The amended provision

authorizes liquidated damages "unless the employer proves a good faith basis to

believe that its underpayment of wages was in compliance with the law."[124]

## III.   CONCLUSIONS OF LAW

### A.   FLSA Exemptions

This is a difficult case.  Kadden's academic qualifications, her job title

of "Litigation Graphics Consultant," and her yearly salary of $75,000 make her a

less than obvious candidate for the protection of the FLSA's maximum hours

requirements.  In a recent opinion, the Supreme Court stated that individuals

earning "more than $70,000 per year . . . are hardly the kind of employees that the

FLSA was intended to protect."[125]

---

[122]     *See* NYLL §§ 198(1–a).

[123]     *See Kuebel v. Black & Decker, Inc.*, 643 F.3d 352, 366 (2d Cir. 2011).
The Second Circuit previously explained that, unlike the FLSA, "liquidated
damages under the Labor Law 'constitute a penalty' to deter an employer's willful
withholding of wages due."  *Reilly v. Natwest Markets Group, Inc.*, 181 F.3d 253,
265 (2d Cir. 1999) (quoting *Carter v. Frito-Lay, Inc.*, 425 N.Y.S.2d 115, 116 (1st
Dep't 1980), *aff'd*, 52 N.Y.2d 994 (1981)).  In contrast, the prejudgment interest
authorized under the NYLL has the purpose of "compensat[ing] a plaintiff for the
loss of use of money."  *Id.*

[124]     NYLL § 198(1–a).

[125]     *Christopher, et al. v. SmithKline Beecham Corp.*, 132 S. Ct. 2156,
2173 (2012).

But the binding regulations make clear that neither title[126] nor a

relatively high salary[127] is dispositive of the exemption determination – what

matters is what this particular employee's primary duties *actually were*.  Because

the parties disagree on what Kadden's primary duties entailed, I was required to

weigh conflicting testimony in light of VisuaLex's initial Job Description, the

Offer Letter, time sheets and other documents placed in evidence, in order to draw

a legal conclusion as to whether Kadden's "particular activities excluded [her]

from the overtime benefits."[128]  My conclusions are narrowly drawn to Kadden's

particular circumstances and do not reflect a judgment about the job of graphics

consultant in the industry more generally.[129]

---

[126]     *See* 29 C.F.R. § 541.2 (job title alone is insufficient).

[127]     Notwithstanding the Supreme Court's statement in *Christopher,* an
employee receiving $75,000 may be covered under the FLSA's overtime
requirements.  In fact, the regulations do not anticipate any relaxation of the
standards for establishing exempt status until the salary rises above $100,000, at
which point the employee is deemed a "highly compensated employee," which
"eliminat[es] the need for a detailed analysis of the employee's job duties."  29
C.F.R. §§ 541.601(a), (c).  Even then the employee is not automatically exempt –
the employer still must show that the "employee customarily and regularly
performs any one or more of the exempt duties or responsibilities of an executive,
administrative or professional employee."  *Id.*

[128]     *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).

[129]     One of many arguments reiterated in defendant's post-trial submission
is that the "legacy" of finding Kadden non-exempt will be "an onslaught of
litigations" harming the "entire professional industry."  Defendant's Post-Trial
Brief at 38.  At trial defense counsel explained that VisuaLex could not settle the

### 1.   Kadden Was Not an Exempt Creative Professional

Visualex argues that Kadden's primary duty was "to review and analyze case materials to conceptually create and develop the most effective visual strategy to help trial teams communicate their case to the trier of fact," which requires "invention, imagination and analysis . . . at every stage of the process."[130] The evidence reflects that the majority of Kadden's time was spent "proofing" and "revising" graphics that other people created.  Moreover, in the limited instances where Kadden was "creating" graphics, her job was dependent on "intelligence, dilligence, and accuracy," rather than imagination or originality.[131]  The job was "NOT a graphics design position."[132]  Romano emphasized that "critical thinking" and "attention to detail" were the essential qualities.[133]

---

case because "[t]his is an entire industry that qualifies graphic consultants as exempt" and VisuaLex could not leave this "unanswered question."  8/13/12 Trial Tr. at 26.  To the extent that this intensely fact-bound opinion has any impact beyond this case, counsel must recognize that courts are not authorized to consider that a certain employee may have been a poor test case for an industry when applying the FLSA's narrowly drawn exemptions, and the decision to litigate on behalf of an entire industry, rather than resolve small labor disputes out of court, carries with it risks beyond immediate financial loss.

[130]   Def. Mem. at 4.

[131]   29 C.F.R. § 541.303.

[132]   PX 2 (Job Advertisement/Description) (emphasis in original).

[133]   *Id.*

VisuaLex's own witnesses testified that the job of a graphics consultant was to convey information about a case in an informative, easily understandable way, to triers of fact.  The First Circuit held local journalists non-exempt where "the focus of their writing was . . . 'to tell someone who wanted to know what happened . . . in a quick and informative and understandable way'"– work that "'depends primarily on intelligence, dilligence, and accuracy.'"[134]  In contrast, a reporter whose "job required him to originate his own story ideas, maintain a wide network of sources, write engaging, imaginative prose, and produce stories containing thoughtful analysis of complex issues" was exempt.[135]  No evidence suggests that Kadden's job required her to originate stories from scratch, or produce complex analyses of or transform the facts she was given.  Thus, none of Kadden's duties  fall within the creative professional exemption.

---

[134]   *Reich v. Newspapers of New England, Inc.*, 44 F.3d 1060, 1075 (1st Cir. 1995) (quoting regulations).  Although the Second Circuit "parted ways" with *Reich* in *Freeman v. National Broadcasting Co.,* 80 F.3d 78, 84-85 (2d Cir. 1996) it did so based on the distinction between the "long" and "short" tests for exemptions, which were eliminated by the 2004 amendments.  It also distinguished between "small town reporters" and "major news organizations" where "[d]izzying technological advances and sophisticated demands of the news consumer" resulted in use of a "variety of combined audio and visual presentations in which creativity is at a premium."  *Id.* at 85-86.  Kadden's work was akin to that discussed in *Reich*, not *Freeman*.

[135]   *See Sherwood v. Washington Post*, 871 F. Supp. 1471, 1482 (D.D.C.1994).

### 2.    Kadden Was Not an Exempt Learned Professional

VisuaLex argues that Kadden was an exempt learned professional because "the decision was made to hire her because of, among other things, her advanced knowledge in the field of law, her legal degree."[136]  But the relevant inquiry under the regulations is whether the employee's primary duty is the performance of work *requiring* advanced knowledge in a field of science or learning that is customarily acquired by a prolonged course of specialized intellectual instruction.[137]

Although Romano testified that in the litigation graphics consulting industry a graduate degree was generally required, VisuaLex explicitly stated that a degree was *preferred*, not required.[138]  And one of the eight graphics consultants Romano hired was a paralegal with no litigation graphics consulting experience. In addition, Romano testified that any graduate degree could qualify an employee for the position of graphics consultant at VisuaLex.

To qualify for the learned professional exemption, the educational

---

[136]    Pl. Mem. at 5-6.

[137]    *See* 29 C.F.R. § 541.301(a).

[138]    *See* 8/13/12 Trial Tr. at 41:3-4 (Romano); PX 2 (Job Advertisement/Description).

requirements must not only be advanced, but also specialized.[139]  "Advanced

knowledge from a general academic education and from [experience]" rather than

from "a prolonged course of specialized intellectual instruction" does not qualify

for the exemption."[140]  Neither the Second Circuit, nor any other court has held that

the requisite specialization is eliminated when the required degree is a graduate,

rather than a bachelor's degree.

There is no evidence that Kadden was hired to fill a different role than

other graphics consultants – one that required use of her law degree.[141]  Neither the

"primary responsibilities" listed in the Offer Letter, nor the actual duties that

Kadden performed (regardless of which party's testimony I credit) appear to

require *any* advanced degree, let alone " specialized academic training" such as a

law degree.  Romano testified that the law degree was "an advantage" because it

---

[139]    *See* 29 C.F.R. § 541.301(e)(7) ("Paralegals and legal assistants
generally do not qualify as exempt learned professionals because an *advanced
specialized academic degree* is not a standard prerequisite for entry into the field. .
. .") (emphasis added).

[140]    *Fife*, 171 F.3d at 1177 (cited approvingly in *Young*, 586 F.3d at 206)

[141]    *Cf.* 29 C.F.R. § 541.301(e)(7) ("the learned professional exemption is
available for paralegals who possess advanced specialized degrees in other
professional fields and apply advanced knowledge in that field in the performance
of their duties.  For example, if a law firm hires an engineer as a paralegal . . . . to
provide expert advice on product liability cases or to assist on patent matters, that
engineer would qualify for exemption.").

gave graphics consultants familiarity with the legal industry – something that could easily be acquired by experience in the litigation industry.

The lack of a required course of specialized training for graphics consultants and the fact that the common thread among the VisuaLex graphics consultants was their experience in litigation support, rather than their particular educational backgrounds, removes the position from the learned professional exemption. Because I find that the education requirement is not met, it is not necessary to address the question of whether the work required "the consistent exercise of discretion and judgment, as distinguished from performance of routine mental work."[142]

### 3.    Kadden Was Not an Exempt Administrative Employee

VisuaLex argues that Kadden was an administrative employee because she "assisted with the servicing of the business of VisuaLex's clients" and "[w]ork that directly relates to the management or general business operations of the employer's clients is work that directly relates to assisting with the running or servicing of a business."[143]

---

[142]    *Id.* § 541.301(b).  *See also Vela v. City of Houston*, 276 F.3d 659, 675 (5th Cir. 2001) (both the education prong and the discretion prong must be satisfied in order for the learned professional exemption to apply) (cited approvingly in *Young*, 586 F.3d at 206).

[143]    Def. Mem. at 7.

The distinction between administrative and production work "is not a clear one" when it comes to non-manufacturing positions.[144]  However, the graphic presentations that VisuaLex created for its clients were "the very product or service that [VisuaLex] offers to the public."[145]  Kadden's time was largely spent helping to generate graphics presentations, which involved editing the presentations, some creation of new graphics, and some supervision of the studio's role creating the presentations.  Kadden's time was billed to the clients and was the service for which VisuaLex was hired.  This was not "employment activity ancillary to [the] employer's principal production activity,"[146] such that it would qualify as administrative work.

To the extent that Kadden supervised other employees, she did so in conjunction with executing that work herself in a non-managerial capacity – such as editing and, in limited circumstances creating new graphics.  "[W]ork does not become management simply because the [employee] directs the work of other employees while performing such work." [147]  "In other words, 'directing the work

---

[144]    *Davis*, 587 F.3d at 532.

[145]    *John Alden Life Ins. Co.*, 126 F.3d at 9.

[146]    *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 904-05 (3d Cir. 1991).

[147]    *Maestas v. Day & Zimmerman, LLC*, 664 F.3d 822, 829-30 (10th Cir. 2012) (quoting Brief for Secretary of Labor as Amicus Curiae at 5, *Mullins v. City*

of employees' . . . is not a managerial duty when it is performed concurrently with" carrying out non-managerial aspects of that work.[148]

The work Kadden did for VisuaLex's client law firms also related to the "very product or service that [the clients] offer[ed] to the public,"[149] much like the trial preparation work that an in-house paralegal would perform.  VisuaLex's attempt to characterize the services as "[i]n essence . . . marketing, public relations, and advertising advice to clients on how to most effectively present its case to the fact-finder" has no basis in the evidence.[150]  As VisuaLex acknowledges, these presentations were not marketing tools directed toward potential clients – they were tools to help law firms "effectively present [their cases] to the fact-finder."[151]

---

*of New York*, 653 F.3d 104 (2d Cir. 2011) (per curiam)).  *Accord Mullins*, 653 F.3d at 115 ("the Secretary's reasoned justification is that such activities, when performed . . . in the course of their front-line duties, do not involve the 'management of the enterprise in which the employee is employed,' and therefore should not be deemed 'management.'") (quoting 29 C.F.R. § 541.3(b)(2)).  The discussion of management applies equally to § 541.3(b)(3), which addresses the administrative exemption.

[148]     *Maestas*, 664 F.3d at 829.  *Accord Reich v. New York*, 3 F.3d at 587-89 (holding that police investigators who supervised investigations performed by state troopers while performing their own investigations were non-administrative "because 'the primary function of the Investigators . . . is to conduct- or 'produce'- its criminal investigations.").

[149]     *John Alden Life Ins. Co.*, 126 F.3d at 9.

[150]     Def. Mem. at 7.

[151]     *Id.*

It is true that an employee whose primary duties were maintaining client relations, securing business, and assisting with VisuaLex's marketing, or that of VisuaLex's clients, would qualify as an exempt administrative employee.  It is also clear that some graphics consultants at VisuaLex – specifically Romano and David Mykel both of whom earned salaries well above $75,000, had as a primary duty bringing in business, and maintaining client relations.[152]  In contrast, Kadden's timesheets, VisuaLex's Job Description, and the trial testimony demonstrate that marketing, research and public relations work were at most occasional tasks of Kadden's.  As VisuaLex recognizes, "an employer can have two people with the same job title with one qualifying for [an exemption] and one not qualifying."[153]

Even if Kadden was performing duties that qualified as administrative, VisuaLex failed to establish that Kadden exercised "discretion and independent judgment" in "matters of significance."[154]  The Second Circuit found

---

[152]    Mykel testified that his base salary was $100,000 with the possibility of a bonus based on how much business he brought in.  *See* 8/15/12 Trial Tr. at 361:9-362:1.

[153]    Plaintiff's Post-Trial Brief at 28.  *Accord Young*, 586 F.3d at 208 (holding that an employee hired into a generally exempt position but who did the work of a non-exempt employee would not be exempt under the FLSA).

[154]    29 C.F.R. § 541.200(a).

that this requirement was not satisfied where there was

> no evidence in the record that the [employees] have any authority to formulate, affect, interpret, or implement [employer's] management policies or its operating practices, or that they are involved in planning [employer's] long-term or short-term business objectives, or that they carry out major assignments in conducting the operations of [the employer's] business, or that they have any authority to commit [the employer] in matters that have significant financial impact.[155]

There is no evidence that Kadden had any such authority with respect to the administration of VisuaLex.  Romano was solely responsible for personnel decisions, procuring and maintaining client relationships, and overseeing the production of litigation presentations.  Her role went well beyond micro-managing – all significant decisions with regard to the company were made in the first instance by Romano.

### 4.     Kadden Is Not Exempt Under the Combination Exemption

Because I did not find that any of Kadden's duties fell under the creative or learned professional exemptions, she cannot be exempt under the combination exemption, even if some of her duties were administrative.  Given my finding that none of the proposed exemptions apply, I proceed to the damages issues addressed at trial.

---

[155]     *In re Novartis Wage and Hour Litig.*, 611 F.3d 141, 156 (2d Cir. 2010) *abrogated on other grounds by Christopher*, 132 S. Ct. 2156.

### B.      Damages Issues

#### 1.      Proper Measure of Overtime Damages

The standard measure of overtime compensation under the FLSA is one and one-half times the employee's hourly rate.  The testimony establishes that VisuaLex graphics consultants were expected to be in the office from nine to six five days a week.  Kadden may have understood, when VisuaLex informed her that she would no longer receive overtime, that her $75,000 salary would not change regardless of how many hours she worked.  However, in light of the original agreement that Kadden would be paid a base salary of $75,000 plus overtime and the unilateral nature of the decision to change the compensation, it cannot be said that there was a "clear mutual understanding."  Given the expectation that graphics consultants would work at least forty hours a week and the initial agreement for overtime, I do not find the fluctuating workweek doctrine applicable here.

#### 2.      Liquidated Damages

Testimony clearly establishes that Romano went to considerable lengths to ascertain whether graphics consultants were exempt from the FLSA overtime requirements.  In light of her genuinely held belief in what the primary duties of a graphics consultant were, notwithstanding the fact that several graphics consultants at VisuaLex did not ultimately perform those duties, I find that the

40

classification was in good faith and no liquidated damages are warranted.

## V.    CONCLUSION

For the foregoing reasons, Kadden was not exempt from the FLSA's overtime requirements, and VisuaLex must compensate her at a rate of one and one-half times her hourly rate for all overtime hours worked that fall within the relevant statutes of limitations.[156]  The damages issues that remain to be decided are (1) how many unpaid hours of overtime Kadden worked, and (2) whether VisuaLex is entitled to any offset of damages for benefits Kadden received because she was classified as an exempt employee.  The parties are directed to submit letters of no longer than five pages, single-spaced, addressing these issues no later than ten days from the date of this Order.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            September 24, 2012

---

[156]    Given my finding that VisuaLex's misclassification was made in good faith, the statute of limitations under the FLSA is two years. *See* 29 U.S.C. § 216(b).  The limitations period under New York Labor Law is six years. *See* NYLL § 198(3); *Dragone v. Bob Bruno Excavating, Inc.*, 847 N.Y.S.2d 251, 253 (3d Dep't 2007) (six-year limitations period, not a three-year period, applied to claim for unpaid overtime wages under New York Labor Law).

**-Appearances-**

**For Adina Kadden:**

Mark D. Risk, Esq.
Mark Risk, P.C.
60 East 42nd Street, Suite 4700
New York, New York 10165
(212) 682-4100

**For VisuaLex, LLC**

Traycee Ellen Klein, Esq.
Margaret Casey Thering, Esq.
Epstein Becker & Green, P.C.
250 Park Avenue
New York, New York
(212) 351-4500